# AMENDED AND RESTATED JOINT VENTURE AGREEMENT

## OF

## 2660 WOODLEY ROAD JOINT VENTURE



DEFENDANT'S
EXHIBIT
B

ALL-STATE LEGAL®

APP. 001

# TABLE OF CONTENTS

Page

ARTICLE I - DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.01    Definitions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.02    Rules of Construction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARTICLE II - CONTINUATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    2.01    Continuation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    2.02    Name. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    2.03    SLR Name. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    2.04    Place of Business. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARTICLE III - BUSINESS PURPOSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    3.01    Business Purposes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    3.02    Authorized Activities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE IV - PARTNERSHIP INTERESTS, CAPITAL
                 CONTRIBUTIONS AND CAPITAL ACCOUNTS . . . . . . . . . . . . . . 15
    4.01    Partners and Interests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    4.02    Capital Contributions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    4.03    Capital Accounts; Code Section 754 Election. . . . . . . . . . . . . . . . . . . . . 15
    4.04    Additional Capital Contributions; Partner Loans. . . . . . . . . . . . . . . . . 16
    4.05    Default in Additional Capital Contributions; Security Agreement. . . . . . . 17
    4.06    No Interest on Capital. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    4.07    Return of Capital. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    4.08    No Deficit Restoration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    4.09    Third Party Creditors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    4.10    No Personal Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

ARTICLE V - PROFITS, LOSSES AND DISTRIBUTIONS . . . . . . . . . . . . . . . . . . . . 20
    5.01    Allocation of Profits and Losses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    5.02    Distribution of Distributable Cash. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    5.03    Distribution of Net Proceeds of a Capital Transaction. . . . . . . . . . . . . . 23
    5.04    Distribution of Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    5.05    Transfers During Fiscal Year. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    5.06    Miscellaneous. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARTICLE VI - MANAGEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    6.01    Managing Partner. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    6.02    Delegation of Authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    6.03    Limitations on Managing Partner. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    6.04    Business Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

APP. 002

6.05    Capital Improvements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
6.06    Future Work. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
        (A)    Pool Enclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
        (B)    Main Building Renovation. . . . . . . . . . . . . . . . . . . . . . . . 34
6.07    Transactions with Partners, Affiliates or Operator. . . . . . . . . . . . 37
6.08    Compensation to Partners. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
6.09    Partnership Expenses; Reimbursement. . . . . . . . . . . . . . . . . . . . . . . 37
6.10    Indemnification and Liability of the Partners. . . . . . . . . . . . . . . . . 37
6.11    Relationship Among the Partners. . . . . . . . . . . . . . . . . . . . . . . . . . . 38
6.12    Powers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
6.13    Meetings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

ARTICLE VII - ACCOUNTING, REPORTS
                    AND TAX MATTERS . . . . . . . . . . . . . . . . . . . . . . . 38
7.01    Books and Records. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
7.02    Bank Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
7.03    Financial Statements and Reports. . . . . . . . . . . . . . . . . . . . . . . . . . . 39
7.04    Tax Returns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
7.05    Tax Elections. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
7.06    Tax Controversies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

ARTICLE VIII - TRANSFERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
8.01    General. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
8.02    Right of First Offer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
8.03    Other Transfers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
8.04    Sheraton Piggyback Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
8.05    Optional Buy-Sell. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

ARTICLE IX - ADMISSION OF SUBSTITUTED
                    PARTNERS, WITHDRAWAL OF PARTNERS . . . . . . . . . . . . . . 47
9.01    Admission of a Substituted Partner. . . . . . . . . . . . . . . . . . . . . . . . . . 47
9.02    Withdrawal of a Partner. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
9.03    Effect of Bankruptcy, Withdrawal or Dissolution of a Partner. . . . . 48

ARTICLE X - TERM AND DISSOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
10.01    Term. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
10.02    Procedure in Dissolution and Liquidation. . . . . . . . . . . . . . . . . . . 49

ARTICLE XI - AMENDMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
11.01    Proposal and Adoption of Amendments. . . . . . . . . . . . . . . . . . . . . 50

ARTICLE XII - MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
12.01    Notices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
12.02    Ownership. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
12.03    Entire Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
12.04    Successors and Assigns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
12.05    Counterparts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
12.06    Additional Instruments and Actions. . . . . . . . . . . . . . . . . . . . . . . . 52
12.07    Governing Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

ii

12.08   Consent to Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
12.09   Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
12.10   Creditors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

EXHIBIT 1 - SCHEDULE OF PARTNERS
EXHIBIT 2 - DESCRIPTION OF LAND
EXHIBIT 3 - CURRENT WORKS
EXHIBIT 4 - MAIN BUILDING - PLAT

iii

## AMENDED AND RESTATED JOINT VENTURE AGREEMENT
## OF
## 2660 WOODLEY ROAD JOINT VENTURE

THIS AMENDED AND RESTATED JOINT VENTURE AGREEMENT (this "Agreement") is made as of this 12th day of June, 1990, by and among JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, a Massachusetts corporation ("Hancock"), SUMITOMO LIFE REALTY (N.Y.), INC., a New York corporation ("SLR"), and WASHINGTON SHERATON CORPORATION, a Delaware corporation ("Sheraton").

### R E C I T A L S:

WHEREAS, 2660 Woodley Road Joint Venture, a District of Columbia general partnership (the "Partnership"), has been created and operated pursuant to that certain Joint Venture Agreement, dated September 27, 1979, as amended by that certain First Amendment to Joint Venture Agreement, dated December 31, 1979, as amended by that certain Second Amendment to Joint Venture Agreement, dated April 18, 1980, and as further amended by that certain Third Amendment to Joint Venture Agreement, dated as of December 19, 1985 (as so amended, the "Joint Venture Agreement");

WHEREAS, the purpose of the Partnership is to own certain land more particularly described on Exhibit 2 attached hereto (the "Land") and to own, maintain, renovate, lease, manage and operate thereon a convention hotel known as the "Sheraton Washington Hotel" located at 2660 Woodley Road, Washington, D.C.;

WHEREAS, pursuant to that certain Purchase Agreement dated as of the date hereof by and between Hancock and SLR, SLR has acquired, effective as of the date hereof, approximately 48.485% of the Partnership interest previously owned by Hancock, which interest represents a 48% general partnership interest in the Partnership; and

WHEREAS, the parties hereto desire to amend and restate the Joint Venture Agreement in its entirety, in order to (i) admit SLR as a Partner, (ii) restate the respective interests of the Partners, and (iii) otherwise continue the Partnership and set forth the respective rights, duties and obligations of the parties hereto with respect to the Partnership and its properties.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

APP. 005

- 2 -

---

## ARTICLE I - DEFINITIONS

---

1.01    **Definitions:**  In addition to terms elsewhere defined herein, the following terms shall have the definitions hereinafter indicated whenever used in this Agreement with initial capital letters:

**Accountants:**  The firm of certified public accountants as may be selected for the Partnership in accordance with the terms of this Agreement.  For calendar year 1989, Arthur Andersen & Co. shall be the Accountant for the Partnership.

**Act:**  The District of Columbia Uniform Partnership Act (Sections 41-101 through 41-304 of the District of Columbia Code (1954)), as it may be amended and in effect from time to time.

**Additional Capital Contributions:**  Any additional Capital Contributions made to the Partnership by the Partners pursuant to Section 4.04 and Section 4.05.

**Affiliate:**  With respect to any referenced Person: (i) such Person or a member of his immediate family; (ii) a legal representative, successor or assignee of the referenced Person in clause (i), above; (iii) a trustee of a trust for the benefit of the referenced Person in clauses (i) and (ii), above; (iv) a Person who directly, or indirectly through intermediaries, Controls, is Controlled by or is under common Control with the referenced Person in clauses (i) through (iii), above; or (v) an officer, director, trustee, employee, partner or stockholder of ten percent (10%) or more of the voting stock of the referenced Person in clauses (i) through (iv), above.

**Affiliate Lease:**  The lease of the Subject Property by the Partnership to the Hancock Affiliate, dated as of the Effective Date.

**Agreement:**  This Amended and Restated Joint Venture Agreement, as it may be amended and in effect from time to time in accordance with the terms of this Agreement.

**Asset Management Agreement:**  That certain Asset Management Agreement dated as of the Effective Date between SLR and John Hancock Properties, Inc. ("JHPI") pursuant to which JHPI will oversee, on SLR's behalf, the operation of the Hotel and SLR's investment in the Partnership, all on the terms and conditions set forth therein.

**APP. 006**

- 3 -

**Bank:** The Bank of Boston, or such other bank as may be selected for the Partnership by the Managing Partner.

**Bankruptcy:** Either (i) the initiation by a referenced Person of a proceeding, or initiation of any proceeding under a federal, state, or local bankruptcy or insolvency law against a referenced Person, or the filing of any petition or answer seeking consenting to, or acquiescing in a reorganization, arrangement, adjustment, composition, liquidation, dissolution or similar relief which has not been vacated or discharged within ninety (90) days of initiation; (ii) an assignment by a referenced Person for the benefit of creditors; (iii) the admission by a referenced Person in writing of its inability to pay debts as they become due; or (iv) the Consent of a referenced Person to appointment of a receiver or trustee for all or a substantial part of his property, or court appointment of such receiver or trustee which is not suspended or terminated within thirty (30) days after appointment.

**Business Day:** Monday through Friday of each week, except that a legal holiday recognized as such by the Government of the United States of America or the District of Columbia shall not constitute a Business Day.

**Business Plan:** The annual marketing, operating plan and budget and capital budget prepared by the Operator pursuant to the Management Contract, as more fully set forth in Section 6.04.

**Capital Account:** The account maintained by the Partnership for each Partner in accordance with the provisions of Code Section 704(b)(2) and the Regulations thereunder, which, as of any given date, reflects its actual Capital Contributions paid to the Partnership increased by its allocable share of Partnership income (including tax exempt income) for each Fiscal Year (or fraction thereof), and decreased by (i) the amount of money distributed to such Partner by the Partnership, (ii) the fair market value of property distributed to such Partner by the Partnership (net of liabilities securing such distributed property that such Partner is treated as assuming or taking subject to under Code Section 752), (iii) its allocable share of Partnership loss and deduction (or items thereof) for each Fiscal Year (or fraction thereof), and (iv) allocations to such Partner of expenditures described in Code Section 705(a)(2)(B) (including expenditures treated as such under Regulations Section 1.704-1(b)); and otherwise as may be adjusted to comply with the capital accounting rules and principles established under Code Section 704(b), including Treasury Regulation Section 1.704-1(b)(2)(iv).

**Capital Additions:** Any capital improvements project undertaken by the Partnership or the Operator on behalf of the Partnership (other than Current Works, Future Works and Emergency Expenditures) which (i) constitute an expansion of the then existing Subject Property; (ii) have an identified commercially reasonable projected return on investment; (iii) do not constitute expenditures for routine maintenance and repair of the Subject Property, and (iv) do not constitute renovation of the then existing Subject Property.

APP. 007

- 4 -

**Capital Contribution:** The total amount of money and the fair market value of other property (net of liabilities securing such contributed property that are treated as being assumed or taken subject to by the Partnership under Code Section 752) contributed by each Partner to the Partnership pursuant to the terms of this Agreement, including Additional Capital Contributions, unless the context requires otherwise.

**Capital Transaction:** The sale, exchange, condemnation (other than for temporary use), abandonment, or other disposition of all or substantially all of the Partnership Assets or any insurance recovery (other than from business interruption and rental insurance) or any financing, or any refinancing of existing indebtedness or any other transaction that, in accordance with generally accepted accounting principles, is considered capital in nature, other than sales or dispositions of furniture, fixtures or equipment in the ordinary course of business.

**Cash Flow:** For any period, the Gross Receipts of the Partnership for such period, less Operating Expenses for such period (to the extent not paid from the Replacement Reserve, the Main Building Renovation Reserve, if any, or a reserve established for a specific purpose pursuant to an approved Business Plan or Major Decision).

**Code:** The Internal Revenue Code of 1986, as amended and in effect from time to time, or any successor law thereto, and all published rules, rulings and regulations thereunder.

**Consent:** The written consent of a Person pursuant to this Agreement, or the affirmative vote of such Person at a meeting duly called and held pursuant to this Agreement, as the case may be, to do the act or thing for which the consent is required or solicited, or the act of granting such consent, as the context may require.

**Control(s)(led):** The ownership, direct or indirect, of more than fifty percent (50%) of all of the voting stock of a corporation or more than fifty percent (50%) of the legal and equitable interest in any other business entity and, in either event, possession of the power, directly or indirectly, to direct or cause the direction of management and policy of such corporation or other business entity, whether through the ownership of voting stock, equity interests, common directors or officers, the contractual right to manage the business affairs of such entity, or otherwise.

**Counsel:** Dunnells, Duvall & Porter, of Washington, D.C., or Coudert Brothers, or such other firm of attorneys selected for the Partnership in accordance with the terms of this Agreement.

**CPI:** The Consumer Price Index for Urban Wage Earners and Clerical Workers, All Items, Washington, D.C. SMSA (1982-1984 = 100), as published by the Bureau of Labor Statistics of the United States Department of Labor.

**Current Works:** The program of maintenance and capital replacement projects currently being conducted by the Operator as described on Exhibit 3 attached hereto, and the furnishing of all necessary labor, equipment, materials, supplies, tools, scaffolding, transportation, insurance, temporary facilities, design and engineering services, and other things and services of every kind necessary for the performance and completion thereof in accordance with the plans and specifications therefor and all requirements of the Purchase Agreement.

APP. 008

- 5 -

**Current Works Completion Costs:** All costs and expenses incurred by the Partnership to design, undertake and complete the Current Works in accordance with the plans and specifications therefor and correct any defects therein. Notwithstanding the foregoing, Current Works Completion Costs shall not include the following:

(a)    Any increase in real estate taxes, levies, charges or assessments arising from or attributable to any increase in the value of the Hotel caused or created by or resulting from the Current Works; and

(b)    Any increase in operating, maintenance and replacement costs and expenses incurred by the Partnership in operating and maintaining the Current Works unless directly and proximately caused by Hancock's failure in its obligation to cause the Current Works to be completed in a good and workmanlike manner in accordance with the terms of the Purchase Agreement.

**Dissolution or Termination:** (i) In the case of a corporate Partner, the earlier of the adoption of a plan of liquidation by such Partner or the effective date of dissolution in accordance with applicable statutory law, and (ii) in the case of a Partner which is a partnership, the date of dissolution and termination of such partnership in accordance with the provisions of the governing partnership agreement or applicable law.

**Distributable Cash:** For any period, Cash Flow during such period reduced by (i) amounts (otherwise constituting Gross Receipts) deposited in the Replacement Reserve during such period; (ii) amounts expended during such period for Future Works, Capital Additions and other capital improvements pursuant to Section 6.05(A)(3); (iii) Emergency Expenditures during such period, to the extent funded from Cash Flow; (iv) amounts (otherwise constituting Gross Receipts) deposited during such period in the Main Building Renovation Reserve, if any, or in a reserve established for a specific purpose pursuant to an approved Business Plan or Major Decision; and (v) repayments of principal and interest on any Partner Loans pursuant to Section 4.04(B).

**Emergency Expenditures:** Any and all costs and expenses reasonably incurred by the Partnership to protect against, avoid, or minimize damage to the Subject Property, injury to persons or the cessation of or substantial impediment to, Hotel operations or services, to the extent such costs or expenses, in the good faith determination of the Managing Partner, or Operator acting in accordance with the terms of the Management Contract, (i) are incurred or arise in situations which are unexpected and where such damage, injury, cessation, or impediment is imminent; (ii) are not reimbursed by insurance; (iii) were not scheduled and budgeted for the period in which incurred for repair or replacement of the then-existing Subject Property because of obsolescence or ordinary wear and tear; and (iv) are not otherwise incurred in the ordinary course of business.

APP. 009

- 6 -

**Effective Date:** The date first written above which the Partners agree shall be the date on which their respective rights, duties, and obligations hereunder shall be effective.

**Fair Market Value:** The fair market value of the Partnership Assets (including any Additional Capital Contributions made by a Contributing Partner on a Non-Contributing Partner's behalf), net of Partnership debts and liabilities encumbering the Partnership Assets, as of a particular date, as determined herein. Fair Market Value shall be determined by mutual agreement of the parties, if at all possible. If the parties are unable to agree on Fair Market Value within fifteen (15) days after any party has requested a determination, then each party shall, within ten (10) Business Days after receipt of a Notice from any other party, designate an independent appraiser having at least ten (10) years experience as a real estate appraiser and who is familiar with hotels and commercial real estate in the District of Columbia (the "Appraiser"). Within thirty (30) days after appointment, the two Appraisers so chosen shall select a third Appraiser having the qualifications set forth above. Each Appraiser shall, within thirty (30) days after appointment of the third Appraiser, prepare and render a report to the parties as to the value (net of all liabilities) of the Partnership Assets as of the date in question, expressed in dollars, assuming a sale of the Partnership Assets between unrelated parties, each acting prudently and knowledgeably. The Fair Market Value of the Partnership Assets shall equal the average of the three (3) appraisals so reported and shall serve as the Fair Market Value of the Partnership Assets for all purposes of this Agreement, provided, however, that any appraised value which is ten percent (10%) or more higher or lower than the middle value of the three (3) reports shall be disregarded in computing such average; if one reported value is ten percent (10%) or more higher than the middle and one reported value is ten percent (10%) or more lower than the middle, then the middle value shall serve as the Fair Market Value. If two of the Appraisers shall report the same value, then such value shall be deemed the middle value. By way of illustration (and not of limitation) of the foregoing mechanism, if the first Appraiser reports a value of $200 million, the second Appraiser reports a value of $210 million and the third Appraiser reports a value of $195 million, the middle value would be $200 million; since neither the second Appraiser's nor the third Appraiser's value is ten percent (10%) or more above or below such middle value, the average of the three values, or $201.67 million, would be the Fair Market Value; however had the third Appraiser reported a value of $170 million (rather than $195 million), such value would have been disregarded by virtue of its being more than ten percent (10%) below the middle value (10% of $200 million = $20 million; $200 million - $170 million = $30 million); accordingly, the Fair Market Value would be $205 million ($210 million + $200 million ÷ 2). Should any party fail to timely designate an Appraiser, that party agrees to be bound by the Fair Market Value determination made by the other party's Appraiser. Each party shall pay its own counsel fees and expenses, if any, in connection with any Fair Market Value determination including the fees and expenses of any Appraiser selected by it. The expense of the third Appraiser shall be borne by the Partnership.

**Fiscal Year:** The twelve (12)-month period ending December 31 of each year; provided, however, that for purposes of the next two sentences, the first Fiscal Year shall be deemed to be the period beginning on the Effective Date of this Agreement and ending on the following December 31, and the last Fiscal Year shall be the period beginning on January 1 of the calendar year in which the final liquidation and termination of the Partnership is completed and ending on the date of completion of such final liquidation and termination. To the extent any computation or other provision hereof provides for an action to be taken on a Fiscal Year basis, an appropriate proration or other adjustment shall be made in respect of the first Fiscal Year and the last Fiscal Year, if necessary, to reflect that

- 7 -

such Fiscal Years are less than a full calendar year. If the first Fiscal Year commences on a date other than January 1, there shall be an interim closing of the Partnership books on the day before the first day of the first Fiscal Year.

