UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| 2660 WOODLEY ROAD JOINT VENTURE,<br>WOODLEY ROAD ASSOCIATES, INC.,<br>JOHN HANCOCK MUTUAL LIFE INSURANCE<br>COMPANY and SUMITOMO LIFE REALTY<br>(N.Y.), INC.,<br><br>     Plaintiffs,<br><br>    v.<br><br>ITT SHERATON CORPORATION and<br>SHERATON OPERATING CORPORATION,<br><br>     Defendants.<br>───────────────────────────────<br><br>ITT SHERATON CORPORATION and<br>WASHINGTON SHERATON CORPORATION,<br>both individually and derivatively<br>on behalf of 2660 WOODLEY ROAD<br>JOINT VENTURE, and<br>SHERATON OPERATING CORPORATION,<br><br>    Counterclaim Plaintiffs,<br><br>    v.<br><br>2660 WOODLEY ROAD JOINT VENTURE,<br>WOODLEY ROAD ASSOCIATES, INC.,<br>JOHN HANCOCK MUTUAL LIFE<br>INSURANCE COMPANY and SUMITOMO<br>LIFE REALTY (N.Y.), INC.,<br><br>    Counterclaim Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  C.A. No. 97-450-JJF<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**SECOND AMENDED ANSWER AND COUNTERCLAIMS**

DEFENDANT'S
EXHIBIT

ALL-STATE LEGAL®

L

Defendants ITT Sheraton Corporation ("ITT Sheraton") and Sheraton Operating Corporation ("Sheraton") (collectively, "Defendants"), by their undersigned attorneys, for their answer to the complaint in the above-captioned action (the "Complaint"), hereby answer as follows:

*Except to the extent expressly, specifically and unambiguously admitted herein, Defendants deny each and every allegation contained in the Complaint and demand strict proof thereof.*

1.    State that the averments in paragraph 1 of the Complaint do not require response and, alternatively, to the extent that such responses are required, deny such averments except admit that plaintiffs 2660 Woodley Road Joint Venture (the "Joint Venture"), Woodley Road Associates, Inc. ("Woodley Road"), John Hancock Mutual Life Insurance Company ("John Hancock") and Sumitomo Life Realty (N.Y.), Inc. ("Sumitomo") (collectively, "Plaintiffs") bring this action against Defendants.

2.    Admit the allegations in paragraph 2 of the Complaint.

3.    Deny knowledge or information sufficient to form a belief as to the allegations in paragraph 3 of the Complaint.

4.    Deny knowledge or information sufficient to form a belief as to the allegations in paragraph 4 of the Complaint.

5.    Deny knowledge or information sufficient to form a belief as to the allegations in Paragraph 5 of the Complaint.

6.    Admit the allegations in Paragraph 6 of the Complaint, except deny that Sheraton is the <u>alter ego</u> of ITT Sheraton with respect to the acts, claims and causes alleged in the Complaint.

7.    Deny the allegations in Paragraph 7 of the Complaint.

8.    Deny the allegations in Paragraph 8 of the Complaint.

9.    Deny the allegations in Paragraph 9 of the Complaint, except admit that the Sheraton Washington Hotel (the "Hotel") is owned by the Joint Venture; that the Hotel is managed pursuant to a September 27, 1979 Management Contract as amended from time to time (the "Management Contract"); and that a copy of the Management Contract is attached as Exhibit A to the Complaint.

10.    Deny the allegations in paragraph 10 of the Complaint.

11.    Deny the allegations in Paragraph 11 of the Complaint.

12.    Deny the allegations in Paragraph 12 of the Complaint, except admit that Plaintiffs purport to have exercised a right to terminate the Management Contract and that a letter referencing "Notice of Termination and Notice to Quit" were delivered to Defendants.

13.    Admit the allegations in Paragraph 13 of the Complaint.

14.    Deny the allegations in Paragraph 14 of the Complaint except admit that Plaintiffs seek relief as averred in said Paragraph.

15.    Admit the allegations in paragraph 15 of the Complaint.

16.    Admit the allegations in paragraph 16 of the Complaint.

17.    Admit the allegations in paragraph 17 of the Complaint.

18.    Deny the allegations in paragraphs 18 through 20 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

19.      Deny the allegations in paragraph 21 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

20.      Deny the allegations in paragraphs 22 and 23 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

21.      Deny the allegations in paragraph 24 of the Complaint except admit that ITT Sheraton established a division named ITT Sheraton Purchasing Resource ("Sheraton Purchasing") to organize exclusive and non-exclusive national and regional contracts with vendors and that Sheraton Purchasing was established to replace an ITT Sheraton entity referred to as "The Hotel Source."

22.      Deny the allegations in paragraph 25 of the Complaint except admit that Sheraton participated in Sheraton Purchasing Program as agent for Woodley Road and in connection with the operation of the Hotel entered into contracts negotiated by ITT Sheraton.

23.      Deny the allegations in paragraph 26 of the Complaint except admit that Sheraton paid a fee to ITT Sheraton in connection with the Sheraton Purchasing program.

24.      Deny the allegations in paragraph 27 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

25.      Deny the allegations in paragraphs 28 through 30 of the Complaint.

26.      Deny the allegations in paragraph 31 of the Complaint, except admit that audited financial statements dated February 17, 1995 were issued to the Joint Venture for the fiscal years 1993 and 1994.

27.    Deny the allegations in paragraphs 32 through 35 of the Complaint.

28.    Deny the allegations in paragraph 36 of the Complaint, except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

29.    Deny the allegations in paragraphs 37 and 38 of the Complaint.

30.    Deny the allegations in paragraph 39 of the Complaint except admit that Sheraton is a party to the Management Complaint and respectfully refer to that document with respect to the terms thereof.

31.    Deny the allegations in paragraph 40 of the Complaint except admit that Sheraton purchased insurance for the Hotel through ITT Sheraton.

32.    Deny the allegations in paragraph 41 of the Complaint except admit that ITT Sheraton charged the Hotel a percentage of an insurance policy that covered a pool of ITT Sheraton hotels.

33.    Deny the allegations in paragraphs 42 and 43 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

34.    Deny the allegations in paragraphs 44 and 45 of the Complaint.

35.    Deny the allegations in paragraph 46 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

36.    Deny the allegations in paragraphs 47 through 49 of the Complaint.

37.    Deny the allegations in paragraphs 50, 51, 52 and 53 of the Complaint.

38.     Deny the allegations in paragraph 54 of the Complaint, except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

39.     Deny the allegations in paragraph 55 of the Complaint.

40.     Deny the allegations in paragraphs 56, 57 and 58 of the Complaint.

41.     Deny the allegations in paragraph 59 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

42.     Deny the allegations in paragraphs 60 through 63 of the Complaint.

43.     Deny the allegations in paragraph 64 of the Complaint.

44.     Deny the allegations in paragraph 65 of the Complaint.

45.     Deny the allegations in paragraph 66 of the Complaint.

46.     Deny the allegations in paragraphs 67 through 72 of the Complaint.

47.     Deny the allegations in paragraph 73 of the Complaint.

48.     Deny the allegations in paragraphs 74 through 76 of the Complaint.

49.     Deny the allegations in paragraph 77 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refers to that document for the terms thereof.

50.     Deny the allegations in paragraph 78 of the Complaint.

51.     Deny the allegations in paragraph 79 of the Complaint.

52.     Deny the allegations in paragraphs 80 through 83 of the Complaint.

53.    Deny the allegations in paragraph 84 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refers to that document with respect to the terms thereof.

54.    Deny the allegations in paragraphs 85 through 87 of the Complaint.

55.    Deny the allegations in paragraphs 88 and 89 of the Complaint.

56.    Deny the allegations in paragraphs 90 through 93 of the Complaint.

57.    Deny the allegations in paragraph 94 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

58.    Deny the allegations in paragraphs 95 through 97 of the Complaint.

59.    Deny the allegations in paragraph 98 of the Complaint except admit that Sheraton received in and about December 1995 from Woodley Road a purported Notice of Default and respectfully refer to that document with respect to the contents thereof.

60.    Deny the allegations in paragraph 99 of the Complaint.

61.    Deny the allegations in paragraph 100 of the Complaint, except admit that Sheraton received in or about December, 1995 from Woodley Road a purported Notice of Default and respectfully refer to that document with respect to the contents thereof.

62.    Deny the allegations in paragraphs 101 and 102 of the Complaint.

### COUNT I
### FEDERAL RACKETEER INFLUENCED
### CORRUPT ORGANIZATION (RICO)
### SECTION 1962(C)

63.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 102 of the Complaint as if fully set forth herein.

64.    Deny the allegations in paragraphs 104 through 117 of the Complaint.

## COUNT II
### FEDERAL RACKETEER INFLUENCED
### CORRUPT ORGANIZATION (RICO)
### SECTION 1962(a)

65.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 117 of the Complaint as if fully set forth herein.

66.    Deny the allegations in paragraphs 119 through 129 of the Complaint.

## COUNT III
### FEDERAL RACKETEER INFLUENCED
### CORRUPT ORGANIZATION (RICO)
### SECTION 1962(d)

67.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 129 of the Complaint as if fully set forth herein.

68.    Deny the allegations in paragraphs 131 through 135 of the Complaint.

## COUNT IV
### FEDERAL ANTITRUST VIOLATIONS

69.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 though 135 as if fully set forth herein.

70.    Deny the allegations in paragraph 137 of the Complaint except admit that Sheraton, acting under the Management Contract, purchased goods, supplies and services from various vendors.

71.    Deny the allegations in paragraphs 138 through 140 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

72.    Deny the allegations in paragraphs 141 through 144 of the Complaint.

## COUNT V
## BREACH OF CONTRACT

73.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 144 as if fully set forth herein.

74.    Deny the allegations in paragraph 146 of the Complaint, except respectfully refer to the Management Contract with respect to the terms thereof.

75.    Deny the allegations in paragraphs 147 and 148 of the Complaint.

76.    Deny the allegations in paragraph 149 of the Complaint.

77.    Deny the allegations in paragraph 150 of the Complaint.

## COUNT VI
## BREACH OF FIDUCIARY DUTY

78.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 150 of the Complaint as if fully set forth herein.

79.    Deny the allegations in paragraphs 152 and 153 of the Complaint except respectfully refer to the Management Contract with respect to the terms thereof.

80.    Deny the allegations in paragraphs 154 through 158 of the Complaint.

## COUNT VII
## BREACH OF IMPLIED DUTIES OF
## GOOD FAITH AND FAIR DEALING

81.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 158 of the Complaint as if fully set forth herein.

82.    Deny the allegations in paragraphs 160 through 162 of the Complaint.

## COUNT VIII
### FRAUD

83.     Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 162 of the Complaint as if fully set forth herein.

84.     Deny the allegations in paragraph 164 of the Complaint except respectfully refer to the Management Contract with respect to the terms thereof.

85.     Deny the allegations in paragraph 165 of the Complaint except respectfully refer to the documents to which reference is made in the paragraph for a statement of any representations contained therein.

86.     Deny the allegations in paragraphs 166 through 169 of the Complaint.

87.     Deny the allegations in paragraph 170 of the Complaint except admit that Plaintiffs seek monetary compensation as averred therein.

88.     Deny the allegations in paragraph 171 of the Complaint except admit that Plaintiffs seek damages as averred therein.

## COUNT IX
### NEGLIGENT AND INTENTIONAL MISREPRESENTATION

89.     Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 171 of the Complaint as if fully set forth herein.

90.     Deny the allegations in paragraphs 173 through 179 of the Complaint.

91.     Deny the allegations in paragraph 180 of the Complaint except admit that Plaintiffs seek monetary compensation as averred therein.

92.     Deny the allegations in paragraph 181 of the Complaint except admit that Plaintiffs seek damages as averred therein.

## COUNT X
## PERMANENT INJUNCTIVE RELIEF

93.    Repeat and incorporate by reference their answers to paragraphs 1 through 181 of the Complaint as if fully set forth herein.

94.    Deny the allegations in paragraph 183 of the Complaint and respectfully refer to the Management Contract with respect to the terms thereof.

95.    Deny the allegations in paragraphs 184 through 186 of the Complaint.

## COUNTY XI
## DECLARATORY JUDGMENT
## TERMINATING MANAGEMENT CONTRACT

96.    Repeat and incorporate by reference their answers to paragraphs 1 through 186 of the Complaint as if fully set forth herein.

97.    Deny the allegations in paragraph 188 of the Complaint except admit that Defendants received in August 1997 a Notice of Termination and Notice to Quit and respectfully refer to that document with regard to the terms thereof.

98.    Deny the allegations in paragraph 189 except admit that Sheraton has refused to leave the premises of the hotel.

99.    Deny the allegations in paragraphs 190 and 191 of the Complaint.

100.    Admit that Plaintiffs seek relief as averred in paragraph 192 of the Complaint and otherwise deny the allegations in paragraph 192 of the Complaint.

## COUNT XII
## ACCOUNTING

101.    Repeat and incorporate by reference their answers to paragraphs 1 through 192 of the Compliant as if fully set forth herein.

102.    Deny the allegations in paragraph 194 of the Complaint but respectfully refer to the Management Contract for the terms thereof.

103.    Deny the allegations in paragraph 195 of the Complaint.

104.    Deny the allegations in paragraph 196 of the Complaint except admit that plaintiffs seek relief as averred therein.

## COUNT XIII
## REQUEST FOR RECEIVER

105.    Repeat and incorporate by reference their answers to paragraphs 1 through 196 of the Complaint as if fully set forth herein.

106.    Deny the allegations in paragraph 198 of the Complaint except admit that Defendants received in August 1997 a purported Notice of Termination and Notice to Quit and respectfully refer to that document with the terms thereof.

107.    Deny the allegations in paragraph 199 through 201 of the Complaint.

## [JURY DEMAND]

108.    Admit that Plaintiffs seek relief as averred in paragraph 202 of the Complaint.

## DEFENSES

### First Defense
(Failure to State a Claim)

The Complaint is barred, in whole and in part, for failure to state a claim upon which relief can be granted.

### Second Defense
(Laches)

Plaintiffs' claims are barred, in whole and in part, by the doctrine of laches.

12

### Third Defense
(Estoppel)

Plaintiffs' claims are barred, in whole and in part, by the doctrine of estoppel.

### Fourth Defense
(Unclean Hands)

Plaintiffs' claims are barred, in whole and in part, by the doctrine of unclean hands.

### Fifth Defense
(Failure to Plead Fraud with Particularity)

Plaintiffs have failed to state the circumstances constituting the alleged fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.

### Sixth Defense
(Plaintiffs Have Sustained No Injury)

Plaintiffs claims are barred, in whole and in part, because plaintiffs have not sustained any injury and cannot establish a likelihood that they will sustain an injury, as a result of any matter alleged in the Complaint.

### Seventh Defense
(Statute of Frauds)

Plaintiffs' claims are barred, in whole and in part, by the Statute of Frauds.