**Future Work:**  Future Work is defined in Section 6.06 hereof.

**Gain or Loss from a Capital Transaction:**  The Partnership's gain or loss, as the case may be, that arises in, results from, or is attributable to a Capital Transaction.

**Gross Receipts:**  During any period, the cash receipts of the Partnership from all sources including, without limitation, all amounts received as base rental, percentage rent, additional rent or otherwise under the Affiliate Lease; provided, however, that Capital Contributions, tenant security deposits and similar items, Net Proceeds of a Capital Transaction and the expenditure of funds from the Replacement Reserve, or the Main Building Renovation Reserve, if any (or a reserve established for a specific purpose pursuant to an approved Business Plan or Major Decision) shall not be treated as Gross Receipts.

**Hancock:**  John Hancock Mutual Life Insurance Company, a Massachusetts corporation.

**Hancock Affiliate:**  Woodley Road Associates, Inc., a Delaware corporation, which leases the Subject Property from the Partnership pursuant to the Affiliate Lease.

**Hancock Base:**  Eighty-Six Million Seven Hundred Thousand Dollars ($86,700,000) reduced (but not below zero) by the aggregate amount of any distributions previously made to Hancock pursuant to Section 5.03 or Section 5.04(C).

**Hancock Return:**  A non-cumulative, non-compounding annual return earned by Hancock on the weighted average amount of the Hancock Base at a rate of seven and one-quarter percent (7.25%) per year and payable to Hancock during the Return Period out of Distributable Cash after payment of the SLR Return as set forth in Section 5.02.

**Hancock's Return Shortfall:**  For any Fiscal Year during the Return Period the difference, if any, between the amount actually distributed to Hancock pursuant to Section 5.02(A)(2) during such Fiscal Year and the amount that would have been distributed to Hancock pursuant to Section 5.02(A)(2) during such Fiscal Year had there been no payments by the Partnership for Capital Additions or Emergency Expenditures during such Fiscal Year which were funded out of Cash Flow.

**Hotel:**  Hotel shall have the meaning ascribed to it in the Purchase Agreement.

**Interest or Partnership Interest:**  The ownership interest of a Partner in the Partnership at any particular time, including the right of such Partner to share in allocations, Distributable Cash, Net Proceeds of a Capital Transaction and all other benefits to which such Partner may be entitled as provided in this Agreement and the Act, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement and of said Act, which Interest for all purposes of this Agreement shall be its Partnership Interest.

APP. 011

- 8 -

**IRS:** The United States Internal Revenue Service.

**Line of Credit:** The line of credit established at the Bank by the Managing Partner on behalf of the Partnership and maintained for the sole and exclusive purpose of funding any Operating Shortfall and Emergency Expenditures of the Partnership. The Line of Credit shall initially be Two Million Dollars ($2,000,000) and may thereafter be changed only with the Consent of the Principals.

**Main Building:** That portion of the Hotel containing approximately 986 guest rooms and suites (excluding exhibition halls, certain common areas and those portions of the Hotel known as the "Wardman Tower" and the "Park Tower"), as outlined on the plat attached hereto as Exhibit 4.

**Main Building Renovation Reserve:** The reserve defined in Section 6.06(B)(iv).

**Major Decision(s):** Major Decision(s) is defined in Section 6.03(B).

**Management Contract:** The Management Contract, dated September 27, 1979, between the Partnership and the Operator, as amended by that certain Amendment dated April 18, 1980, between the Partnership and the Operator and by that certain Second Amendment dated as of December 19, 1985, between the Partnership and the Operator, and as further amended by that certain Third Amendment dated as of the Effective Date between the Hancock Affiliate and the Operator.

**Managing Partner:** Hancock, or any other Person who becomes Managing Partner in accordance with the terms of this Agreement.

**Managing Partner Default:** The (i) failure of the Managing Partner to perform or comply with any condition, obligation or undertaking under this Agreement (other than a failure to make a Capital Contribution pursuant to Article IV or a breach of Section 6.01(C)(1)-(8)) or Section 6.06 or the Act, which, if such default is one that can be cured by the payment of money, is not cured within ten (10) Business Days following receipt of Notice of such default from any non-defaulting Partner or which, if such default is not one that can be cured by payment of money but is otherwise capable of cure, is not cured within sixty (60) days following receipt of Notice of such default from any non-defaulting Partner; (ii) the Bankruptcy of the Managing Partner; or (iii) the Dissolution or Termination of the Managing Partner.

**Net Proceeds of a (from the) Capital Transaction:** The proceeds received by the Partnership in connection with a Capital Transaction, after (i) the payment of all costs and expenses of any kind or nature incurred by the Partnership in connection with such Capital Transaction; (ii) the utilization of any such proceeds in connection with the discharge of debts and other obligations of the Partnership required or intended to be discharged with the proceeds of such Capital Transaction; (iii) the retention of such proceeds or a portion of such proceeds for a reserve established pursuant to a Major Decision for contingencies and anticipated cash disbursements, including, without limitation, capital requirements of the Partnership, major renovations and repairs, real estate taxes and insurance; (iv) in the case of insurance proceeds required to repair or restore the damaged or destroyed assets, the amount of such proceeds required to be paid to the holder of any mortgage encumbering the Subject Property or any portion thereof in payment of interest or in reduction of principal; (v) in the case of condemnation proceeds, reduction for the costs of restoring the remaining portion of the

APP. 012

- 9 -

Subject Property to usable condition if necessary following such taking and less the amount of such proceeds required to be paid to the holder of any mortgage encumbering the Subject Property or any portion thereof in payment of interest or in reduction of principal.

      **Notice:**  A writing containing information required by this Agreement to be communicated to a Person, which writing is delivered in accordance with Section 12.01.

      **Operating Expenses:**  With respect to any Fiscal Year or other specified accounting period, all cash expenditures of any kind (other than distributions to Partners under Sections 5.02, 5.03 and 5.04) made with respect to the ownership, operation and maintenance of the Partnership and Partnership Assets in the course of its business, including, but not limited to, fees, reimbursements, costs and expenses payable to the Hancock Affiliate and/or the Operator pursuant to the Affiliate Lease, debt service and prepayments on indebtedness of the Partnership, financing, development, leasing and management costs (including fees to the Partners and their Affiliates, if any), ad valorem taxes, real estate taxes and assessments, insurance premiums, repair and maintenance costs, management fees and salaries, advertising expenses, professional fees, wages, and utility costs; provided however, that Operating Expenses shall not include (i) any expenditure not made out of Gross Receipts (including the expenditure of funds held in a reserve); (ii) any expenditure for a Capital Addition, an Emergency Expenditure, Current Works or Future Works; (iii) any addition to the Replacement Reserve, the Main Building Renovation Reserve, if any, or a reserve established for a specific purpose pursuant to an approved Business Plan or Major Decision; or (iv) expenditures taken into account in determining the Net Proceeds of a Capital Transaction.

      **Operating Shortfall:**  During any period or portion thereof, the excess, if any, of Operating Expenses over Gross Receipts for such period, if and to the extent that: (i) such shortfall is not caused by Emergency Expenditures during such period; (ii) such shortfall has not been budgeted in an approved Business Plan or Major Decision and is otherwise unexpected; (iii) such shortfall is not a result of the intentional or willful act of any Partner; and (iv) the failure to fund such shortfall would in the good faith judgment of the Managing Partner result in an interruption or impediment to Hotel operations or otherwise violate the terms of the Management Contract.

      **Operator:**  Sheraton Operating Corporation, a Delaware corporation.

      **Partner(s):**  Hancock, SLR, Sheraton and such other Persons who become partners pursuant to the terms of this Agreement.

      **Partnership:**  The District of Columbia general partnership referred to herein as "2660 Woodley Road Joint Venture," as said partnership may from time to time be constituted.

      **Partnership Assets:**  The Subject Property, together with all other assets (tangible and intangible) owned or held by the Partnership from time to time.

      **Percentage Interest:**  As to any Partner, the percentage shown opposite the name of such Partner on Exhibit 1 attached hereto, as the same may be adjusted from time to time in accordance with this Agreement. For the purpose of determining the amounts of Distributable Cash and Net Proceeds from a Capital Transaction to be distributed to each Partner pursuant to the terms

- 10 -

of this Agreement, a Partner's Percentage Interest shall (a) with respect to distributions of Distributable Cash, be such Partner's Percentage Interest as of the date such distribution is made, and (b) with respect to distributions of Net Proceeds from a Capital Transaction, be such Partner's Percentage Interest on the date on which the Capital Transaction giving rise to such Net Proceeds from a Capital Transaction occurs.

**Person:**    Any individual, person, corporation, partnership, trust, joint venture, proprietorship, estate, association, governmental authority or other incorporated or unincorporated enterprise or entity or organization of any kind.

**Principal(s):**  Hancock and/or SLR, and any of their permitted successors and assigns; provided however, that in the event that the Percentage Interest of either Hancock or SLR shall be reduced to less than thirty-five percent (35%) of the aggregate Percentage Interests of all Partners pursuant to the provisions of Sections 4.05(B) or (C) hereof, then, for all purposes of this Agreement, Hancock or SLR, as the case may be, shall cease to be a "Principal" as of the date that its Percentage Interest is reduced to less than thirty-five percent (35%).

**Profits and Losses:**  The profit or loss of the Partnership, as the case may be, for each Fiscal Year or other taxable period, determined as follows:

(a)     The Partnership's gross income, from all sources, other than a Gain from a Capital Transaction during such period, as calculated for federal income purposes by the Partnership; plus

(b)     Any income of the Partnership that is exempt from federal income tax; reduced by

(c)     Depreciation (as defined below); and further reduced by

(d)     All other items of expense or deduction that are allowable as deductions to the Partnership under the Code for such period, but excluding any item of expense or deduction attributable either to Depreciation or to a Loss from a Capital Transaction, as calculated for federal income tax purposes by the Partnership; and further reduced by

(e)     Any expenditure of the Partnership described in Code Section 705(a)(2)(B) or treated as expenditures described in Code Section 705(a)(2)(B) pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing taxable income.

As used herein, "Depreciation" shall mean, for each Fiscal Year or other taxable period, an amount equal to the depreciation, amortization, or other cost recovery deductions allowable to the Partnership with respect to the Partnership Assets for such period for federal income tax purposes computed by reference to the Partnership's adjusted basis of such Partnership Assets, as it may from time to time be thereafter properly adjusted using the same method used by the Partnership in computing depreciation, amortization, or other cost recovery deductions in preparing its federal income tax returns, provided, however, that if any of the Partnership Assets shall have a book value different

APP. 014

- 11 -

from its adjusted tax basis as a result of Code Section 704(c) and/or Regulations Section 1.704-1(b)(2)(iv)(f), then Depreciation shall be computed in accordance with Regulations Section 1.704-1(b)(2)(iv)(g). Depreciation shall not include any special basis adjustment under Code Section 743(b), which adjustment shall be taken into account after the allocation of Profits or Losses (or items thereof) hereunder.

**Purchase Agreement:** That certain Purchase Agreement between Hancock and SLR dated as of the Effective Date pursuant to which SLR acquired its Interest in the Partnership.

**Regulations:** Income Tax Regulations promulgated pursuant to the Internal Revenue Code of 1986, as amended from time to time (including corresponding provisions of succeeding Income Tax Regulations).

**Replacement Reserve:** An account established by the Managing Partner on behalf of the Partnership for the payment of capital costs and replacements, to be funded monthly in an amount equal to four and one-half percent (4.5%) of Gross Revenues (as defined in the Management Contract) for such month, unless a different percentage shall be determined by the Managing Partner and Consented to by SLR, but subject in all events to any requirements for reserves contained in the Management Contract. The Replacement Reserve shall be inclusive of, and not in addition to, the reserve for replacements required under the Management Contract.

**Return Period:** The period beginning on the Effective Date of this Agreement and ending on December 31 of the Fiscal Year during which occurs the fifth (5th) anniversary of the Effective Date.

**Return Shortfall:** The sum of Hancock's Return Shortfall and SLR's Return Shortfall.

**SLR:** Sumitomo Life Realty (N.Y.), Inc., a New York corporation.

**SLR Base:** Eighty-One Million Six Hundred Thousand Dollars ($81,600,000), reduced (but not below zero) by the aggregate amount of any distributions previously made to SLR pursuant to Section 5.03 or Section 5.04(C).

**SLR Return:** A non-cumulative, non-compounding return earned by SLR on the weighted average amount of the SLR Base at a rate of seven and one-quarter percent (7.25%) per year and payable to SLR during the Return Period out of Distributable Cash as set forth in Section 5.02.

**SLR's Return Shortfall:** For any Fiscal Year during the Return Period, the difference, if any, between the amount actually distributed to SLR pursuant to Section 5.02(A)(1) during such Fiscal Year and the amount that would have been distributed to SLR pursuant to Section 5.02(A)(1) during such Fiscal Year had there been no payments by the Partnership for Capital Additions or Emergency Expenditures during such Fiscal Year which were funded out of Cash Flow.

APP. 015

- 12 -

Sheraton:  Washington Sheraton Corporation, a Delaware corporation.

Subject Property:  Subject Property shall have the meaning ascribed to it in the Purchase Agreement.

Substituted Partner:  Any Person who or which is an assignee or successor of a Partner and is admitted to the Partnership pursuant to Section 9.01.

Tax Matters Partner:  The Managing Partner, its successors or assigns, or such other Person who becomes Tax Matters Partner in accordance with the terms of this Agreement.

Transfer:  Any sale, assignment, transfer, gift, bequest, succession through intestacy, contribution, distribution, conveyance, pledge, hypothecation, mortgage, exchange or other disposition or encumbrance, whether voluntary, involuntary or by operation of law.

Transfer Affiliate:  As to any Person, any other Person which, directly or indirectly through one or more intermediaries, Controls or is under common Control with or is Controlled by such Person.

Unavoidable Delay:  Any delay, interruption or interference arising from causes beyond the reasonable control and without the fault or negligence of the Managing Partner or any of its Affiliates including, but not limited to, acts of God, acts of the public enemy, acts of any government body, fires, floods, quarantine restrictions, strikes, freight embargoes and delays of contractors or subcontractors.

1.02  Rules of Construction.  The following rules of construction shall apply to this Agreement:

(A)  All section headings in this Agreement are for convenience of reference only and are not intended in any way to affect, define or qualify the meaning, construction or scope of any section.

(B)  All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all other genders, the singular shall include the plural, and vice versa, as the context may require.

(C)  Each provision of this Agreement shall be considered severable from the rest and if any provision of this Agreement or its application to any Person or circumstances shall be held invalid and contrary to any existing or future law or unenforceable to any extent, the remainder of this Agreement and the application of any other provision to any Person or circumstances shall not be affected thereby and shall be interpreted and enforced to the greatest extent permitted by law so as to give effect to the original intent of the parties hereto.

APP. 016

- 13 -

(D)    Any matter requiring the consent, decision, election or vote of a specified Percentage Interest of the Partners shall be determined by reference to the total Percentage Interests of those Partners who are entitled to consent, decide, make an election or vote on such matter, unless otherwise expressly provided herein.

---

## ARTICLE II - CONTINUATION

---

2.01    **Continuation.**   The parties hereto hereby continue the Partnership as a general partnership under the Act.  Upon the execution of this Agreement by all parties hereto, the Managing Partner shall take all action required by law to maintain the Partnership as a general partnership under the Act.  The Managing Partner shall also promptly register the Partnership under applicable assumed or fictitious name statutes or similar laws if and to the extent necessary.  Copies of each document as duly filed will be maintained at the principal place of business of the Partnership.

2.02    **Name.**   The name under which the Partnership shall conduct its business is "2660 Woodley Road Joint Venture" which name may be changed by the Managing Partner with the Consent of all Partners.

2.03    **SLR Name.**   The parties agree that no right or entitlement to use the name of SLR or Sumitomo is conveyed to the Partnership or to any Partner by reason of the admission of SLR to the Partnership; provided, however, that the provisions of this <u>Section 2.03</u> shall not preclude or prohibit the Partnership or the Partners from including SLR's name or the Sumitomo name in any disclosures made to comply with any statute, regulation, rule or order of any governmental authority, court, administrative body or other body or entity having jurisdiction over the Partnership or any licensing authority with respect to Partnership operations.

2.04    **Place of Business.**   The principal place of business of the Partnership shall be located at c/o John Hancock Properties, Inc., Two Copley Place, Suite 200, Boston, Massachusetts 02117.  The Managing Partner may thereafter change the principal place of business of the Partnership to such other place or places within the United States as the Managing Partner may from time to time determine in its reasonable discretion, provided that the Managing Partner shall give Notice thereof to the other Partners within thirty (30) days before the effective date of any such change and, if necessary, shall amend this Agreement in accordance with the applicable requirements of the Act.  The Managing Partner may, in its reasonable discretion, establish and maintain such other offices and additional places of business of the Partnership, either within or without the District of Columbia, as it deems appropriate.

- 14 -

## ARTICLE III - BUSINESS PURPOSE

**3.01    Business Purposes.** The business of the Partnership shall be to (i) own, finance, refinance, manage, lease, maintain, improve, renovate, and otherwise use the Subject Property as an investment; (ii) sell, exchange or otherwise dispose of the Subject Property in appropriate circumstances; and (iii) enter into any lawful transaction and engage in any other kind of lawful activity in connection with or related to the foregoing.

**3.02    Authorized Activities.** Subject to the terms and conditions of this Agreement, the Partnership shall be authorized and empowered to do any and all acts and things necessary, appropriate, advisable or convenient for the furtherance and accomplishment of the purposes and business described herein, including without limitation the following:

> **(A)** Enter into such contracts and take such actions as are required or appropriate to develop, own, finance, manage, lease, and operate the Subject Property as an investment;

> **(B)** Acquire, operate, maintain, finance, improve, buy, own, sell, convey, assign, mortgage or lease real or personal property which may be reasonably necessary to the accomplishment of the purposes of the Partnership;

> **(C)** Borrow money, by assuming obligations or otherwise, and issue evidences of indebtedness in furtherance of any or all of the purposes of the Partnership, and to secure the same by mortgage, pledge or other lien on the Subject Property or any other Partnership Assets;

> **(D)** Establish reserves or escrows;

> **(E)** Sell, exchange, dispose of, prepay in whole or part, refinance, recast, increase, modify, or extend mortgages affecting the Subject Property or all or any part of other Partnership Assets, and obtain additional or substitute mortgages, and in connection therewith execute any extensions, renewals or modifications of any mortgage or deed of trust on the Subject Property;

> **(F)** Own and operate the Subject Property;

> **(G)** Enter into the Management Contract and other agreements with the Operator as may be required to operate the Subject Property;

> **(H)** Enter into the Affiliate Lease and thereby lease the Subject Property to the Hancock Affiliate and collect all rents as provided therein;

**APP. 018**

- 15 -

(I)    Enter into, perform, deliver and carry out contracts, certificates and instruments of any kind, including contracts with Affiliates of the Partners pursuant to Section 6.07, necessary or incidental to the performance thereof and the accomplishment of the purposes of the Partnership;

(J)    Bring, defend, pay, extend, renew, modify, adjust, submit to arbitration, prosecute or compromise any obligation, suit, liability, cause of action or claim with respect to the Partnership;

(K)    Make interim investments in government obligations, insured obligations, certificates of deposit, commercial paper and bankers' acceptances;

(L)    Lend money in furtherance of the Partnership's business;

(M)    Guarantee the obligations of others (including the obligations of the Hancock Affiliate under the Affiliate Lease);

(N)    Engage in any kind of lawful activity, and perform and carry out contracts of any kind, necessary or advisable in connection with the accomplishment of the purposes of the Partnership.