### Eighth Defense
(Statutes of Limitations)

Plaintiffs' claims are barred, in whole and in part, by the applicable statutes of limitations.

### Ninth Defense
(Breach of Duties and Covenants)

Plaintiffs' claims are barred, in whole and in part, by Plaintiffs' breaches of fiduciary duties and covenants of good faith and fair dealing.

### Tenth Defense
(Subject Matter Jurisdiction)

The Court lacks subject matter jurisdiction over Counts V through XIII of the

Complaint, and should decline to exercise supplemental jurisdiction over those claims.

### Eleventh Defense
(Good Faith)

Plaintiffs have at all times and with respect to all acts alleged in the Complaint

acted in good faith.

### Twelfth Defense
(Proximate Cause)

Any alleged harm to Plaintiffs was not proximately caused by Defendants but was

caused by the wrongful conduct of John Hancock, Woodley Road and the Joint Venture as is

more fully alleged in the following counterclaims.

## COUNTERCLAIMS

1.    These counterclaims are brought (a) by Sheraton against the Joint Venture and Woodley Road based on these parties' breaches of their contractual duties under the Management Contract; (b) by Sheraton against John Hancock and Sumitomo to enforce these parties' undertaking to secure defendants' rights to damages as a result of wrongful injunction or wrongful termination of the Management Contract, and (c) by ITT Sheraton and its subsidiary Washington Sheraton Corporation ("Washington Sheraton"), both on their own behalves and derivatively on behalf of the Joint Venture, against John Hancock and Sumitomo based on their breaches of contractual and fiduciary duties arising out of the June 12, 1990 Amended and Restated Joint Venture Agreement among John Hancock, Sumitomo and Washington Sheraton as amended from time to time (the "Joint Venture Agreement").

2.    Defendants' counterclaims, like the claims asserted in the Complaint, arise from the parties' varying interests in the management and ownership of the Hotel, a large hotel in the District of Columbia which, when originally opened by the Joint Venture (the "Owner") in the early 1980s, was a leading convention hotel.  In more recent years, the Hotel's competitive position in the Washington market has deteriorated, and the Hotel is badly in need of renovation, repositioning and capital improvement.

### Jurisdiction

3.    This Court has jurisdiction of the counterclaims pursuant to Rule 13(a) and/or(b), Rule 13(e), Rule 20, Rule 65 and Rule 65.1 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1367, and pursuant to the Court's authority to enforce an undertaking provided pursuant to Rule 65 of the Federal Rules of Civil Procedure and the order of the Court.

15

**Parties**

4.      Sheraton, ITT Sheraton and Washington Sheraton (collectively, the "Sheraton Parties") are corporations organized under the laws of the State of Delaware and maintain their principal place of business at 60 State Street, Boston, Massachusetts 02109. Sheraton and Washington Sheraton are wholly-owned subsidiaries of ITT Sheraton.

5.      The Joint Venture, the owner of the Hotel, is a general partnership organized under the laws of the District of Columbia which maintains its principal office c/o John Hancock Properties, Inc., Two Copley Place, Suite 200, Boston, Massachusetts 02117.

6.      On information and belief, John Hancock is a corporation organized under the laws of the Commonwealth of Massachusetts, with its principal place of business at 200 Clarendon Street, Boston, Massachusetts 02117.

7.      On information and belief, Sumitomo is corporation organized under the laws of the state of New York, with its principal place of business at 245 Park Avenue, New York, New York 10167, and a subsidiary of a major Japanese corporation.

8.      Woodley Road is a corporation organized under the laws of the State of Delaware which is wholly owned, directly or through intervening subsidiaries, by John Hancock. Woodley Road maintains its principal place of business c/o John Hancock Properties, Inc., Two Copley Square, Suite 200, Boston, Massachusetts 02117. Woodley Road leases the Hotel from the Joint Venture, and is jointly and severally liable to Sheraton for the violations of the Management Contract alleged herein.

## The Nature of the Litigation

9.    Until March 15, 1998, Sheraton and ITT Sheraton managed the Hotel pursuant to the September 27, 1979 Management Contract, as amended.  On March 15, 1998, in accordance with the demands of the plaintiffs and the preliminary injunction issued by this Court, Sheraton quit the premises of the Hotel.

10.    The plaintiffs commenced this litigation not because of any alleged breach of the Management Contract by Sheraton but rather because the plaintiffs were displeased with the economic terms of the Management Contract and wished to "walk away" from their obligations under it.

11.    Plaintiffs have resorted to meritless litigation to free themselves from the Management Contract in part because of the Management Contract's lengthy term.  The Management Contract's initial term was to end in December, 2000, but Sheraton had the right to renew the Management Contract for three additional terms of ten years each, or until the year 2030.

12.    Plaintiffs' claims of Sheraton's supposed breaches are purely pretextual. This litigation is a means by which the plaintiffs are attempting to extort Sheraton and to obfuscate their decision to terminate the Management Agreement wrongfully and without cause.

13.    Because Sheraton has the right to renew the Management Contract for ten year terms through the year 2030, the Joint Venture stood to gain as much as $200 million, in John Hancock's estimation, if it could terminate the Management Contract.

14.    While the plaintiffs might wish nothing more than to "walk away" from their obligations to Sheraton under the Management Contract, the law does not permit a party to

such a contract to breach the contract without consequences merely because, with the benefit of hindsight, the party believes that it struck a bad bargain.

15.    Sheraton and ITT Sheraton dispute not only the veracity of the allegations contained in the Plaintiffs' Complaint but also that the Plaintiffs make their allegations in good faith.

16.    Sheraton comprehensively refuted the plaintiffs' claims in correspondence between Sheraton and the plaintiffs many months before the plaintiffs commenced this litigation. Sheraton made available to the plaintiffs all documents on which it based its refutation of the plaintiffs' allegations.  The plaintiffs did not avail themselves of the opportunity to review the documents upon which Sheraton's refutation was based.

17.    In commencing baseless litigation, wrongfully terminating the Management Contract and improperly revoking Sheraton's agency, the Owner breached its duties under the Management Contract.  Moreover, as is explained below, the Owner also breached the Management Contract by failing to make required repairs and improvements to the Hotel property and by refusing and failing to pay fees, reimbursements and other charges due and owing to Sheraton, ITT Sheraton and Washington Sheraton.

18.    In addition, John Hancock and the Joint Venture have breached their contractual and fiduciary duties to Washington Sheraton and ITT Sheraton under the Joint Venture Agreement, by, inter alia, failing to ensure adequate capital spending and by commencing the baseless litigation against Sheraton and ITT Sheraton.  For the same reasons, John Hancock is liable not only to ITT Sheraton and Washington Sheraton, but also to the Joint Venture itself, on whose behalf ITT Sheraton and Washington Sheraton sue.  John Hancock, as Managing Partner

of the Joint Venture, has also breached its contractual duty to Washington Sheraton by wrongfully withholding Washington Sheraton's share of the proceeds obtained from the sale of the Hotel.

## FACTUAL ALLEGATIONS

### Background

19.     The Joint Venture partnership was formed in or about 1979 to expand and improve the then existing Sheraton Park Hotel located on the Hotel site.  Washington Sheraton and John Hancock each held a 50% interest in the Joint Venture at that time.  In 1985, John Hancock purchased an additional 49 percent interest in the Joint Venture from Washington Sheraton.  Plaintiff Sumitomo purchased its 48 percent interest in the Joint Venture from Plaintiff John Hancock in 1990, becoming a third partner in the Joint Venture.  On March 9, 1998, Sumitomo sold its 48% interest in the Joint Venture back to John Hancock.  To this day, Washington Sheraton retains a one percent ownership in the Joint Venture.

20.     Pursuant to the terms of the Joint Venture Agreement, John Hancock is the Managing Partner for the Joint Venture (the "Managing Partner").  Among the partners to the Joint Venture, the Managing Partner has the responsibility for the day-to-day affairs of the Joint Venture.  JVA ¶ 6.01.

21.     The Joint Venture Agreement provides, *inter alia,* that:  (a) only the Managing Partner may bind the Joint Venture (6.01); (b) only the Managing Partner is obligated and responsible to manage the affairs of the Joint Venture (6.01); (c) the Managing Partner cannot act with respect to Major Decisions without the consent of Sumitomo (6.03); (d) Major Decisions include (i) the undertaking of any capital improvement project, (ii) the retention of counsel (6.03), and (iii) the termination or modification of the Management Contract or any rights of the Operator;  (e) *any* Partner may effectuate the removal of a defaulting Managing Partner

19

(6.01); and the Managing Partner is obligated to proceed with reasonable promptness to liquidate the business of the Joint Venture upon an event of dissolution and must distribute the assets of the Joint Venture to the Partners (10.01).

22.    In connection with Sumitomo's purchase of an interest in the Joint Venture, the Joint Venture leased the Hotel to John Hancock's wholly-owned subsidiary Woodley Road, and assigned its rights and obligations under the Management Contract to Woodley Road. The Joint Venture was not released from its obligations to Sheraton under the Management Contract.

### The Operating Term

23.    The initial "Operating Term" of the Management Contract was September 27, 1979 to December 31, 2000.

24.    Under the Management Contract, Sheraton, the "Operator," had the unilateral right to extend the Operating Term for three successive periods of ten years each through December 31, 2030.  The Owner had no right to prevent these three successive 10-year renewals.

25.    Article XXIV of the Management Contract allows a (non-defaulting) party to terminate the Operating Term only in the event that an "event of default" is not cured within 15 days (or, depending upon the default, 90 days) after notice of such event of default is given.

26.    Article VI of the Management Contract provides:

> Operator shall have complete authority in respect of and be responsible for, the operation, direction, management and supervision of the Hotel, subject only to those specific approvals of Owner set forth herein and to such qualification on such complete authority as are contained in the Business Plan referred to in this Article XI (3).  Such authority of Operator shall include, without limitation,

determination of labor policies (including the hiring, transfer and discharge of all employees and entering into a contract or contracts with an applicable union or unions in Owner's name), credit policies (including entering into agreements with credit card organizations), terms of admittance, charges for rooms, entertainment and amusement policies, food and beverage policies (including the right to conduct catering operations outside of the Hotel), the institution of such legal proceedings as Operator shall deem appropriate in connection with the operation of the Hotel, and all phases of sales, marketing, advertising, promotion and publicity relating to the Hotel. In exercising such authority, Operator may enter into such contract, leases, concession agreements and other undertakings on behalf of Owner as it shall from time to time consider appropriate, in Owner's name, and Owner (if Owner is an individual) or officers of Owner (if Owner is a corporation or other legal entity) will execute any or all of same at Operator's request.

## The Need For Repositioning and Renovation of the Hotel

27.    Under the applicable contractual documents, the responsibility to address the capital needs of the Hotel rests upon John Hancock as the Managing Partner of the Joint Venture. Under the Management Contract, Woodley Road and the Joint Venture are required to provide funds for, inter alia, any "structural repairs or changes in the Hotel or extraordinary repairs to or replacements of [Building Appurtenance] equipment" necessary to maintain the Hotel in good operating condition. Management Contract, Article XVI, and Assignment of and Third Amendment to Management Contract.

28.    While John Hancock must seek Sumitomo's agreement to non-emergency capital spending, it is John Hancock's job to anticipate and provide for the Hotel's capital needs, and to prepare capital spending plans for the consideration of the Joint Venture.

29.     The June 12, 1990 restatement of the Joint Venture Agreement, which admitted Sumitomo as a partner, expressly provided for and contemplated that necessary repairs and improvements to the Hotel would be undertaken.  Joint Venture Agreement Section 6.06.

30.     Although certain repairs to the Hotel were undertaken subsequent to Sumitomo's purchase of its 48% interest in the Joint Venture, the Hotel remained in need of substantial repairs and renovation in the early and mid-1990s.  In part, this need for capital spending arose from the age of the Hotel, which led to the need to repair or replace obsolete or deteriorated mechanical and structural systems.  For example, the facade of the Wardman Tower, the oldest part of the Hotel complex, required extensive repairs to maintain its structural integrity and safety.

31.     In addition to the need for renovation and repair, capital spending for the Hotel was necessary to "reposition" the Hotel to compete more effectively with other convention hotels in the Washington area.  During 1983, a large new convention center was opened in downtown Washington, and during the 1980s a number of new hotels opened in its vicinity.  Not only were these new competitors more modern than the Hotel, they had the advantage of a location much nearer to traditional Washington tourist attractions, such as the Capitol, White House and Smithsonian Institute, than the Hotel, which is located several miles from central Washington near the National Zoo.

32.     Partly as a result of this new competition, and partly as a result of changing trends in the convention industry, including new competition in other cities, the Hotel's convention business changed, and the Hotel was frequently hosting two or more groups simultaneously, rather than a single convention that sold out the entire Hotel.  This created a critical need to reconfigure the Hotel to add more meeting space that could be used more flexibly.

In addition, the Hotel needed more, and more varied, restaurants and food outlets, and a more modern, expanded health and fitness center. Finally, the public spaces and rooms in the Hotel, no matter how well maintained, had become "dated" and uninviting in appearance. Of particular concern was the entrance lobby, which, by contemporary standards, is poorly laid out and confusing to guests. For all these reasons, the Hotel was in urgent need of a "Master Plan" of capital spending to address both physical and competitive issues.

33. In the early 1990s, the Joint Venture stated its intention to develop a "master strategic plan" to, as described by John Hancock in September 1993, estimate "future cash flow and investment value and as a guideline in deciding upon the level of re-investment of cash flow into the property and/or the amount of additional capital to be invested in the project.

34. In a letter to Mr. Potrykus dated September 30, 1994, ITT Sheraton complained that the master plan studies were proceeding far too slowly, and that Hancock's involvement of ITT Sheraton and communications with Sheraton in that regard were inadequate.

35. The Sheraton Parties were not the first to complain about John Hancock's handling of such matters. In a July 12, 1994 Capital Expense Form, Sumitomo indicated that "the best way to resolve the asset management issue is to handle Hancock as if they were a third-party asset manager, i.e. Yarmouth. If they are unable to provide adequate service to us, we will use this as leverage to get out of our agreement." Upon information and belief, in a letter dated July 22, 1994, Sumitomo raised concerns regarding John Hancock's services under the Asset Management Agreement and the Joint Venture Agreement, and suggested that the Joint Venture should hire an independent asset manager.

36.    Although some work was in fact done, the Hotel has continued to deteriorate over the last seven years, and its need for substantial capital spending to "reposition" itself in its competition with neighboring hotels has remained unaddressed.

37.    Notwithstanding repeated requests from Sheraton, and despite Sheraton's assistance in preparing numerous potential renovation plans for the Hotel, Hancock, prior to the initiation of this litigation, never suggested to the Joint Venture, approved or otherwise implemented a capital spending plan that adequately addressed the Hotel's need for renovation and repositioning.