---

## ARTICLE IV - PARTNERSHIP INTERESTS, CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

---

4.01    **Partners and Interests.** The names, addresses and Percentage Interests of the Partners are set forth on Exhibit 1 attached hereto.

4.02    **Capital Contributions.** The Partners have made no Capital Contributions in connection with the admission of SLR to the Partnership.

4.03    **Capital Accounts; Code Section 754 Election.**

(A)    A Capital Account shall be maintained for each Partner. As a result of its acquisition of a portion of Hancock's Interest in the Partnership, approximately 48.485% of Hancock's Capital Account (as calculated to the Effective Date hereof) shall carryover to SLR. The Partners' Capital Account balances as of the Effective Date shall be calculated following the Effective Date to reflect the closing of the Partnership's books as of 11:59 p.m. (E.S.T.) of the day immediately preceding the Effective Date and allocation of all items through such date between Hancock and Sheraton in proportion to their respective Percentage Interests as in effect prior to the admission of SLR.

APP. 019

- 16 -

(B)    The Managing Partner shall timely file an election under Code Section 754 on behalf of the Partnership, in accordance with the Regulations and effective for the Fiscal Year in which the Effective Date occurs, in order to adjust the tax basis of the Partnership Assets in the manner provided in Code Section 743(b).  The allocation of such adjustment under Code Section 755 shall be subject to SLR's review and approval, which approval shall not be unreasonably withheld or delayed to the extent such allocation is made in accordance with Code Section 755 and the Regulations thereunder.

**4.04    Additional Capital Contributions; Partner Loans.**

(A)    If, at any time or from time to time, the Managing Partner shall determine that the Partnership requires additional capital (i) to effect a Major Decision which has been approved by the Principals and for which the Principals specifically agreed to make Additional Capital Contributions, or (ii) to satisfy obligations provided for in an approved Business Plan (which Business Plan specifically provided that Additional Capital Contributions may be required to satisfy such obligations), then the Managing Partner may send a Notice for additional capital to the Partners.  Each Partner shall thereafter be required within fifteen (15) Business Days after receipt of such Notice to make an Additional Capital Contribution in immediately available funds equal to the product of its Percentage Interest and the amount of additional capital determined by the Managing Partner to be required.

(B)    If (i) the Partnership, from time to time or at any time, experiences an Operating Shortfall, (ii) funds therefor are not available from Cash Flow or the Replacement Reserve, and (iii) no Partner is otherwise obligated to contribute such funds under the terms hereof (including without limitation Sections 4.04(A), 4.04(C) or 4.04(D), the Managing Partner shall cause such Operating Shortfall to be satisfied as follows:

(i)    First, the Managing Partner shall draw such amounts under the Line of Credit as may be necessary to fund such Operating Shortfall;

(ii)    Next, if amounts then available under the Line of Credit shall be insufficient to satisfy the Operating Shortfall, then each Partner shall be obligated to loan ("Partner Loan") to the Partnership its proportionate share of the necessary funds (based on its relative Percentage Interest) within five (5) Business Days after Notice of the need therefor from the Managing Partner.  Any Partner Loan shall bear interest at the rate of one percent (1%) above the Prime Rate (as defined in Section 4.05(C), below) on the unpaid principal balance thereof, calculated from the date on which made to the repayment date.

Any borrowings pursuant to this Section 4.04(B) shall be repaid by the Partnership from the first available Cash Flow.

(C)    Notwithstanding the provisions of Section 4.04(A) or Section 4.04(B), in the event the Partnership, whether under the terms of the Management Contract or otherwise, incurs or is required to make Emergency Expenditures (including Emergency Expenditures which may be subject to reimbursement through insurance coverage) and the funds therefor are not available from Cash Flow or the Replacement Reserve, then the Managing Partner (or any other Principal in the event the

APP. 020

- 17 -

Managing Partner shall fail to do so in a timely manner) shall cause such Emergency Expenditures to be satisfied as follows:

(I)    First, the Managing Partner (or such other Principal) shall draw such amounts under the Line of Credit as may be necessary to fund such Emergency Expenditures;

(II)    Next, if amounts then available under the Line of Credit shall be insufficient to satisfy the Emergency Expenditures, then each Partner shall be obligated to contribute its proportionate share of the necessary funds (based on its relative Percentage Interest) within three (3) Business Days after Notice of the need therefor from the Managing Partner (or such other Principal).    If such Notice is, in the good faith judgment of the Managing Partner (or such other Principal), unreasonable or impractical if the Partnership is to avoid damage, injury, cessation or substantial impediment to Hotel services, then the Managing Partner (or such other Principal) may, but shall not be required to, make such Emergency Expenditures on behalf of all Partners.   Thereafter, the other Partners shall reimburse the Managing Partner (or such other Principal) for their proportionate share of such Emergency Expenditures within five (5) Business Days after Notice thereof from the Managing Partner (or such other Principal).

If any Emergency Expenditures shall thereafter be reimbursed by insurance, the proceeds therefrom shall be applied to repay any borrowing applied thereto or distributed to the Partners in proportion to the relative Additional Capital Contributions made to satisfy such Emergency Expenditures.    To the extent not reimbursed by insurance, available Cash Flow shall thereafter be applied first to repay any borrowings incurred, and thereafter to return Additional Capital Contributions made by the Partners pursuant to this Section 4.04(C).

(D)    Notwithstanding the foregoing provisions of this Section 4.04, in the event that additional funds are required to satisfy Current Works Completion Costs (and funds therefor are not available from (i) the Replacement Reserve on hand as of the December 31, 1989, or (ii) amounts distributable to the Partners through the day preceding the Effective Date), then Hancock agrees to contribute the necessary funds to the Partnership within fifteen (15) Business Days after the date Notice of the necessity for such funds is received, which Notice shall include a statement of the funds required and the underlying basis for their need, together with supporting documentation, if any, and which Notice may be given by any of the Principals.

4.05    Default in Additional Capital Contributions; Security Agreement.

(A)    If any Partner who is required to make an Additional Capital Contribution pursuant to Sections 4.04(A), or 4.04(C), or 4.04(D), or a Partner Loan pursuant to Section 4.04(B) fails to make an Additional Capital Contribution or a Partner Loan within the time specified in the applicable subsection of Section 4.04 (hereinafter referred to as the "Non-Contributing Partner"), such Non-Contributing Partner shall be in default and any Partners who made their required Additional Capital Contributions or Partner Loans, as the case may be (hereinafter referred to as the "Contributing Partners") shall thereafter have the right, but not the obligation, by Notice to the Non-Contributing Partner to make contributions to the Partnership in an amount equal to the Additional Capital Contribution or Partner Loan which the Non-Contributing Partner failed to make. If the Contributing Partners make a contribution to the Partnership pursuant to this Section 4.05(A),

- 18 -

they shall have the right, in the case of a default under Section 4.04(A) or 4.04(D), to elect either of the following: (i) to dilute the Partnership Interest of the Non-Contributing Partner pursuant to Section 4.05(B), or (ii) to treat such contribution as a loan to the Non-Contributing Partner (a "Contribution Loan").  In the case of a default under Section 4.04(B) or Section 4.04(C), the Contributing Partners shall have the right to treat such contribution as a Contribution Loan to the Non-Contributing Partner pursuant to Section 4.05(C).  If more than one Partner desires to be a Contributing Partner, such Partners shall make the Non-Contributing Partner's Additional Capital Contributions or Partner Loans, as the case may be, in such proportions as they shall agree, or, failing such agreement, in proportion to their respective Percentage Interests.

(B)    If a Contributing Partner elects to dilute the Partnership Interest of the Non-Contributing Partner pursuant to and in accordance with Section 4.05(A) for a default under Section 4.04(A) or 4.04(D), its Percentage Interest shall be increased and the Percentage Interest of the Non-Contributing Partner shall be decreased effective as of the date of such contribution (hereinafter referred to as the "Computation Date").  The Percentage Interest of the Non-Contributing Partner shall be reduced and the Contributing Partner's Percentage Interest shall be correspondingly increased by the amount, expressed as a percentage, that the Additional Capital Contributions made by the Contributing Partner on the Non-Contributing Partner's behalf multiplied by three (3) bears to the Fair Market Value of the Partnership Assets as of the Computation Date.

(C)    If a Contributing Partner makes or elects to make a Contribution Loan to the Non-Contributing Partner pursuant to and in accordance with Section 4.05(A), such Contribution Loan shall be due and payable sixty (60) days after demand from the Contributing Partner and shall bear interest at the rate of three and one-half percent (3-1/2%) per year, compounded annually, over the prime rate of interest (the "Prime Rate") announced from time to time by Riggs National Bank ("Riggs"), or the maximum rate permitted under applicable law, whichever is less, calculated from the date on which such Contribution Loan is made.  (In the event Riggs ceases to use the term prime rate in setting a rate of interest for commercial loans, then the Prime Rate herein shall be the rate used by Riggs as a base rate of interest for commercial loans as the same shall be designated by Riggs to the Partnership.  In the event Riggs shall cease to announce and/or publish a prime rate or a base rate of interest for commercial loans, the prime rate or base rate of interest for commercial loans shall be the rate announced from time to time by Citibank, N.A.)  Until the Contribution Loan and any accrued but unpaid interest thereon has been repaid, all distributions of Distributable Cash or Net Proceeds of a Capital Transaction (or repayment of any Partner Loans) otherwise to be made to such Non-Contributing Partner under this Agreement shall be paid to the Contributing Partner for the Non-Contributing Partner's account, in payment of such loan (but shall be accounted for hereunder as distributed or paid to the Non-Contributing Partner and then paid by the Non-Contributing Partner to the Contributing Partner).  If the Contribution Loan, together with all accrued interest thereon, shall not have been repaid within sixty (60) days after demand from the Contributing Partner, the Contributing Partner shall have the right, upon five (5) Business Days' Notice to the Non-Contributing Partner, to convert its Contribution Loan into a Capital Contribution and dilute the Non-Contributing Partner's Partnership Interest.  Upon the sixth Business Day after such Notice, which date shall be deemed the "Computation Date," the Percentage Interest of the Non-Contributing Partner shall be reduced and the Contributing Partner's Percentage Interest shall be correspondingly increased by the amount, expressed as a percentage, that the Contribution Loan, together with all accrued but unpaid

APP. 022

- 19 -

interest thereon, multiplied by three (3), bears to the Fair Market Value of the Partnership Assets, as of the Computation Date.

(D)    In order to secure the repayment of any Contribution Loan, the Partners agree that a Contributing Partner shall have a security interest in the Non-Contributing Partner's Partnership Interest including its right to distributions with respect thereto under Article V.    The Partners acknowledge and agree that the foregoing grant and the terms of this Section 4.05 regarding Contribution Loans shall constitute a security agreement under the terms of the Uniform Commercial Code of the District of Columbia, and that all Partners are both prospective debtors and secured parties.    At the request of any Contributing Partner, the Non-Contributing Partner shall execute such further security agreements, financing statements or other appropriate documents in form suitable for recording where necessary as the Contributing Partner may deem reasonably necessary for perfecting the security interest granted herein.

(E)    If the Percentage Interests of the Partners are adjusted during a Fiscal Year pursuant to Section 4.05(B) or Section 4.05(C), the Partnership's books shall, unless otherwise approved by all Partners, be closed as of the date immediately preceding the Computation Date.  Profits and Losses for the period ended on such date shall be allocated pursuant to the provisions of Article V, according to the Percentage Interests in effect prior to the Computation Date.  Thereafter, Profits and Losses for the balance of such Fiscal Year shall be allocated pursuant to the provisions of Article V according to the Percentage Interests of the Partners, as so adjusted.  Nothing in this Section 4.05(E) shall be construed to require distributions at a date earlier than specified in Article V.

4.06    No Interest on Capital.  Interest earned on Partnership funds shall inure solely to the benefit of the Partnership and no interest shall be paid to a Partner upon any contributions or advances to the capital of the Partnership or upon any undistributed or reinvested income or profits of the Partnership.

4.07    Return of Capital.  Except as otherwise specifically provided in this Agreement: (i) no Partner shall have any right to withdraw or reduce its Capital Contributions, or to demand and receive property other than cash from the Partnership in return for its Capital Contributions, (ii) no Partner shall have any priority over any other Partners as to the return of its Capital Contributions, and (iii) any return of Capital Contributions or Capital Accounts to the Partners shall be solely from Partnership Assets, and no Partner shall be personally liable for any such return.

4.08    No Deficit Restoration.  No Partner shall be obligated to contribute additional capital to the Partnership in order to restore a deficit balance in its Capital Account upon liquidation of the Partnership or such Partner's Partnership Interest.  The foregoing provision shall not be construed to limit any Partner's obligation (i) to make Capital Contributions or loans to the Partnership pursuant to other Sections of this Agreement, (ii) to satisfy the claims of third party creditors, or (iii) to satisfy any guaranty of Partnership indebtedness by such Partner.

4.09    Third Party Creditors.  The foregoing provisions of this Article IV are not intended to be for the benefit of any creditor or other Person (other than a Partner in its capacity as a Partner) to whom any debts, liabilities or obligations are owed by (or who otherwise has any claim against) the Partnership or any of the Partners; and no such creditor or other Person shall obtain any right as a

APP. 023

- 20 -

result of any such foregoing provision against the Partnership or any of the Partners by reason of any debt, liability, contract or obligation (or otherwise).

**4.10** __No Personal Liability.__  No Partner shall have any personal liability to make any Additional Capital Contributions or Partner Loan or to pay any amount due under any loan made pursuant to __Section 4.05__, the rights and remedies granted to the Partnership and the non-defaulting Partners under this __Article IV__ being intended as exclusive.

---

## ARTICLE V - PROFITS, LOSSES AND DISTRIBUTIONS

---

**5.01** __Allocation of Profits and Losses.__

(A)  Profits and Losses of the Partnership (and items of income, gain, loss, deduction, or credit with respect thereto) for a Fiscal Year shall be allocated to the Partners in accordance with the provisions of this __Article V__.

(B)  Losses of the Partnership including Losses from Capital Transactions (and items thereof) shall be allocated to and among the Partners in proportion to their Percentage Interests.

(C)  Profits of the Partnership (and items thereof) shall be allocated to and among the Partners in the same proportion that, and to the extent that, Distributable Cash for the Fiscal Year (exclusive of Net Proceeds from Capital Transactions) is distributed to the Partners pursuant to __Section 5.02__; any remaining Profits shall be allocated to and among the Partners in accordance with their Percentage Interests.

(D)  Gains from any Capital Transaction (and items thereof) shall be allocated to and among the Partners in the same proportion that Net Proceeds from such Capital Transaction for the Fiscal Year are distributed to the Partners pursuant to __Section 5.03__.

(E)  With respect to any property of the Partnership that is or has been contributed to the Partnership and that had a value that differed from the adjusted basis of the property for federal income tax purposes on the date of contribution, items of depreciation, and gain or loss, arising in, resulting from or attributable to the ownership or disposition thereof, as computed for federal income tax purposes, shall be allocated to and among the Partners so as to take into account the variation between such adjusted basis, for federal income tax purposes, of such property and such value of such property in accordance with the requirements of Regulations Section 1.704-1(b)(4)(i) and Code Section 704(c) and the Regulations thereunder.  The foregoing allocations shall continue to be made, to the extent permitted under the Code, notwithstanding any repeal of, or amendment to, Regulations Section 1.704-1(b)(4)(i) and Code Section 704(c) and/or the Regulations thereunder.

APP. 024

- 20 -

result of any such foregoing provision against the Partnership or any of the Partners by reason of any debt, liability, contract or obligation (or otherwise).

4.10    **No Personal Liability.**    No Partner shall have any personal liability to make any Additional Capital Contributions or Partner Loan or to pay an amount due under any loan made pursuant to Section 4.05, the rights and remedies granted to the Partnership and the non-defaulting Partners under this Article IV being intended as exclusive.

## ARTICLE V - PROFITS, LOSSES AND DISTRIBUTIONS

5.01    **Allocation of Profits and Losses.**

(A)    Profits and Losses of the Partnership (and items of income, gain, loss, deduction, or credit with respect thereto) for a Fiscal Year shall be allocated to the Partners in accordance with the provisions of this Article V.

(B)    Losses of the Partnership including Losses from Capital Transactions (and items thereof) shall be allocated to and among the Partners in proportion to their Percentage Interests.

(C)    Profits of the Partnership (and items thereof) shall be allocated to and among the Partners in the same proportion that, and to the extent that, Distributable Cash for the Fiscal Year (exclusive of Net Proceeds from Capital Transactions) is distributed to the Partners pursuant to Section 5.02; any remaining Profits shall be allocated to and among the Partners in accordance with their Percentage Interests.

(D)    Gains from any Capital Transaction (and items thereof) shall be allocated to and among the Partners in the same proportion that Net Proceeds from such Capital Transaction for the Fiscal Year are distributed to the Partners pursuant to Section 5.03.

(E)    With respect to any property of the Partnership that is or has been contributed to the Partnership and that had a value that differed from the adjusted basis of the property for federal income tax purposes on the date of contribution, items of depreciation, and gain or loss, arising in, resulting from or attributable to the ownership or disposition thereof, as computed for federal income tax purposes, shall be allocated to and among the Partners so as to take into account the variation between such adjusted basis, for federal income tax purposes, of such property and such value of such property in accordance with the requirements of Regulations Section 1.704-1(b)(4)(i) and Code Section 704(c) and the Regulations thereunder. The foregoing allocations shall continue to be made, to the extent permitted under the Code, notwithstanding any repeal of, or amendment to, Regulations Section 1.704-1(b)(4)(i) and Code Section 704(c) and/or the Regulations thereunder.

APP. 025

- 21 -

(F)    In the event that the Partnership has taxable income that is characterized as ordinary income under the recapture provisions of the Code (e.g., Code Sections 1245 and 1250), each Partner's distributive share of taxable Gain or Loss from a Capital Transaction (to the extent possible) shall include a proportionate share of this recapture income equal to that Partner's share of prior cumulative Depreciation deductions with respect to the assets which give rise to the recapture income, provided that this Section 5.01(F) shall not affect the amount of gain allocable to any Partner.