38.    The plaintiffs have no one but themselves to blame for the Hotel's needs for significant capital spending, which resulted from the failures of the Joint Venture, Woodley Road and John Hancock to address properly the extensive renovations that are required to make the Hotel competitive with other hotels of its type in its geographic area. Indeed, in view of the Hotel's clear need for renovations, Sheraton's management of the Hotel was an unqualified success.

39.    On October 30, 1996, Washington Sheraton made formal demand under the Joint Venture Agreement that John Hancock be removed and replaced as Managing Partner of the Joint Venture based, *inter alia*, on John Hancock's failure to plan and provide for the capital needs of the Hotel. Pursuant to section 6.01 of the Joint Venture Agreement, John Hancock as Managing Partner was then required either to cure its default or step down as Managing Partner in favor of Sumitomo. Without satisfying section 6.01, John Hancock, on November 21, 1996, John Hancock rejected Washington Sheraton's demand. John Hancock remains the Managing Partner of the Joint Venture in violation of the joint Venture Agreement.

40.     John Hancock's failure to plan and provide for the capital needs of the Hotel constitutes a breach of the Management Contract made wilfully and in bad faith.

## John Hancock's Incentive to Terminate or Renegotiate

41.     Sumitomo made its investment in the Joint Venture a time when the convergence of record-high real estate prices in the United States and the booming "bubble" economy in Japan led many Japanese companies to make real estate investments in this country which turned disastrous when both of these economic phenomena collapsed in the early 1990s.

42.     While Sumitomo overpaid for its interest in the Joint Venture, John Hancock was able, through its sale to Sumitomo, to recover all of its original investment in the Hotel project, which had the effect of reducing John Hancock's economic incentive to invest additional capital in the Hotel to preserve or improve its physical condition and performance.

43.     The Hotel's need for capital contributions coincided with a downturn in Washington, D.C., hotel revenues during the early 1990s, which limited John Hancock's and Sumitomo's returns on their investment in the Joint Venture.

44.     The failure by the Joint Venture and Woodley Road to maintain the Hotel also derived from a set of agreements which collectively assured that no one other than Sheraton had any immediate economic interest in maintaining the Hotel.

45.     Under the Management Contract, Sheraton has received payments based in part on the revenues of the hotel.  Therefore, the amount of Sheraton's revenues under the Management Contract has depended, in part, on the extent to which the public found the Hotel to be a well maintained, inviting facility.

46.     However, John Hancock's incentive to invest additional capital to renovate and reposition the Hotel was reduced even further by provisions in the Joint Venture Agreement

providing, for the June 12, 1990 through December 31, 1995 time period, a preferred return to Sumitomo from the Hotel's cash flow. The preferred return provisions were more likely to reduce John Hancock's own income from the Hotel if significant portions of the Hotel were closed for renovations.

47.     Moreover, precisely because Sumitomo received a preferred return, Sumitomo had no immediate incentive to demand the extensive renovations that the parties recognized the Hotel needed at the time when Sumitomo purchased its interest in the Joint Venture.

### The Operations Audit

48.     John Hancock, apparently to (a) delay making needed capital contributions, (b) divert attention from its own managerial shortcomings following Sumitomo's July 1994 complaints and (c) search for an excuse to escape the Joint Venture's obligations under the Management Contract, commenced in late 1994 an "operations" audit of Sheraton's performance under the Management Contract.

49.     The Joint Venture was permitted to conduct such an audit under Article XII of the Management Contract.

50.     The plaintiffs represented to Sheraton that the "operations" audit was being conducted by the Joint Venture in connection with its consideration of further capital investment in the Hotel.

51.     The plaintiffs never indicated that the audit was being conducted by John Hancock (except as Managing Partner for the Joint Venture) or Sumitomo.

52.     In reliance on plaintiffs' representations as to the purpose of the audit and pursuant to Article XII of the Management Contract, Sheraton cooperated fully with the audit,

even though it quickly became apparent that the persons who conducted it were woefully ignorant of the economics and practices of the hospitality industry.

53.    After the audit progressed well into 1995, the Joint Venture claimed that it had discovered

> an overwhelming demonstration of breach of contractual obligations, breach of fiduciary obligation, neglect of proper operations, and failure of managerial supervision

causing damages in the amount of $80 million and constituting "cause" to terminate the Management Contract.

54.    The Joint Venture's claim of "cause" to terminate the Management Contract was particularly significant because, as was widely understood at that time by the parties, the terms of the 1979 Management Contract, which bound the Joint Venture at Sheraton's option until the year 2030, had become unfavorable to the Joint Venture in comparison to hotel management contracts that were typical of what was available to hotel owners in the market at that time.

55.    As explained by Steven Dwyer of Sumitomo in 1997, the Management Contract was "not at all competitive". Another 1997 document generated by John Hancock explained more precisely that renegotiation of the Management Contract "will save us $3 M per year (as is) and $6 M per year" after renovations.

56.    By John Hancock's own estimates, the Joint Venture stood to gain in the range of $100 to $200 million by renegotiating or terminating the Management Contract.

57.    Sheraton denied the Joint Venture's claim of "cause" for termination and requested substantiation of the claim.

58.    Concurrent with its 1995 requests for substantiation, Sheraton determined that, to improve its relationship with the Joint Venture, reduce disruption at the Hotel and facilitate the needed renovations, it was willing from a business perspective to renegotiate the terms of the management contract to the benefit of the Joint Venture.

59.    In late 1995, Sheraton offered to renegotiate the terms of the Management Contract, and to discuss any actual damages that might be owing to the Joint Venture, while emphasizing that Sumitomo and John Hancock had adduced no evidence of any such damages.

60.    The Joint Venture made no effort to substantiate its damages claim until December 29, 1995, when it sent to Sheraton a Notice of Default (the "1995 Notice of Default"). A copy of the 1995 Notice of Default is annexed hereto as Exhibit A.

61.    "Notice of default" is not required by and triggers no provisions of the Management Contract. (The Management Contract does provide for notice of "intention to terminate" upon expiry of a fifteen day period. No such notice was given until July 31, 1997, as discussed below.)

62.    The Notice of Default claimed 15 categories of events of default under subparts XXIV(A)(1) and XXIV(A)(6) of the Management Contract.

63.    Subpart XXIV(A)(1) of the Management Contract states, in summary, that the failure of any party to pay to the other amounts required under the Management Contract for a period of 30 days after it becomes payable constitutes an event of default.

64.    Subpart XXIV(A)(6) of the Management Contract states that failure to perform any "other" _material_ obligation under the Agreement constitutes an event of default.

65.    Responding to the 1995 Notice of Default in a 21-page single-spaced letter dated January 31, 1996 (the "January 31, 1996 letter), Sheraton comprehensively refuted each of

28

the 15 categories of alleged breaches and restated its willingness to further discuss and remedy any defaults and to renegotiate the terms of the Management Contract to the benefit of the Joint Venture. A copy of the January 31, 1996 letter is annexed hereto as Exhibit B.

66.    Sheraton's January 31, 1996 letter responded directly to the Joint Venture's specific allegations, as summarized below.

67.    The first category of breach alleged by the Owner in the 1995 Notice of Default was the Operator's supposed entry of employee wages and other employee expenses as capital expenses rather than ordinary operating costs, and the Operator's supposed failure to gain reimbursement for the costs associated with employees assigned temporarily to other properties. With respect to this first category of defaults, the Operator clarified the Owner's misunderstanding of normal accounting practices and explained in detail how Sheraton ensures that employee loaning does not harm Sheraton hotels.

68.    The second category of alleged defaults comprised allegations that the Operator commingled funds of the Owner with its own funds, used the Hotel's funds to pay for services for the Operator's affiliates, and used Hotel facilities to subsidize the purchasing costs of other hotels in the region. With respect to this second category, the Operator explained how the Hotel benefits from and is compensated for use of space and services, denied knowledge of any commingling of funds, and requested additional information regarding any examples of commingling. The Owner has provided no such additional information.

69.    The third category of alleged defaults comprised allegations that the Operator failed to disclose compensation of senior Hotel employees, and paid excessive and unauthorized compensation to certain employees. With respect to this third category, the Operator explained that relocation expenses are not considered to be part of "benefits" as that

term is used in subpart VI(5) of the Management Contract. The Operator recognized that it had erroneously on two occasions compensated employees in amounts requiring the Owner's advance approval without having obtained such advance approval. The Operator further agreed to address this error and any other compensation-related disputes as part of any overall resolution of the issues outstanding among the parties.

70.     The fourth category of alleged breaches concerned employee turnover and employee benefits. The Owner alleged that the Operator permitted and caused excessive turnover among senior employees and that the Operator gave excessive relocation benefits, violated regulations concerning withholding taxes, and improperly used Owner's funds to reimburse an employee for the employee's loss upon the sale of a residence. With respect to this fourth category of alleged defaults, the Operator denied that excessive turnover had occurred, stated that all relocation benefits had been given in accordance with written policies, and stated that the Operator had paid withholding taxes to employees only where appropriate. The Operator requested more information so as to address any other concerns. The Owner provided no such further information.

71.     The fifth category of alleged breaches concerned the use of complimentary rooms. The Owner alleged that the Operator improperly allowed use of Hotel rooms free of charge and at unreasonably low rates, while failing to maintain adequate controls and record of such uses of rooms. With respect to this fifth category of alleged breaches, the Operator responded in detail with references to numerous reports and studies concerning the complimentary room use permitted by the Management Contract and customary in the industry, including detailed information concerning the complimentary use of rooms at the Hotel and at other Sheraton hotels by Plaintiffs and their employees. After further discussions among the

30

parties, the Operator, as an accommodation, instituted in mid-1995 monthly reporting to the Owner with respect to complimentary room use.

72.     The sixth category of alleged breaches by the Operator pertained to the Owner's rights and purported rights to approve contracts that the Operator entered into. With respect to this sixth category of alleged breaches, the Operator recognized that in each of the years 1991-1993, the Operator might have executed without Owner approval one contract for services in excess of the adjusted maximum amount set forth in subpart VI(8) of the Management Contract. The Operator stated that each of these three contracts was beneficial to the hotel and, in any case, each of them had subsequently been reviewed with the Owner's representatives at quarterly Owner's meetings.

73.     The seventh category of alleged breaches concerned rebates that the Operator received. In two full single-spaced pages, the Operator comprehensively explained how the Hotel had received value for the rebates that the Operator received, how the Hotel had benefited from Sheraton's bargaining power at the national level, and how the rebates had been disclosed to the Owner on numerous occasions.

74.     The eighth category of alleged breaches comprised allegations that the Operator had inequitably and disproportionately allocated insurance costs to the Hotel. In response, Operator stated exactly how costs of general liability coverage and property coverage were allocated, and asked the Owner to provide further information to permit the Operator to address the Owner's concern. No such further information was forthcoming from the Owner.

75.     The ninth category of alleged breaches comprised allegations that the Operator had improperly imposed on the Hotel marketing costs and the costs of a frequent traveler program that was not in the best interests of the Hotel. In response, the Operator pointed

out that participation in the marketing and frequent traveler program was authorized by the Management Contract and did not involve any improper allocations of costs. The Operator further noted that Sheraton had provided funding for sales in addition to that required under the Management Contract, and stated its strong basis for believing that the frequent traveler programs was in the Hotel's best interests.

76.    The tenth category of alleged breaches comprised allegations that the Operator had failed to maintain adequate internal controls, including internal audit procedures. The Operator flatly denied these allegations, noting that the Hotel's books and records had always been kept in accordance with the Uniform System of Accounting for Hotels, generally accepted accounting practices, and the requirements of the Management Contract. The Operator also noted that Arthur Anderson LLP, the Hotel's independent auditor in recent years, had certified its audits without the issuance of a blueback report that would have been required if the audit had discovered accounting deficiencies or inadequate financial controls.

77.    The eleventh category of alleged breaches was comprised of Owner's allegations that the Operator had failed to make full disclosure concerning the Hotel's capital needs. In response, Sheraton pointed out the numerous occasions on which the Owner became aware of the Hotel's capital needs and chose to do nothing about them. For example, Sheraton reminded the Owner that Sumitomo was made fully aware in 1990, when it purchased its share of the Joint Venture, that the Hotel required extensive capital expenditures.

78.    The twelfth category of alleged breaches comprised allegations that the Operator failed to make needed repair and maintenance expenditures. In response, the Operator demonstrated that its repair and maintenance expenditures had risen markedly over the previous ten years, both in terms of dollars and in terms of percentage of the Hotel's total revenue. The

Operator also noted the Owner's hypocrisy in arguing that the Operator had not spent enough money on capital replacements, when representatives of Sumitomo and Hancock had actually instructed the Operator to <u>reduce</u> the amount of planned capital spending in the Hotel's 1996 capital plan from 4.5 percent of budgeted revenue to 3.0 percent.

79.    The thirteenth category of alleged breaches comprised allegations that the Operator had presented materially misleading budgets and other financial information.  Operator categorically denied these allegations.  With respect to the Owner's further allegation that the Operator failed to produce to the Owner any letters to management issued by the Operator's public accountants, the Operator stated that, to the best of its knowledge, it never received any such letters.  And finally, with respect to the fourteenth and fifteenth categories of alleged breaches, the Operator noted that these were mere rehashings of the allegations the Owner had made in the first through thirteenth categories of the 1995 Notice of Default.

80.    As described above, the purported "breaches" of the Management Contract that John Hancock alleged after the "operations" audit were all either nonexistent, examples of standard practice in the hospitality industry, or of relatively minor economic significance.

81.    Yet, somehow, John Hancock claimed that as a result of alleged "breaches," Sheraton had caused damages <u>in excess of $80 million</u> to the Hotel, which has a value of no more than twice that amount.  Short of imploding the Hotel buildings with explosives, it is inconceivable how Sheraton could cause damages even remotely approaching this magnitude to the Hotel, and despite repeated requests, John Hancock has refused to substantiate this figure or explain how it was derived.

82.    Moreover, the Operator's inadvertent lack of precise compliance with the terms of the Management Contract in two instances over the long history of the contract did not

33

constitute, either singly or in combination, an event of default that would permit the Owner to terminate the Management Contract.

83. In the January 31, 1996 letter, and repeatedly thereafter, Sheraton offered to provide John Hancock with the documentation on which the January 31, 1996 letter was based. The plaintiffs failed to avail themselves of this opportunity and have continued to insist, without providing any substantiation whatsoever, that Sheraton somehow caused astronomical amounts of damage to the Hotel.

84. Despite the disingenuousness and bad-faith posturing of John Hancock, Sheraton was willing to discuss changes to the Management Contract purely as a business matter, as a way of facilitating the adoption of a renovation plan for the Hotel. For example, Sheraton indicated its willingness to reduce its fees and restructure the terms of the Management Contract if an appropriate renovation plan is adopted.

85. However, John Hancock, which is either institutionally incapable of making a decision or seduced by its own rhetoric of astronomical damages, has been unwilling to agree to any reasonable approach to resolving the controversy.