(G)    To the extent permitted, the Partnership shall elect (i) the straight line method of cost recovery and the minimum cost recovery period with respect to real property, and (ii) the maximum accelerated method of cost recovery and the minimum cost recovery period with respect to personal property. Each of the Partners hereby represents that it is not a "tax-exempt entity" within the meaning of Code Section 168(h)(2)(A).

(H)    Any tax credits available to the Partnership under the Code shall be shared by the Partners in proportion to their respective Percentage Interests.

(I)    Notwithstanding the foregoing provisions of this Section 5.01, in the event that any fees, interest, or other amounts paid to a Partner or an Affiliate of a Partner (pursuant to this Agreement, or any agreement between the Partnership and the Partner or Affiliate providing for the payment of such amounts) and deducted by the Partnership in reliance on Code Section 707(a) or Code Section 707(c) are disallowed as deductions to the Partnership on its federal income tax return for the Fiscal Year in or with respect to which such amounts are paid and are as a result of such disallowance treated as Partnership distributions, then:

(1)    items of Partnership income, gain, credit, loss or deduction, as the case may be, for the Fiscal Year in or with respect to which such fees, interest or other amounts were paid shall be increased or decreased, as the case may be, by the amount of such fees, interest or other amounts which are so disallowed and treated as Partnership distributions; and

(2)    there shall be allocated to the Partner who received (or whose Affiliate received) such payments, prior to the allocations pursuant to the other subsections of this Section 5.01, an amount of profit for the Fiscal Year in or with respect to which such fees, interest or other amounts were paid (or, if necessary, later Fiscal Years) equal to the amount of such fees, interest or other amounts that were so disallowed and treated as Partnership distributions.

(J)    Notwithstanding the foregoing provisions of this Section 5.01, Gain or Loss from a Capital Transaction (or series of Capital Transactions) involving all or substantially all of the Partnership Assets or in contemplation of a liquidation of the Partnership shall be allocated to and among the Partners (after all allocations of Profits and Losses and all distributions of Distributable Cash for all prior periods are made and accounted for, but before distributions are made under Sections 5.03 or 5.04(C)) first, so as and to the extent necessary to make the ratio among the Partners' Capital Account balances equal to the ratio among the Partners' Percentage Interests, and next in proportion to their Percentage Interests.

APP. 026

- 22 -

5.02    Distribution of Distributable Cash.

(A)    Distributable Cash shall be distributed among the Partners pro rata in proportion to their respective Percentage Interests, provided, however, that, with respect to the Return Period, Distributable Cash distributable to SLR and Hancock shall, subject to Section 5.02(D), below, be distributed as follows:

(1)    First, to SLR, an amount equal to the SLR Return;

(2)    Second, to Hancock, an amount equal to the Hancock Return; and

(3)    Third, the balance, if any, to SLR and Hancock, pro rata in accordance with their respective Percentage Interests.

To the extent that distributions of Distributable Cash during any month (or other period in which distributions are made in accordance with the terms hereof) during the Return Period shall be insufficient to satisfy the SLR Return and the Hancock Return for such period, then such shortfall shall carryover to the succeeding month (or other period) during the Return Period until satisfied and be payable from Distributable Cash in the same priority as provided in this Section 5.02(A) provided, however, that any shortfall in the SLR Return or the Hancock Return at the close of a Fiscal Year shall lapse and shall not carryover to the next Fiscal Year.

(B)    Unless otherwise agreed by the Partners, Distributable Cash, if any, shall be distributed on a monthly basis by the Managing Partner commencing with the first full calendar month ending after the Effective Date.  The Managing Partner may withhold from any monthly distribution (with the first funds withheld being those which, but for the withholding, would be distributed under the lowest order of priority in Section 5.02(A)(1)-(3)) such amounts as it reasonably believes are necessary to satisfy anticipated expense items (pursuant to the approved Business Plan) for the calendar month in which such distribution shall be made.  All distributions of Distributable Cash shall be subject to year-end adjustment.  Distributions of Distributable Cash made during any Fiscal Year shall first be considered to be distributions of the prior Fiscal Year's Distributable Cash, to the extent attributable to the prior Fiscal Year's Distributable Cash but not actually distributed in such prior Fiscal Year(s), for purposes of this Section 5.02.

(C)    The Partners agree that, within thirty (30) days after determination by the Accountants that an overpayment was made to any Partner for any Fiscal Year pursuant to this Section 5.02, such Partner shall repay to the Partnership (or make such other adjustments as the Partners determine to be appropriate) the amount of such overpayment.  Similarly, distributions (or other appropriate adjustments) shall be made to remedy any such underpayment.

(D)    Notwithstanding the provisions of Section 5.02(A), if during the Return Period, there exists a Return Shortfall in a Fiscal Year in which distributions of Distributable Cash are made, then such Return Shortfall shall be borne by SLR and Hancock pro rata in accordance with their respective Percentage Interests, as set forth in this Section 5.02(D).  Within ninety (90) days after the close of any Fiscal Year in which a Return Shortfall exists, the Managing Partner shall cause to be prepared and delivered to SLR and Hancock a statement setting forth the following:

- 23 -

    (1)    The amount paid by the Partnership for Capital Additions and Emergency Expenditures for such Fiscal Year;

    (2)    The amount of the Return Shortfall; and

    (3)    Each of SLR's and Hancock's proportionate share of such Return Shortfall.

Within fifteen (15) days after receipt of such statement, SLR shall be obligated and hereby agrees to pay to Hancock, SLR's proportionate share of Hancock's Return Shortfall, provided, however, in no event shall SLR be obligated to pay to Hancock any amount in excess of Distributable Cash received by SLR during such Fiscal Year pursuant to Section 5.02(A)(1). Any such payment by SLR shall be accounted for hereunder as a Capital Contribution by SLR and a simultaneous distribution to Hancock. Within fifteen (15) days after receipt of such statement, Hancock shall be obligated and hereby agrees to pay to SLR, Hancock's proportionate share of SLR's Return Shortfall. Any such payment by Hancock shall be accounted for hereunder as a Capital Contribution by Hancock and a simultaneous distribution to SLR. For purposes of satisfying the payment obligations under this Section 5.02(D), SLR shall be permitted to offset the amount due to Hancock hereunder by any amount due to SLR hereunder.

    **5.03**    **Distribution of Net Proceeds of a Capital Transaction.** The Net Proceeds of a Capital Transaction shall be distributed to the Partners pro rata in proportion to their respective Percentage Interests.

    **5.04**    **Distribution of Assets.** Upon dissolution of the Partnership, and after the distribution to the Partners of Distributable Cash accruing during the winding up period, which shall be distributed to the Partners in accordance with Section 5.02, the proceeds from the liquidation of Partnership Assets in dissolution of the Partnership and collection of the receivables of the Partnership, to the extent sufficient therefor, shall be distributed in the following order of priority:

    (A)    First, to the payment of any debts and liabilities of the Partnership to third parties which shall then be due and payable, including, but not limited to, the expenses of liquidation;

    (B)    Second, to the establishment of any reserves which the Managing Partner deems necessary to provide for any contingent or unforeseen liabilities or obligations of the Partnership; and

    (C)    Third, in the manner set forth in Section 5.03.

    **5.06**    **Transfers During Fiscal Year.**

    (A)    In the event of a Transfer of an Interest (in accordance with the provisions of this Agreement) during a Fiscal Year (and after the Effective Date hereof), the share of income, profits, gains, losses, deductions and credits attributable to such Interest shall be allocated among the holders of the Interest being Transferred in proportion to the number of days that each such holder was recognized as the owner of the Interest without regard to the results of Partnership operations

APP. 027

- 24 -

during the period in which each such holder was recognized as the owner of such Interest, and without regard to the date, amount or recipient of any distributions which may have been made with respect to such Interest, or as the transferor and transferee may otherwise agree. The provisions of this Section 5.05 shall not apply to Gain or Loss from a Capital Transaction or other extraordinary nonrecurring items. Such Gain or Loss from a Capital Transaction shall be allocated on the basis of the Partners' Percentage Interests on the date of closing of the sale, and extraordinary nonrecurring items of income, profit, gains, losses, deductions or credits shall be allocated on the basis of the Partners' Percentage Interests on the date such item was realized or incurred, as the case may be. Except as expressly provided otherwise in this Agreement, distributions of Distributable Cash or Net Proceeds of a Capital Transaction shall be made to the Partners of record on the record date established by the Partners for the distribution, without regard to the length of time the record holder has been such.

(B)    The Partnership shall close its books as of the day immediately preceding the Effective Date, and all items of income, loss, deduction and credit attributable to periods prior to the Effective Date shall be allocated between Sheraton and Hancock pro rata in accordance with their respective Interests pursuant to the Joint Venture Agreement as in effect immediately prior to the Effective Date.

5.06    Miscellaneous. No distribution of Partnership funds under Sections 5.02, Section 5.03 or Section 5.04 shall cause any adjustment to the Percentage Interest of any Partner. The Partners are aware of the income tax consequences of the allocations made by this Article V and hereby agree to be bound by the provisions of this Article V in reporting their shares of Partnership income and loss for income tax purposes. The Managing Partner shall be authorized to withhold from amounts to be distributed to any Partner hereunder any withholding required by the Code and to pay such amounts to the IRS in accordance with the Code. For purposes of this Agreement, any amount of taxes required to be withheld by the Partnership with respect to any amount distributable by the Partnership to any Partner shall be deemed to be a distribution or payment to such Partner and shall reduce the amount otherwise distributable to such Partner pursuant to this Agreement.

**ARTICLE VI - MANAGEMENT**

6.01    Managing Partner.

(A)    Subject to and limited by the provisions of this Agreement, the Managing Partner shall have the authority, discretion, obligation and responsibility to manage and control the affairs of the Partnership to the best of its ability and shall use its reasonable best efforts to carry out the business of the Partnership. The Managing Partner shall oversee the day-to-day affairs of the Partnership and shall make all decisions and take all actions with respect thereto, subject to and limited

APP. 028

- 25 -

by the terms and provisions of this Agreement. The Partners, other than the Managing Partner, shall take no action purporting to bind the Partnership unless specifically authorized under this Agreement or delegated to them pursuant to Section 6.02. Notwithstanding the foregoing, all Partners shall have the right at all reasonable times to inspect the Subject Property and all of the books and records of the Partnership.

(B)    Unless and until removed as provided in this Agreement, the Managing Partner shall be Hancock. The Managing Partner may be changed at any time with the Consent of the Principals. If Hancock should sell its Interest in the Partnership to a Substituted Partner, SLR shall act as the Managing Partner unless at the time of sale, Hancock is no longer the Managing Partner, in which event the then Managing Partner shall continue to be the Managing Partner.

(C)    The Managing Partner shall be subject to removal upon the occurrence of any of the following:

(1)    On any three (3) occasions during any five (5) year period, the Managing Partner fails to make Capital Contributions or Partner Loans to the Partnership as and when required by Article IV; or

(2)    The Managing Partner's Percentage Interest for any reason drops below thirty-five percent (35%); or

(3)    The Managing Partner has committed an act of fraud under this Agreement or the Purchase Agreement; or

(4)    The Managing Partner has been grossly negligent in the management of the Partnership business; or

(5)    The undertaking by the Managing Partner, on behalf of the Partnership, of any action constituting a Major Decision under Section 6.03(B) without the Consent of the Principals; or

(6)    The Transfer by the Managing Partner of all or any portion of its Interest in violation of the transfer restrictions contained in Article VIII or Article IX; or

(7)    Any intentional breach by the Managing Partner of a representation or warranty made or given by it in the Purchase Agreement; or

(8)    Any assignment of the Asset Management Agreement by JHPI in violation of the terms thereof, or the termination of the Asset Management Agreement by SLR by reason of fraud or misappropriation of funds by JHPI; or

(9)    The occurrence of an uncured Managing Partner Default.

(D)    Except in circumstances where the basis for removal shall be the failure to make Additional Capital Contributions or Partner Loans pursuant to Section 6.01(C)(1), reduction of

APP. 029

- 26 -

Interest pursuant to Section 6.01(C)(2), or an act of fraud pursuant to Section 6.01(C)(3), upon the occurrence of any act or event set forth in this Section 6.01(C), any Partner may deliver a Notice to the Managing Partner setting forth the act or event justifying removal. The Managing Partner shall thereafter have thirty (30) days within which to cure its default, provided, however, that in the event of an Unavoidable Delay, the cure period shall be tolled during the period thereof, so long as the Managing Partner continues to exercise diligence and good faith in attempting to effect a cure, and provided further that, in the event that the basis for removal shall be an act or omission of the Managing Partner described in Sections 6.01(C)(4)-(8), in no event shall the period during which the cure period is tolled as a result of Unavoidable Delay exceed sixty (60) days. If the Managing Partner shall cure its default within such period (and shall provide evidence of cure to the Partners), then the Managing Partner shall continue to serve as Managing Partner. If the Managing Partner shall have failed to cure its default within such cure period, then it shall immediately cease to be Managing Partner. If the basis for removal shall be the failure to make Additional Capital Contributions or Partner Loans pursuant to Section 6.01(C)(1), the fraud of the Managing Partner pursuant to Section 6.01(C)(3) or reduction of Interest pursuant to Section 6.01(C)(2), the Managing Partner shall cease to be Managing Partner upon (i) the expiration of the period for making the third Additional Capital Contribution or Partner Loan pursuant to Section 4.04, (ii) Notice of the fraud accompanied by a statement certified by the sending Partner detailing the act constituting the fraud and appropriate documentation thereof, or (iii) the effective date of the reduction in Interest, as the case may be. Notwithstanding the foregoing, for purposes of determining whether a basis for removal of the Managing Partner exists, any default by the Managing Partner in the performance of any act or delivery to the Partners of any reports or information required hereunder by a date certain shall not constitute a basis for removal if and to the extent that such act or delivery is effected by the Managing Partner within the cure period.

(E)    Upon any removal of the Managing Partner, the remaining Principal shall become the Managing Partner; if there shall be no remaining Principal, a successor Managing Partner shall be elected by the Partners owning a majority of the Percentage Interests owned by all Partners.

6.02    Delegation of Authority.  The Managing Partner may, with the Consent of the Principals, delegate all or any of its powers, rights and obligations hereunder, and, subject to and as limited by the terms and provisions of this Agreement, may appoint, employ, contract or otherwise deal with any Person for the transaction of the business of the Partnership, which Person may, under supervision of the Managing Partner, perform any acts or services for the Partnership as the Managing Partner may approve.  The Partners acknowledge that primary responsibility for the day-to-day operation of the Subject Property has been and will continue to be delegated to the Hancock Affiliate under the Affiliate Lease and the Operator under the Management Contract and that, subject to the provisions of Section 6.03(B)(15), below, the Managing Partner shall have full power and authority to act on the Partnership's behalf in all matters requiring actions or decisions by the Partnership under the Affiliate Lease and/or the Management Contract except to the extent specifically limited or otherwise provided herein.

**APP. 030**

- 27 -

6.03    Limitations on Managing Partner.

(A)    The Managing Partner shall not have any authority to perform (i) any act in violation of any applicable law or regulation thereunder, or (ii) any act without any Consent or ratification which is required to be Consented to or ratified by the Partners pursuant to any provision of this Agreement, including all "Major Decisions" set forth in Section 6.03(B) and approval of the Business Plan in accordance with Section 6.04.

(B)    The Consent of the Principals shall be required prior to any action by the Managing Partner with respect to all "Major Decisions." Each Principal shall designate and provide Notice to the Managing Partner of the appropriate Person who has authority to act on behalf of such Principal in granting or denying its Consent to such Major Decisions or any of them. For purposes of this Agreement, "Major Decisions" shall mean and refer to the following:

(1)    The borrowing of funds by the Partnership, or the execution of any promissory note, bond, security agreement, mortgage, deed of trust, guarantee or other document or instrument evidencing any indebtedness of the Partnership, or pledging, granting a security interest in, or otherwise encumbering any of the Partnership Assets other than pursuant to the Business Plan or other approved budget required pursuant to and in accordance with the terms of the Management Contract.

(2)    Changing the name of the Subject Property.

(3)    Causing or permitting the Partnership to sell, exchange, assign, convey, transfer or otherwise dispose of, or approve any offer to purchase or exchange, the Partnership Assets or any component thereof, including any transferable development or other zoning rights pertaining thereto.

(4)    The acquisition by the Partnership of any land or building which is not part of the Subject Property on the Effective Date;

(5)    The assignment of Partnership Assets or any part thereof in trust for creditors.

(6)    The sale, exchange, assignment, conveyance or other disposition of all or any part of the Subject Property, the Hotel or the Land;

(7)    The confession by the Partnership of a judgment against itself, the Partnership Assets, or any portion thereof.

(8)    The binding of the Partnership as guarantor or surety for the Partners or on behalf of any Person.

(9)    Any financing of the Subject Property, the Hotel or the Land except to the extent provided in an approved Business Plan;

APP. 031

- 28 -

(10)    The taking of any action by which the business of the Partnership shall be endangered or prejudiced, or the result of which would be to prevent the Partnership from conducting the Partnership's ordinary business.

(11)    Any capital expenditures other than (i) those set forth in an approved Business Plan; and (ii) Emergency Expenditures made in accordance with Section 4.04 hereof.

(12)    Any noncapital expenditure not set forth in an approved Business Plan or other approved budget required pursuant to and in accordance with the terms of the Management Contract or the Affiliate Lease except for (i) Emergency Expenditures and (ii) Operating Shortfalls (the Managing Partner shall report all such Emergency Expenditures and Operating Shortfalls to the Principals as soon as possible).

(13)    The selection of an operator for the Subject Property upon the expiration or earlier termination of the Management Contract and the entering into of a new management contract.

(14)    The commitment for or undertaking of any Capital Additions or other capital improvement project or undertaking (other than the Current Works or in accordance with an approved Business Plan).

(15)    Termination, renewal, modification or change to the terms of the Affiliate Lease or the rights, duties and obligations of the Partnership and/or the Hancock Affiliate thereunder, or the making of any decision or the taking of any action required of the Partnership, as landlord thereunder; in addition, approval or reimbursement of Tenant Operating Expenses under the Affiliate Lease (as defined therein) by the Partnership as Landlord thereunder in excess of Ten Thousand Dollars ($10,000) in any lease year shall require the Consent of the Principals.

(16)    Termination, renewal, amendment, modification or change to the terms of the Management Contract or any other management contract or the rights, duties and obligations of the Operator, any other operator or manager and/or the Partnership thereunder.

(17)    The taking of any action for which Consent is required from any of the other Partners pursuant to the terms of this Agreement.

(18)    Causing the Partnership to engage in any business other than that specified in this Agreement.

(19)    The admission of any Person as a Partner (except to the extent otherwise set forth in Article VIII).