86. Plaintiffs have declined to share with Sheraton the audit upon which its damages claims are based. (Now, following the commencement of this litigation, plaintiffs take the position that the audit was prepared in anticipation of litigation on behalf of individual partners John Hancock and Sumitomo, and not by the Joint Venture for operational reasons, and that therefore all documents and communications in connection with the audit constitute privileged matter not subject to discovery or even review by Joint Venture Partner Washington Sheraton Corporation.)

87. During the first half of 1996, the Joint Venture used its unsubstantiated allegations of breach constituting cause for termination in an effort to extort from Sheraton not only concessions in the terms of the Management Contract but also exorbitant sums in damages. When pressed for substantiation of its allegations, the Joint Venture routinely sidestepped the issue.

88. It soon became apparent that the Joint Venture was trying to squeeze out of Sheraton funds to offset the capital investments of over $60 million required of John Hancock and Sumitomo to carry out the necessary renovation and repositioning of the Hotel. By reducing Sumitomo's further investment, John Hancock could avoid Sumitomo's further questioning of its authority as Managing Partner, and perhaps of the nature of its disclosure to Sumitomo in 1990 concerning the Hotel's need for capital investment.

89. Any suggestion that Sumitomo was not satisfied with Sheraton's operation of the Hotel was and is belied by Sumitomo's solicitation of Sheraton in or around summer 1996 as a potential operator of a Sumitomo-owned hotel in the Chicago area. Sheraton declined Sumitomo's 1996 request because, already managing a major convention hotel in Chicago, it was contractually constrained from considering it.

90. By mid-1997, Plaintiffs had changed counsel and the parties had arrived at various potentially viable scenarios involving the renegotiation or replacement of the management Contract. The parties remained, however, unable to resolve the question of the Joint Venture's still unsubstantiated damage claims.

91. The filing of the complaint herein is merely the continuation of Plaintiffs' efforts to escape the terms of the Management Contract and extort money from Sheraton by claiming damages without any good faith basis.

## **Wrongful Termination and Revocation**

92.    In or about July 1997, John Hancock and Sumitomo, upon the recommendation of John Hancock, authorized the Joint Venture to terminate the Operating Term of the Contract.

93.    Subsequently, by notice dated July 31, 1997, Woodley Road, on behalf of the Joint Venture, gave notice of intention to terminate the Management Contract after the expiration of 15 days due to Sheraton's alleged failure to cure the events of default specified in the 1995 Notice of Default including without limitation defaults under Sections A.1 and A.6 of Article XXIV of the Management Contract (the "1997 Notice of Intention to Terminate"). The 1997 Notice of Intention to Terminate relied completely upon, and did not make any allegations of breach additional to, the allegations set forth in the 1995 Notice of Default.

94.    The 1997 Notice of Intention to Terminate invoked part A of Article XXIV of the Management Contract, which provides that the Management Contract will terminate 15 days after such notice unless noticed events of default are cured within such period or, with respect to defaults referred to in items (1), (5) and (6) of part A that cannot be cured within 15 days after such notice, such noticed events of default are cured within 90 days after such notice.

95.    No events of default existed on July 31, 1997.

96.    Any event of default existing on July 31, 1997 was subsequently cured to as to make the 1997 Notice of Intention to Terminate "of no force and effect" pursuant to part A of Article XXIV of the Management Contract.

97.    Any failure to cure any event of default existing on July 31, 1997 so as to make the 1997 Notice of Intention to Terminate "of no force and effect" pursuant to part A of

36

Article XXIV of the Management Contract is wholly attributable to Plaintiffs' failure to act in good faith.

98.     The Management Contract has not been terminated according to its terms.

99.     Plaintiffs' efforts to terminate the Management Contract constitute a breach of the Management Contract made wilfully and in bad faith.

100.     Rather than awaiting resolution of the contractual termination dispute with Sheraton, Woodley Road, in the 1997 Notice of Intention to Terminate, purported to revoke Sheraton's agency to manage the Hotel as of August 15, 1997.

101.     The Joint Venture's purported revocation of Sheraton's agency to manage the Hotel was improper under agency law.

102.     The Joint Venture invoked the jurisdiction of this Court to enjoin Sheraton from resisting the improper revocation of Sheraton's agency.

103.     The revocation of Sheraton's agency to manage the Hotel, which effectively terminated the Operating Term of the Management Contract without cause, constitutes a breach of the Management Contract made wilfully and in bad faith.

104.     The harm caused to Sheraton by the revocation of its agency to manage the Hotel, and by the enforcement of such revocation by this Court, cannot be remedied by reinstatement of Sheraton as agent.

### Failure to Distribute Assets of the Joint Venture

105.     In or about February, 1999, the Joint Venture sold the Hotel. Upon information and belief the sale price for the Hotel was in excess of two-hundred million dollars. Washington Sheraton, as the holder of a 1% interest in the Joint Venture, is entitled to its share of the sale proceeds, approximately two million dollars.

106.    Sale or other disposition of all or substantially all of the Joint Venture's assets is an event of dissolution under Section 10.01(3) of the Joint Venture Agreement.   The Hotel constituted all or substantially all of the Joint Venture's assets.

107.    John Hancock, as Managing Partner, is obligated to proceed with reasonable promptness to liquidate the business of the Joint Venture upon an event of dissolution and must distribute the assets of the Joint Venture to the Partners.

108.    The sale of the Hotel occurred over seven months ago and despite Washington Sheraton's repeated demands, John Hancock has failed to distribute any of the proceeds from the sale of the Hotel.

## First Counterclaim

109.    This claim for relief is brought by Sheraton on its own behalf against the Joint Venture and Woodley Road.

110.    Sheraton repeats and realleges the allegations of Paragraphs 1 through 105, above, as if set forth in full herein.

111.    Sheraton has properly and fully performed its duties under the Management Contract and has not breached that Contract in any material respect.  As a result, Plaintiffs have no contractual right to terminate the Management Contract.  By nonetheless revoking Sheraton's agency to operate the Hotel without cause and by obtaining this Court's preliminary injunction to effectuate that revocation, the Joint Venture and Woodley Road have breached the Management Contract and are liable to Sheraton for monetary damages, in an amount to be proved at trial, equivalent to the fees Sheraton would have earned if it had been allowed to continue to perform the Management Contract through its final extension period ending in the year 2030.

112.    According to Plaintiffs' own estimations, the amount of damages to which Sheraton is entitled exceeds $100 million.

## Second Counterclaim

113.    This claim for relief is brought by Sheraton on its own behalf against Hancock and Sumitomo.

114.    Sheraton repeats and realleges the allegations of Paragraphs 1 through 109 above, as if set forth in full herein.

115.    As a condition for the entry of its preliminary injunction, the Court required Hancock and Sumitomo to undertake, and they did in fact undertake, to pay all damages suffered by Sheraton if it was wrongfully enjoined, or if the revocation of its agency to operate the Hotel

39

was wrongful and in violation of the Management Contract.  Accordingly, Hancock and

Sumitomo are directly liable to Sheraton for all damages awarded to Sheraton pursuant to its first

counterclaim herein.

### Third Counterclaim

116.    This claim for relief is brought by Sheraton on its own behalf against the

Joint Venture and Woodley Road.

117.    Sheraton repeats and realleges the allegations of Paragraphs 1 through 112,

above, as if set forth in full herein.

118.    Prior to the wrongful revocation of Sheraton's agency to operate the

Hotel, Woodley Road and the Joint Venture breached the Management Agreement in material

respects.

119.    First, Woodley Road and the Joint Venture each failed to meet their

contractual obligations to Sheraton as an Operator to adequately maintain and provide capital

repairs and improvements to the Hotel property.  As a result, the Hotel lost substantial business

and revenue, causing damage to Sheraton in the form of decreased management fees.

120.    Second, the Joint Venture and Woodley Road have refused to pay fees and

reimbursements to which Sheraton is entitled under the Management Agreement, including

without limitation certain Sheraton sales offices fees, fees for customer complaint servicing, and

fees for an employee training program known as SGS 2000.  The amount of these unpaid fees,

which will be proved at trial, exceeds $1 million.

121.    Third, at the time when Sheraton quit the Hotel premises, there remained

due and owing certain unbilled charges and expenses that have not yet been quantified, and the

Joint Venture and Woodley Road are also liable to Sheraton for any employee severance payments resulting from Sheraton's removal from the Hotel.

122.    By virtue of the foregoing allegations, the Joint Venture and Woodley Road have breached their contractual obligations under the Management Contract and are liable to Sheraton for damages resulting from that breach in an amount to be proved at trial.

### Fourth Counterclaim

123.    This claim for relief is brought by ITT Sheraton and Washington Sheraton on their own behalf against John Hancock.

124.    ITT Sheraton and Washington Sheraton repeat and reallege the allegations of Paragraphs 1 through 119 above as if set forth in full herein.

125.    Under the Joint Venture Agreement, John Hancock, as Managing Partner, took on the contractual obligations to the Joint Venture and the other partners to oversee the day-to-day operations of the Hotel and to develop plans and budgets for all necessary capital spending, including capital spending needed to maintain or improve the Hotel.

126.    In addition to its contractual obligations, John Hancock as Managing Partner had a fiduciary duty to the Joint Venture and its other partners to use due care and reasonable diligence in carrying out its responsibilities under the Joint Venture Agreement.

127.    ITT Sheraton and Washington Sheraton have been injured by the failure of John Hancock to perform its duties as Managing Partner because (a) the value of their Joint Venture interest has been diminished because John Hancock has caused the Joint Venture to incur the existing and potential financial obligations to Sheraton resulting from the Joint Venture's termination, and thus breach, of the Management Contract; (b) the values of interests in the Joint Venture and its assets have been further reduced as the result of the failure to provide adequate

funds for capital renovations and improvements; (c) the cost of necessary repairs has increased as

the result of further deterioration caused by John Hancock's delay in addressing the Hotel's capital

needs, which will result in larger capital calls to the Joint Venture's partners when the renovation

is finally done; and (d) as a result of lost business at the Hotel, the income of the Joint Venture

and thus its partners have been reduced.

128.    By virtue of the foregoing allegations, John Hancock has acted in bad faith

and with wilful misconduct, ill will, recklessness, wantonness and oppressiveness in breaching its

contractual and fiduciary duties to ITT Sheraton and Washington Sheraton, and is liable to them

for damages resulting from those breaches in an amount to be proved at trial.

## Fifth Counterclaim

129.    This claim for relief is brought by ITT Sheraton and Washington Sheraton

on their own behalf against John Hancock and the Joint Venture.

130.    ITT Sheraton and Washington Sheraton repeat and reallege the allegations

of Paragraphs 1 through 125 above as if set forth in full herein.

131.    Based on the foregoing allegations, ITT Sheraton and Washington

Sheraton are entitled to judgment declaring that, as provided for in section 6.01 of the Joint

Venture Agreement, they have validly demanded the removal for cause of John Hancock as

Managing Partner, and ordering and directing that John Hancock cease to be Managing Partner.

## Sixth Counterclaim

132.    This claim for relief is brought by ITT Sheraton and Washington Sheraton

derivatively on behalf of the Joint Venture against John Hancock.

133.    Prior to bringing this claim derivatively, Washington Sheraton made a demand on the Joint Venture to remove John Hancock as Managing Partner of the Joint Venture, which demand was refused.

134.    ITT Sheraton and Washington Sheraton repeat and reallege the allegations of Paragraph 1 through 129 above as if set forth in full herein.

135.    By virtue of the foregoing allegations, John Hancock, in breach of its contractual obligations and fiduciary duties to the Joint Venture, has wrongfully caused the Joint Venture to incur liability for damages to Sheraton as alleged in the First and Third counterclaims, and is therefore liable to the Joint Venture for all damages awarded to Sheraton.

136.    In causing the Joint Venture to incur the foregoing liabilities to Sheraton, John Hancock has acted in bad faith and with wilful misconduct, ill will, recklessness, wantonness and oppressiveness in breaching its fiduciary duties to the Joint Venture.

### Seventh Counterclaim

137.    This claim for relief is brought by Washington Sheraton against John Hancock as Managing Partner of the Joint Venture.

138.    Washington Sheraton repeats and realleges the allegations of Paragraphs 1 through 136 above as if set forth in full herein.

139.    Based on the foregoing, John Hancock has breached its contractual obligations as Managing Partner of the Joint Venture to distribute with reasonable promptness the net assets of the Joint Venture to Washington Sheraton following the sale of the Hotel. John Hancock is liable to Washington Sheraton for damages in the amount of the share of the net assets of the Joint Venture to which Washington Sheraton is entitled.

WHEREFORE, it is respectively requested that the Court enter judgment:

A.      Dismissing the Complaint in all respects;

B.      Granting Sheraton judgments on the First and Third Counterclaims and awarding it damages against the Joint Venture and Woodley Road in an amount to be proved at trial;

C.      Granting Sheraton judgment on the Second Counterclaim and awarding it damages against Hancock and Sumitomo in an amount to be proved at trial;

D.      Granting ITT Sheraton and Washington Sheraton judgment on the Fourth and Fifth Counterclaims; awarding them compensatory and punitive damages against John Hancock in an amount to be proved at trial; declaring that ITT Sheraton and Washington Sheraton have properly demanded the removal for cause of John Hancock as Managing Partner; and directing that John Hancock cease to be Managing partner of the Joint Venture;

E.      Granting judgment derivatively to the Joint Venture on the Sixth Counterclaim declaring that John Hancock is liable to the Joint Venture for the reimbursement of all damages paid by the Joint Venture to Sheraton and awarding compensatory and punitive damages against John Hancock in an amount to be proved at trial;

F.      Granting Washington Sheraton judgment on the Seventh Counterclaim and awarding it damages in an amount to be proved at trial.

G.    Granting Sheraton, ITT Sheraton and Washington Sheraton their costs and

disbursements of this action, together with such other or further relief as the Court deems just and

proper.