(20)    The execution, on behalf of the Partnership, of any contract or agreement (other than those contracts or agreements which are provided in an approved Business Plan or which are entered into on the Partnership's behalf by the Operator without the Partnership's approval in accordance with the Management Contract) for the purpose of providing goods, materials or services to the Subject Property which (a) cannot be terminated by the Partnership unilaterally upon

APP. 032

- 29 -

thirty (30) days prior notice without penalty or premium, or (b) is with any Partner or any Affiliate of any Partner, except the Consent of the Principals shall not be unreasonably withheld or delayed if the cost of such contract or agreement does not exceed the cost which would be charged by an entity other than a Partner or an Affiliate of any Partner for a similar contract or agreement and the Managing Partner has provided evidence reasonably satisfactory to the Principals (which may include one or more bids as reasonably requested by said Principals) which clearly establishes that said contract or agreement would not exceed the cost of contracts or agreements from other non-affiliated entities in Washington, D.C.

(21)    Except as set forth in Sections 4.03(B) and 7.05, the making of all tax elections and filing of all tax returns on behalf of the Partnership (notwithstanding the foregoing, the Partners will not unreasonably withhold or delay their Consent to any tax elections and filing of tax returns when requested to do so by the Tax Matters Partner).

(22)    The approval of any salaries, fees, commissions or other compensation or reimbursement to be paid by the Partnership to any Partner or Affiliate, or partner, officer or employee of any Partner or its Affiliates; provided, however, that the Consent of the Partners shall not be unreasonably withheld or delayed where such agreements are not materially different in terms of compensation or other rights and obligations than such "arms'-length" agreements as would be entered into with an independent third party.

(23)    Entering into, terminating or approving any lease or sublease with a term of five (5) years or longer or for more than two thousand five hundred (2,500) rentable square feet in the Hotel.

(24)    [Intentionally omitted]

(25)    The approval of the annual Business Plan, and any amendments or modification of any approved Business Plan; provided, however, that the manner and method of approval thereto and resolution of any disputes with respect thereto shall be governed by Section 6.04.

(26)    The application for any material change in zoning or zoning variance, or the institution of any material action to appeal any change in zoning or the issuance of any variance.

(27)    The decision whether to rebuild the Hotel or portion thereof after the occurrence of a substantial casualty or loss thereto or a substantial condemnation. For this purpose, "substantial casualty or loss" shall mean replacement, repair or reconstruction costs as a result of such casualty or loss estimated by a reputable independent contractor to be in excess of Twenty Five Million Dollars ($25,000,000). The parties agree that if the costs of reconstruction, replacement or repair shall be less than Twenty Five Million Dollars ($25,000,000), then such reconstruction, replacement or repair shall be undertaken by the Partnership unless the Principals shall otherwise mutually agree.

(28)    The creation of any easement encumbering the Subject Property other than easements for utility services benefitting the Subject Property.

APP. 033

(29) The change in depreciation or other accounting methods of the Partnership or change in the Fiscal Year of the Partnership.

(30) The making or approval of any change or adjustment in the Percentage Interest of any Partner (other than as provided for in Section 4.05).

(31) The engagement of any Accountants or the engagement of any Counsel other than Dunnells, Duvall & Porter or Coudert Brothers; the Principals acknowledge that Arthur Andersen & Co. shall serve as the Accountants for purposes of the 1989 audit and that thereafter the Partnership shall solicit bids for accounting services from among the six (6) major national accounting firms.

(32) The establishment by the Managing Partner of a reserve or escrow which either exceeds or is less than the amount set forth in any approved Business Plan.

(33) Any increase or decrease in the amount of the Line of Credit or modification, amendment or change to the terms thereof.

(34) The establishment of the types, amounts, coverage and limits of insurance to be maintained by the Partnership.

(35) The reduction in the amount of insurance for the Subject Property or the Partnership, or any change in the type, coverage or limits of such insurance that increases the Partnership's or SLR's level of exposure to risk of loss as a result thereof.

(36) The initiation of any litigation, arbitration or other legal proceeding (other than a tax controversy) or the settlement of any litigation, arbitration or other legal proceeding (excluding a tax controversy), as the case may be, involving the Partnership, the Partnership Assets or any part thereof and, in the event of a tax controversy, the settlement of such controversy, including the consent of the Partnership to any of the foregoing actions taken on its behalf by the Operator under the Management Contract; the Principals acknowledge the rights of the Operator to act on the Partnership's behalf with respect to certain disputes pursuant to the Management Contract.

(37) Upon approval of casino gaming operations by the District of Columbia for hotel facilities generally, the decision whether to conduct casino gaming operations at the Hotel.

(38) Call Notices for Additional Capital Contributions or Partner Loans except as provided in Article IV hereof.

(C) If there is a dispute concerning a Major Decision of the type described in Section 6.03(B)(23) (as to the commercial reasonableness of the proposed lease), Sections 6.03(B)(20) and (22) (as to the rate of compensation) Section 6.03(B)(34) (as to whether the insurance proposed to be carried is commercially reasonable for a first-class hotel in the District of Columbia) or Section 6.03(B)(25) (as to an amendment or modification of any previously approved Business Plan, but only in the case where the amendment or modification relates to reallocation of the budgeted amounts among existing items and the Partnership's consent to such reallocation is otherwise required

- 31 -

under the terms of the Management Contract), such dispute shall be determined by arbitration in accordance with this Section 6.03(C) and, to the extent not inconsistent with this Section 6.03(C), the Commercial Arbitration Rules then obtaining of the American Arbitration Association or any successor body of similar function. Each year at the annual meeting of the Partners held pursuant to Section 6.13, the Principals shall designate five (5) people who are acceptable to them to act as the third arbitrator in the event the dispute resolution procedure is implemented. Within five (5) days after receipt of Notice from the Managing Partner of a dispute, SLR shall appoint a disinterested Person as arbitrator on its behalf (the "SLR Arbitrator"), and Hancock shall appoint a disinterested Person as arbitrator on its behalf (the "Hancock Arbitrator"). SLR and Hancock shall each notify the other of such appointments. SLR and Hancock shall each have the absolute right to include in its Notice its election to exclude, without cause, as a possible third arbitrator any one of the five (5) designated third arbitrators. If such right is exercised, the SLR Arbitrator and the Hancock Arbitrator shall not have the right to select such excluded people as the third arbitrator. During the immediately succeeding ten (10) day period the SLR Arbitrator and the Hancock Arbitrator shall meet in the District of Columbia on a continuous basis to the extent feasible with a view toward finding a resolution of the dispute which is acceptable to all parties to the dispute. If no acceptable resolution is found within the ten (10) day period, within three (3) days following the expiration of said ten (10) day period, the SLR Arbitrator and the Hancock Arbitrator shall appoint a third disinterested person as arbitrator (the "Third Arbitrator"). The Third Arbitrator shall be selected from the list of acceptable third arbitrators. All of the arbitrators shall have at least ten (10) years experience in managing properties which are similar in character to the Subject Property and located in the District of Columbia.

The arbitrators shall meet within five (5) days after appointment of the Third Arbitrator and shall make a determination within twenty-five (25) days after appointment of the Third Arbitrator. Any meeting of the arbitrators shall be held in the District of Columbia. SLR and Hancock shall make available such information concerning the subject matter of the dispute within the possession of SLR or Hancock, as the case may be, as the arbitrators reasonably require. The decision of the arbitrators shall be upon the concurrence of at least two (2) of their number, shall be final and binding on all parties, and judgment upon the award may be entered in any court having jurisdiction. SLR shall pay the fees and expenses of the SLR Arbitrator; Hancock shall pay the fees and expenses of the Hancock Arbitrator, and SLR and Hancock shall share equally the fees and expenses of the Third Arbitrator. Each party shall be responsible for the fees and disbursements of its own attorneys and the expenses of its own proof. SLR and Hancock agree to sign all documents and do all other things necessary to submit such dispute to arbitration and shall, and hereby do, waive any and all rights they or either of them may at any time have to revoke their agreement hereunder to submit to arbitration and agree to abide by the decision rendered thereunder.

(D)    In requesting Consent to actions constituting a Major Decision, the Managing Partner shall submit in writing all proposals for action requiring the Consent of the Principals. The failure of any Principal to Consent in writing to a proposal within fifteen (15) Business Days (or such shorter period as may be set forth in such submission as may be necessary to protect the Subject Property or the Partnership's interest therein, but in no event less than five (5) Business Days) after the receipt of the proposal shall be deemed an approval of such proposal. Copies of all Notices and requests to the Principals shall be delivered to Sheraton.

APP. 035

- 32 -

(E)    Notwithstanding anything in this Agreement to the contrary, if an event shall have occurred and shall not have been cured during any applicable time period provided under the Affiliate Lease which would permit the Partnership to terminate the Affiliate Lease pursuant to the provisions thereof, then in such event (but subject to Section 6.02), the Affiliate Lease may be terminated by SLR alone acting on behalf of the Partnership without any requirement to obtain the Consent of Hancock, Sheraton or any other Partner to such termination.

6.04    Business Plan.  Pursuant to the Management Contract, the Operator is obligated to prepare and formulate a proposed annual plan for the Subject Property (the "Business Plan"), setting forth estimated revenues and expenses (including taxes and debt service, if any), capital expenditures, reserves, contingencies, sources and applications of funds and loans contemplated, if any.  The Business Plan, when prepared by the Operator (or any successor operator of the Hotel), shall be submitted to the Principals for their approval not more than five (5) days after its receipt by the Managing Partner from the Operator.  Each Principal shall notify the Managing Partner in writing of any objections to the Business Plan or specific items therein within thirty (30) days after receipt thereof.  Failure of a Principal to respond or object to the Business Plan, or any specific item thereof, within such thirty (30) day period shall conclusively be considered approval thereof.  SLR and Hancock shall endeavor in good faith to agree to the adoption of the Business Plan, together with such modifications to the Business Plan as may from time to time be agreed to by mutual Consent in writing.  If the Managing Partner and the Principals have not agreed upon the Business Plan or a specific item therein, and a Principal shall have made timely objection thereto within the foregoing time period, then the Partnership shall not grant its approval of the Business Plan or specific item therein to the Operator pursuant to the Management Contract.  The issue shall thereafter be resolved in accordance with the terms of the Management Contract.  Pending such resolution, operation of the Subject Property shall be conducted as provided in the Management Contract.  Each Principal shall have the right to participate fully in meetings, discussions, arbitrations or other proceedings between the Partnership and the Operator.  In the event the issues shall be resolved by arbitration or mutual agreement in favor of the Operator and the basis for the Partnership's failure to approve the Business Plan or specific item therein shall have been a Principal's failure to Consent to such Business Plan or specific item therein (unless all Principals shall have concurred in such objections or other Principals did not approve other specific items in the Business Plan), then such Principal shall be responsible for any costs and expenses, including reasonable attorneys' fees, incurred by the Partnership and the other Principals as a result thereof.

6.05    Capital Improvements.

(A)    Provided that all requisite Consents, if any, have been obtained, the Managing Partner shall satisfy the costs of any capital improvement project or program (including without limitation Capital Additions and Future Work (to the extent not funded from the Main Building Renovation Reserve, if any)) from the following sources in the following order:

(1)    First, from borrowings for such purpose, to the extent agreed upon by the Partners pursuant to the provisions of this Agreement, provided that this Section 6.05(A)(1) shall not be construed to mean that borrowing is a preferred source for funding such costs;

- 33 -

      (2)    Next, from the Replacement Reserve, to the extent permitted under the terms of the Management Contract, or from any reserve established for such purpose pursuant to an approved Business Plan or Major Decision;

      (3)    Next, from Cash Flow; and

      (4)    Finally, from Additional Capital Contributions by the Partners.

      (B)    The Managing Partner reserves the right to submit to the Principals for characterization as Capital Additions, from time to time, proposals for significant renovation projects of existing Hotel facilities which have an identifiable projected return on investment.

    **6.06**    **Future Work.**  Hancock and SLR acknowledge that plans are being developed for certain capital improvement programs involving enclosure of the area around the Main Building pool (the "Pool Enclosure") and renovation of certain guest rooms and suites (the "Main Building Renovation") (together, the Pool Enclosure and Main Building Renovation being referred to as the "Future Work"), which work shall be commenced and completed subsequent to the Effective Date, in accordance with the provisions set forth below, and subject to availability of funds therefor from the Replacement Reserve (to the extent permitted under the Management Contract) and Cash Flow. SLR and Hancock expressly acknowledge and agree that in the event that either (i) Hancock is subsequently removed as Managing Partner or (ii) SLR otherwise assumes responsibility for overseeing the completion of all or any part of the Future Work, then in either such event, SLR shall assume all of the obligations of the Responsible Partner (as hereinafter defined) under this Section 6.06 with respect to such work. As used herein, the term "Responsible Partner" shall mean the Managing Partner unless, with respect to Section 6.06(B) only, a Principal exercises its right, pursuant to Section 6.06(B)(iii), below, to assume responsibility for overseeing the completion of the Main Building Renovation, in which case such Principal shall become the "Responsible Partner" with respect thereto.

      (A)    **Pool Enclosure.**  The Managing Partner has tendered to SLR a preliminary design plan (the "Preliminary Plan") and budget estimate for the Pool Enclosure. Once the Principals have approved the preliminary design, the Responsible Partner shall cause to be prepared and submitted to the Principals a full set of plans and specifications (the "Pool Plans") for the Pool Enclosure, and the Responsible Partner shall use reasonable efforts to insure that such Pool Plans are substantially similar to the preliminary design for the Pool Enclosure approved by the Principals. Upon receipt by the Principals of a "project release" for the Pool Enclosure work, containing (i) proposed Pool Plans which describe Pool Enclosure work substantially similar to that described in the Preliminary Plan, (ii) a proposed budget between $3.9 million and $4.75 million, (iii) a construction contract for such work, and (iv) a timetable for the Pool Enclosure Work which contains a completion date occurring within three (3) years of the Effective Date, the Principals shall grant their Consent to such work. In the event that the proposed Pool Plans and/or timetable submitted to the Principals deviate from the standards set out above, the Principals and the Responsible Partner shall work together in good faith to reach agreement as to acceptable Pool Plans and a timetable for such work. Subject to Unavoidable Delays and availability of funds from the Replacement Reserve and/or Cash Flow, the Responsible Partner shall use all reasonable efforts to complete, or cause to be completed, the Pool Enclosure work within three (3) years from the Effective Date.

**APP. 037**

(B)    Main Building Renovation.

(i)    Hancock and SLR acknowledge that the Main Building Renovation is to be performed subsequent to the Effective Date, and that such work shall include without limitation refinishing of the guest bathrooms and replacement of soft goods and case goods, in such finish, appointment and manner as may be mutually agreeable to the Principals.    The Main Building Renovation shall be performed and completed in a good and workmanlike manner, and in accordance with the quality standards of a "first class convention hotel."

(ii)    On or before November 30, 1992, the Responsible Partner shall submit to the Principals for their review and approval, preliminary plans for the Main Building Renovation, along with a proposed budget for such work, and a year by year timetable for the completion of such work.    Within thirty (30) days after it has received the preliminary plans, the proposed budget and timetable submitted by the Responsible Partner, each Principal shall notify the Responsible Partner as to whether such Principal has approved the proposed design and budget for the Main Building Renovation.    The Responsible Partner shall be deemed to have approved all material which it submits to the other Principal.    In the event that any Principal does not approve such design and budget within such period, the Principals shall negotiate in good faith with the Responsible Partner in an effort to reach agreement as quickly as practicable as to a mutually-acceptable scope of work and proposed cost of the Main Building Renovation.    Once the Principals have approved the preliminary plans and proposed budget for the Main Building Renovation, each Principal shall notify the Responsible Partner as to whether the Responsible Partner's proposed timetable for completion of the Main Building Renovation is acceptable to such Principal in its reasonable discretion.    If such timetable is not acceptable to any Principal, such Principal and the Responsible Partner shall negotiate in good faith to reach a mutually-acceptable timetable.    Once the Principal and the Responsible Partner have reached agreement as to the timetable for completing the Main Building Renovation, the Responsible Partner shall cause final plans and specifications to be prepared for each phase of the Main Building Renovation to be completed within the following twelve (12)-month period, select one or more contractors to undertake such work and otherwise take such steps as it believes necessary so that it may satisfy the timetable previously agreed upon by the Principals.    In the event that the bids for the Main Building Renovation deviate from projected budgets and/or timetables, the Responsible Partner shall meet with the Principals to discuss possible extension of the timetable for completion of the Main Building Renovation and/or modification of the scope of the Main Building Renovation.    Unless the Principals mutually agree to an extension of the original timetable, the Responsible Partner shall use reasonable efforts to cause the Partnership to undertake the Main Building Renovation within the timetable previously agreed upon by the Principals.

(iii)    In the event that (w) the Responsible Partner fails to submit to the Principals for their approval preliminary plans, a proposed budget and timetable for the Main Building Renovation on or before November 30, 1992, and the Responsible Partner fails to submit the same within thirty (30) days of Notice from any Principal; or (x) the Principals acting in good faith are unable to agree on an acceptable timetable for completion within ninety (90) days after submission of the same to the Principals; or (y) during any given year, the Responsible Partner fails to complete its required portion of the Main Building Renovation; or (z) the Responsible Partner has not completed the Main Building Renovation prior to the fifth (5th) anniversary of the Effective Date, then in any such event, and subject to Unavoidable Delays, the Principal which is not then the Responsible

Partner may, as its sole and exclusive remedy (except as expressly set forth below), notify the Responsible Partner that unless the Responsible Partner remedies such failure within ten (10) days of its receipt of such Notice, the Principal shall be entitled to assume the responsibility for completing the Main Building Renovation and become the Responsible Partner with respect to such work as of such date. In the event that the Responsible Partner is replaced, it shall have no further responsibility for overseeing completion of the Main Building Renovation work, nor shall the Partnership fund the Main Building Renovation Reserve.

(iv) In the event that a portion of the Main Building Renovation has not been completed by the fifth (5th) anniversary of the Effective Date, and provided that SLR is not then the Responsible Partner, the Partnership shall create a reserve fund (the "Main Building Renovation Reserve"), out of the Replacement Reserve, and, if necessary, Cash Flow from the Partnership's Fiscal Year in which occurs the fifth (5th) anniversary of the Effective Date, in an amount which the Principals believe in their reasonable judgment acting in good faith is necessary to complete the Main Building Renovation.

(v) Promptly upon determination of that portion of the Main Building Renovation Reserve to be funded out of such Cash Flow, the Principals shall return to the Partnership all or a sufficient portion of Distributable Cash attributable to such Fiscal Year which was previously distributed to them; provided that the first Distributable Cash so returned shall be that which was distributed under Section 5.02(A)(3), the next Distributable Cash so returned shall be that which was distributed under Section 5.02(A)(2), and the last Distributable Cash so returned shall be that which was distributed under Section 5.02(A)(1). If such return of Distributable Cash by the Principals shall be insufficient to fund the portion of the Main Building Renovation Reserve to be funded out of Cash Flow, then Cash Flow from the remainder of such Fiscal Year shall be applied to fund such reserve. At the end of the Fiscal Year in which such fifth anniversary occurs, Distributable Cash for such Fiscal Year shall be recalculated and appropriate adjustments in distributions under Section 5.02 (including, if necessary, return of excess distributions) shall be made to reflect funding of the Main Building Renovation Reserve.