Dated:  Wilmington, Delaware
        October 25, 1999

_____
Allen M. Terrell, Jr. (I.D. #709)
Srinivas M. Raju (I.D. #3313)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 658-6541
Attorneys for Defendants and
    Counterclaims and Third-Party
    Plaintiffs


OF COUNSEL:
John S. Kinzey
Scot C.  Gleason
Nicholas W.C. Corson
LeBOEUF, LAMB, GREENE & MacRAE
            L.L.P.
125 West 55th Street
New York, New York 10019-5389
212-424-8000

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

2660 WOODLEY ROAD JOINT VENTURE, )
WOODLEY ROAD ASSOCIATES, INC., )
JOHN HANCOCK MUTUAL LIFE INSURANCE )
COMPANY and SUMITOMO LIFE REALTY )
(N.Y.), INC., )
)
Plaintiffs,       )       C.A. No. 97-450-JJF
)
v.       )
)
ITT SHERATON CORPORATION and )
SHERATON OPERATING CORPORATION, )
)
Defendants.       )
)
———————————————————)
)
ITT SHERATON CORPORATION and )
WASHINGTON SHERATON CORPORATION, )
both individually and derivatively )
on behalf of 2660 WOODLEY ROAD )
JOINT VENTURE, and )
SHERATON OPERATING CORPORATION, )
)
Counterclaim Plaintiffs,       )
)
v.       )
)
2660 WOODLEY ROAD JOINT VENTURE, )
WOODLEY ROAD ASSOCIATES, INC., )
JOHN HANCOCK MUTUAL LIFE )
INSURANCE COMPANY and SUMITOMO )
LIFE REALTY (N.Y.), INC., )
)
Counterclaim Defendants.       )

## SECOND AMENDED ANSWER AND ~~AMENDED~~ COUNTERCLAIMS

Defendants ITT Sheraton Corporation ("ITT Sheraton") and Sheraton Operating Corporation ("Sheraton") (collectively, "Defendants"), by their undersigned attorneys, for their

106.    Sale or other disposition of all or substantially all of the Joint Venture's assets is an event of dissolution under Section 10.01(3) of the Joint Venture Agreement.   The Hotel constituted all or substantially all of the Joint Venture's assets.

107.    John Hancock, as Managing Partner, is obligated to proceed with reasonable promptness to liquidate the business of the Joint Venture upon an event of dissolution and must distribute the assets of the Joint Venture to the Partners.

108.    The sale of the Hotel occurred over seven months ago and despite Washington Sheraton's repeated demands, John Hancock has failed to distribute any of the proceeds from the sale of the Hotel.

7.    Deny the allegations in Paragraph 7 of the Complaint.

8.    Deny the allegations in Paragraph 8 of the Complaint.

9.    Deny the allegations in Paragraph 9 of the Complaint, except admit that the Sheraton Washington Hotel (the "Hotel") is owned by the Joint Venture; that the Hotel is managed pursuant to a September 27, 1979 Management Contract as amended from time to time (the "Management Contract"); and that a copy of the Management Contract is attached as Exhibit A to the Complaint.

10.    Deny the allegations in paragraph 10 of the Complaint.

11.    Deny the allegations in Paragraph 11 of the Complaint.

12.    Deny the allegations in Paragraph 12 of the Complaint, except admit that Plaintiffs purport to have exercised a right to terminate the Management Contract and that a letter referencing "Notice of Termination and Notice to Quit" were delivered to Defendants.

13.    Admit the allegations in Paragraph 13 of the Complaint.

14.    Deny the allegations in Paragraph 14 of the Complaint except admit that Plaintiffs seek relief as averred in said Paragraph.

15.    Admit the allegations in paragraph 15 of the Complaint.

16.    Admit the allegations in paragraph 16 of the Complaint.

17.    Admit the allegations in paragraph 17 of the Complaint.

18.    Deny the allegations in paragraphs 18 through 20 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

19.    Deny the allegations in paragraph 21 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

20.    Deny the allegations in paragraphs 22 and 23 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

21.    Deny the allegations in paragraph 24 of the Complaint except admit that ITT Sheraton established a division named ITT Sheraton Purchasing Resource ("Sheraton Purchasing") to organize exclusive and non-exclusive national and regional contracts with vendors and that Sheraton Purchasing was established to replace an ITT Sheraton entity referred to as "The Hotel Source."

22.    Deny the allegations in paragraph 25 of the Complaint except admit that Sheraton participated in Sheraton Purchasing Program as agent for Woodley Road and in connection with the operation of the Hotel entered into contracts negotiated by ITT Sheraton.

23.    Deny the allegations in paragraph 26 of the Complaint except admit that Sheraton paid a fee to ITT Sheraton in connection with the Sheraton Purchasing program.

24.    Deny the allegations in paragraph 27 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

25.    Deny the allegations in paragraphs 28 through 30 of the Complaint.

26.    Deny the allegations in paragraph 31 of the Complaint, except admit that audited financial statements dated February 17, 1995 were issued to the Joint Venture for the fiscal years 1993 and 1994.

27.    Deny the allegations in paragraphs 32 through 35 of the Complaint.

28.    Deny the allegations in paragraph 36 of the Complaint, except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

29.    Deny the allegations in paragraphs 37 and 38 of the Complaint.

30.    Deny the allegations in paragraph 39 of the Complaint except admit that Sheraton is a party to the Management Complaint and respectfully refer to that document with respect to the terms thereof.

31.    Deny the allegations in paragraph 40 of the Complaint except admit that Sheraton purchased insurance for the Hotel through ITT Sheraton.

32.    Deny the allegations in paragraph 41 of the Complaint except admit that ITT Sheraton charged the Hotel a percentage of an insurance policy that covered a pool of ITT Sheraton hotels.

33.    Deny the allegations in paragraphs 42 and 43 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

34.    Deny the allegations in paragraphs 44 and 45 of the Complaint.

35.    Deny the allegations in paragraph 46 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

36.    Deny the allegations in paragraphs 47 through 49 of the Complaint.

37.    Deny the allegations in paragraphs 50, 51, 52 and 53 of the Complaint.

38.    Deny the allegations in paragraph 54 of the Complaint, except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

39.    Deny the allegations in paragraph 55 of the Complaint.

40.    Deny the allegations in paragraphs 56, 57 and 58 of the Complaint.

41.    Deny the allegations in paragraph 59 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

42.    Deny the allegations in paragraphs 60 through 63 of the Complaint.

43.    Deny the allegations in paragraph 64 of the Complaint.

44.    Deny the allegations in paragraph 65 of the Complaint.

45.    Deny the allegations in paragraph 66 of the Complaint.

46.    Deny the allegations in paragraphs 67 through 72 of the Complaint.

47.    Deny the allegations in paragraph 73 of the Complaint.

48.    Deny the allegations in paragraphs 74 through 76 of the Complaint.

49.    Deny the allegations in paragraph 77 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refers to that document for the terms thereof.

50.    Deny the allegations in paragraph 78 of the Complaint.

51.    Deny the allegations in paragraph 79 of the Complaint.

52.    Deny the allegations in paragraphs 80 through 83 of the Complaint.

53.    Deny the allegations in paragraph 84 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refers to that document with respect to the terms thereof.

54.    Deny the allegations in paragraphs 85 through 87 of the Complaint.

55.    Deny the allegations in paragraphs 88 and 89 of the Complaint.

56.    Deny the allegations in paragraphs 90 through 93 of the Complaint.

57.    Deny the allegations in paragraph 94 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

58.    Deny the allegations in paragraphs 95 through 97 of the Complaint.

59.    Deny the allegations in paragraph 98 of the Complaint except admit that Sheraton received in and about December 1995 from Woodley Road a purported Notice of Default and respectfully refer to that document with respect to the contents thereof.

60.    Deny the allegations in paragraph 99 of the Complaint.

61.    Deny the allegations in paragraph 100 of the Complaint, except admit that Sheraton received in or about December, 1995 from Woodley Road a purported Notice of Default and respectfully refer to that document with respect to the contents thereof.

62.    Deny the allegations in paragraphs 101 and 102 of the Complaint.

## COUNT I
### FEDERAL RACKETEER INFLUENCED
### CORRUPT ORGANIZATION (RICO)
### SECTION 1962(C)

63.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 102 of the Complaint as if fully set forth herein.

64.    Deny the allegations in paragraphs 104 through 117 of the Complaint.

### COUNT II
### FEDERAL RACKETEER INFLUENCED
### CORRUPT ORGANIZATION (RICO)
### SECTION 1962(a)

65.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 117 of the Complaint as if fully set forth herein.

66.    Deny the allegations in paragraphs 119 through 129 of the Complaint.

### COUNT III
### FEDERAL RACKETEER INFLUENCED
### CORRUPT ORGANIZATION (RICO)
### SECTION 1962(d)

67.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 129 of the Complaint as if fully set forth herein.

68.    Deny the allegations in paragraphs 131 through 135 of the Complaint.

### COUNT IV
### FEDERAL ANTITRUST VIOLATIONS

69.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 though 135 as if fully set forth herein.

70.    Deny the allegations in paragraph 137 of the Complaint except admit that Sheraton, acting under the Management Contract, purchased goods, supplies and services from various vendors.

71.    Deny the allegations in paragraphs 138 through 140 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

72.    Deny the allegations in paragraphs 141 through 144 of the Complaint.

## COUNT V
## BREACH OF CONTRACT

73.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 144 as if fully set forth herein.

74.    Deny the allegations in paragraph 146 of the Complaint, except respectfully refer to the Management Contract with respect to the terms thereof.

75.    Deny the allegations in paragraphs 147 and 148 of the Complaint.

76.    Deny the allegations in paragraph 149 of the Complaint.

77.    Deny the allegations in paragraph 150 of the Complaint.

## COUNT VI
## BREACH OF FIDUCIARY DUTY

78.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 150 of the Complaint as if fully set forth herein.

79.    Deny the allegations in paragraphs 152 and 153 of the Complaint except respectfully refer to the Management Contract with respect to the terms thereof.

80.    Deny the allegations in paragraphs 154 through 158 of the Complaint.

## COUNT VII
## BREACH OF IMPLIED DUTIES OF
## GOOD FAITH AND FAIR DEALING

81.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 158 of the Complaint as if fully set forth herein.

82.    Deny the allegations in paragraphs 160 through 162 of the Complaint.

## COUNT VIII
### FRAUD

83.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 162 of the Complaint as if fully set forth herein.

84.    Deny the allegations in paragraph 164 of the Complaint except respectfully refer to the Management Contract with respect to the terms thereof.

85.    Deny the allegations in paragraph 165 of the Complaint except respectfully refer to the documents to which reference is made in the paragraph for a statement of any representations contained therein.

86.    Deny the allegations in paragraphs 166 through 169 of the Complaint.

87.    Deny the allegations in paragraph 170 of the Complaint except admit that Plaintiffs seek monetary compensation as averred therein.

88.    Deny the allegations in paragraph 171 of the Complaint except admit that Plaintiffs seek damages as averred therein.

## COUNT IX
### NEGLIGENT AND INTENTIONAL MISREPRESENTATION

89.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 171 of the Complaint as if fully set forth herein.

90.    Deny the allegations in paragraphs 173 through 179 of the Complaint.

91.    Deny the allegations in paragraph 180 of the Complaint except admit that Plaintiffs seek monetary compensation as averred therein.

92.    Deny the allegations in paragraph 181 of the Complaint except admit that Plaintiffs seek damages as averred therein.

## COUNT X
## PERMANENT INJUNCTIVE RELIEF

93.     Repeat and incorporate by reference their answers to paragraphs 1 through 181 of the Complaint as if fully set forth herein.

94.     Deny the allegations in paragraph 183 of the Complaint and respectfully refer to the Management Contract with respect to the terms thereof.

95.     Deny the allegations in paragraphs 184 through 186 of the Complaint.

## COUNTY XI
## DECLARATORY JUDGMENT
## TERMINATING MANAGEMENT CONTRACT

96.     Repeat and incorporate by reference their answers to paragraphs 1 through 186 of the Complaint as if fully set forth herein.

97.     Deny the allegations in paragraph 188 of the Complaint except admit that Defendants received in August 1997 a Notice of Termination and Notice to Quit and respectfully refer to that document with regard to the terms thereof.

98.     Deny the allegations in paragraph 189 except admit that Sheraton has refused to leave the premises of the hotel.

99.     Deny the allegations in paragraphs 190 and 191 of the Complaint.

100.     Admit that Plaintiffs seek relief as averred in paragraph 192 of the Complaint and otherwise deny the allegations in paragraph 192 of the Complaint.

## COUNT XII
## ACCOUNTING

101.     Repeat and incorporate by reference their answers to paragraphs 1 through 192 of the Compliant as if fully set forth herein.

102.   Deny the allegations in paragraph 194 of the Complaint but respectfully refer to the Management Contract for the terms thereof.

103.   Deny the allegations in paragraph 195 of the Complaint.

104.   Deny the allegations in paragraph 196 of the Complaint except admit that plaintiffs seek relief as averred therein.

## COUNT XIII
## REQUEST FOR RECEIVER

105.   Repeat and incorporate by reference their answers to paragraphs 1 through 196 of the Complaint as if fully set forth herein.

106.   Deny the allegations in paragraph 198 of the Complaint except admit that Defendants received in August 1997 a purported Notice of Termination and Notice to Quit and respectfully refer to that document with the terms thereof.

107.   Deny the allegations in paragraph 199 through 201 of the Complaint.

### [JURY DEMAND]

108.   Admit that Plaintiffs seek relief as averred in paragraph 202 of the Complaint.

### DEFENSES

### First Defense
(Failure to State a Claim)

The Complaint is barred, in whole and in part, for failure to state a claim upon which relief can be granted.

### Second Defense
(Laches)

Plaintiffs' claims are barred, in whole and in part, by the doctrine of laches.

### Third Defense
(Estoppel)

Plaintiffs' claims are barred, in whole and in part, by the doctrine of estoppel.

### Fourth Defense
(Unclean Hands)

Plaintiffs' claims are barred, in whole and in part, by the doctrine of unclean hands.

### Fifth Defense
(Failure to Plead Fraud with Particularity)

Plaintiffs have failed to state the circumstances constituting the alleged fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.

### Sixth Defense
(Plaintiffs Have Sustained No Injury)

Plaintiffs claims are barred, in whole and in part, because plaintiffs have not sustained any injury and cannot establish a likelihood that they will sustain an injury, as a result of any matter alleged in the Complaint.

### Seventh Defense
(Statute of Frauds)

Plaintiffs' claims are barred, in whole and in part, by the Statute of Frauds.

### Eighth Defense
(Statutes of Limitations)

Plaintiffs' claims are barred, in whole and in part, by the applicable statutes of limitations.

### Ninth Defense
(Breach of Duties and Covenants)

Plaintiffs' claims are barred, in whole and in part, by Plaintiffs' breaches of fiduciary duties and covenants of good faith and fair dealing.

### Tenth Defense
(Subject Matter Jurisdiction)

The Court lacks subject matter jurisdiction over Counts V through XIII of the

Complaint, and should decline to exercise supplemental jurisdiction over those claims.

### Eleventh Defense
(Good Faith)

Plaintiffs have at all times and with respect to all acts alleged in the Complaint

acted in good faith.

### Twelfth Defense
(Proximate Cause)

Any alleged harm to Plaintiffs was not proximately caused by Defendants but was

caused by the wrongful conduct of John Hancock, Woodley Road and the Joint Venture as is

more fully alleged in the following counterclaims.

## COUNTERCLAIMS

1.     These counterclaims are brought (a) by Sheraton against the Joint Venture
and Woodley Road based on these parties' breaches of their contractual duties under the
Management Contract; (b) by Sheraton against John Hancock and Sumitomo to enforce these
parties' undertaking to secure defendants' rights to damages as a result of wrongful injunction or
wrongful termination of the Management Contract, and (c) by ITT Sheraton and its subsidiary
Washington Sheraton Corporation ("Washington Sheraton"), both on their own behalves and
derivatively on behalf of the Joint Venture, against John Hancock and Sumitomo based on their
breaches of contractual and fiduciary duties arising out of the June 12, 1990 Amended and
Restated Joint Venture Agreement among John Hancock, Sumitomo and Washington Sheraton as
amended from time to time (the "Joint Venture Agreement").