(vi) Each Principal shall make every effort to promptly respond to all requests by the Responsible Partner for approval or Consent in connection with the Main Building Renovation, and in no event shall any Principal fail to respond to any such request within ten (10) Business Days after such Principal's receipt of such request along with all information reasonably necessary to render a decision. If a Principal requires additional information to render a decision, it shall so notify the Responsible Partner within ten (10) Business Days after receipt by such Principal of a request for Consent or approval. Failure by any Principal to approve or reject a request by the Responsible Partner or to specify the additional information which the Principal requires to render a decision, within ten (10) Business Days after receipt of a request for approval from the Responsible Partner, shall constitute an approval of or Consent to such request.

(vii) Once the Responsible Partner and the Principals have reached agreement as to the preliminary plans, proposed budget and timetable for the Main Building Renovation, the Responsible Partner shall not, without first obtaining each Principal's Consent, intentionally take any action (whether by way of change order or other form of alterations or revision) to (x) materially increase or decrease the scope of the Main Building Renovation; (y) materially

- 36 -

decrease the standards of quality and workmanship for the Main Building Renovation; or (z) substantially increase the cost of the Main Building Renovation.

(viii)    The Responsible Partner shall provide each Principal, and its construction consultants, if any, and their agents and representatives with access to all Main Building Renovation projects, at all reasonable times for the purpose of making a physical inspection thereof and of each of its component parts. While on the Subject Property, all such Persons shall comply with any reasonable safety requirements imposed by the Responsible Partner.

(ix)    The Responsible Partner shall cooperate with, and cause the Partnership, the Operator, all consultants and all contractors, and their respective agents and representatives to cooperate with, the Principals and their construction consultants (and their respective agents and representatives) in connection with their ongoing monitoring of the completion of the Main Building Renovation.

(x)    Each Principal, its construction consultants, and their agents and representatives shall be entitled to attend all project meetings in connection with the Main Building Renovation, and the Responsible Partner shall cause reasonable advance notice to be given to the Principals and their construction consultants of the time and location of all such meetings.

(xi)    The Responsible Partner shall maintain (or cause to be maintained) all studies, reports, books, records and other documents or items produced in connection with the Main Building Renovation, including the following:

(x)    Cost records of all payments to the contractors, subcontractors, architects and all other consultants used by the Responsible Partner the Partnership and/or the Operator (or any of their Affiliates) in connection with the Main Building Renovation.

(y)    Copies of all documents prepared, issued or received by all architects, contractors and subcontractors in connection with the Main Building Renovation, including all construction contracts, change orders, purchase orders, bonds, subcontracts, shop drawings, licenses, certificates, test reports and insurance documentation.

(z)    Photographs taken of any portion of the Main Building Renovation during the course of construction.

The Responsible Partner shall provide each Principal and their construction consultants with access to all of the above-referenced items at all reasonable times and upon reasonable notice and shall permit the Principals and their construction consultants to make copies of any such documents.

(xii)    The Responsible Partner shall not take or fail to take any actions, or otherwise permit any actions to be taken, or not taken, in connection with the Main Building Renovation which would in any way void or limit the coverages provided under any warranties or

APP. 040

guaranties being provided with respect thereto. Neither the Responsible Partner, the Partnership, the Operator nor any of their respective Affiliates shall assign, terminate or amend any of such warranties and/or guaranties, or waive or release any of their rights under such warranties and guaranties without the prior Consent of the Principals.

(xiii) The Responsible Partner shall use all reasonable efforts to see that all licenses and permits obtained in connection with the Main Building Renovation are kept in full force and effect; to renew the same if and to the extent that any such license or permit is scheduled to expire prior to the completion of the Main Building Renovation; and to replace any license or permit which is revoked prior to completion of the Main Building Renovation.

(xiv) The Responsible Partner shall cause the Partnership to maintain liability, casualty, workmen's compensation, and such other insurance with respect to the Main Building Renovation as it reasonably believes necessary or appropriate; provided however, that the Responsible Partner shall not decrease any existing insurance coverage without first having obtained each Principal's Consent.

6.07 <u>Transactions with Partners, Affiliates or Operator.</u> The Partnership cannot in the normal course of its business or otherwise enter into transactions with the Managing Partner and with any Affiliate of the Managing Partner except to the extent approved by the Principals pursuant to <u>Section 6.03</u>. Each Principal hereby ratifies the Affiliate Lease with the Hancock Affiliate and the Management Contract with the Operator.

6.08 <u>Compensation to Partners.</u> The Partners shall not receive any compensation from the Partnership for services rendered in their capacity as partners of the Partnership.

6.09 <u>Partnership Expenses; Reimbursement.</u> Except as provided in the Management Contract and Affiliate Lease, or otherwise expressly set forth in this Agreement, the Partnership shall bear all costs and expenses incurred in connection with the management and operation of the business and affairs of the Partnership or in carrying out the business, purposes, and objectives of the Partnership. If the Managing Partner at any time or from time to time advances its own funds to pay any such costs or expenses in accordance with the terms of this Agreement, it shall be entitled to reimbursement of such funds from the Partnership promptly upon demand.

6.10 <u>Indemnification and Liability of the Partners.</u> The Partnership shall indemnify and hold harmless the Partners (to the extent of available assets, but without the requirement that any Partner make Additional Capital Contributions for this purpose) from and against any and all claims, demands, costs, liabilities, damages, losses, and expenses of any nature whatsoever (including attorneys' fees and disbursements) (collectively "Claims"), arising out of acts or omissions performed or omitted by them in good faith on behalf of the Partnership except if such Claims arise out of a Partner's actual fraud, bad faith, gross negligence, willful misconduct or breach of its fiduciary duty with respect to such act or omission. Neither the Partnership nor any Partner shall have any claim against the Partners by reason of any act or omission of the Partners except where such claim is based on the actual fraud, bad faith, gross negligence or willful misconduct of a Partner. The indemnification rights of the Partners set forth in this <u>Section 6.10</u> shall be cumulative of, and in addition to, any and all rights,

- 38 -

remedies, and recourse to which the Partners shall be entitled, whether pursuant to the provisions of this Agreement, the Purchase Agreement, at law or in equity.

**6.11** **Relationship Among the Partners.** The relationship created by this Agreement among the Partners shall be limited to the performance of this Agreement and shall not affect any other business or activity of any Partner or any Affiliates of any Partner except as may otherwise be provided herein and as provided in any lease agreement or amendments or extensions thereof pursuant to which any Partners or any of their respective Affiliates now lease or occupy or will lease or occupy space located in or at the Subject Property. Except as specifically provided herein, nothing in this Agreement shall be construed to authorize or require any Partner or Affiliate to act as agent for any other Partner or Affiliate, or to require any Partner or Affiliate to offer to other Partners or the Partnership any business opportunity that a Partner or Affiliate may wish to pursue with Persons other than Partners, or to prohibit any Partner or Affiliate from entering into business activities in competition with the Partnership or any other Partner.

**6.12** **Powers.** Notwithstanding Section 6.10, no Partner shall bind or have any power to bind the Partnership or the other Partners except as specifically provided in this Agreement. Any Partner that acts for or binds or assumes any obligation or responsibility on behalf of the Partnership or any other Partner or incurs any liability, indebtedness or obligation affecting the Partnership in violation of the provisions of this Agreement shall, and hereby agrees to, indemnify and hold harmless the Partnership and the other Partner(s) from and against any and all costs, claims, liabilities, damages and expenses with respect to all such obligations, responsibilities, liabilities and indebtedness.

**6.13** **Meetings.** Once each year during April, there shall be a meeting of the Partners. The Managing Partner shall give to the other Partners no less than thirty (30) days Notice of the date, time and place of such meeting, which Notice shall establish the agenda for such meeting. Additionally, any Partner shall have the right to call a meeting of the Partners by giving the aforesaid Notice.

## ARTICLE VII - ACCOUNTING, REPORTS AND TAX MATTERS

**7.01** **Books and Records.** The Managing Partner shall keep and maintain books and records of the Partnership (which books and records shall be the property of the Partnership) at the Partnership's principal place of business, setting forth a true and accurate account of all business transactions arising out of or in connection with the conduct of the Partnership's business, including all income, expenditures, assets and liabilities thereof. Such books and records shall be maintained on the accrual basis of accounting or as the Partners may mutually agree in accordance with generally accepted accounting principles. The Partners acknowledge and agree that statements and reports prepared by the Operator will be prepared and rendered in accordance with the Uniform Systems of

**APP. 042**

- 39 -

Accounts for Hotels as adopted by the American Hotel and Motel Association of the United States and Canada, and as modified by the Management Contract, and that records and books maintained in accordance therewith shall constitute adequate book, records, and reports for the Partners. Each Partner and its authorized representatives shall have the right at all reasonable times during normal business hours to have access to and inspect and copy the Partnership's books, records, files, and other documents, including without limitation all financial records, vouchers, canceled checks and bank statements of the Partnership.

7.02    Bank Accounts.  All funds of the Partnership shall be deposited in its name in an account or accounts maintained with the Bank, and such other banking institutions as may be designated from time to time by the Managing Partner.  The funds of the Partnership shall not be commingled with the funds of any other Person.  Checks shall be drawn upon the Partnership account or accounts only for the purposes of the Partnership and shall be signed by duly authorized representatives of the Partnership, subject to the provisions of Article VI.

7.03    Financial Statements and Reports.

(A)    All financial statements under this Agreement shall be accurate and complete in all material respects, shall present fairly the financial position and operating results of the Partnership, and shall be prepared on the accrual basis or as the Partners may mutually agree for each Fiscal Year of the Partnership during the term of this Agreement.

(B)    Promptly upon its receipt thereof, commencing with the first full month after the Effective Date, the Managing Partner shall deliver to the other Partners any monthly profit and loss statement prepared by the Operator showing the results of Hotel operations for the month reflected therein.

(C)    Subject to delays attributable to the Operator's preparation and delivery of annual reports and information required under the Management Contract, no later than ninety (90) days after the end of each Fiscal Year during the term of this Agreement, the Managing Partner shall cause the Accountants to prepare and submit to the Partners at the expense of the Partnership (i) an audited balance sheet, together with audited statements of profit and loss, Partners' equity and changes in financial position for the Partnership during such Fiscal Year; (ii) a report summarizing the fees and other remuneration paid by the Partnership for such Fiscal Year to any Partner or any Affiliate thereof; (iii) a report of the activities of the Partnership during the Fiscal Year; (iv) an audited statement showing any Cash Flow, Distributable Cash, any Return Shortfall (and its components), any Proceeds of a Capital Transaction, and distributions to the Partners in respect of such Fiscal Year; and (v) a certification from the Accountants that the financial statements were prepared in accordance with generally accepted accounting principles, consistently applied.

7.04    Tax Returns.  The Managing Partner shall engage the Accountants, at the expense of the Partnership, to prepare the Partnership's federal and District of Columbia income tax returns and shall furnish to all Partners within ninety (90) days of the close of each Fiscal Year the tax information reasonably required for federal and District of Columbia income tax reporting purposes.  In addition, the Managing Partner shall make reasonable efforts to furnish to all Partners within sixty (60) days of

- 40 -

the close of the Fiscal Year tax information sufficient to permit a Partner to estimate its income tax liabilities (for return extension and estimated tax purposes) for such prior Fiscal Year.

7.05   **Tax Elections.**  If the election made pursuant to Section 4.03(B) hereof under Code Section 754 ceases to be in effect (because, for example, a Code Section 708 termination has occurred), and if there is a distribution of any property of the Partnership within the meaning of Section 734 of the Code or a transfer of an interest in the Partnership within the meaning of Section 743 of the Code, then, at the request of any Partner, the Managing Partner shall cause the Partnership to file an election under Section 754 of the Code to provide for an optional adjustment to the basis of the property of the Partnership.

7.06   **Tax Controversies.**  Subject to the provisions hereof, the Managing Partner is designated as the Tax Matters Partner (as defined in the Code) of the Partnership and is authorized and required to represent the Partnership (at the expense of the Partnership) in connection with all examinations of the affairs of the Partnership by any federal, state, District of Columbia or local tax authorities, including any resulting administrative and judicial proceedings, and to expend funds of the Partnership for professional services and costs associated therewith.  The Tax Matters Partner shall deliver to the Partners within five (5) Business Days of the receipt thereof, a copy of any notice or other communication with respect to the Partnership received by the Managing Partner from the IRS (or other governmental tax authority), and if requested by any Principal, shall provide to counsel designated by such Principal a copy of any submission to be made to the IRS (or other governmental tax authority) or any court with respect to any administrative or judicial proceeding involving the Partnership at least fifteen (15) Business Days prior to the submission thereof to the IRS (or other governmental tax authority) or the court, as the case may be, and shall direct Counsel for the Partnership to confer with counsel for the Principals and to consider in good faith all comments or suggestions of counsel for the Principals.  The Managing Partner shall not enter into any agreement with the IRS or other governmental tax authority that binds the Partnership (whether in connection with forum selection, statute of limitation, settlement or otherwise) without the prior written approval of the Partners, which approval shall not be unreasonably withheld.  The Partners agree to cooperate with the Managing Partner in connection with the conduct of all proceedings pursuant to this Section 7.06.

**ARTICLE VIII - TRANSFERS**

8.01   **General.**

(A)   No Partner may Transfer its Partnership Interest, in whole or in part, without the prior Consent of the Partners, except as otherwise expressly provided under the terms and conditions set forth in this Article VIII and Article IX.  The grant of any Consent by a Partner to any

APP. 044

- 41 -

one or more Transfers shall not be deemed to constitute a waiver of the necessity for obtaining Consent from such Partner in any other or subsequent Transfer.

(B) Any purported Transfer in violation of Article VIII and Article IX shall be null and void and of no force or effect. If any Partner shall Transfer or attempt to Transfer its Interest in violation of this Agreement, then the non-transferring Partners shall, in addition to all rights and remedies at law and in equity, be entitled to a decree or order, from any court of law or equity having proper jurisdiction, restraining and enjoining such Transfer, and the offending Partner shall not plead in defense thereto that there would be an adequate remedy at law, it being hereby expressly acknowledged and agreed that damages at law would be an inadequate remedy for breach or threatened breach of the violation of the provisions concerning Transfer set forth in this Agreement.

(C) In order to effect the purpose of this Article VIII and Article IX, each Partner agrees that it shall seek to Transfer its Interest only through a direct Transfer of such Interest in the manner contemplated in this Article VIII and Article IX, and further that, except as expressly authorized thereby, no Transfer or other disposition of any stock or partnership or other beneficial interest in any entity which holds an Interest will be effected, directly or indirectly, unless approved by the Partners not seeking to Transfer their Interests or otherwise permitted under this Article VIII or Article IX.

(D) If a Partner shall Transfer its Interest to any Person other than another Partner, no such Transfer (including without limitation a Transfer permitted under Section 9.01) shall be effective to make the transferee a Partner or entitle the transferee to any benefits or rights hereunder unless or until all requisite Consents thereto have been obtained, all other conditions to Transfer set forth in this Article VIII and Article IX have been satisfied or waived and the transferee agrees in writing to assume and be bound by all the obligations of the transferor hereunder and to be subject to all the restrictions to which the transferor is subject under the terms of this Agreement and any agreements with respect to the Partnership Assets to which the transferor is then subject or is then required to be a party. No transferee of any part of an Interest shall make any further disposition of such transferred part of an Interest except in accordance with the terms and conditions of this Agreement.

(E) All costs and expenses incurred by the Partnership in connection with any Transfer of an Interest, including any filing or recording costs and the costs of preparing, negotiating and executing as appropriate amendment to this Agreement, including the fees and disbursements of counsel to the Partnership, shall be paid by the transferor of such Interest.

(F) The effect, if any, of any Transfer of a Partner's Interest on the Affiliate Lease, and the respective rights, duties and obligations of the Partnership as "Landlord," the Hancock Affiliate as "Tenant" and each of the Principals resulting therefrom, shall be determined in accordance with, and governed by, the terms of the Affiliate Lease. Any purchaser of Hancock's Interest shall be required to acquire such Interest in the Partnership subject to the Affiliate Lease and any decisions thereafter made by or on behalf of the Partnership as Landlord thereunder with respect to the assignment, renewal, extension or termination of the Affiliate Lease shall be made solely by SLR.

**APP. 045**

- 42 -

**8.02    Right of First Offer.**  Neither Hancock nor SLR may transfer all or any part of its respective Interest prior to the third (3rd) anniversary of the Effective Date.  At any time following the third (3rd) anniversary of the Effective Date, a Partner may sell its Interest if (and only if) such sale complies with this Section 8.02:

(A)    If any Partner (the "Offeror") desires to sell its Interest to a Person who is not a Partner or not a Transfer Affiliate, the selling Partner shall give Notice (the "Offer Notice") of its intent to sell to the remaining Partners (the "Offerees").  Such Offer Notice shall state the price (the "Offer Price") and other terms and conditions upon which the Offeror agrees to sell its Interest.  Each of the Offerees shall have a period of sixty (60) days from receipt of the Offer Notice within which to give the Offeror a Notice (the "Reply Notice") of its intent to purchase the Interest of the Offeror, on the same terms as set forth in the Offer Notice and for a price equal to the Offer Price (the "Purchasing Partner").  If more than one Purchasing Partner shall desire to purchase the Interest of the Offeror, then each such Purchasing Partner shall have the right to acquire a ratable share of the Offeror's interest based on the relative Percentage Interests of the Purchasing Partners at the time of the Offer Notice or as the Purchasing Partners may otherwise agree.  If any Offeree fails to provide a Reply Notice within the above sixty (60) day period, it shall be deemed to have elected not to purchase the Interest of the Offeror.

(B)    If the Offerees elect to purchase the Interest of the Offeror pursuant to Section 8.02(A), the sale shall be closed on or before ninety (90) days after the date of the Reply Notice or the closing date set forth in the Offer Notice, whichever is later, on a date and at a time determined by the Purchasing Partners.  Except as provided in the Offer Notice, at the closing, the Offeror shall Transfer its Interest free and clear of any liens, encumbrances and interests of any third party and shall execute or cause to be executed any and all documents required to fully transfer such Interest to the Purchasing Partners, including but not limited to any documents necessary to evidence such Transfer, and all documents required to release the rights of any other Person who may claim an interest in the Interest.  In addition, the Offeror shall indemnify the Purchasing Partners with respect to the Offeror's share of all liabilities of the Partnership existing on the date of the Transfer or relating to periods prior to the date of such Transfer.  The Partners shall execute and deliver an appropriate amendment to this Agreement and, if required under the Act, an appropriate amendment to any certificate filed in the public records.  Unless specified in the Offer Notice, any transfer and/or recordation taxes payable in connection with such purchase and sale shall be allocated fifty percent (50%) to the Offeror and fifty percent (50%) to the Offerees.  All other expenses associated with such purchase and sale shall be paid by the Partner incurring such expenses and any amounts due and owing under this Agreement from the Offeror to the Partnership or the Offerees may be offset against the balance due the Offeror at such closing.  The Purchasing Partners' obligations to consummate the purchase and sale hereunder shall be enforceable by an action for specific performance.