2.     Defendants' counterclaims, like the claims asserted in the Complaint, arise
from the parties' varying interests in the management and ownership of the Hotel, a large hotel in
the District of Columbia which, when originally opened by the Joint Venture (the "Owner") in the
early 1980s, was a leading convention hotel.  In more recent years, the Hotel's competitive
position in the Washington market has deteriorated, and the Hotel is badly in need of renovation,
repositioning and capital improvement.

### Jurisdiction

3.     This Court has jurisdiction of the counterclaims pursuant to Rule 13(a)
and/or(b), **Rule 13(e),** Rule 20, Rule 65 and Rule 65.1 of the Federal Rules of Civil Procedure, 28

U.S.C. § 1367, and pursuant to the Court's authority to enforce an undertaking provided pursuant to Rule 65 of the Federal Rules of Civil Procedure and the order of the Court.

## Parties

4.    Sheraton, ITT Sheraton and Washington Sheraton (collectively, the "Sheraton Parties") are corporations organized under the laws of the State of Delaware and maintain their principal place of business at 60 State Street, Boston, Massachusetts 02109. Sheraton and Washington Sheraton are wholly-owned subsidiaries of ITT Sheraton.

5.    The Joint Venture, the owner of the Hotel, is a general partnership organized under the laws of the District of Columbia which maintains its principal office c/o John Hancock Properties, Inc., Two Copley Place, Suite 200, Boston, Massachusetts 02117.

6.    On information and belief, John Hancock is a corporation organized under the laws of the Commonwealth of Massachusetts, with its principal place of business at 200 Clarendon Street, Boston, Massachusetts 02117.

7.    On information and belief, Sumitomo is corporation organized under the laws of the state of New York, with its principal place of business at 245 Park Avenue, New York, New York 10167, and a subsidiary of a major Japanese corporation.

8.    Woodley Road is a corporation organized under the laws of the State of Delaware which is wholly owned, directly or through intervening subsidiaries, by John Hancock. Woodley Road maintains its principal place of business c/o John Hancock Properties, Inc., Two Copley Square, Suite 200, Boston, Massachusetts 02117. Woodley Road leases the Hotel from the Joint Venture, and is jointly and severally liable to Sheraton for the violations of the Management Contract alleged herein.

### The Nature of the Litigation

9.     Until March 15, 1998, Sheraton and ITT Sheraton managed the Hotel pursuant to the September 27, 1979 Management Contract, as amended.  On March 15, 1998, in accordance with the demands of the plaintiffs and the preliminary injunction issued by this Court, Sheraton quit the premises of the Hotel.

10.     The plaintiffs commenced this litigation not because of any alleged breach of the Management Contract by Sheraton but rather because the plaintiffs were displeased with the economic terms of the Management Contract and wished to "walk away" from their obligations under it.

11.     Plaintiffs have resorted to meritless litigation to free themselves from the Management Contract in part because of the Management Contract's lengthy term.  The Management Contract's initial term was to end in December, 2000, but Sheraton had the right to renew the Management Contract for three additional terms of ten years each, or until the year 2030.

12.     Plaintiffs' claims of Sheraton's supposed breaches are purely pretextual. This litigation is a means by which the plaintiffs are attempting to extort Sheraton and to obfuscate their decision to terminate the Management Agreement wrongfully and without cause.

13.     Because Sheraton has the right to renew the Management Contract for ten year terms through the year 2030, the Joint Venture stood to gain as much as $200 million, in John Hancock's estimation, if it could terminate the Management Contract.

14.     While the plaintiffs might wish nothing more than to "walk away" from their obligations to Sheraton under the Management Contract, the law does not permit a party to

such a contract to breach the contract without consequences merely because, with the benefit of hindsight, the party believes that it struck a bad bargain.

15.    Sheraton and ITT Sheraton dispute not only the veracity of the allegations contained in the Plaintiffs' Complaint but also that the Plaintiffs make their allegations in good faith.

16.    Sheraton comprehensively refuted the plaintiffs' claims in correspondence between Sheraton and the plaintiffs many months before the plaintiffs commenced this litigation. Sheraton made available to the plaintiffs all documents on which it based its refutation of the plaintiffs' allegations. The plaintiffs did not avail themselves of the opportunity to review the documents upon which Sheraton's refutation was based.

17.    In commencing baseless litigation, wrongfully terminating the Management Contract and improperly revoking Sheraton's agency, the Owner breached its duties under the Management Contract. Moreover, as is explained below, the Owner also breached the Management Contract by failing to make required repairs and improvements to the Hotel property and by refusing and failing to pay fees, reimbursements and other charges due and owing to Sheraton, ITT Sheraton and Washington Sheraton.

18.    In addition, John Hancock and the Joint Venture have breached their contractual and fiduciary duties to Washington Sheraton and ITT Sheraton under the Joint Venture Agreement, by, inter alia, failing to ensure adequate capital spending and by commencing the baseless litigation against Sheraton and ITT Sheraton. For the same reasons, John Hancock is liable not only to ITT Sheraton and Washington Sheraton, but also to the Joint Venture itself, on whose behalf ITT Sheraton and Washington Sheraton sue. **John Hancock, as Managing Partner of the Joint Venture, has also breached its contractual duty to Washington**

<u>**Sheraton by wrongfully withholding Washington Sheraton's share of the proceeds obtained**</u>

<u>**from the sale of the Hotel.**</u>

**FACTUAL ALLEGATIONS**

<u>**Background**</u>

19.    The Joint Venture partnership was formed in or about 1979 to expand and improve the then existing Sheraton Park Hotel located on the Hotel site.  Washington Sheraton and John Hancock each held a 50% interest in the Joint Venture at that time.  In 1985, John Hancock purchased an additional 49 percent interest in the Joint Venture from Washington Sheraton.  Plaintiff Sumitomo purchased its 48 percent interest in the Joint Venture from Plaintiff John Hancock in 1990, becoming a third partner in the Joint Venture.  <u>**On March 9, 1998,**</u> <u>**Sumitomo sold its 48% interest in the Joint Venture back to John Hancock.**</u>  To this day, Washington Sheraton retains a one percent ownership in the Joint Venture.

20.    Pursuant to the terms of the Joint Venture Agreement, John Hancock is the Managing Partner for the Joint Venture (the "Managing Partner").  Among the ~~three~~ partners to the Joint Venture, the Managing Partner has the responsibility for the day-to-day affairs of the Joint Venture.  JVA ¶ 6.01.

21.    The Joint Venture Agreement provides, *inter alia*, that:  (a) only the Managing Partner may bind the Joint Venture (6.01); (b) only the Managing Partner is obligated and responsible to manage the affairs of the Joint Venture (6.01); (c) the Managing Partner cannot act with respect to Major Decisions without the consent of Sumitomo (6.03); (d) Major Decisions include (i) the undertaking of any capital improvement project, (ii) the retention of counsel (6.03), and (iii) the termination or modification of the Management Contract or any rights of the Operator;  ~~and~~(e) *any* Partner may effectuate the removal of a defaulting Managing Partner

(6.01); and the Managing Partner is obligated to proceed with reasonable promptness to liquidate the business of the Joint Venture upon an event of dissolution and must distribute the assets of the Joint Venture to the Partners (10.01).

  22. In connection with Sumitomo's purchase of an interest in the Joint Venture, the Joint Venture leased the Hotel to John Hancock's wholly-owned subsidiary Woodley Road, and assigned its rights and obligations under the Management Contract to Woodley Road. The Joint Venture was not released from its obligations to Sheraton under the Management Contract.

**The Operating Term**

  23. The initial "Operating Term" of the Management Contract was September 27, 1979 to December 31, 2000.

  24. Under the Management Contract, Sheraton, the "Operator," had the unilateral right to extend the Operating Term for three successive periods of ten years each through December 31, 2030. The Owner had no right to prevent these three successive 10-year renewals.

  25. Article XXIV of the Management Contract allows a (non-defaulting) party to terminate the Operating Term only in the event that an "event of default" is not cured within 15 days (or, depending upon the default, 90 days) after notice of such event of default is given.

  26. Article VI of the Management Contract provides:

> Operator shall have complete authority in respect of and be responsible for, the operation, direction, management and supervision of the Hotel, subject only to those specific approvals of Owner set forth herein and to such qualification on such complete authority as are contained in the Business Plan referred to in this Article XI (3). Such authority of Operator shall include, without limitation,

determination of labor policies (including the hiring, transfer and discharge of all employees and entering into a contract or contracts with an applicable union or unions in Owner's name), credit policies (including entering into agreements with credit card organizations), terms of admittance, charges for rooms, entertainment and amusement policies, food and beverage policies (including the right to conduct catering operations outside of the Hotel), the institution of such legal proceedings as Operator shall deem appropriate in connection with the operation of the Hotel, and all phases of sales, marketing, advertising, promotion and publicity relating to the Hotel.  In exercising such authority, Operator may enter into such contract, leases, concession agreements and other undertakings on behalf of Owner as it shall from time to time consider appropriate, in Owner's name, and Owner (if Owner is an individual) or officers of Owner (if Owner is a corporation or other legal entity) will execute any or all of same at Operator's request.

## The Need For Repositioning and Renovation of the Hotel

27.     Under the applicable contractual documents, the responsibility to address the capital needs of the Hotel rests upon John Hancock as the Managing Partner of the Joint Venture.  Under the Management Contract, Woodley Road and the Joint Venture are required to provide funds for, inter alia, any "structural repairs or changes in the Hotel or extraordinary repairs to or replacements of [Building Appurtenance] equipment" necessary to maintain the Hotel in good operating condition.  Management Contract, Article XVI, and Assignment of and Third Amendment to Management Contract.

28.     While John Hancock must seek Sumitomo's agreement to non-emergency capital spending, it is John Hancock's job to anticipate and provide for the Hotel's capital needs, and to prepare capital spending plans for the consideration of the Joint Venture.

29.    The June 12, 1990 restatement of the Joint Venture Agreement, which admitted Sumitomo as a partner, expressly provided for and contemplated that necessary repairs and improvements to the Hotel would be undertaken.  Joint Venture Agreement Section 6.06.

30.    Although certain repairs to the Hotel were undertaken subsequent to Sumitomo's purchase of its 48% interest in the Joint Venture, the Hotel remained in need of substantial repairs and renovation in the early and mid-1990s.  In part, this need for capital spending arose from the age of the Hotel, which led to the need to repair or replace obsolete or deteriorated mechanical and structural systems.  For example, the facade of the Wardman Tower, the oldest part of the Hotel complex, required extensive repairs to maintain its structural integrity and safety.

31.    In addition to the need for renovation and repair, capital spending for the Hotel was necessary to "reposition" the Hotel to compete more effectively with other convention hotels in the Washington area.  During 1983, a large new convention center was opened in downtown Washington, and during the 1980s a number of new hotels opened in its vicinity.  Not only were these new competitors more modern than the Hotel, they had the advantage of a location much nearer to traditional Washington tourist attractions, such as the Capitol, White House and Smithsonian Institute, than the Hotel, which is located several miles from central Washington near the National Zoo.

32.    Partly as a result of this new competition, and partly as a result of changing trends in the convention industry, including new competition in other cities, the Hotel's convention business changed, and the Hotel was frequently hosting two or more groups simultaneously, rather than a single convention that sold out the entire Hotel.  This created a critical need to reconfigure the Hotel to add more meeting space that could be used more flexibly.

In addition, the Hotel needed more, and more varied, restaurants and food outlets, and a more modern, expanded health and fitness center. Finally, the public spaces and rooms in the Hotel, no matter how well maintained, had become "dated" and uninviting in appearance. Of particular concern was the entrance lobby, which, by contemporary standards, is poorly laid out and confusing to guests. For all these reasons, the Hotel was in urgent need of a "Master Plan" of capital spending to address both physical and competitive issues.

33.    In the early 1990s, the Joint Venture stated its intention to develop a "master strategic plan" to, as described by John Hancock in September 1993, estimate "future cash flow and investment value and as a guideline in deciding upon the level of re-investment of cash flow into the property and/or the amount of additional capital to be invested in the project.

34.    In a letter to Mr. Potrykus dated September 30, 1994, ITT Sheraton complained that the master plan studies were proceeding far too slowly, and that Hancock's involvement of ITT Sheraton and communications with Sheraton in that regard were inadequate.

35.    The Sheraton Parties were not the first to complain about John Hancock's handling of such matters. In a July 12, 1994 Capital Expense Form, Sumitomo indicated that "the best way to resolve the asset management issue is to handle Hancock as if they were a third-party asset manager, i.e. Yarmouth. If they are unable to provide adequate service to us, we will use this as leverage to get out of our agreement." Upon information and belief, in a letter dated July 22, 1994, Sumitomo raised concerns regarding John Hancock's services under the Asset Management Agreement and the Joint Venture Agreement, and suggested that the Joint Venture should hire an independent asset manager.

36.     Although some work was in fact done, the Hotel has continued to deteriorate over the last seven years, and its need for substantial capital spending to "reposition" itself in its competition with neighboring hotels has remained unaddressed.

37.     Notwithstanding repeated requests from Sheraton, and despite Sheraton's assistance in preparing numerous potential renovation plans for the Hotel, Hancock, prior to the initiation of this litigation, never suggested to the Joint Venture, approved or otherwise implemented a capital spending plan that adequately addressed the Hotel's need for renovation and repositioning.

38.     The plaintiffs have no one but themselves to blame for the Hotel's needs for significant capital spending, which resulted from the failures of the Joint Venture, Woodley Road and John Hancock to address properly the extensive renovations that are required to make the Hotel competitive with other hotels of its type in its geographic area.  Indeed, in view of the Hotel's clear need for renovations, Sheraton's management of the Hotel was an unqualified success.

39.     On October 30, 1996, Washington Sheraton made formal demand under the Joint Venture Agreement that John Hancock be removed and replaced as Managing Partner of the Joint Venture based, *inter alia*, on John Hancock's failure to plan and provide for the capital needs of the Hotel.  Pursuant to section 6.01 of the Joint Venture Agreement, John Hancock as Managing Partner was then required either to cure its default or step down as Managing Partner in favor of Sumitomo.  Without satisfying section 6.01, John Hancock, on November 21, 1996, John Hancock rejected Washington Sheraton's demand.  John Hancock remains the Managing Partner of the Joint Venture in violation of the joint Venture Agreement.

40.    John Hancock's failure to plan and provide for the capital needs of the Hotel constitutes a breach of the Management Contract made wilfully and in bad faith.