(C)    If the Offerees do not exercise their right to purchase the Offeror's Interest which the Offeror has offered to sell, then none of the Offeror's Interest shall be purchased by the Offerees or any other Partner and the selling Partner shall be free, for a period of one hundred twenty (120) days from the date the Offeror receives Reply Notices from all of the Offerees (or the date on which the Offerees' rights to acquire the Offeror's Interest has lapsed, as the case may be), to solicit offers for the purchase of such Interest on terms no less favorable to the Offeror than those

APP. 046

- 43 -

presented to the Offerees in the Offer Notice; provided, however, that it shall be a condition precedent to any such sale that the third party purchaser (1) become a Substituted Partner under this Agreement by (i) assuming all existing and future obligations of the Offeror under this Agreement and agreeing to be bound hereby and (ii) executing and delivering such instruments in form and substance as the Offerees may deem necessary or desirable to reflect and confirm such assumption and agreement and otherwise to effectuate the third party's admission as a Substituted Partner and (2) meet any financial and other capability standards required under the Management Contract. If such sale is not consummated within such one hundred twenty (120) day period, the Offeror's right to offer the Interest to a purchaser who is not a Partner shall be deemed to have lapsed and the offered Interest shall again be subject to the provisions of this Section 8.02.

(D)     In the event of fire or other casualty to the Subject Property or if an entity possessing the right of eminent domain has given notice of its intent to take or acquire a substantial portion of the Subject Property, and if such damage or notice occurs after the giving of an Offer Notice and prior to closing, then the following rules shall apply to this Section 8.02:

(1)     If the damage is the result of an insured casualty or an uninsured casualty not resulting in substantial damage, or if the taking or acquisition does not result in a substantial reduction in the income producing capacity of the Subject Property, then the rights and obligations of the Partners under this Section 8.02 shall not be affected and closing shall occur as specified herein and the Purchasing Partners shall be entitled to receive an assignment of any insurance proceeds and/or condemnation award resulting from the damage or taking;

(2)     If the damage is the result of an uninsured casualty resulting in substantial damage or if the taking or acquisition results in a substantial reduction in the income producing capacity of the Subject Property, then the Partner who is purchasing the Interest under this Section 8.02 shall have the option to (i) complete the purchase in accordance with the provisions of Section 8.02(B) and receive an assignment of the insurance proceeds and/or condemnation award or (ii) cancel the purchase, in which case the selling Partner shall be free to offer the Interest to a purchaser who is not a Partner pursuant to Section 8.02(C).

(E)     If any sale pursuant to this Section 8.02 involves the sale of the Offeror's Interest to a Person other than a Partner or Transfer Affiliate, then closing on such sale and admission of the purchaser as a Substituted Partner shall be further subject to receipt of the Consent to such sale by Partners owning a majority of the remaining Interests in the Partnership. The Partners agree that such Consent will not be unreasonably withheld if the purchaser meets the following criteria:

(1)     The purchaser possesses a net worth in excess of One Hundred Million Dollars ($100,000,000) (subject to increase in the CPI);

(2)     The purchaser's investment in the Partnership is not subject to review or approval by any domestic or foreign government or other regulatory body or such approval has been obtained;

(3)     Any required consent from or by the Operator has been obtained;

APP. 047

- 44 -

(4)    The purchaser has prior experience in acquiring and holding investments similar to that of the Partnership and is of good character and reputation;

(5)    The purchaser's reputation and prior operating history are of a nature that reasonably suggest it will be able to, and will, perform and satisfy its duties and obligations hereunder in a timely and effective manner; and

(6)    In the case of Transfers by Hancock, the transferee is not a Person with whom SLR may not under applicable law engage in a joint enterprise.

8.03    Other Transfers.

(A)    At any time following the third (3rd) anniversary of the Effective Date, SLR and/or Hancock shall have the right to Transfer a portion of its Interest in the Partnership (or the rights to income, profits, or distributions with respect thereto) to a Transfer Affiliate without the Consent of the other Partners if (and only if) such Transfer meets the following criteria:

(1)    Following such Transfer, the Interest of the transferring Partner is more than fifty percent (50%) of its Interest on the Effective Date;

(2)    The Operator has approved such Transfer, if required; and

(3)    All other prerequisites to admission of such Transfer Affiliate as a Substituted Partner (including those set forth in Section 8.01(E) and Section 9.01) have been satisfied or waived.

(B)    Any Partner may Transfer, by pledge or collateral assignment, its Interest in the Partnership to any other Partner to secure indebtedness of such Partner to the pledgee Partner. The Partners acknowledge the pledge of Sheraton's Interest to Hancock pursuant to that certain Security Agreement dated December 19, 1985.

8.04    Sheraton Piggyback Rights.   In addition to the rights established under Section 8.02, if, at any time, Hancock or SLR receives a bona fide offer (herein called the "Piggyback Offer") from a third party (herein called the "Piggyback Offeror") to purchase all of Hancock's or SLR's Interest, as the case may be, and Hancock or SLR, as the case may be, desires to accept such Piggyback Offer or shall have entered into a contract with the Piggyback Offeror for such a sale, Hancock or SLR, as the case may be, shall give Notice to Sheraton including the name and address of the Piggyback Offeror, sufficient information with respect to the financial capacity of the Piggyback Offeror to demonstrate its ability to consummate the purchase, and enclosing Hancock's or SLR's, as the case may be, offer to purchase Sheraton's Interest at and for a price proportionate to the offered sales price of Hancock's or SLR's Interest offered for sale. On the date of closing, Hancock or SLR, as the case may be, shall deliver to Sheraton a certified or bank cashier's check for the full amount of the purchase price for Sheraton's Interest and Sheraton shall execute an assignment of its Interest to Hancock or SLR, as the case may be. Notwithstanding the foregoing, in the event that the sale of Hancock's or SLR's Interest does not proceed, neither Hancock nor SLR shall be obligated to conclude the purchase of Sheraton's Interest on the foregoing terms, nor shall Sheraton be obligated

APP. 048

- 45 -

to sell such Interest. Any subsequent sale of the entire Interest of Hancock or SLR in the Partnership shall be subject to the terms of this Section 8.04.

8.05  Optional Buy-Sell.  Notwithstanding Section 8.01 and Section 8.02, in the event a dispute shall arise over a Major Decision set forth in Section 8.05(E), and SLR and Hancock shall be unable to resolve such dispute in a timely manner, then either of Hancock or SLR (as applicable, the "Tendering Partner") may, at its option, cause a sale of its Interest as follows:

(A)  The Tendering Partner shall submit a written proposal ("Buy-Sell Offer") to the other Partner (the "Non-Tendering Partner") for a sale of its Interest based on a valuation of one hundred percent (100%) of the Partnership as set forth in the Buy-Sell Offer (the "Buy-Sell Value"). The Non-Tendering Partner shall have the right to elect, by Notice to the Tendering Partner given no later than thirty (30) days following receipt of such Buy-Sell Offer, either (i) to purchase the Interest of the Tendering Partner for a price equal to an amount determined by multiplying the Tendering Partner's Percentage Interest in the Partnership by the Buy-Sell Value, or (ii) to sell its Interest to the Tendering Partner for a price equal to an amount determined by multiplying the Non-Tendering Partner's Percentage Interest in the Partnership by the Buy-Sell Value. If any sale of the Interest by Hancock or SLR, as the case may be, pursuant to the foregoing sentence does not occur on or before the date which is one hundred eighty (180) days after the date of the Buy-Sell Offer, then, absent willful and intentional efforts to hinder, delay or impede such sale, any further sale of Interests by Hancock or SLR shall be subject to the procedures set forth in this Section 8.05.  If the Non-Tendering Partner fails to notify the Tendering Partner of its election under this Section 8.05(A) within the thirty (30) day period required herein, then the Non-Tendering Partner shall be conclusively deemed to have elected to sell its Interest to the Tendering Partner pursuant to the foregoing clause (ii).

(B)  The purchase price to be paid to the selling Partner under this Section 8.05 shall be adjusted in accordance with this Section 8.05(B).  There shall be determined, as of the date of closing, (i) the aggregate amount of all Additional Capital Contributions made by the selling Partner pursuant to the provisions of this Agreement between the date of the Buy-Sell Offer and the date of closing, and (ii) the aggregate amount of all distributions of Partnership funds made to the selling Partner during such period pursuant to the provisions hereof in respect of Additional Capital Contributions.  If the amount determined under the foregoing clause (i) exceeds the amount determined under the foregoing clause (ii), the purchase price shall be increased by an amount equal to such excess.  If the amount determined under the foregoing clause (ii) exceeds the amount determined under the foregoing clause (i), the purchase price shall be decreased by an amount equal to such excess.  In addition, any closing adjustments which are then usual and customary in the District of Columbia shall be made between the purchasing Partner and selling Partner effective as of midnight of the day immediately preceding the date of closing.  The selling Partner shall transfer its Interest free and clear of any liens, encumbrances and interests of any third party and shall execute or cause to be executed any and all documents required fully to Transfer such Interest to the purchasing Partner, including but not limited to any document necessary to evidence such Transfer, and all documents required to release any Interest of any other Person who may claim an interest in the selling Partner's interest.  The Partners shall execute and deliver an appropriate amendment to this Agreement and, if required under the Act, an appropriate amendment to any certificate filed in the public records.  Any such amendment to such certificate shall be filed by the purchasing Partner in the

- 46 -

places prescribed by law. The purchase price plus any interest earned thereon shall be paid at closing in cash, by wire transfer of immediately available federal funds or by certified or cashier's check. Any transfer and/or recordation taxes payable in connection with the purchase and sale shall be paid by the selling Partner or purchasing Partner in accordance with local custom. All other expenses associated with such purchase and sale shall be paid by the Partner incurring such expenses. Any monetary default under this Agreement by the selling Partner must be cured out of the proceeds from such sale at the closing. Following the date of closing, the selling Partner shall have no further rights to any distributions of Distributable Cash or Net Proceeds of a Capital Transaction which is attributable to any period or event following the date of closing, and all such rights shall vest in the purchasing Partner. Effective as of closing, the selling Partner shall cease to be a Partner of the Partnership and shall have no further obligations with respect to Partnership contributions or obligations.

(C)    If the Subject Property is damaged by fire or other casualty, or if any governmental or other authority possessing the right of eminent domain shall give notice of an intention to take or acquire a substantial part of the Subject Property (other than on a temporary basis), and such damage occurs or such notice is given, as the case may be, between the date of a Buy-Sell Offer and closing, then the selling Partner and the purchasing Partner shall each have the right to cancel the purchase. In the event that the purchase is cancelled by either the selling Partner or the purchasing Partner, the terms of this Agreement, including the provisions of this Section 8.05 to subsequent Buy-Sell Offers, shall remain in effect and continue to be binding upon the Partners.

(D)    In the event that the selling Partner or purchasing Partner shall, for any reason, fail to close on any acquisition pursuant to this Section 8.05, then the selling Partner or purchasing Partner, as the case may be, affected thereby shall have the right, in addition to such other legal and equitable remedies as may be available to institute an action for specific performance. In addition, if the cause of such failure shall be the intentional or willful efforts of such Partner, then from and after the date of such failure, the Partner so failing to close shall forfeit any rights to Consent or otherwise approve actions (including Major Decisions) of or by the Partnership.

(E)    The ability of either SLR or Hancock to invoke the provisions of this Section 8.05 shall require a dispute with respect to any of the following Major Decisions, which dispute shall not be resolved by mutual agreement of SLR and Hancock within sixty (60) days after the date that a request for Consent to the Major Decision in question has been received by SLR:

(1)    Section 6.03(B)(4) (relating to acquisition of land and buildings);

(2)    Section 6.03(B)(6) (relating to the sale of the Hotel);

(3)    Section 6.03(B)(9) (relating to certain financings);

(4)    Section 6.03(B)(11) (relating to certain capital expenditures);

(5)    Section 6.03(B)(13) (relating to selection of a new or replacement operator);

APP. 050

- 47 -

(6)    Section 6.03(B)(16) (relating to termination, renewal, amendment or modification of the Management Contract and duties of Operator);

(7)    Section 6.03(B)(23) (relating to certain long term leases);

(8)    Section 6.03(B)(27) (relating to rebuilding following destruction or condemnation);

(9)    Section 6.03(B)(35) (relating to certain insurance); or

(10)   Section 6.03(B)(37) (relating to casino gaming operations).

---

## ARTICLE IX - ADMISSION OF SUBSTITUTED PARTNERS, WITHDRAWAL OF PARTNERS

---

9.01    Admission of a Substituted Partner.  A transferee of all or any portion of the Interest of a Partner pursuant to Section 8.02 or Section 8.03 shall be admitted to the Partnership as a Partner (in the place of the transferor or former Partner) upon receipt by the Partnership of all of the following:

(A)    The Substituted Partner's acceptance of, and agreement to be bound by, all of the terms and provisions of this Agreement, in form and substance satisfactory to the Partnership;

(B)    Evidence in form and substance satisfactory to the Partnership of the authority of such Substituted Partner to become a Partner and to be bound by all of the terms and conditions of this Agreement and that the Transfer complies with the terms of this Agreement;

(C)    The written agreement of the Substituted Partner to continue the business of the Partnership in accordance with the terms and provisions of the Agreement;

(D)    Such other documents or instruments as may be required in order to effect the admission of the Substituted Partner as a Partner under this Agreement; and

(E)    Evidence in form and substance satisfactory to the Partnership that such Transfer (i) would not violate the then applicable ERISA requirements or regulations or Federal and state securities laws and rules and regulations of the Securities and Exchange Commission, state securities commissions, and any other governmental authorities with jurisdiction over such disposition, (ii) would not result in the Partnership's being classified for Federal income tax purposes as an "association taxable as a corporation" rather than as a partnership, (iii) would not affect the

APP. 051

- 48 -

Partnership's existence as a partnership under the Act, and (iv) would not violate the provisions of any mortgage encumbering the Partnership Assets.

9.02    Withdrawal of a Partner. A Partner may voluntarily withdraw from the Partnership at any time upon a Transfer of all of such Partner's Interest in accordance with Article VIII and this Article IX.

9.03    Effect of Bankruptcy, Withdrawal or Dissolution of a Partner.

(A)    In the event of the Bankruptcy, withdrawal or dissolution of a Partner, the business of the Partnership shall be continued by the other Partner(s) and the other Partners, by their execution of this Agreement, expressly so agree to continue the business of the Partnership.

(B)    In the event of the Bankruptcy of any Partner, the remaining non-Bankrupt Partners, in proportion to their respective Percentage Interests, shall have the absolute right and option to acquire the entire Interest of such Partner (the "Bankrupt Partner") at a price equal to the product of the Bankrupt Partner's Percentage Interest on the date of such Bankruptcy and the Fair Market Value of the Partnership Assets on such date. Payment of the amount so determined shall be made by payment of ten percent (10%) of the total amount due within ninety (90) days after Notice of exercise of the option is delivered to the trustee or administrator of the Bankrupt Partner's estate and delivery of an unsecured, nonrecourse note from the Purchasing Partners to the Bankrupt Partner for the balance. Such note shall provide for ten (10) equal annual payments of principal and bear interest at the rate of eight percent (8%) per annum on the unpaid principal balance, payable annually in arrears. Notwithstanding anything to the contrary contained in this Agreement, from and after the date of a Bankruptcy of a Partner pursuant to this Agreement, the Bankrupt Partner shall have no further right, power or authority to make any decision or election on behalf of the Partnership or to participate in the overall management and control of the business and affairs of the Partnership.

---

## ARTICLE X - TERM AND DISSOLUTION

---

10.01    Term.

(A)    The term of the Partnership shall continue until the first to occur of the following, at which time it shall be dissolved:

(1)    December 31, 2050;

(2)    The acquisition by one Partner of all the Interests;

APP. 052

· 49 ·

(3)    The total loss or sale or other disposition of all or substantially all of the Partnership Assets and the collection by the Partnership and distribution to the Partners of all proceeds from such sale (whether such proceeds be cash, notes or other property), but a disposition referred to in this subsection shall not include the granting of a lien or security interest in the Subject Property or a sale/leaseback;

(4)    The Partnership ceases to maintain any interest (which term shall include, but not be limited to, a security or leasehold interest or an indirect interest through another partnership) in the Partnership Assets;

(5)    The Partners mutually agree to terminate, dissolve and liquidate the Partnership;

(6)    The Bankruptcy, dissolution, removal, death or adjudication of incompetence of a Partner which leaves only one Partner remaining; or

(7)    Any other event causing a dissolution of the Partnership under the Act.

(B)    Except as set forth in this Agreement, no Partner shall have the right, and each Partner hereby agrees not to petition a court for the dissolution, termination or liquidation of, the Partnership, and no Partner at any time shall have the right to petition or to take any action to subject the Subject Property, or any part thereof, or the Partnership Assets or any part thereof, to the authority of any court of bankruptcy, insolvency, receivership or similar proceeding. Any dissolution of the Partnership shall be effective only upon the filing of any documents or certificates of dissolution required under the Act or the laws of the District of Columbia.

10.02    Procedure in Dissolution and Liquidation.

(A)    Upon the dissolution of the Partnership pursuant to the provisions of Section 10.01, the Partnership shall immediately commence to wind up its affairs and the Managing Partner shall proceed with reasonable promptness to liquidate the business of the Partnership. The Partnership Assets shall either be (i) distributed in kind in the manner set forth in Section 5.04 or (ii) liquidated, with the Net Proceeds from a Capital Transaction applied in the manner set forth in Section 5.04 by the later of (y) the last day of the Fiscal Year in which liquidation occurs, or (z) ninety (90) days after the date of liquidation.

(B)    Every reasonable effort shall be made to dispose of non-cash Partnership Assets so that the distributions may be made in cash provided that significant economic loss would not result from such disposition. If at the time of such distribution, the Partnership owns any assets in the form of work in progress, notes, deeds of trust or other non-cash assets, the Managing Partner may distribute such assets in kind to the Partners, in lieu of cash, proportionately to their right to receive the Partnership Assets on an equitable basis reflecting the fair market value of the assets so distributed.

(C)    During the period of the winding up of the affairs of the Partnership, the Managing Partner shall manage the Partnership and all decisions relating to the conduct of any

APP. 053

- 50 -

business or operations of the Partnership and of the sale or other disposition of Partnership Assets shall be made in accordance with Article VI.

(D)   The Partnership shall terminate when all Partnership Assets shall have been disposed of (except for any liquid assets not so disposed of), and the net proceeds therefrom, as well as any other liquid assets of the Partnership, shall, after payment of or due provision for all liabilities to creditors of the Partnership have been distributed to the Partners.  Upon the dissolution of the Partnership, the Accountants shall promptly prepare, and the Managing Partner shall furnish to each Partner upon receipt, a statement setting forth the assets and liabilities of the Partnership.  Promptly following the complete liquidation and distribution of the Partnership Assets, the Accountants shall prepare, and the Managing Partner shall furnish to each Partner upon receipt, a statement showing the manner in which the Partnership Assets were liquidated and distributed.