## John Hancock's Incentive to Terminate or Renegotiate

41.    Sumitomo made its investment in the Joint Venture a time when the convergence of record-high real estate prices in the United States and the booming "bubble" economy in Japan led many Japanese companies to make real estate investments in this country which turned disastrous when both of these economic phenomena collapsed in the early 1990s.

42.    While Sumitomo overpaid for its interest in the Joint Venture, John Hancock was able, through its sale to Sumitomo, to recover all of its original investment in the Hotel project, which had the effect of reducing John Hancock's economic incentive to invest additional capital in the Hotel to preserve or improve its physical condition and performance.

43.    The Hotel's need for capital contributions coincided with a downturn in Washington, D.C., hotel revenues during the early 1990s, which limited John Hancock's and Sumitomo's returns on their investment in the Joint Venture.

44.    The failure by the Joint Venture and Woodley Road to maintain the Hotel also derived from a set of agreements which collectively assured that no one other than Sheraton had any immediate economic interest in maintaining the Hotel.

45.    Under the Management Contract, Sheraton has received payments based in part on the revenues of the hotel. Therefore, the amount of Sheraton's revenues under the Management Contract has depended, in part, on the extent to which the public found the Hotel to be a well maintained, inviting facility.

46.    However, John Hancock's incentive to invest additional capital to renovate and reposition the Hotel was reduced even further by provisions in the Joint Venture Agreement

providing, for the June 12, 1990 through December 31, 1995 time period, a preferred return to Sumitomo from the Hotel's cash flow. The preferred return provisions were more likely to reduce John Hancock's own income from the Hotel if significant portions of the Hotel were closed for renovations.

47.    Moreover, precisely because Sumitomo received a preferred return, Sumitomo had no immediate incentive to demand the extensive renovations that the parties recognized the Hotel needed at the time when Sumitomo purchased its interest in the Joint Venture.

### The Operations Audit

48.    John Hancock, apparently to (a) delay making needed capital contributions, (b) divert attention from its own managerial shortcomings following Sumitomo's July 1994 complaints and (c) search for an excuse to escape the Joint Venture's obligations under the Management Contract, commenced in late 1994 an "operations" audit of Sheraton's performance under the Management Contract.

49.    The Joint Venture was permitted to conduct such an audit under Article XII of the Management Contract.

50.    The plaintiffs represented to Sheraton that the "operations" audit was being conducted by the Joint Venture in connection with its consideration of further capital investment in the Hotel.

51.    The plaintiffs never indicated that the audit was being conducted by John Hancock (except as Managing Partner for the Joint Venture) or Sumitomo.

52.    In reliance on plaintiffs' representations as to the purpose of the audit and pursuant to Article XII of the Management Contract, Sheraton cooperated fully with the audit,

even though it quickly became apparent that the persons who conducted it were woefully ignorant

of the economics and practices of the hospitality industry.

        53.    After the audit progressed well into 1995, the Joint Venture claimed that it

had discovered

> an overwhelming demonstration of breach of contractual
> obligations, breach of fiduciary obligation, neglect of proper
> operations, and failure of managerial supervision

causing damages in the amount of $80 million and constituting "cause" to terminate the

Management Contract.

        54.    The Joint Venture's claim of "cause" to terminate the Management

Contract was particularly significant because, as was widely understood at that time by the

parties, the terms of the 1979 Management Contract, which bound the Joint Venture at Sheraton's

option until the year 2030, had become unfavorable to the Joint Venture in comparison to hotel

management contracts that were typical of what was available to hotel owners in the market at

that time.

        55.    As explained by Steven Dwyer of Sumitomo in 1997, the Management

Contract was "not at all competitive". Another 1997 document generated by John Hancock

explained more precisely that renegotiation of the Management Contract "will save us $3 M per

year (as is) and $6 M per year" after renovations.

        56.    By John Hancock's own estimates, the Joint Venture stood to gain in the

range of $100 to $200 million by renegotiating or terminating the Management Contract.

        57.    Sheraton denied the Joint Venture's claim of "cause" for termination and

requested substantiation of the claim.

58.     Concurrent with its 1995 requests for substantiation, Sheraton determined that, to improve its relationship with the Joint Venture, reduce disruption at the Hotel and facilitate the needed renovations, it was willing from a business perspective to renegotiate the terms of the management contract to the benefit of the Joint Venture.

59.     In late 1995, Sheraton offered to renegotiate the terms of the Management Contract, and to discuss any actual damages that might be owing to the Joint Venture, while emphasizing that Sumitomo and John Hancock had adduced no evidence of any such damages.

60.     The Joint Venture made no effort to substantiate its damages claim until December 29, 1995, when it sent to Sheraton a Notice of Default (the "1995 Notice of Default"). A copy of the 1995 Notice of Default is annexed hereto as Exhibit A.

61.     "Notice of default" is not required by and triggers no provisions of the Management Contract. (The Management Contract does provide for notice of "intention to terminate" upon expiry of a fifteen day period. No such notice was given until July 31, 1997, as discussed below.)

62.     The Notice of Default claimed 15 categories of events of default under subparts XXIV(A)(1) and XXIV(A)(6) of the Management Contract.

63.     Subpart XXIV(A)(1) of the Management Contract states, in summary, that the failure of any party to pay to the other amounts required under the Management Contract for a period of 30 days after it becomes payable constitutes an event of default.

64.     Subpart XXIV(A)(6) of the Management Contract states that failure to perform any "other" material obligation under the Agreement constitutes an event of default.

65.     Responding to the 1995 Notice of Default in a 21-page single-spaced letter dated January 31, 1996 (the "January 31, 1996 letter), Sheraton comprehensively refuted each of

the 15 categories of alleged breaches and restated its willingness to further discuss and remedy any defaults and to renegotiate the terms of the Management Contract to the benefit of the Joint Venture. A copy of the January 31, 1996 letter is annexed hereto as Exhibit B.

66.    Sheraton's January 31, 1996 letter responded directly to the Joint Venture's specific allegations, as summarized below.

67.    The first category of breach alleged by the Owner in the 1995 Notice of Default was the Operator's supposed entry of employee wages and other employee expenses as capital expenses rather than ordinary operating costs, and the Operator's supposed failure to gain reimbursement for the costs associated with employees assigned temporarily to other properties. With respect to this first category of defaults, the Operator clarified the Owner's misunderstanding of normal accounting practices and explained in detail how Sheraton ensures that employee loaning does not harm Sheraton hotels.

68.    The second category of alleged defaults comprised allegations that the Operator commingled funds of the Owner with its own funds, used the Hotel's funds to pay for services for the Operator's affiliates, and used Hotel facilities to subsidize the purchasing costs of other hotels in the region. With respect to this second category, the Operator explained how the Hotel benefits from and is compensated for use of space and services, denied knowledge of any commingling of funds, and requested additional information regarding any examples of commingling. The Owner has provided no such additional information.

69.    The third category of alleged defaults comprised allegations that the Operator failed to disclose compensation of senior Hotel employees, and paid excessive and unauthorized compensation to certain employees. With respect to this third category, the Operator explained that relocation expenses are not considered to be part of "benefits" as that

term is used in subpart VI(5) of the Management Contract. The Operator recognized that it had erroneously on two occasions compensated employees in amounts requiring the Owner's advance approval without having obtained such advance approval. The Operator further agreed to address this error and any other compensation-related disputes as part of any overall resolution of the issues outstanding among the parties.

70.     The fourth category of alleged breaches concerned employee turnover and employee benefits. The Owner alleged that the Operator permitted and caused excessive turnover among senior employees and that the Operator gave excessive relocation benefits, violated regulations concerning withholding taxes, and improperly used Owner's funds to reimburse an employee for the employee's loss upon the sale of a residence. With respect to this fourth category of alleged defaults, the Operator denied that excessive turnover had occurred, stated that all relocation benefits had been given in accordance with written policies, and stated that the Operator had paid withholding taxes to employees only where appropriate. The Operator requested more information so as to address any other concerns. The Owner provided no such further information.

71.     The fifth category of alleged breaches concerned the use of complimentary rooms. The Owner alleged that the Operator improperly allowed use of Hotel rooms free of charge and at unreasonably low rates, while failing to maintain adequate controls and record of such uses of rooms. With respect to this fifth category of alleged breaches, the Operator responded in detail with references to numerous reports and studies concerning the complimentary room use permitted by the Management Contract and customary in the industry, including detailed information concerning the complimentary use of rooms at the Hotel and at other Sheraton hotels by Plaintiffs and their employees. After further discussions among the

parties, the Operator, as an accommodation, instituted in mid-1995 monthly reporting to the Owner with respect to complimentary room use.

72.    The sixth category of alleged breaches by the Operator pertained to the Owner's rights and purported rights to approve contracts that the Operator entered into. With respect to this sixth category of alleged breaches, the Operator recognized that in each of the years 1991-1993, the Operator might have executed without Owner approval one contract for services in excess of the adjusted maximum amount set forth in subpart VI(8) of the Management Contract. The Operator stated that each of these three contracts was beneficial to the hotel and, in any case, each of them had subsequently been reviewed with the Owner's representatives at quarterly Owner's meetings.

73.    The seventh category of alleged breaches concerned rebates that the Operator received. In two full single-spaced pages, the Operator comprehensively explained how the Hotel had received value for the rebates that the Operator received, how the Hotel had benefited from Sheraton's bargaining power at the national level, and how the rebates had been disclosed to the Owner on numerous occasions.

74.    The eighth category of alleged breaches comprised allegations that the Operator had inequitably and disproportionately allocated insurance costs to the Hotel. In response, Operator stated exactly how costs of general liability coverage and property coverage were allocated, and asked the Owner to provide further information to permit the Operator to address the Owner's concern. No such further information was forthcoming from the Owner.

75.    The ninth category of alleged breaches comprised allegations that the Operator had improperly imposed on the Hotel marketing costs and the costs of a frequent traveler program that was not in the best interests of the Hotel. In response, the Operator pointed

out that participation in the marketing and frequent traveler program was authorized by the

Management Contract and did not involve any improper allocations of costs. The Operator

further noted that Sheraton had provided funding for sales in addition to that required under the

Management Contract, and stated its strong basis for believing that the frequent traveler programs

was in the Hotel's best interests.

      76.    The tenth category of alleged breaches comprised allegations that the

Operator had failed to maintain adequate internal controls, including internal audit procedures.

The Operator flatly denied these allegations, noting that the Hotel's books and records had always

been kept in accordance with the Uniform System of Accounting for Hotels, generally accepted

accounting practices, and the requirements of the Management Contract. The Operator also

noted that Arthur Anderson LLP, the Hotel's independent auditor in recent years, had certified its

audits without the issuance of a blueback report that would have been required if the audit had

discovered accounting deficiencies or inadequate financial controls.

      77.    The eleventh category of alleged breaches was comprised of Owner's

allegations that the Operator had failed to make full disclosure concerning the Hotel's capital

needs. In response, Sheraton pointed out the numerous occasions on which the Owner became

aware of the Hotel's capital needs and chose to do nothing about them. For example, Sheraton

reminded the Owner that Sumitomo was made fully aware in 1990, when it purchased its share of

the Joint Venture, that the Hotel required extensive capital expenditures.

      78.    The twelfth category of alleged breaches comprised allegations that the

Operator failed to make needed repair and maintenance expenditures. In response, the Operator

demonstrated that its repair and maintenance expenditures had risen markedly over the previous

ten years, both in terms of dollars and in terms of percentage of the Hotel's total revenue. The

Operator also noted the Owner's hypocrisy in arguing that the Operator had not spent enough money on capital replacements, when representatives of Sumitomo and Hancock had actually instructed the Operator to reduce the amount of planned capital spending in the Hotel's 1996 capital plan from 4.5 percent of budgeted revenue to 3.0 percent.

79.    The thirteenth category of alleged breaches comprised allegations that the Operator had presented materially misleading budgets and other financial information.  Operator categorically denied these allegations.  With respect to the Owner's further allegation that the Operator failed to produce to the Owner any letters to management issued by the Operator's public accountants, the Operator stated that, to the best of its knowledge, it never received any such letters.  And finally, with respect to the fourteenth and fifteenth categories of alleged breaches, the Operator noted that these were mere rehashings of the allegations the Owner had made in the first through thirteenth categories of the 1995 Notice of Default.

80.    As described above, the purported "breaches" of the Management Contract that John Hancock alleged after the "operations" audit were all either nonexistent, examples of standard practice in the hospitality industry, or of relatively minor economic significance.

81.    Yet, somehow, John Hancock claimed that as a result of alleged "breaches," Sheraton had caused damages in excess of $80 million to the Hotel, which has a value of no more than twice that amount.  Short of imploding the Hotel buildings with explosives, it is inconceivable how Sheraton could cause damages even remotely approaching this magnitude to the Hotel, and despite repeated requests, John Hancock has refused to substantiate this figure or explain how it was derived.

82.    Moreover, the Operator's inadvertent lack of precise compliance with the terms of the Management Contract in two instances over the long history of the contract did not

constitute, either singly or in combination, an event of default that would permit the Owner to terminate the Management Contract.

83.     In the January 31, 1996 letter, and repeatedly thereafter, Sheraton offered to provide John Hancock with the documentation on which the January 31, 1996 letter was based. The plaintiffs failed to avail themselves of this opportunity and have continued to insist, without providing any substantiation whatsoever, that Sheraton somehow caused astronomical amounts of damage to the Hotel.

84.     Despite the disingenuousness and bad-faith posturing of John Hancock, Sheraton was willing to discuss changes to the Management Contract purely as a business matter, as a way of facilitating the adoption of a renovation plan for the Hotel.  For example, Sheraton indicated its willingness to reduce its fees and restructure the terms of the Management Contract if an appropriate renovation plan is adopted.

85.     However, John Hancock, which is either institutionally incapable of making a decision or seduced by its own rhetoric of astronomical damages, has been unwilling to agree to any reasonable approach to resolving the controversy.

86.     Plaintiffs have declined to share with Sheraton the audit upon which its damages claims are based.  (Now, following the commencement of this litigation, plaintiffs take the position that the audit was prepared in anticipation of litigation on behalf of individual partners John Hancock and Sumitomo, and not by the Joint Venture for operational reasons, and that therefore all documents and communications in connection with the audit constitute privileged matter not subject to discovery or even review by Joint Venture Partner Washington Sheraton Corporation.)

87.    During the first half of 1996, the Joint Venture used its unsubstantiated allegations of breach constituting cause for termination in an effort to extort from Sheraton not only concessions in the terms of the Management Contract but also exorbitant sums in damages. When pressed for substantiation of its allegations, the Joint Venture routinely sidestepped the issue.

88.    It soon became apparent that the Joint Venture was trying to squeeze out of Sheraton funds to offset the capital investments of over $60 million required of John Hancock and Sumitomo to carry out the necessary renovation and repositioning of the Hotel.  By reducing Sumitomo's further investment, John Hancock could avoid Sumitomo's further questioning of its authority as Managing Partner, and perhaps of the nature of its disclosure to Sumitomo in 1990 concerning the Hotel's need for capital investment.