---

## ARTICLE XI - AMENDMENTS

---

11.01   Proposal and Adoption of Amendments.  This Agreement may be amended with the Consent of Partners owning not less than seventy-five percent (75%) of the Interests owned by all Partners provided; however, that no amendment shall be adopted without the Consent of all Partners which (i) affects or alters the Interest of any Partner in Profits and Losses, Gain or Loss from a Capital Transaction, Distributable Cash or Net Proceeds of a Capital Transaction (other than pursuant to Section 4.04 and Section 4.05 hereof), or (ii) amends this Section 11.01.

---

## ARTICLE XII - MISCELLANEOUS

---

12.01   Notices.  Any notice provided or permitted to be given under this Agreement must be in writing, and may be served by depositing the same in the United States mail, addressed to the Partner to be notified, postage prepaid, and registered or certified, with return receipt requested or by recognized overnight delivery service, such as Federal Express, Purolator or Emery.  For purposes of Notice, the addresses of the Partners shall be as follows:

APP. 054

- 51 -

| | |
|---|---|
| If to Managing Partner: | John Hancock Mutual Life<br>Insurance Company<br>c/o John Hancock Properties, Inc.<br>Two Copley Place, Suite 200<br>Boston, Massachusetts  02117<br>Attn:   James H. Patterson, II and<br>Peter E. Potrykus |
| With a copy to: | David S. Kahn, Esquire<br>Dunnells, Duvall & Porter<br>2100 Pennsylvania Avenue, N.W.<br>Suite 400<br>Washington, D.C.  20037 |
| If to SLR: | Sumitomo Life Realty (N.Y.), Inc.<br>245 Park Avenue<br>New York, New York  10167<br>Attn:  Mr. M. Yamaguchi |
| With a copy to: | Gerard V. Hannon, Esquire<br>Coudert Brothers<br>200 Park Avenue<br>New York, New York  10166 |
| If to Sheraton: | Washington Sheraton Corporation<br>60 State Street<br>Boston, Massachusetts  02117<br>Attn:   James D. Latham, Esquire |
| With a copy to: | John R. Risher, Esquire<br>Arent, Fox, Kintner, Plotkin & Kahn<br>1050 Connecticut Avenue, N.W.<br>Washington, D.C.  20036 |
| If to the Partnership: | John Hancock Mutual Life<br>Insurance Company<br>c/o John Hancock Properties, Inc.<br>Two Copley Place, Suite 200<br>Boston, Massachusetts  02117<br>Attn:  Mr. James H. Patterson, II |

Each Notice given by registered or certified mail shall be deemed delivered when deposited as aforesaid, and each Notice delivered in any other manner shall be deemed to be effective at the time of actual delivery to the addressee. Each Partner may change its address for Notice by giving Notice thereof in the manner hereinabove provided.

APP. 055

- 52 -

12.02  Ownership.  The Interest of each Partner shall be personal property for all purposes. All property and interests in property, real or personal, owned by the Partnership, shall be deemed to be owned by the Partnership as an entity, and no Partner, individually, shall have any ownership of such property or any interest owned by the Partnership except as a member of the Partnership. Each Partner's interest in all Partnership Assets shall be determined by this Agreement.  Each of the Partners irrevocably waives, for itself and its respective successors and assigns, during the term of the Partnership and during any period of liquidation following any dissolution, any right that it may have to maintain any action for partition with respect to any of the Partnership Assets.

12.03  Entire Agreement.  This Agreement and the agreements and documents referred to herein contain the entire understanding among the Partners as to the subject matter hereof and supersede any prior understanding and agreements among them respecting said subject matter. There are no representations, agreements, arrangements or understandings, oral or written, among the Partners hereto relating to the subject of this Agreement which are not fully expressed herein.

12.04  Successors and Assigns.  This Agreement shall be transferable by a Partner only in accordance with the provisions of Article VIII and Article IX hereof.  Subject to the restrictions on Transfer set forth therein, this Agreement shall inure to the benefit of and be binding upon the successors and assigns of the parties hereto.

12.05  Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same instrument.

12.06  Additional Instruments and Actions.  In connection with this Agreement, as well as all transactions contemplated by this Agreement, each Partner agrees to execute and deliver such additional documents and instruments and to perform such additional actions as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions and conditions of this Agreement and all transactions contemplated herein.

12.07  Governing Law.  This Agreement and the rights and obligations of the respective parties hereunder shall be governed by and interpreted and enforced in accordance with the laws of the District of Columbia.

12.08  Consent to Jurisdiction.  The Partners hereby consent to the jurisdiction and venue of the Courts of the District of Columbia and the United States District Court for the District of Columbia in connection with any claim or controversy arising out of or relating to this Agreement on the condition that, with respect to any federal litigation, the amount in controversy exceeds the statutory requirement in force as of the Effective Date.  The Managing Partner appoints CT Corporation System as its agent for the service of process in connection therewith or such Person residing in the District of Columbia as it may designate by written Notice to the other Partners as provided in this Agreement.   SLR hereby appoints United States Corporation Company, Attention: Service of Process Department as its agent for the service of process in connection therewith or such other Person residing in the District of Columbia as it may designate by written Notice to the other Partners as provided in this Agreement.  Sheraton appoints CT Corporation System

- 53 -

as its agent for the service of process in connection therewith or such Person residing in the District of Columbia as it may designate by written Notice to the other Partners as provided in this Agreement.

12.09  Amendment.  This Agreement may not be amended, altered or modified except by an instrument in writing and signed by all Partners, except as specifically otherwise provided herein.

12.10  Creditors.  None of the provisions of this Agreement applicable to parties other than the Partners shall be for the benefit of or enforceable by any such third party creditors of the Partnership, as creditors.

IN WITNESS WHEREOF, the parties hereto have executed or caused this Agreement to be executed by their duly authorized corporate officers, each on the day and year first above written.

JOHN HANCOCK MUTUAL LIFE
INSURANCE COMPANY

WITNESS:                         By: John Hancock Properties, Inc., its Agent

                                 By _____
                                 Its: PRESIDENT

WITNESS:                         SUMITOMO LIFE REALTY (N.Y.), INC.

                                 By _____
                                 Its: PRESIDENT

WITNESS:                         WASHINGTON SHERATON CORPORATION

James D Latham                   By _____
                                 Its: AUTHORIZED AGENT

APP. 057

EXHIBIT 1

## SCHEDULE OF PARTNERS

| Partners – Name and Address | Percentage Interest |
|---|---|
| John Hancock Mutual Life<br>  Insurance Company<br>c/o John Hancock Properties, Inc.<br>Two Copley Place<br>Suite 200<br>Boston, Massachusetts  02117 | 51% |
| Sumitomo Life Realty (N.Y.), Inc.<br>245 Park Avenue<br>New York, New York  10167 | 48% |
| Washington Sheraton Corporation<br>60 State Street<br>Boston, Massachusetts  02117 | 1% |

APP. 058

EXHIBIT 2

## DESCRIPTION OF LAND

All that certain property located in the City of Washington, District of Columbia, and more particularly described as follows:

Lot numbered Thirty-two (32) in Square numbered Twenty-one Hundred Thirty-two (2132) in the subdivision made by Washington Sheraton Corporation as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber 167 at Folio 164.

**APP. 059**

EXHIBIT 3

## CURRENT WORKS

1.    The renovation of the Sheraton Washington Ballroom of the Hotel pursuant to (a) that certain document entitled "Ballroom Renovation – 1989 Project Budget"; (b) that certain three (3)-page document entitled "Sheraton Washington Ballroom – Labor Contracts"; (c) that certain contract by and between Sheraton Operating Corporation and Hudson Shatz Mid-Atlantic Painting Co., Inc., undated, for interior painting of the gypsum board ceilings above the balcony in the Sheraton Washington Ballroom; (d) that certain contract by and between Sheraton Operating Corporation and United Sheet Metal, undated, for the furnishing and installation of new fan ceiling diffusers, the extension of a duct into the new ceiling, and the furnishing and installation of perforated square air grilles; (e) that certain contract by and between Sheraton Operating Corporation and Commercial Interior Builders, undated, for the installation of acoustical and gypsum ceiling above the balconies in the Sheraton Washington Ballroom; (f) that certain contract by and between Sheraton Operating Corporation and Recording Consultants, Inc., undated, for the installation of speakers and the replacement of speaker cables; (g) that certain contract by and between Sheraton Operating Corporation and The Enterprise Group, Inc., undated, for the shortening of existing drapery traverse hardware in the Sheraton Washington Ballroom; (h) that certain contract by and between Sheraton Operating Corporation and Total Electric Service, Inc., undated, for the furnishing of labor and materials to install lighting fixtures in the new acoustical and gypsum ceilings in the Sheraton Washington Ballroom; (i) five (5) purchase orders from The Hotel Source (P.O. numbers 14344, 14496, 14499, 14500, and 25025) for the purchase of carpeting, fabrics, wallcoverings, furniture, acoustical panels, fixtures and furnishings for the Sheraton Washington Ballroom; (j) two (2) purchase orders from Design Sales Associates, Inc. (P.O. numbers 14488 and 14489) for the purchase of stage opening metal picture frame for the Sheraton Washington Ballroom; (k) one (1) purchase order from J.B. Acoustical Supply (P.O. number 14461) for the purchase of acoustical panels and hanger wire for the Sheraton Washington Ballroom; (l) one (1) purchase order from Total Electric Service, Inc., (P.O. number 14463) for the purchase of lighting fixtures and lamps for the Sheraton Washington Ballroom; (m) one (1) purchase order from Hal's Stage Lighting (P.O. number 14490) for the purchase of dimming equipment for lighting fixtures and lamps for the Sheraton Washington Ballroom; (n) one (1) purchase order from Astrolite Corp. (P.O. number 14491) for the purchase of lighting fixtures for the Sheraton Washington Ballroom; and (o) one (1) purchase order from DecoGard Products (P.O. number 14497) for the purchase of acrovyn wall sheets and adhesive for the Sheraton Washington Ballroom. Hancock hereby notifies Investor that Hancock has completed all of the above-described work and that the Defect Release Period (set forth on Schedule 24) applicable thereto shall begin as of the date hereof.

2.    The removal of certain asbestos from the Hotel (Project #303-906) described in (a) those certain professional services agreements between Sheraton Washington Hotel and Hygienetics, Inc., consisting of (i) that certain Proposal for the Preparation of Bid Documents and Review/Selection of Contractor Bids to Remove Asbestos-Containing Materials from the Hotel dated March 8, 1989 and accepted on April 14, 1989, (ii) that certain Change Order # 1 dated April 25, 1989 and accepted by the Hotel on August 3, 1989, (iii) that certain Change Order # 2 dated June 26, 1989 and accepted by the Hotel on August 3, 1989, and (iv) that certain Cost of Fee Proposal for Construction Monitoring and Compliance Report for Asbestos Abatement at the Hotel accepted by the Hotel on July 21, 1989; (b) that certain Abbreviated Form of Agreement Between Owner and Contractor For Construction Projects of Limited Scope Where The Basis of Payment is a Stipulated Sum (AIA Form A107 – 1987 Edition) dated July 19, 1989 between Washington Sheraton Corporation, as Owner, and Brand Mid-Atlantic, Inc., as Contractor, for asbestos abatement in the Washington Ballroom of the

APP. 060

Hotel and the Sheraton Ballroom (North and South) of the Hotel; and (c) that certain Abbreviated Form of Agreement Between Owner and Contractor For Construction Projects of Limited Scope Where The Basis of Payment is a Stipulated Sum (AIA Form A107 – 1987 Edition) dated July 18, 1989 between Washington Sheraton Corporation, as Owner, and ACMAT Corporation, as Contractor, for asbestos abatement in thirty (30) separate areas of the Hotel as specified on Exhibit A to the said agreement. Hancock hereby notifies Investor that Hancock has completed all of the above-described work and that the Defect Release Period (set forth on Schedule 24) applicable thereto shall begin as of the date hereof.

3.    The design and installation of a fire sprinkler and fire protection system at the Hotel (Project # 303-904) pursuant to (a) that certain bid package submitted by "Automatic" Sprinkler Corp. of America, a division of Figgie International, Inc. ("Automatic"), for the installation of a sprinkling system on floor levels 1 through 10 of the Main Building of the Hotel consisting of (i) that certain Bid Form dated January 13, 1989, and (ii) that certain Proposal with attached specifications dated January 13, 1989; (b) that certain Contract by and between Sheraton Operating Corporation and Automatic for the installation of a sprinkling system on level 1 through 10 of the Main Building of the Hotel at a contract price of $398,400.00 and dated June 15, 1989; (c) that certain Proposal with attached specifications prepared by Automatic and dated August 28, 1989 for the installation of an automatic fire sprinkler system to be installed in the Washington and Sheraton Ballrooms and adjacent areas of the Hotel; (d) that certain bid package submitted by Total Electric Service, Inc., dated November 9, 1989 for the expansion of the Fire Alarm System at the Hotel to incorporate the Main Building levels 1-10 automatic sprinkler system; and (e) such other contracts as are necessary to carry out the following work: (i) installation of flow and tamper switches into the existing alarm system for the Washington and Sheraton Ballrooms; (ii) installation of sprinkler system (specifications for which have been designed by Rolf Jensen & Associates) for the Cotillion Ballroom; (iii) installation of flow and tamper system into existing alarm system for the Cotillion Ballroom; (iv) install sprinkler system in remaining 40,000 (approximately) square feet of the Hotel; and (v) install necessary flow and tamper switches in connection with installation of sprinkler system in balance of Hotel.

4.    Renovation and refurbishing of the two-hundred forty nine (249) bays located in the Wardman Tower Building including, among other things, electrical rewiring, the installation of new doors, decorative moldings, carpeting, furnishings and hardware. Hancock and Investor acknowledge that all of the above-described work has been completed to the satisfaction of Investor and its Construction Consultant.

5.    Construction, furnishing and renovation associated therewith of a Lobby Bar (Project # 303-903) pursuant to (a) that certain contract by and between Sheraton Operating Corporation and Hudson Shatz Mid-Atlantic Painting Co., Inc., dated October 27, 1989 for interior painting, the removal of existing wallcoverings, surface preparation, and the installation of wall coverings and wall treatments; (b) that certain contract by and between Sheraton Operating Corporation and Annandale Millwork Corporations dated November 6, 1989 for the demolition of existing seating and partitions, the cutting and chipping of concrete at the stairs, the installation of wood decking, the installation and furnishing of free-standing bar and associated structures and cabinets, the installation of lobby columns and rough carpentry and the installation of brass and glass fixtures and finishes; (c) that certain contract by and between Sheraton Operating Corporation and Lite Makers, Inc., dated October 16, 1989 for the furnishing and installation of one (1) chandelier and eight (8) torchiers; (d) that certain contract by and between Sheraton Operating Corporation and J. H. Harrison Stone & Tile, undated, for the removal and reinstallation of carpeting, the furnishing and installation of marble for (i) floors, (ii) bar

top, and (iii) table tops, and the furnishing and installation of quarry tile; (e) that certain contract by and between Sheraton Operating Corporation and James J. Madden, Inc., undated, for the demolition of an existing fountain, the installation of two (2) floor sinks, the hookup of bar equipment, the installation of all required hot and cold plumbing lines, sewer lines and vent lines and the insulation of hot and cold water lines; (f) that certain contract by and between Sheraton Operating Corporation and Haislip Corporation, undated, for the demolition of an existing chandelier fixture, the installation of all necessary electrical wiring, the hookup of all electric bar appliances and light fixtures, the installation of fifteen (15) twenty amp circuits and the installation of dimmer switches; (g) nine (9) purchase orders from The Hotel Source (P.O. numbers 14482, 25024, 14498, 14457, 14459, 14481, 14458, 14460 and 14482) for the purchase of materials, furniture, fixtures and equipment for the said lobby bar. Hancock and Investor acknowledge that all of the above-described work has been completed to the satisfaction of Investor and its Construction Consultant.

6.      The installation of new lobby carpeting and the furnishing of the lobby area (Project # 303-902) pursuant to (a) that certain contract by and between Sheraton Operating Corporation and A. D. O. Decorating, undated, in the amount of $3,180.00 (b) that certain contract by and between Sheraton Operating Corporation and J. H. Harrison Stone & Tile, undated, for removal and reinstallation of carpeting, the furnishing and installation of one (1) marble console table top and four (4) marble end table tops; (c) three (3) purchase orders from The Hotel Source (P.O. numbers 14480, 14479 and 14478) for the purchase of materials, carpeting, furniture and fixtures for the said lobby area. Hancock and Investor acknowledge that all of the above-described work has been completed to the satisfaction of Investor and its Construction Consultant.

7.      Technical computer hardware and software upgrades to the Hotel's property management system including, but not limited to, upgrades to the EECO system, and purchase of Pegasus Energy Computer and Adaco upgrade to general stores program.

8.      Upgrading of the six (6) public men's restrooms located at the Hotel (Project # 303-909), for which Hancock has set aside $100,000.00. This upgrading will consist of the installation of Dal-Tile #135, 6" x 6" Almond Color ceramic tiles and 6" x 6" Dark Green color accent ceramic tiles on walls and the removal of existing materials and the installation of Marble Composite 12" x 12" tiles, Iberian Green color. Colors and materials may be changed by Hancock in its sole discretion provided that Hancock does so in compliance with Section 7.3 of the Purchase Agreement.

9.      The Hotel has engaged in a program to install and upgrade the signs located throughout the Hotel for the 1989 year and has set aside $175,000.00 to be used for such program. The Hotel has received a written quotation for the aforesaid signage program from EEC Industries Ltd. dated June 28/29, 1989 in the amount of $153,475.00 and an estimate, contained in the same quotation letter of $2,500 for signs to be located at the main entrance to the Hotel. The written quotation from EEC Industries Ltd. presents the scope of work to be completed in this Current Work Project, although the level of finish, total cost and timing of the project have not been finalized by Hancock in its sole discretion.

10.     The Hotel has purchased or intends to purchase certain equipment and furniture for convention service equipment (Project # 303-915). This equipment includes (per purchase order # 25008), a JLG Commander Scissor-lift, a JLG A/C Platform Outlet and a set of removable guard rails. A list of additional equipment and furniture consisting of plywood and foam to tables, tripod easels, one hundred fifty (150) portable dance floor sections, metal trim, portable wall partitions, and

<center>**Page 4 of 3 Pages**</center>

three (3) heavy-duty vacuum cleaners is set forth in that certain Memorandum dated December 7, 1989 from Eli Vidnjvich to Beth Bradmon entitled "1989 Project Purchases". Hancock and Investor acknowledge that the Scissor-lift has been purchased to the satisfaction of Investor and its Construction Consultant.

mwpt4346-0474-jvash3.582

<div align="right">**APP. 063**</div>

EXHIBIT 4

MAIN BUILDING - PLAT



APP. 064