89.    Any suggestion that Sumitomo was not satisfied with Sheraton's operation of the Hotel was and is belied by Sumitomo's solicitation of Sheraton in or around summer 1996 as a potential operator of a Sumitomo-owned hotel in the Chicago area.  Sheraton declined Sumitomo's 1996 request because, already managing a major convention hotel in Chicago, it was contractually constrained from considering it.

90.    By mid-1997, Plaintiffs had changed counsel and the parties had arrived at various potentially viable scenarios involving the renegotiation or replacement of the management Contract.  The parties remained, however, unable to resolve the question of the Joint Venture's still unsubstantiated damage claims.

91.    The filing of the complaint herein is merely the continuation of Plaintiffs' efforts to escape the terms of the Management Contract and extort money from Sheraton by claiming damages without any good faith basis.

## Wrongful Termination and Revocation

92.     In or about July 1997, John Hancock and Sumitomo, upon the recommendation of John Hancock, authorized the Joint Venture to terminate the Operating Term of the Contract.

93.     Subsequently, by notice dated July 31, 1997, Woodley Road, on behalf of the Joint Venture, gave notice of intention to terminate the Management Contract after the expiration of 15 days due to Sheraton's alleged failure to cure the events of default specified in the 1995 Notice of Default including without limitation defaults under Sections A.1 and A.6 of Article XXIV of the Management Contract (the "1997 Notice of Intention to Terminate"). The 1997 Notice of Intention to Terminate relied completely upon, and did not make any allegations of breach additional to, the allegations set forth in the 1995 Notice of Default.

94.     The 1997 Notice of Intention to Terminate invoked part A of Article XXIV of the Management Contract, which provides that the Management Contract will terminate 15 days after such notice unless noticed events of default are cured within such period or, with respect to defaults referred to in items (1), (5) and (6) of part A that cannot be cured within 15 days after such notice, such noticed events of default are cured within 90 days after such notice.

95.     No events of default existed on July 31, 1997.

96.     Any event of default existing on July 31, 1997 was subsequently cured to as to make the 1997 Notice of Intention to Terminate "of no force and effect" pursuant to part A of Article XXIV of the Management Contract.

97.     Any failure to cure any event of default existing on July 31, 1997 so as to make the 1997 Notice of Intention to Terminate "of no force and effect" pursuant to part A of

Article XXIV of the Management Contract is wholly attributable to Plaintiffs' failure to act in good faith.

98.    The Management Contract has not been terminated according to its terms.

99.    Plaintiffs' efforts to terminate the Management Contract constitute a breach of the Management Contract made wilfully and in bad faith.

100.    Rather than awaiting resolution of the contractual termination dispute with Sheraton, Woodley Road, in the 1997 Notice of Intention to Terminate, purported to revoke Sheraton's agency to manage the Hotel as of August 15, 1997.

101.    The Joint Venture's purported revocation of Sheraton's agency to manage the Hotel was improper under agency law.

102.    The Joint Venture invoked the jurisdiction of this Court to enjoin Sheraton from resisting the improper revocation of Sheraton's agency.

103.    The revocation of Sheraton's agency to manage the Hotel, which effectively terminated the Operating Term of the Management Contract without cause, constitutes a breach of the Management Contract made wilfully and in bad faith.

104.    The harm caused to Sheraton by the revocation of its agency to manage the Hotel, and by the enforcement of such revocation by this Court, cannot be remedied by reinstatement of Sheraton as agent.

### Failure to Distribute Assets of the Joint Venture

**105.    In or about February, 1999, the Joint Venture sold the Hotel.  Upon information and belief the sale price for the Hotel was in excess of two-hundred million dollars.  Washington Sheraton, as the holder of a 1% interest in the Joint Venture, is entitled to its share of the sale proceeds, approximately two million dollars.**

106.    Sale or other disposition of all or substantially all of the Joint Venture's assets is an event of dissolution under Section 10.01(3) of the Joint Venture Agreement.   The Hotel constituted all or substantially all of the Joint Venture's assets.

107.    John Hancock, as Managing Partner, is obligated to proceed with reasonable promptness to liquidate the business of the Joint Venture upon an event of dissolution and must distribute the assets of the Joint Venture to the Partners.

108.    The sale of the Hotel occurred over seven months ago and despite Washington Sheraton's repeated demands, John Hancock has failed to distribute any of the proceeds from the sale of the Hotel.

### First Counterclaim

~~105~~ **109**.        This claim for relief is brought by Sheraton on its own behalf against the Joint Venture and Woodley Road.

~~106~~ **110**.        Sheraton repeats and realleges the allegations of Paragraphs 1 through 105, above, as if set forth in full herein.

~~107~~ **111**.        Sheraton has properly and fully performed its duties under the Management Contract and has not breached that Contract in any material respect.  As a result, Plaintiffs have no contractual right to terminate the Management Contract.  By nonetheless revoking Sheraton's agency to operate the Hotel without cause and by obtaining this Court's preliminary injunction to effectuate that revocation, the Joint Venture and Woodley Road have breached the Management Contract and are liable to Sheraton for monetary damages, in an amount to be proved at trial, equivalent to the fees Sheraton would have earned if it had been allowed to continue to perform the Management Contract through its final extension period ending in the year 2030.

~~108~~ **112**.        According to Plaintiffs' own estimations, the amount of damages to which Sheraton is entitled exceeds $100 million.

### Second Counterclaim

~~109~~ **113**.        This claim for relief is brought by Sheraton on its own behalf against Hancock and Sumitomo.

~~110~~ **114**.        Sheraton repeats and realleges the allegations of Paragraphs 1 through 109 above, as if set forth in full herein.

~~111~~ **115**.        As a condition for the entry of its preliminary injunction, the Court required Hancock and Sumitomo to undertake, and they did in fact undertake, to pay all damages

suffered by Sheraton if it was wrongfully enjoined, or if the revocation of its agency to operate the

Hotel was wrongful and in violation of the Management Contract.  Accordingly, Hancock and

Sumitomo are directly liable to Sheraton for all damages awarded to Sheraton pursuant to its first

counterclaim herein.

## Third Counterclaim

~~112~~ **116**.    This claim for relief is brought by Sheraton on its own behalf

against the Joint Venture and Woodley Road.

~~113~~ **117**.    Sheraton repeats and realleges the allegations of Paragraphs 1

through 112, above, as if set forth in full herein.

~~114~~ **118**.    Prior to the wrongful revocation of Sheraton's agency to operate

the Hotel, Woodley Road and the Joint Venture breached the Management Agreement in material

respects.

~~115~~ **119**.    First, Woodley Road and the Joint Venture each failed to meet their

contractual obligations to Sheraton as an Operator to adequately maintain and provide capital

repairs and improvements to the Hotel property.  As a result, the Hotel lost substantial business

and revenue, causing damage to Sheraton in the form of decreased management fees.

~~116~~ **120**.    Second, the Joint Venture and Woodley Road have refused to pay

fees and reimbursements to which Sheraton is entitled under the Management Agreement,

including without limitation certain Sheraton sales offices fees, fees for customer complaint

servicing, and fees for an employee training program known as SGS 2000.  The amount of these

unpaid fees, which will be proved at trial, exceeds $1 million.

~~117~~ **121**.    Third, at the time when Sheraton quit the Hotel premises, there

remained due and owing certain unbilled charges and expenses that have not yet been quantified,

and the Joint Venture and Woodley Road are also liable to Sheraton for any employee severance payments resulting from Sheraton's removal from the Hotel.

~~118~~ **122.**    By virtue of the foregoing allegations, the Joint Venture and Woodley Road have breached their contractual obligations under the Management Contract and are liable to Sheraton for damages resulting from that breach in an amount to be proved at trial.

### Fourth Counterclaim

~~119~~ **123.**    This claim for relief is brought by ITT Sheraton and Washington Sheraton on their own behalf against John Hancock.

~~120~~ **124.**    ITT Sheraton and Washington Sheraton repeat and reallege the allegations of Paragraphs 1 through 119 above as if set forth in full herein.

~~121~~ **125.**    Under the Joint Venture Agreement, John Hancock, as Managing Partner, took on the contractual obligations to the Joint Venture and the other partners to oversee the day-to-day operations of the Hotel and to develop plans and budgets for all necessary capital spending, including capital spending needed to maintain or improve the Hotel.

~~122~~ **126.**    In addition to its contractual obligations, John Hancock as Managing Partner had a fiduciary duty to the Joint Venture and its other partners to use due care and reasonable diligence in carrying out its responsibilities under the Joint Venture Agreement.

~~123~~ **127.**    ITT Sheraton and Washington Sheraton have been injured by the failure of John Hancock to perform its duties as Managing Partner because (a) the value of their Joint Venture interest has been diminished because John Hancock has caused the Joint Venture to incur the existing and potential financial obligations to Sheraton resulting from the Joint Venture's termination, and thus breach, of the Management Contract; (b) the values of interests in the Joint Venture and its assets have been further reduced as the result of the failure to provide adequate

funds for capital renovations and improvements; (c) the cost of necessary repairs has increased as the result of further deterioration caused by John Hancock's delay in addressing the Hotel's capital needs, which will result in larger capital calls to the Joint Venture's partners when the renovation is finally done; and (d) as a result of lost business at the Hotel, the income of the Joint Venture and thus its partners have been reduced.

124 **128**.    By virtue of the foregoing allegations, John Hancock has acted in bad faith and with wilful misconduct, ill will, recklessness, wantonness and oppressiveness in breaching its contractual and fiduciary duties to ITT Sheraton and Washington Sheraton, and is liable to them for damages resulting from those breaches in an amount to be proved at trial.

## Fifth Counterclaim

125 **129**.    This claim for relief is brought by ITT Sheraton and Washington Sheraton on their own behalf against John Hancock and the Joint Venture.

126 **130**.    ITT Sheraton and Washington Sheraton repeat and reallege the allegations of Paragraphs 1 through 125 above as if set forth in full herein.

127 **131**.    Based on the foregoing allegations, ITT Sheraton and Washington Sheraton are entitled to judgment declaring that, as provided for in section 6.01 of the Joint Venture Agreement, they have validly demanded the removal for cause of John Hancock as Managing Partner, and ordering and directing that John Hancock cease to be Managing Partner.

## Sixth Counterclaim

128 **132**.    This claim for relief is brought by ITT Sheraton and Washington Sheraton derivatively on behalf of the Joint Venture against John Hancock.

~~129~~ **133**.         Prior to bringing this claim derivatively, Washington Sheraton made

a demand on the Joint Venture to remove John Hancock as Managing Partner of the Joint

Venture, which demand was refused.

~~130~~ **134**.         ITT Sheraton and Washington Sheraton repeat and reallege the

allegations of Paragraph 1 through 129 above as if set forth in full herein.

~~131~~ **135**.         By virtue of the foregoing allegations, John Hancock, in breach of

its contractual obligations and fiduciary duties to the Joint Venture, has wrongfully caused the

Joint Venture to incur liability for damages to Sheraton as alleged in the First and Third

counterclaims, and is therefore liable to the Joint Venture for all damages awarded to Sheraton.

~~132~~ **136**.         In causing the Joint Venture to incur the foregoing liabilities to

Sheraton, John Hancock has acted in bad faith and with wilful misconduct, ill will, recklessness,

wantonness and oppressiveness in breaching its fiduciary duties to the Joint Venture.

<u>**Seventh Counterclaim**</u>

**137.**   <u>This claim for relief is brought by Washington Sheraton against John</u>

<u>Hancock as Managing Partner of the Joint Venture.</u>

**138.**   <u>Washington Sheraton repeats and realleges the allegations of</u>

<u>Paragraphs 1 through 136 above as if set forth in full herein.</u>

**139.**   <u>Based on the foregoing, John Hancock has breached its contractual</u>

<u>obligations as Managing Partner of the Joint Venture to distribute with reasonable</u>

<u>promptness the net assets of the Joint Venture to Washington Sheraton following the sale</u>

<u>of the Hotel.  John Hancock is liable to Washington Sheraton for damages in the amount of</u>

<u>the share of the net assets of the Joint Venture to which Washington Sheraton is entitled.</u>

WHEREFORE, it is respectively requested that the Court enter judgment:

A.    Dismissing the Complaint in all respects;

B.    Granting Sheraton judgments on the First and Third Counterclaims and awarding it damages against the Joint Venture and Woodley Road in an amount to be proved at trial;

C.    Granting Sheraton judgment on the Second Counterclaim and awarding it damages against Hancock and Sumitomo in an amount to be proved at trial;

D.    Granting ITT Sheraton and Washington Sheraton judgment on the Fourth and Fifth Counterclaims; awarding them compensatory and punitive damages against John Hancock in an amount to be proved at trial; declaring that ITT Sheraton and Washington Sheraton have properly demanded the removal for cause of John Hancock as Managing Partner; and directing that John Hancock cease to be Managing partner of the Joint Venture;

E.    Granting judgment derivatively to the Joint Venture on the Sixth Counterclaim declaring that John Hancock is liable to the Joint Venture for the reimbursement of all damages paid by the Joint Venture to Sheraton and awarding compensatory and punitive damages against John Hancock in an amount to be proved at trial;

F.    **Granting Washington Sheraton judgment on the Seventh Counterclaim and awarding it damages in an amount to be proved at trial.**

    **G.**    Granting Sheraton, ITT Sheraton and Washington Sheraton their costs and disbursements of this action, together with such other or further relief as the Court deems just and proper.

Dated:  Wilmington, Delaware
        ~~March 27, 1998~~ **October 25, 1999**

                                        Allen M. Terrell, Jr. (I.D. #709)
                                        Srinivas M. Raju (I.D. #3313)
                                        RICHARDS, LAYTON & FINGER
                                        One Rodney Square
                                        P.O. Box 551
                                        Wilmington, Delaware 19899
                                        (302) 658-6541
                                        Attorneys for Defendants and
                                            Counterclaims and Third-Party
                                            Plaintiffs

OF COUNSEL:
John S. Kinzey
~~Elizabeth Page Smith Fouché~~Scot C.  Gleason
~~James E. Schwartz~~ Nicholas W.C. Corson
LeBOEUF, LAMB, GREENE & MacRAE
                L.L.P.
125 West 55th Street
New York, New York 10019-5389
212-424-8000

## CERTIFICATE OF SERVICE

I hereby certify this 25th day of October, 1999, that I caused copies of the foregoing Motion for Leave to Supplement Counterclaims to be served upon the following counsel in the manner indicated:

**BY HAND**
James P. Hughes, Esq.
Young, Conaway, Stargatt & Taylor
Rodney Square North
P.O. Box 391
Wilmington, DE  19899

**BY FEDERAL EXPRESS**
William Wallace, III
Morgan, Lewis & Bockius, LLP
1800 M Street, N.W.
Washington, D.C.  20036

Allen M. Terrell, Jr. (#709)

RLF1-199590-1