## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **WASHINGTON SHERATON CORPORATION,** | ) | |
| **Plaintiff,** | ) | |
| v. | ) | |
| **2660 WOODLEY ROAD JOINT VENTURE,** | ) | |
| **and** | ) | **Case No. 1:05CV0971-HHK** |
| **JOHN HANCOCK LIFE INSURANCE COMPANY (formerly known as John Hancock Mutual Life Insurance Company),** | ) | |
| **Defendants.** | ) | |

## <u>PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS</u>

Plaintiff Washington Sheraton Corporation (n/k/a Washington Sheraton L.L.C.) ("WSC") files this Motion to Dismiss the Counterclaims of Defendant John Hancock Life Insurance Company and Defendant 2660 Woodley Road Joint Venture (collectively, "Defendants"), pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rule 7(a) of the District Court of the District of Columbia.

Based on the statement of facts and specific points of law and authority set forth in WSC's accompanying Memorandum of Law in Support of Plaintiff's Motion to Dismiss Defendants' Counterclaims, WSC respectfully requests that this Court: (1) grant WSC's motion; (2) dismiss Defendants' Counterclaims; and (3) award WSC its attorneys' fees and costs in connection with the preparation, filing, and prosecution of this motion.

Respectfully submitted,

**SCHEUERMANN & MENIST**

700 E. Street, S.E.
Washington, D.C. 20003
Telephone: 202-547-9180
Telecopier: 202-547-2050

_____

John E. Scheuermann

**ATTORNEYS FOR PLAINTIFF**

Of Counsel:

**BICKEL & BREWER**

William A. Brewer III
James S. Renard
767 Fifth Avenue
New York, New York 10153
Telephone: 212-489-1400
Telecopier: 212-489-2384

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 26, 2006, I electronically filed and caused to be served

by First Class Mail copies of Plaintiff's Motion to Dismiss Defendants' Counterclaims to

Defendants' counsel of record addresses as follows:

William E. Wallace III
Jonathan C. Poling
MILBANK TWEED HADLEY & McCLOY LLP
1850 K Street, N.W., Suite 1100
Washington, D.C. 20006

_____

John E. Scheuermann

5121557.1
1643-35

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **WASHINGTON SHERATON CORPORATION,** | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| **2660 WOODLEY ROAD JOINT VENTURE,** | ) |
| | ) **Case No. 1:05CV0971-HHK** |
| **and** | ) |
| | ) |
| **JOHN HANCOCK LIFE INSURANCE COMPANY** | ) |
| **(formerly known as John Hancock Mutual Life** | ) |
| **Insurance Company),** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS

**SCHEUERMANN & MENIST**
John E. Scheuermann
700 E. Street, S.E.
Washington, D.C. 20003
Telephone: (202) 547-9180
Telecopier: (202) 547-2050
*Attorneys for Plaintiff*

*Of Counsel*:
**BICKEL & BREWER**
William A. Brewer III
Luke McGrath
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 489-1400
Telecopier: (212) 489-2384

Table of Contents

Page

Table of Authorities .................................................................................... iii

I.  Preliminary Statement ............................................................................... 1

II. Statement of Relevant Facts ...................................................................... 3

    A.    An Overview Of This Action And The Parties' Respective Claims ..................... 3

    B.    WSC And Hancock Formed The Partnership In 1979 ..................................... 3

    C.    Defendants Commenced The Delaware Action In 1997 ................................... 4

    D.    Defendants Sold The Hotel In 1999, But
         Have Made No Interim Or Final Distributions To WSC. ................................ 5

    E.    The Delaware Court Entered Judgment In The Prior Delaware
         Action Providing For Full Compensation To Defendants For Any
         Injuries Arising From The Operative Facts Underlying Their Counterclaims ........ 5

    F.    WSC Initiated This Action Based Upon Defendants'
         Failure To Make Final Distributions In Connection With
         The Liquidation And Winding-Up Of The Partnership's Affairs ........................ 6

    G.    This Court Has Held That WSC's Claims Are Not Based Upon
         The Same Transactions That Was The Subject Of The Delaware Action .............. 7

    H.    Defendants Assert Counterclaims For Recoupment Based
         Upon Transactions That Were The Subject Of The Delaware Action. ................. 7

III. Summary Of Argument ............................................................................. 8

IV. Arguments And Authorities ...................................................................... 8

    A.    Defendants Cannot State A Defensive Counterclaim For Recoupment ............... 9

        1.    Defendants' Counterclaims Do Not Arise from
             the Same Transaction as WSC's Claims in this Action. ......................... 10

        2.    Defendants cannot re-litigate whether
             the transactions in the Delaware Action and
             those forming the basis of WSC's claims are distinct. ......................... 13

        3.    Defendants' Counterclaims seek relief for
             litigation costs and fees, which is not the same kind or
             nature of relief as that sought by WSC's claims in this action. ............. 13

Table of Contents
(continued)

Page

B.    Defendants' Counterclaims Are Likewise Barred By The
      Doctrine Of Satisfaction And The Prohibition Against Double Recovery............14

C.    WSC Should Be Awarded Its Fees And Costs In
      Obtaining Dismissal Of Defendants' Meritless Counterclaims............................17

V. Request For Relief ................................................................................................18

Table of Authorities

<u>Case</u>                                                                                                              <u>Page</u>

*2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*,
    369 F.3d 732 (3d Cir. 2004)\*.......................................................................6, 7, 8

*2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*,
    No. 97-450-JJF, 1999 U.S. Dist. LEXIS 20860 (D. Del. Dec. 2, 1999)\*.........................5

*Advantage Health Plan, Inc. v. Knight*,
    139 F. Supp. 2d 108 (D. D.C. 2001).......................................................9, 17

*Allen v. McCurry*,
    449 U.S. 90 (1980)..........................................................................17

*Estate of Anthony Phillips v. District of Columbia*,
    355 F. Supp. 2d 212 (D. D.C. 2005).............................................................9

*Apotex, Inc. v. Food & Drug Admin.*,
    393 F.3d 210 (D.C. Cir. 2004)...............................................................17

*Arizona v. California*,
    460 U.S. 605 (1983)..........................................................................13

*Baker v. Gold Seal Liquors, Inc.*,
    417 U.S. 467, *Fiondella v. Tidwell*, No. 95-535  1996 U.S. Dist. LEXIS 17462
    (D. D.C. Nov. 12, 1996)...................................................................10, 17

*Baylor v. Bortolussi*,
    194 A.2d 653 (D.C. 1963)\* ...........................................................9, 10, 11, 12

*Boyd v. O'Neill*,
    273 F. Supp. 2d 92 (D. D.C. 2003)...........................................................15

*Christianson v. Colt Indus. Operating Corp.*,
    486 U.S. at 816..........................................................................13

*Corto v. National Scenery Studios, Inc.*,
    705 A.2d 615 (D.C. 1997).................................................................12, 17

*District of Columbia v. Jackson*,
    451 A.2d 867 (D.C. 1982)...................................................................16

*Drake v. Federal Aviation Admin.*,
    291 F.3d 59 (D.C. Cir. 2002)...............................................................17

*Faison v. Nationwide Mortgage Corp.*,
    839 F.2d 680 (D.C. Cir. 1987) ..................................................................................16

*Franklin Inv. Co. v. Smith*,
    383 A.2d 355 (D.C. 1978) ................................................................................14, 16

*Galliher v. Rubin*,
    969 F. Supp. 1329 (S.D. Ga. 1997) ..........................................................................15

*Gregg v. Barrett*,
    771 F.2d 539 (D.C. Cir. 1985) ....................................................................................9

*Hinton v. Shaw Pittman Potts & Trowbridge*,
    257 F. Supp. 2d 96 (D. D.C. 2003) ............................................................................4

*Hoesing v. Sears, Roebuck & Co.*,
    484 F. Supp. 478 (D. Neb. 1980) ......................................................................15, 17

*Jacobs v. H. L. Rust Co.*,
    353 A.2d 6 (D.C. 1976) ............................................................................................15

*Kassman v. American Univ.*,
    546 F.2d 1029 (D.C. Cir. 1976)* ....................................................................14, 15, 16

*Kirk v. Allegheny Towing Inc.*,
    620 F. Supp. 458 (W.D. Pa. 1985) ............................................................................15

*Larson v. Agri-Lines Irrigation, Inc.*,
    No. 00-604-HA, 2001 U.S. Dist. LEXIS 8345 (D. Ore. May 23, 2001) ....................15

*Lipsig v. National Student Mktg. Corp.*,
    663 F.2d 178 (D.C. Cir. 1980) ..................................................................................17

*McLaughlin v. Bradlee*,
    602 F. Supp. 1412 (D. D.C. 1985) ......................................................................17, 18

*Miskunas v. Union Carbide Corp.*,
    399 F.2d 847 (7th Cir. 1968) ....................................................................................15

*Phillips v. Bureau of Prisons*,
    591 F.2d 966 (D.C. Cir. 1979) ....................................................................................4

*Runyon v. District of Columbia*,
    463 F.2d 1319 (D.C. Cir. 1972) ................................................................................14

*Sherman Treaters Ltd. v. Ahlbrandt*,

115 F.R.D. 519 (D. D.C. 1987)...................................................................14

*Snowden v. D.C. Transit Sys., Inc.,*
    454 F.2d 1047 (D.C. Cir. 1971) .........................................................14, 16

*Thompson, Cobb, Bazilio & Assocs., P.C. v. Grant Thornton, LLP,*
    No. 99-8 (RMU/JMF), 2002 U.S. Dist. LEXIS 4976 (D. D.C. Mar. 25, 2002) ...............17

*Timberland Co. v. Sanchez,*
    129 F.R.D. 382 (D. D.C. 1990)...........................................................17

*United States v. Intrados/International Mgmt. Group,*
    277 F. Supp. 2d 55 (D. D.C. 2003)* ....................................................9, 10, 12

*Valdes v. District of Columbia,*
    No. 04-0051 (RMU), 2005 U.S. Dist. LEXIS 17960 (D. D.C. Aug. 18, 2005) ...............13

*Vile v. Chamberlain,*
    No. 542830, 1999 Conn. Super. LEXIS 1715 (Conn. Super. Ct. June 29, 1999).............14

*Washington Med. Ctr., Inc. v. Holle,*
    573 A.2d 1269 (D.C. 1990) ................................................................15, 16

## STATUTES

28 U.S.C. § 1927.................................................................................17

D.C. Code § 12-301(8) (2006)....................................................................17

Fed. R. Civ. P. 12(b)(6)..........................................................................8

Fed. R. Civ. P. 13(a) ............................................................................17

Fed. R. Civ. P. 54(b) ............................................................................13

895.TOA
-35

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WASHINGTON SHERATON CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| 2660 WOODLEY ROAD JOINT VENTURE, | ) | |
| | ) | |
| and | ) | Case No. 1:05CV0971-HHK |
| | ) | |
| JOHN HANCOCK LIFE INSURANCE COMPANY | ) | |
| (formerly known as John Hancock Mutual Life | ) | |
| Insurance Company), | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
TO DISMISS DEFENDANTS' COUNTERCLAIMS**

Plaintiff Washington Sheraton Corporation ("WSC") files this Memorandum in Support of its Motion to Dismiss the Counterclaims of Defendants John Hancock Life Insurance Company ("Hancock") and 2660 Woodley Road Joint Venture (the "Partnership") (jointly, "Defendants"), pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rule 7(a) of the District Court of the District of Columbia, as follows:

**I.**

**PRELIMINARY STATEMENT**

Pursuant to their counterclaims for recoupment ("Counterclaims"), Defendants seek to offset from any recovery awarded to WSC in this action the alleged damages they sustained as a result of WSC's purported acts of aiding and abetting, and conspiracy to aid and abet, the prior-adjudicated breaches of fiduciary duty of the so-called "Sheraton Entities." Those alleged breaches were the subject of the now-final Delaware federal action to which WSC was a party.

1

Alternatively, Defendants assert that WSC is "an alter ego to one or more of the Sheraton Entities," thus imposing liability on WSC for those same alleged breaches of fiduciary duty.

As demonstrated herein, the Counterclaims must be dismissed as a matter of law because, by Defendants' own admission, they arise out of the same transactions and operative facts as the prior Delaware federal action. Indeed, so inextricably connected are the Counterclaims to the Delaware federal suit that Defendants seek, as an offset to WSC's damages, "the significant legal costs" they supposedly incurred "in defense of the Sheraton Entities' and WSC's claims" in that prior action.

There is a fundamental flaw in Defendants' attempt to resuscitate, through the vehicle of a recoupment claim, matters that were raised in the prior proceeding. Defendants have completely ignored this Court's ruling in September 2006 that WSC's claims here do not arise out of the same "nucleus of facts" as the prior litigation. Thus, WSC's claims and Defendants' Counterclaims do not share a common nucleus of operative fact—which is fatal to Defendants' attempt to assert, under the guise of "recoupment," claims that would otherwise be barred by limitations and claim preclusion.[1] The matters at issue in the prior-adjudicated Delaware action are now dead—and Defendants' Counterclaims must necessarily meet a similar fate. Accordingly, WSC respectfully requests that the Court grant this motion and dismiss those Counterclaims from this action.

---

[1] It is telling that, prior to the recent filing of Defendants' amended pleading, Hancock's counterclaim was not limited to offset and recoupment but, instead, sought a net positive recovery. Then, in obvious recognition of the fact that its original counterclaim was barred both by limitations and *res judicata*, Hancock, joined by the Partnership, filed an Amended Answer and Counterclaims and narrowed the counterclaim to one which merely seeks an offset against any damages awarded to WSC.

## II.

## STATEMENT OF RELEVANT FACTS

### A.    An Overview Of This Action And The Parties' Respective Claims.

WSC initiated this action against Defendants to obtain a final Partnership accounting and to recover money damages as a result of Defendants' failure to make a final distribution of WSC's proportionate share of the proceeds from the sale of the Partnership's assets in connection with the dissolution, liquidation, and winding-up of the Partnership's affairs.[2]  In reaction to WSC's exercise of its rights, the Partnership and Hancock, the managing partner of the Partnership, asserted the subject Counterclaims against WSC.[3]  Although characterized as claims for "recoupment," Defendants' Counterclaims are not based upon any true defense to WSC's claims, but, rather, are predicated on the same operative facts that Defendants previously litigated in an action in the United States District Court for the District of Delaware entitled, *2660 Woodley Road Joint Venture, et al. v. ITT Sheraton Corporation, et al.*, Civil Action No. 97-450-JJF (the "Delaware Action"), which resulted in a judgment in favor of Defendants against ITT Sheraton Corporation ("Sheraton") and one of Sheraton's other wholly-owned subsidiaries.

### B.    WSC And Hancock Formed The Partnership In 1979.

In 1979, pursuant to the Amended and Restated Joint Venture Agreement of the Partnership (the "Agreement"), WSC and Hancock, as co-equal owners, formed the Partnership to operate the property formerly known as the Sheraton Washington Hotel (the "Hotel").[4]  The

---

[2]  *See* WSC's Complaint ("Complaint") [Document 1] at ¶¶ 19, 24-30.

[3]  *See* Amended Answer and Counterclaims of John Hancock Life Insurance Company & 2660 Woodley Road Joint Venture ("Answer") [Document 31], filed on December 8, 2006, at ¶¶ 47-90.

[4]  *See* Answer [Document 31], filed on December 8, 2006, at ¶¶ 52-53.

Agreement was later amended and Hancock subsequently acquired a 99% ownership interest in the Partnership, while WSC maintained a 1% ownership interest in the Partnership.[5]  Pursuant to the Agreement, Hancock also served as the managing partner of the Partnership.[6]

## C.    Defendants Commenced The Delaware Action In 1997.

In August 1997, Defendants filed the Delaware Action, seeking damages for Sheraton's alleged breach of the Agreement, breach of fiduciary duty arising from the Agreement, RICO violations, and violations of the Robinson-Patman Act.[7]  In September 1997, WSC, with Sheraton, asserted counterclaims in the Delaware Action against Hancock for breach of fiduciary duty and breach of the Agreement as counterclaim plaintiffs.[8]  After Sheraton and WSC amended those counterclaims in March 1998,[9] Defendants answered[10] and moved to dismiss those counterclaims.[11]

In April 1999, the Delaware Court denied Defendants' motion to dismiss[12] and, in so doing, found that Defendants' federal claims and WSC's state law counterclaims shared a common nucleus of operative fact.[13]  Defendants did not appeal that order.  Nor did Defendants,

---

[5]  *Id.* at ¶¶ 54-55.

[6]  *Id.* at ¶¶ 69, 72.

[7]  *Id.* at ¶ 57.

[8]  *Id.* at ¶ 70.

[9]  *See* Defendants' Answer and Amended Counterclaims in the Delaware Action, filed on March 27, 1998, attached hereto as Exhibit 1.  This Court may take judicial notice of this pleading and all other court filings in the Delaware Action.  *See Hinton v. Shaw Pittman Potts & Trowbridge*, 257 F.Supp.2d 96, 100 & n.5 (D. D.C. 2003); *see also Phillips v. Bureau of Prisons*, 591 F.2d 966, 969 (D.C. Cir. 1979).

[10]  *See* Counterdefendants' Reply to Counterplaintiffs' Amended Counterclaims in the Delaware Action, filed on April 17, 1998, attached hereto as Exhibit 2.

[11]  *See* Plaintiffs' Motion to Dismiss Amended Counterclaims in the Delaware Action, filed on April 17, 1998, attached hereto as Exhibit 3.

[12]  *See* Memorandum Order in the Delaware Action ("Order"), filed on April 6, 1999, at 2, 16, attached hereto as Exhibit 4.

[13]  *Id.* at 4; 8.

although having the right to do so, assert claims against WSC in the Delaware Action following the denial of their motion to dismiss.

**D.    Defendants Sold The Hotel In 1999, But Have Made No Interim Or Final Distributions To WSC.**

In January 1999, during the pendency of the Delaware Action, the Partnership sold the Hotel.[14]  To date, WSC has yet to receive any portion of its proportionate share of the proceeds from that transaction, which share is believed to have been approximately $2 million at the time of the sale.[15]

**E.    The Delaware Court Entered Judgment In The Prior Delaware Action Providing For Full Compensation To Defendants For Any Injuries Arising From The Operative Facts Underlying Their Counterclaims.**

In December 1999, Defendants obtained a jury verdict in their favor on their claims against Sheraton in the Delaware Action.[16]  The jury awarded Defendants $50,082,000 ($12,582,000 in compensatory damages and $37,500,000 in punitive damages).[17]  The Delaware Court then entered judgment for Defendants based on the jury's verdict,[18] but subsequently amended that judgment twice, first reducing the jury's award to Defendants to the amount of $32,247,000 ($12,582,000 in compensatory damages, $17,415,000 in punitive damages, and

---

[14]  *See* Answer [Document 31] at ¶ 60.  In October 1999, WSC moved for leave in the Delaware Action to supplement its counterclaims to assert a claim for an interim (but not a final) distribution of its portion of its proportionate share of the proceeds from the sale of the Hotel.  *See* Counterclaimant's Motion for Leave to Supplement Counterclaims in the Delaware Action, filed on October 25, 1999, attached hereto as Exhibit 5.  In December 1999, on the eve of trial in the Delaware Action, the Delaware Court denied WSC's motion for leave and severed all of WSC's counterclaims from the impending trial. *See* Answer at ¶ 73; *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, No. 97-450-JJF, 1999 U.S. Dist. LEXIS 20860, at *1 (D. Del. Dec. 2, 1999), attached hereto as Exhibit 6.

[15]  *See* Complaint [Document 1] at ¶¶ 18-19.

[16]  *See* Answer [Document 31] at ¶ 58; Judgment in the Delaware Action ("Judgment"), filed on December 13, 1999, attached hereto as Exhibit 7.

[17]  *See* Judgment.

[18]  *See id.*

5

$2,250,000 under the Robinson-Patman Act),[19] and then reducing the jury's award to Defendants

to the amount of $31,497,000 ($12,582,000 in compensatory damages, $17,415,000 in punitive

damages, and $1,500,000 under the Robinson-Patman Act).[20] On appeal, the Third Circuit Court

of Appeals further reduced the jury's award to Defendants to the amount of $3,347,000

($1,322,000 in compensatory damages and $2,025,000 in punitive damages).[21] In March 2005,

consistent with the Third Circuit's opinion, the Delaware Court entered its final judgment in the

Delaware Action.[22]

**F.     WSC Initiated This Action Based Upon Defendants' Failure To Make Final Distributions In Connection With The Liquidation And Winding-Up Of The Partnership's Affairs.**

In April 2005, WSC commenced this action in the Superior Court of the District of

Columbia to obtain an accounting of the Partnership's affairs and to recover its final distribution

of Partnership assets.[23] On June 22, 2005, after Hancock removed this action on May 16, 2005,

Hancock filed a motion to dismiss WSC's claims or, in the alternative, for summary judgment

("Hancock's Motion").[24]

---

[19] *See* Amended Judgment in the Delaware Action ("Amended Judgment"), filed on January 10, 2002, attached hereto as Exhibit 8.

[20] *See* Second Amended Judgment in the Delaware Action ("Second Amended Judgment"), filed on March 4, 2002, attached hereto as Exhibit 9.

[21] *See 2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 745 (3d Cir. 2004), attached hereto as Exhibit 10.

[22] *See* Answer [Document 31] at ¶ 59; Consent Judgment in the Delaware Action, filed on March 1, 2005, attached hereto as Exhibit 11.

[23] *See* Complaint [Document 1] at ¶¶ 18-19, 23.

[24] *See* Defendant John Hancock Life Insurance Company's Motion to Dismiss or in the Alternative for Summary Judgment [Document 9], filed on June 22, 2005; *see also* Defendant John Hancock Life Insurance Company's Motion for Summary Judgment [Document 10], filed on June 22, 2005.

**G.    This Court Has Held That WSC's Claims Are Not Based Upon The Same Transactions That Was The Subject Of The Delaware Action.**

On September 27, 2006, this Court denied Hancock's Motion as to WSC's allegations of breach of contract and breach of fiduciary duty.[25]  In doing so, this Court rejected Hancock's *res judicata* argument, stating:  "WSC's claim in the current action concerns the Partnership's actions surrounding the *final* distribution of [its] assets, a cause of action which did not yet exist at the time of the Delaware Action."[26]  This Court continued:

> WSC's claims in the second suit involve claims that did not accrue until six years after the first claims were asserted, and thus, they are not identical [to WSC's claims in the Delaware Action]. . . . To be sure, WSC sought, and was denied, leave to supplement its counterclaim in the Delaware Action to include a claim that the Partnership was required to make an interim distribution to WSC of its share of the proceeds from the sale of the Hotel. . . . [S]uch a claim is distinct from WSC's present claim for distribution following the dissolution of the partnership.  Thus, the Delaware Action cannot be said to be a decision on the merits of the claims asserted in the present action.[27]

In short, this Court held that WSC's claims in the present action were distinct in time, space, origin, and motivation from the transactions in the Delaware Action.

**H.    Defendants Assert Counterclaims For Recoupment In This Action Based Upon Transactions That Were The Subject Of The Delaware Action.**

On December 8, 2006, Defendants answered WSC's Complaint and asserted the subject Counterclaims.[28]  Defendants assert that WSC is liable for recoupment for alleged breaches of

---

[25]    *See* Memorandum Opinion and Order [Document 19], filed on September 27, 2006.  This Court granted Hancock's Motion to dismiss without prejudice WSC's allegations of fraud and misrepresentation under Count III of WSC's Complaint.  *See id.* at 9-10 (dismissing Count III for failure to plead fraud with requisite particularity).

[26]    *Id.* at 7 (emphasis in original).

[27]    *Id.* at 8.

[28]    *See* Answer [Document 31] at ¶¶ 47-90.  Hancock alone initially filed in this action an answer and the Counterclaims against WSC on October 26, 2006; the Partnership did not file a responsive pleading to the Complaint and as of that time had not otherwise made an appearance in this action.  By

fiduciary duty, the duty of loyalty, and the duty of good faith and fair dealing owed to them, based upon the contention that WSC is the *alter ego* of, conspired with, and aided and abetted Sheraton with respect to the conduct for which Sheraton was previously adjudicated to be liable in the Delaware Action.[29] The relief sought by Defendants is for costs and fees associated with the defense of claims brought by Sheraton and WSC in this action and the prior Delaware Action.[30]

## III.

## SUMMARY OF ARGUMENT

Defendants' Counterclaims are without merit and should be dismissed for two independent reasons. First, Defendants cannot state a defensive counterclaim for recoupment. Second, Defendants' Counterclaims are barred by the doctrine of satisfaction and the prohibition against double recovery. For these reasons, WSC respectfully requests that the Court dismiss Defendants' Counterclaims and award WSC its fees and costs incurred in connection with the preparation, filing, and prosecution of this motion.

## IV.

## ARGUMENTS AND AUTHORITIES

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits this Court to dismiss Defendants' Counterclaims for "failure to state a claim upon which relief can be granted."[31] Although it must accept the allegations in the challenged pleading as true and resolve any

---

agreement of the parties, however, WSC afforded the Partnership the opportunity to appear in this action by allowing Defendants to amend Hancock's prior answer to the Complaint and the Counterclaims by December 8, 2006, and Defendants extended the deadline for WSC to respond to the Counterclaims until December 18, 2006.

[29] *See id.* at ¶¶ 47-90.

[30] *Id.* at ¶¶ 84, 87, and 90.

[31] Fed. R. Civ. P. 12(b)(6).

ambiguities in favor of the non-movant,[32] "[n]evertheless, '[a] court must dismiss a complaint where, even assuming all the factual allegations are true, the plaintiff has failed to establish a right to relief based upon those facts.'"[33] Such is the case here.

## A.  **Defendants Cannot State A Defensive Counterclaim For Recoupment.**

Recoupment is a compulsory counterclaim that seeks to rebate or offset the potential recovery of a claim "upon which one is sued by means of a legal or equitable right resulting from a counterclaim *arising out of the same transaction.*"[34]  To establish a defensive counterclaim for recoupment, a defendant must demonstrate the following three elements:  "(1) the claim must arise from the same transaction or occurrence as the [plaintiff's] suit; (2) the relief sought must be of the same kind or nature as the [plaintiff's] requested relief; and (3) any damages sought cannot exceed the amount sought by the [plaintiff's] claim."[35]  Defendants cannot meet their burden here for three reasons.  First, Defendants' Counterclaims do not arise from the same transaction as WSC's claims in this action.  Second, Defendants cannot re-litigate this Court's prior determination that the transactions in the Delaware Action and those forming the basis of WSC's claims are distinct.  Third, Defendants' Counterclaims seek relief for litigation costs and fees, which is not the same kind or nature of relief as that sought by WSC's claims in this action.

---

[32]  *See Estate of Anthony Phillips v. District of Columbia*, 355 F.Supp.2d 212, 216 (D. D.C. 2005).

[33]  *Advantage Health Plan, Inc. v. Knight*, 139 F.Supp.2d 108, 110 (D. D.C. 2001) (quoting *Gregg v. Barrett*, 771 F.2d 539, 547 (D.C. Cir. 1985)).

[34]  *Baylor v. Bortolussi*, 194 A.2d 653, 656 (D.C. 1963) (emphasis in original; internal quotations and citations omitted) ("Recoupment by way of defense is the right to cut down the original demand of the plaintiff because the plaintiff has violated some duty imposed by law upon him in the performance of the terms of the same contract or transaction on which the plaintiff's cause of action is based.  If the claim is not immediately connected with or has not arisen out of the same contract or transaction, recoupment is not permitted as a defense." (internal citations omitted)); *see also United States v. Intrados/International Mgmt. Group*, 277 F. Supp. 2d 55, 62 (D. D.C. 2003) (stating that the Supreme Court has recognized that recoupment is a compulsory counterclaim) (citing *Reiter v. Cooper*, 507 U.S. 258, 263-64 (1993)).

[35]  *Intrados/International Mgmt. Group*, 277 F. Supp. 2d at 60.

1.    **Defendants' Counterclaims do not arise from the same transaction as WSC's claims in this action.**

Defendants' basis for their Counterclaims for recoupment is not the same as those that form the basis for WSC's current claims. Whether a recoupment claim relates to the same transaction as a plaintiff's claim is measured by reference to Rule 13.[36] Under a similar analysis, this Court has already determined that the transactions that form the basis of the Delaware Action—the same transactions forming the basis for Defendants' Counterclaims—are distinct from the claims now asserted by WSC.[37] Where, as here, a counterclaim for recoupment does not arise immediately out of the same transaction as the plaintiff's claim, the counterclaim must be dismissed.[38]

a.    **Defendants' Counterclaims arise out of the same transactions as the Delaware Action.**

Defendants' Counterclaims are immediately connected with the Delaware Action, not with WSC's current claims. WSC seeks to recover money damages as a result of Defendants' failure to make a final distribution of WSC's proportionate share of the proceeds from the sale of the Partnership's assets in connection with the dissolution, liquidation, and winding-up of the

---

[36] *Id.* at 60. Pursuant to Rule 13, whether a claim relates to the same "transaction" as the opposing party's claim depends upon the existence of a logical relationship between them. *See Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469 n.1 (1974) ("Under Rule 13(a)'s predecessor this Court held that 'transaction' is a word of flexible meaning which may comprehend a series of occurrences if they have logical connection, and this is the rule generally followed by the lower courts in construing Rule 13(a)." (internal citations omitted)); *Fiondella v. Tidwell*, No. 95-535 (TFH), 1996 U.S. Dist. LEXIS 17462, at *12-*13 (D. D.C. Nov. 12, 1996) ("In determining whether or not a counterclaim is compulsory, that is, whether it arises out of the same 'transaction or occurrence' as the original claim, a court must construe the term 'transaction' flexibly, in order to prevent wasteful parallel proceedings. . . . [A] claim is deemed compulsory so long as the 'issues of law and fact raised by the claims are largely the same' and 'substantially the same evidence would support or refute both claims.'" (internal citations omitted)).

[37] *See supra* Sections II. E. and F.

[38] *Baylor*, 194 A.2d at 656 ("If the claim is not immediately connected with or has not arisen out of the same contract or transaction, recoupment is not permitted as a defense." (internal citations omitted)).

Partnership's affairs.  In contrast, Defendants allege in support of their Counterclaims that WSC is liable for Sheraton's misconduct as previously determined in the Delaware Action:  (1) "The [Delaware Action] conclusively established the numerous breaches of fiduciary duty committed by [Sheraton] against [Defendants]."[39]  (2)  "As the wholly-owned subsidiary and alter ego of [Sheraton], WSC . . . assisted and aided and abetted in those breaches;"[40]  (3) "WSC aided and abetted [Sheraton] in [its] breaches of fiduciary duty to [Defendants];"[41]  (4) "WSC conspired with [Sheraton] to cause harm to [Defendants] by aiding and abetting [Sheraton] in breaches of fiduciary duty;"[42]  and (5) "WSC, as an alter ego to [Sheraton], breached fiduciary duties that have been proven, in part in [the Delaware Action]."[43]  As Defendants' allegations demonstrate, the Counterclaims are grounded in Sheraton's conduct in the Delaware Actions.

In contrast, the resolution of WSC's claims in this action for an accounting of the assets of the Partnership may be resolved pursuant to this Court's interpretation of the rights and obligations under the Agreement.  This is not so for Defendants' Counterclaims.  Accordingly, Defendants' allegations fail to connect Defendants' Counterclaims to WSC's current claims but, instead, connect the Counterclaims firmly to the Delaware Action.

  **b.** **This Court previously ruled that the Delaware Action and WSC's current claims are distinct.**

A determination that Defendants' Counterclaims arise from the same transactions as WSC's claims would contradict this Court's prior order.  Hancock previously tried and failed to persuade this Court that WSC's claims were based upon the same transactions as the Delaware

---

[39]  Answer [Document 31] at ¶ 81.

[40]  *Id.*

[41]  *Id.* at ¶ 83.

[42]  *Id.* at ¶ 86.

[43]  *Id.* at ¶ 89.

Action and were thus barred by the doctrine of *res judicata*.[44]  In rejecting Hancock's argument, this Court found a fundamental distinction between WSC's current claims and the claims in the Delaware Action.[45]

The Court's previous distinction holds true here.  WSC's claims relate to its Partnership rights under the Agreement,[46] whereas Defendants' Counterclaims relate to conduct that took place six years or more before WSC's claims accrued.[47]  No "immediate" connection may be drawn between these disparate claims.[48]  Accordingly, Defendants' allegations of past misconduct are not sufficiently connected to WSC's current claims for an accounting of the final dissolution of the Partnership to support a counterclaim for recoupment.[49]

---

[44]  *See* Memorandum Opinion and Order [Document 19] at 7, 9-10 ("WSC's claim in the current action concerns the Partnership's actions surrounding the final distribution of [its] assets, a cause of action which did not yet exist at the time of the Delaware Action … WSC's claims in the second suit involve claims that did not accrue until six years after the first claims were asserted, and thus, they are not identical [to WSC's claims in the Delaware Action … such a claim is distinct from WSC's present claim for distribution following the dissolution of the partnership.").

[45]  *Id.*

[46]  *See generally* Complaint [Document 1]; Memorandum Opinion and Order [Document 19] at 3 ("On April 22, 2005, WSC filed the instant complaint against [Defendants] seeking to recover its share of the proceeds from the 1999 sale ($2 million) that WSC contends it is due under the terms of the Partnership Agreement.") (emphasis added).

[47]  *See* Answer [Document 31] at ¶ 81 ("The [Delaware Action] conclusively established the numerous breaches of fiduciary duty committed by [Sheraton] against [Defendants].  As the wholly-owned subsidiary and alter ego of [Sheraton], WSC . . . assisted and aided and abetted in those breaches"); *see also supra* Sections II. E. and F.

[48]  *Baylor*, 194 A.2d at 656 ("If the claim is not immediately connected with or has not arisen out of the same contract or transaction, recoupment is not permitted as a defense." (internal citations omitted)).

[49]  *See Corto v. National Scenery Studios, Inc.*, 705 A.2d 615, 621-22 (D.C. 1997) ("Corto's counterclaim against National does not arise from the same contract giving rise to National's claim against Corto to recover payment due for services performed.  Therefore, Corto is precluded from bringing a claim in recoupment against National."); *Baylor*, 194 A.2d at 656 ("The record clearly showed that the counterclaim did not arise out of the same contract sued upon by Bortolussi.  If it had, the trustees could have recouped."); *cf. Intrados/International Mgmt. Group*, 277 F. Supp. 2d at 61 ("In the case at bar, the issues of law and fact presented by the defendants' counterclaim are similar to those in the plaintiff's claims because both rely on the same contract.").

**2.** **Defendants cannot re-litigate this Court's prior determination that the transactions in the Delaware Action and those forming the basis of WSC's claims are distinct.**

Defendants cannot seek to re-litigate whether WSC's claims arise out of the same transactions as the Delaware Action. Once an issue is determined by this Court, it cannot and should not be re-litigated by the parties.[50] This Court has previously ruled that the Delaware Action and WSC's current claims are distinct. Accordingly, this Court need not entertain Defendants' attempt to re-litigate that issue.

**3.** **Defendants' Counterclaims seek relief for litigation costs and fees, which is not the same kind or nature of relief as that sought by WSC's claims in this action.**

Defendants seek relief that is different in kind and nature from the relief sought by WSC in this current action. WSC seeks to recover actual, compensatory, consequential, and punitive damages related to Defendants' willful failure to disburse to WSC its proportionate share of the proceeds from the sale of the Partnership's assets.[51] Conversely, for each of their recoupment claims, Defendants seek: "recoupment of the significant legal costs in defense of Sheraton

---

[50] *See Valdes v. District of Columbia*, No. 04-0051 (RMU), 2005 U.S. Dist. LEXIS 17960, at *8-*12 (D.D.C. Aug. 18, 2005) ("'[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was "clearly erroneous and would work a manifest injustice."'" (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 n.8 (1983))); *Valdes*, No. 04-0051 (RMU), 2005 U.S. Dist. LEXIS 17960, at *8-*12 (although district courts may revise their interlocutory decisions at any time before entry of final judgment under Fed. R. Civ. P. 54(b) as justice and equity require, the underlying rationale of the law of the case doctrine, which provides that a court's decision on a rule of law "'should continue to govern the same issues in subsequent stages in the same case,'" applies to guide Rule 54(b) decisions (quoting *Christianson*, 486 U.S. at 816 (quoting *Arizona*, 460 U.S. at 618)). Notably, Defendants have not moved for reconsideration of the Court's Memorandum Opinion and Order [Document 19], which was filed on September 27, 2006.

[51] *See generally* Complaint [Document 1]; Memorandum Opinion and Order [Document 19] at 3 ("On April 22, 2005, WSC filed the instant complaint against [Defendants] seeking to recover its share of the proceeds from the 1999 sale ($2 million) that WSC contends it is due under the terms of the Partnership Agreement.") (emphasis added).

Entities and WSC's claims in now two separate jurisdictions."[52] Defendants fail to demonstrate any valid basis under District of Columbia law for the requested costs and fees[53] and, in fact, no authority supports the recovery of litigation costs and fees pursuant to a defensive counterclaim for recoupment.[54] In any event, Defendants do not seek the same kind or nature of recovery that WSC seeks in this action and, accordingly, their Counterclaims for recoupment must fail.

**B.    Defendants' Counterclaims Are Barred By The Doctrine Of Satisfaction And The Prohibition Against Double Recovery.**

Defendants' Counterclaims are barred by operation of the double recovery rule.    A plaintiff can recover damages for the same injury only once,[55] and the collateral source rule is the

---

[52] Answer [Document 31] at ¶¶ 84, 87, and 90.

[53] *See Sherman Treaters Ltd. v. Ahlbrandt*, 115 F.R.D. 519, 522 (D. D.C. 1987) ("The federal courts of the United States early adopted what has become known as the 'American Rule' in the handling of attorney fee requests.  Absent congressional authorization to the contrary, the American Rule compels each side to bear its own litigation costs . . . .  The policy behind the Rule is fundamental – to avoid penalizing a party for merely defending or prosecuting a lawsuit.") (internal quotations and citations omitted).

[54] WSC has been unable to locate any such authority in the United States, which is not surprising, given that a claim for the recovery of fees and costs is an affirmative claim for relief rather than a defensive claim in recoupment.  *See Vile v. Chamberlain*, No. 542830, 1999 Conn. Super. LEXIS 1715, at *5-*7 (Conn. Super. Ct. June 29, 1999) ("this court [cannot] discern from the pleadings that the counterclaim plaintiffs genuinely seek recoupment as a purely defensive mechanism to the plaintiff's cause of action," because "the counterclaim plaintiffs explicitly request affirmative relief for: compensatory damages, punitive damages, *attorneys fees* and declaratory relief.") (emphasis added) (granting motion for summary judgment because counterclaim did not fall within recoupment exception so as to avoid the effect of the statute of limitations).

[55] *See Snowden v. D.C. Transit Sys., Inc.*, 454 F.2d 1047, 1048 (D.C. Cir. 1971) ("A cardinal principle of law is that in the absence of punitive damages a plaintiff can recover no more than the loss actually suffered.  'When the plaintiff has accepted satisfaction in full for the injury done him, from whatever source it may come, he is so far affected in equity and good conscience, that the law will not permit him to recover again for the same damages.'"); *Kassman v. American Univ.*, 546 F.2d 1029, 1033 (D.C. Cir. 1976) ("The office of compensatory damages is to make the plaintiff whole, but certainly not more than whole."); *Runyon v. District of Columbia*, 463 F.2d 1319, 1321 (D.C. Cir. 1972) ("we have stated, and now reiterate, 'that double recovery for the same elements of damage should of course be avoided.'") (citation omitted); *Franklin Inv. Co. v. Smith*, 383 A.2d 355, 358 (D.C. 1978) ("It is elementary that damages for the same injury may be recovered only once, even though recoverable under two theories or for two wrongs, for a plaintiff is not entitled to be made more than whole unless punitive damages are warranted.").

14

only exception to this principle.[56]  A Rule 12(b)(6) motion to dismiss is proper when, as a matter

of law, a claim will result in a proscribed double recovery.[57]

Defendants' Counterclaims are based entirely upon an injury purportedly sustained as a

result of WSC's alleged involvement in and responsibility for <u>Sheraton's</u> conduct at issue in the

Delaware Action.[58]  Other than Defendants' allegations of damages for litigation costs and fees,

discussed above, Defendants allege no facts supporting any injury that was not the subject of the

Delaware Action.[59]  Defendants have already received compensatory and punitive damages in

---

[56]  *See Kassman*, 546 F.2d at 1034 ("There is, however, a well entrenched exception to the doctrine that the injured party can recover only the amount of his loss—the so-called collateral source rule.  Under that rule, 'an injured person may usually recover in full from a wrongdoer regardless of anything he might get from a "collateral source" unconnected with the wrongdoer.'" (internal citation omitted)); *Jacobs v. H. L. Rust Co.*, 353 A.2d 6, 7 (D.C. 1976) ("The collateral source rule provides that when a tort plaintiff's items of damage are reimbursed by a third party who is independent of the wrongdoer, the plaintiff may still seek full compensation from the tortfeasor even though the effect may be a double recovery. . . . Thus, the receipt of payment from a collateral source may not be injected into a trial to mitigate damages or in any manner which would mislead, improperly influence or prejudice the jury.").

[57]  *See Galliher v. Rubin*, 969 F.Supp. 1329, 1331 (S.D. Ga. 1997) (granting partial motion to dismiss to preclude double recovery because only single award of compensatory damages for separate Title VII actions consolidated for trial purposes was recoverable); *Larson v. Agri-Lines Irrigation, Inc.*, No. 00-604-HA, 2001 U.S. Dist. LEXIS 8345, at *1-*4 (D. Ore. May 23, 2001) (granting motion to dismiss because, as matter of law, state statute did not permit requested double recovery); *Hoesing v. Sears, Roebuck & Co.*, 484 F.Supp. 478, 478 & 480-81 (D. Neb. 1980) (granting defendant's motion to dismiss complaint seeking to extend liability for loss of consortium into new area because of risk of double recovery); *Miskunas v. Union Carbide Corp.*, 399 F.2d 847, 848, 850-51 (7th Cir. 1968) (affirming grant of motion to dismiss complaint because of risk of double recovery); *see also Boyd v. O'Neill*, 273 F.Supp.2d 92, 94-95, 97 (D. D.C. 2003) (denying motion to dismiss because complaint did not seek impermissible double recovery); *Kirk v. Allegheny Towing Inc.*, 620 F.Supp. 458, 461-63 (W.D. Pa. 1985) (granting motion to dismiss counterclaim because plaintiff did not receive double recovery).

[58]  *See supra* Section IV. A.

[59]  Answer [Document 31] at ¶¶ 46-81.  In addition, Defendants cannot support its Counterclaim for recoupment based upon WSC's commencement of this action.  WSC is entitled to assert its Partnership rights herein under the terms of the parties' Agreement, *see* Complaint at ¶¶ 10-16 (describing Defendants' applicable obligations under the Agreement).  The assertion of such rights cannot constitute a breach of fiduciary duty under District of Columbia law, *see Washington Med. Ctr., Inc. v. Holle*, 573 A.2d 1269, 1285 (D.C. 1990) ("A partner's right to an in-court accounting is an essential incident of the partnership relation.  It is the means by which a partner can enforce the duty of his co-partners to hold as trustee for the partnership any benefit derived from transactions connected with the formation, conduct or liquidation of the partnership without destroying the enterprise.  An accounting is also the penultimate event in the lifetime of the partnership.  It follows dissolution and the winding up of partnership affairs,

that action.[60] Accordingly, Defendants cannot now obtain an additional windfall in offset from WSC's claims.[61] Any award would amount to an improper double recovery as a matter of law.

In addition, the collateral source rule does not apply here. Neither Sheraton nor WSC is a "collateral source" recognized as an exception to the double recovery rule.[62] If WSC were found liable for the same injuries caused by Sheraton, WSC would merely be jointly and severally liable with Sheraton.[63] As discussed above, Defendants have already been compensated for their injury. Therefore, the Counterclaims should be dismissed as a matter of law.

---

and marks the point at which the partners' fiduciary duties *inter se* and the legal existence of the partnership terminate. As we recently held: 'A partner has a right to an accounting upon dissolution, and indeed has a right to obtain the assistance of the court if such an accounting is refused.' Because the right to an account is a central incident of partnership status, its assertion cannot in itself, under ordinary circumstances, form the basis for a claim of fiduciary breach." (internal citations omitted)). Further, this Court and the Delaware Action court recognized that WSC's claims were not frivolous by refusing to dismiss WSC's claims upon Hancock's motions. *See* Memorandum Opinion and Order [Document 19].

[60] *Id.* at ¶¶ 58-59, 81.

[61] *See Snowden,* 454 F.2d at 1048 ("an 'injured person may [not] have more than full satisfaction, except as punitive damages. He has no right to make profit from his harm because several share in causing it.'"); *Kassman,* 546 F.2d at 1033-34 ("There is nothing in logic or precedent which requires limitation of the underlying principle to situations involving joint tortfeasors or to those involving unintentional torts; on the contrary; there is the soundest of reasons to indulge its operation wherever more than one is responsible for a single injury. Where there has been only one injury, the law confers only one recovery, irrespective of the multiplicity of parties whom or theories which the plaintiff pursues."); *Franklin Inv. Co.,* 383 A.2d at 358 ("It is elementary that damages for the same injury may be recovered only once, even though recoverable under two theories or for two wrongs, for a plaintiff is not entitled to be made more than whole unless punitive damages are warranted.").

[62] *See Kassman,* 546 F.2d at 1034-35 ("The policy behind the [collateral source] rule is that 'a benefit which came to the injured party should not be shifted so as to become a windfall to the tortfeasor. If the plaintiff was himself responsible for the benefit as by maintaining his own insurance, or by making advantageous employment arrangements, the law allows him to keep it for himself. If the benefit was a gift to the plaintiff from a third party, or established for him by law, he should not be deprived of the advantage which it confers.' . . . Consistently with that policy, we have held that the collateral source rule, which broadly intercepts benefits derived contractually or gratuitously, does not apply to the proceeds of settlements of litigation, even when made by one later found not liable to the recipient."); *District of Columbia v. Jackson,* 451 A.2d 867, 873 (D.C. 1982) ("In sum, '[a] plaintiff may invoke the collateral source rule . . . either [1] when the payment in question came from a source wholly independent of the liable party or [2] when the plaintiff may be said to have contracted for the prospect of a double recovery.' Otherwise, the rule is not available to the plaintiff." ((internal citation omitted).

[63] *See Faison v. Nationwide Mortgage Corp.,* 839 F.2d 680, 686-87 (D.C. Cir. 1987) ("Under District of Columbia law, multiple defendants found liable for a single injury are deemed to be joint

**C.    This Court Should Dismiss Defendants' Counterclaims And Award WSC Its Fees And Costs Incurred In Connection With The Preparation, Filing, And Prosecution Of This Motion.**

28 U.S.C. § 1927 and Rule 11 of the Federal Rules of Civil Procedure authorize sanctions for certain conduct that increases another party's litigation costs.[64]    In addition, a court has the inherent power to impose sanctions on recalcitrant litigants.[65]    Federal courts may award fees to a successful party when an opposing party acts vexatiously, wantonly, or for oppressive reasons.[66]

As discussed above, Defendants' Counterclaims are not claims for recoupment but, rather, are time-barred claims[67] that Defendants could have brought years ago in the now-final

---

tortfeasors, and any compensatory damages for that single injury must be awarded jointly and severally against them. . . . 'If two or more tortfeasors produce a single injury, . . . the plaintiff can obtain only a single recovery . . . .") (citations omitted).

[64]    Section 1927 provides as follows: "Any attorney or other person admitted to conduct cases in any court of the United States . . . who so multiplies the proceedings in any case as to increase costs unreasonably may be required by the court to satisfy personally such excess costs."  28 U.S.C. § 1927; *see also McLaughlin v. Bradlee*, 602 F. Supp. 1412, 1416 (D. D.C. 1985) (stating § 1927 is designed to deter such abuses).

[65]    *See McLaughlin*, 602 F. Supp. at 1417.

[66]    *Id.* (quoting *Hall v. Cole*, 412 U.S. 1, 5 (1973)); *see also Lipsig v. National Student Mktg. Corp.*, 663 F.2d 178, 180-81 (D.C. Cir. 1980).

[67]    *See Sears, Roebuck & Co.*, 290 A.2d at 830 ("the generally accepted view [is] that affirmative claims made by way of setoffs and counterclaims must be tested by the statute of limitations while recoupment sought only by way of defense is a right that continues in existence with the primary claim. . . . To the extent that Goudie's claim went beyond matters of defense, it must be tested by the statute of limitations."); *Corto*, 705 A.2d at 621-22 ("*Sears* does not provide the support Corto seeks.  The only way recoupment can be had is by a 'legal or equitable right resulting from a counterclaim arising out of the same transaction.'").  Defendants' Counterclaims concern WSC's alleged aiding and abetting, and conspiracy to aid and abet, Sheraton's breaches of fiduciary duty—which were litigated in the Delaware Action.  Defendants bring those claims in the form of "recoupment" because, otherwise, they would be barred on limitations grounds.  *See* D.C. Code § 12-301(8) (2006) ("Except as otherwise specifically provided by law, actions for the following purposes may not be brought after the expiration of the period specified below from the time the right to maintain the action accrues . . . for which a limitation is not otherwise specially prescribed -- 3 years"); *Thompson, Cobb, Bazilio & Assocs., P.C. v. Grant Thornton, LLP*, No. 99-8 (RMU/JMF), 2002 U.S. Dist. LEXIS 4976, at *7-*9 (D. D.C. Mar. 25, 2002) ("In the District of Columbia, the statute of limitations for . . . breach of fiduciary duty claims is three years.").

Delaware Action but are now precluded by operation of *res judicata*.[68]  It is appropriate to impose sanctions where the doctrines of *res judicata* and collateral estoppel plainly preclude relitigation of the suit, because "[t]he imposition of sanctions is one of the few options available to a court to deter and punish people who relitigate cases hopelessly foreclosed."[69]  There may not be a more clear-cut case in which a litigant attempted to re-litigate foreclosed issues than here, where Defendants' seek to avoid the operation of limitations and claim preclusion under the guise of "recoupment."  Accordingly, this Court should award of fees and costs to WSC.

<div align="center">

**V.**

**REQUEST FOR RELIEF**

</div>

In light of the foregoing, WSC respectfully requests that this Court:  (1) grant WSC's motion; (2) dismiss Defendants' Counterclaims; and (3) award WSC its attorneys' fees and costs in connection with the preparation, filing, and prosecution of this motion.

---

[68] *See supra* Section IV. A.  Defendants' claims—if not styled as recoupment—would also have been barred under the doctrine of *res judicata* as a compulsory counterclaim in the Delaware Action that was never asserted.  *See Allen v. McCurry*, 449 U.S. 90, 94 (1980) ("a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."); *Advantage Health Plan, Inc.*, 139 F. Supp. 2d at 110 ("The three elements required for claim preclusion are:  (1) a final judgment on the merits in the first action; (2) the present claim is the same as a claim that was raised or that might have been raised in the first proceeding; and (3) the party against whom res judicata is asserted was a party or in privity with a party in the previous case."); Fed. R. Civ. P. 13(a) ("A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction."); *id.*, cmt. 7 ("If the action proceeds to judgment without the interposition of a counterclaim as required by subdivision (a) of this rule, the counterclaim is barred."); *Baker*, 417 U.S. at 469 n.1 ("A counterclaim which is compulsory but is not brought is thereafter barred."); *Timberland Co. v. Sanchez*, 129 F.R.D. 382, 383 (D. D.C. 1990) ("Rule 13 bars a party from asserting a compulsory counterclaim in a second action.")  *Drake v. Federal Aviation Admin.*, 291 F.3d 59, 66 (D.C. Cir. 2002) ("[w]hether two cases implicate the same cause of action turns on whether they share the same 'nucleus of facts.'"); *Apotex, Inc. v. Food & Drug Admin.*, 393 F.3d 210, 217 (D.C. Cir. 2004) (In determining whether two cases share the same nucleus of facts, courts are to consider "whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.") (internal quotations omitted).

[69] *See McLaughlin*, 602 F. Supp. at 1417.

<div align="center">

18

</div>

Respectfully submitted,

**SCHEUERMANN & MENIST**
700 E. Street, S.E.
Washington, D.C.  20003
Telephone:  (202) 547-9180
Telecopier:  (202) 547-2050


_____
John E. Scheuermann
*Attorneys for Plaintiff*

*Of Counsel*:

**BICKEL & BREWER**[70]
William A. Brewer III
Luke McGrath
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 489-1400
Telecopier:  (212) 489-2384

---

[70] Applications *Pro Hac Vice* will be submitted to this Court shortly following this submission.

## CERTIFICATE OF SERVICE

I hereby certify that on December 26, 2006, I electronically filed and caused to be served by First Class Mail copies of the foregoing (1) Memorandum of Law in Support of Plaintiff's Motion to Dismiss Defendants' Counterclaims and the following (2) Proposed Memorandum Opinion and Order and (3) Declaration of John E. Scheuermann in Support of Plaintiff's Motion to dismiss Defendants' Counterclaims (with attached Exhibits 1-11) to Defendants' counsel of record addresses as follows:

> William E. Wallace III
> Jonathan C. Poling
> MILBANK TWEED HADLEY & McCLOY LLP
> 1850 K Street, N.W., Suite 1100
> Washington, D.C. 20006

> _____
> John E. Scheuermann

5121895.10
1643-35

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WASHINGTON SHERATON CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| 2660 WOODLEY ROAD JOINT VENTURE, | ) | |
| | ) | |
| and | ) | Case No. 1:05CV0971-HHK |
| | ) | |
| JOHN HANCOCK LIFE INSURANCE COMPANY | ) | |
| (formerly known as John Hancock Mutual Life | ) | |
| Insurance Company), | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Having considered the pleadings and submissions and arguments of counsel, the Court is of the opinion that the Counterclaims of Defendant John Hancock Life Insurance Company and Defendant 2660 Woodley Road Joint Venture (collectively, "Defendants") should be and are hereby dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

By their Counterclaims, Defendants seek to recover in recoupment for the alleged breaches of fiduciary duty, the duty of loyalty, and the duty of good faith and fair dealing by Plaintiff Washington Sheraton Corporation (n/k/a Washington Sheraton L.L.C.) ("WSC"), which Defendants allege is the alter ego, co-conspirator, and aider and abettor of certain misconduct of various other Sheraton entities. Such misconduct, however, was previously litigated in an action between these same (and other) parties in the United States District Court for the District of Delaware entitled, *2660 Woodley Road Joint Venture, et al. v. ITT Sheraton Corporation, et al.*,

Civil Action No. 97-450-JJF (the "Delaware Action"), which resulted in a jury verdict and final judgment in favor of Defendants against these other Sheraton entities but not WSC. Thus, because the Delaware Action was based on the same operative facts underlying Defendants' Counterclaims allegations against WSC, Defendants' Counterclaims are barred by *res judicata* and the prohibition against obtaining a double recovery. Further, because the Delaware Action was commenced by Defendants in August 1997 and proceeded to trial in December 1999, Defendants' Counterclaims, which were filed at the earliest in October 2006, are barred by the applicable three-year statute of limitations.

IT IS THEREFORE ORDERED that WSC's motion to dismiss is GRANTED. IT IS THEREFORE FURTHER ORDERED that WSC shall file with the Court a fees and costs affidavit within ten days of entry of this Order.

_____

United States District Judge

5121639.2
1643-35

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **WASHINGTON SHERATON CORPORATION,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **2660 WOODLEY ROAD JOINT VENTURE,** | ) | |
| | ) | |
| **and** | ) | **Case No. 1:05CV0971-HHK** |
| | ) | |
| **JOHN HANCOCK LIFE INSURANCE COMPANY** (formerly known as John Hancock Mutual Life Insurance Company), | ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

## DECLARATION OF JOHN E. SCHEUERMANN IN SUPPORT OF PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS

1.　　My name is John E. Scheuermann.　I am counsel for Plaintiff Washington Sheraton Corporation (n/k/a Washington Sheraton L.L.C.) in this action.　I make this Declaration in support of Plaintiff's Motion to Dismiss Defendants' Counterclaims.　I have personal knowledge of and am fully competent to testify to the facts stated herein.

2.　　Attached hereto as **Exhibit 1** is a true and correct copy of the pleading entitled Defendants' Answer and Amended Counterclaims, filed on March 27, 1998 in the previously litigated action between the parties in the United States District Court for the District of Delaware entitled, *2660 Woodley Road Joint Venture, et al. v. ITT Sheraton Corporation, et al.,* Civil Action No. 97-450-JJF (the "Delaware Action").

3.　　Attached hereto as **Exhibit 2** is a true and correct copy of Counterdefendants' Reply to Counterplaintiffs' Amended Counterclaims, filed on April 17, 1998 in the Delaware Action.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of the pleading entitled Plaintiffs' Motion to Dismiss Amended Counterclaims, filed on April 17, 1998 in the Delaware Action.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of the pleading entitled Memorandum Order, filed on April 6, 1999 in the Delaware Action.

6.      Attached hereto as **Exhibit 5** is a true and correct copy of the pleading entitled Counterclaimant's Motion for Leave to Supplement Counterclaims, filed on October 25, 1999 in the Delaware Action.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of the judicial opinion set forth at *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, No. 97-450-JJF, 1999 U.S. Dist. LEXIS 20860, at *1 (D. Del. Dec. 2, 1999).

8.      Attached hereto as **Exhibit 7** is a true and correct copy of the pleading entitled Judgment, filed on December 13, 1999 in the Delaware Action.

9.      Attached hereto as **Exhibit 8** is a true and correct copy of the pleading entitled Amended Judgment, filed on January 10, 2002 in the Delaware Action.

10.     Attached hereto as **Exhibit 9** is a true and correct copy of the pleading entitled Second Amended Judgment, filed on March 4, 2002 in the Delaware Action.

11.     Attached hereto as **Exhibit 10** is a true and correct copy of *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732 (3d Cir. 2004).

12.     Attached hereto as **Exhibit 11** is a true and correct copy of the pleading entitled Consent Judgment, filed on March 1, 2005 in the Delaware Action.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on December 26, 2006.

_____

John E. Scheuermann

5121573.1
1643-35

# Exhibit 1



UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

2660 WOODLEY ROAD JOINT VENTURE,  )
WOODLEY ROAD ASSOCIATES, INC.,     )
JOHN HANCOCK MUTUAL LIFE INSURANCE )
COMPANY and SUMITOMO LIFE REALTY   )
(N.Y.), INC.,                      )
                                   )
              Plaintiffs,          )      C.A. No. 97-450-JJF
                                   )
         v.                        )
                                   )
ITT SHERATON CORPORATION and       )
SHERATON OPERATING CORPORATION,    )
                                   )
              Defendants.          )
                                   )
_____     )
                                   )
ITT SHERATON CORPORATION and       )
WASHINGTON SHERATON CORPORATION,   )
both individually and derivatively )
on behalf of 2660 WOODLEY ROAD     )
JOINT VENTURE, and                 )
SHERATON OPERATING CORPORATION,    )
                                   )
         Counterclaim Plaintiffs,  )
                                   )
         v.                        )
                                   )
2660 WOODLEY ROAD JOINT VENTURE,   )
WOODLEY ROAD ASSOCIATES, INC.,     )
JOHN HANCOCK MUTUAL LIFE           )
INSURANCE COMPANY and SUMITOMO     )
LIFE REALTY (N.Y.), INC.,          )
                                   )
         Counterclaim Defendants.  )

## ANSWER AND AMENDED COUNTERCLAIMS

Defendants ITT Sheraton Corporation ("ITT Sheraton")

and Sheraton Operating Corporation ("Sheraton") (collectively,

"Defendants"), by their undersigned attorneys, for their answer

RLF1-158972-1

to the complaint in the above-captioned action (the "Complaint"), hereby answer as follows:

*Except to the extent expressly, specifically and unambiguously admitted herein, Defendants deny each and every allegation contained in the Complaint and demand strict proof thereof.*

1.    State that the averments in paragraph 1 of the Complaint do not require response and, alternatively, to the extent that such responses are required, deny such averments except admit that plaintiffs 2660 Woodley Road Joint Venture (the "Joint Venture"), Woodley Road Associates, Inc. ("Woodley Road"), John Hancock Mutual Life Insurance Company ("John Hancock") and Sumitomo Life Realty (N.Y.), Inc. ("Sumitomo") (collectively, "Plaintiffs") bring this action against Defendants.

2.    Admit the allegations in paragraph 2 of the Complaint.

3.    Deny knowledge or information sufficient to form a belief as to the allegations in paragraph 3 of the Complaint.

4.    Deny knowledge or information sufficient to form a belief as to the allegations in paragraph 4 of the Complaint.

5.    Deny knowledge or information sufficient to form a belief as to the allegations in Paragraph 5 of the Complaint.

6.    Admit the allegations in Paragraph 6 of the Complaint, except deny that Sheraton is the alter ego of ITT

Sheraton with respect to the acts, claims and causes alleged in the Complaint.

  7. Deny the allegations in Paragraph 7 of the Complaint.

  8. Deny the allegations in Paragraph 8 of the Complaint.

  9. Deny the allegations in Paragraph 9 of the Complaint, except admit that the Sheraton Washington Hotel (the "Hotel") is owned by the Joint Venture; that the Hotel is managed pursuant to a September 27, 1979 Management Contract as amended from time to time (the "Management Contract"); and that a copy of the Management Contract is attached as Exhibit A to the Complaint.

  10. Deny the allegations in paragraph 10 of the Complaint.

  11. Deny the allegations in Paragraph 11 of the Complaint.

  12. Deny the allegations in Paragraph 12 of the Complaint, except admit that Plaintiffs purport to have exercised a right to terminate the Management Contract and that a letter referencing "Notice of Termination and Notice to Quit" were delivered to Defendants.

  13. Admit the allegations in Paragraph 13 of the Complaint.

14.   Deny the allegations in Paragraph 14 of the Complaint except admit that Plaintiffs seek relief as averred in said Paragraph.

15.   Admit the allegations in paragraph 15 of the Complaint.

16.   Admit the allegations in paragraph 16 of the Complaint.

17.   Admit the allegations in paragraph 17 of the Complaint.

18.   Deny the allegations in paragraphs 18 through 20 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

19.   Deny the allegations in paragraph 21 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

20.   Deny the allegations in paragraphs 22 and 23 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

21.   Deny the allegations in paragraph 24 of the Complaint except admit that ITT Sheraton established a division named ITT Sheraton Purchasing Resource ("Sheraton Purchasing") to organize exclusive and non-exclusive national and regional

contracts with vendors and that Sheraton Purchasing was established to replace an ITT Sheraton entity referred to as "The Hotel Source."

22. Deny the allegations in paragraph 25 of the Complaint except admit that Sheraton participated in Sheraton Purchasing Program as agent for Woodley Road and in connection with the operation of the Hotel entered into contracts negotiated by ITT Sheraton.

23. Deny the allegations in paragraph 26 of the Complaint except admit that Sheraton paid a fee to ITT Sheraton in connection with the Sheraton Purchasing program.

24. Deny the allegations in paragraph 27 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

25. Deny the allegations in paragraphs 28 through 30 of the Complaint.

26. Deny the allegations in paragraph 31 of the Complaint, except admit that audited financial statements dated February 17, 1995 were issued to the Joint Venture for the fiscal years 1993 and 1994.

27. Deny the allegations in paragraphs 32 through 35 of the Complaint.

28. Deny the allegations in paragraph 36 of the Complaint, except admit that Sheraton is a party to the

Management Contract and respectfully refer to that document with respect to the terms thereof.

29. Deny the allegations in paragraphs 37 and 38 of the Complaint.

30. Deny the allegations in paragraph 39 of the Complaint except admit that Sheraton is a party to the Management Complaint and respectfully refer to that document with respect to the terms thereof.

31. Deny the allegations in paragraph 40 of the Complaint except admit that Sheraton purchased insurance for the Hotel through ITT Sheraton.

32. Deny the allegations in paragraph 41 of the Complaint except admit that ITT Sheraton charged the Hotel a percentage of an insurance policy that covered a pool of ITT Sheraton hotels.

33. Deny the allegations in paragraphs 42 and 43 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

34. Deny the allegations in paragraphs 44 and 45 of the Complaint.

35. Deny the allegations in paragraph 46 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

36.    Deny the allegations in paragraphs 47 through 49 of the Complaint.

37.    Deny the allegations in paragraphs 50, 51, 52 and 53 of the Complaint.

38.    Deny the allegations in paragraph 54 of the Complaint, except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

39.    Deny the allegations in paragraph 55 of the Complaint.

40.    Deny the allegations in paragraphs 56, 57 and 58 of the Complaint.

41.    Deny the allegations in paragraph 59 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

42.    Deny the allegations in paragraphs 60 through 63 of the Complaint.

43.    Deny the allegations in paragraph 64 of the Complaint.

44.    Deny the allegations in paragraph 65 of the Complaint.

45.    Deny the allegations in paragraph 66 of the Complaint.

46.  Deny the allegations in paragraphs 67 through 72 of the Complaint.

47.  Deny the allegations in paragraph 73 of the Complaint.

48.  Deny the allegations in paragraphs 74 through 76 of the Complaint.

49.  Deny the allegations in paragraph 77 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refers to that document for the terms thereof.

50.  Deny the allegations in paragraph 78 of the Complaint.

51.  Deny the allegations in paragraph 79 of the Complaint.

52.  Deny the allegations in paragraphs 80 through 83 of the Complaint.

53.  Deny the allegations in paragraph 84 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refers to that document with respect to the terms thereof.

54.  Deny the allegations in paragraphs 85 through 87 of the Complaint.

55.  Deny the allegations in paragraphs 88 and 89 of the Complaint.

56. Deny the allegations in paragraphs 90 through 93 of the Complaint.

57. Deny the allegations in paragraph 94 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

58. Deny the allegations in paragraphs 95 through 97 of the Complaint.

59. Deny the allegations in paragraph 98 of the Complaint except admit that Sheraton received in and about December 1995 from Woodley Road a purported Notice of Default and respectfully refer to that document with respect to the contents thereof.

60. Deny the allegations in paragraph 99 of the Complaint.

61. Deny the allegations in paragraph 100 of the Complaint, except admit that Sheraton received in or about December, 1995 from Woodley Road a purported Notice of Default and respectfully refer to that document with respect to the contents thereof.

62. Deny the allegations in paragraphs 101 and 102 of the Complaint.

## COUNT I
### FEDERAL RACKETEER INFLUENCED CORRUPT ORGANIZATION (RICO) SECTION 1962(C)

63.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 102 of the Complaint as if fully set forth herein.

64.    Deny the allegations in paragraphs 104 through 117 of the Complaint.

## COUNT II
### FEDERAL RACKETEER INFLUENCED CORRUPT ORGANIZATION (RICO) SECTION 1962(a)

65.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 117 of the Complaint as if fully set forth herein.

66.    Deny the allegations in paragraphs 119 through 129 of the Complaint.

## COUNT III
### FEDERAL RACKETEER INFLUENCED CORRUPT ORGANIZATION (RICO) SECTION 1962(d)

67.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 129 of the Complaint as if fully set forth herein.

68.    Deny the allegations in paragraphs 131 through 135 of the Complaint.

## COUNT IV
## FEDERAL ANTITRUST VIOLATIONS

69. Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 though 135 as if fully set forth herein.

70. Deny the allegations in paragraph 137 of the Complaint except admit that Sheraton, acting under the Management Contract, purchased goods, supplies and services from various vendors.

71. Deny the allegations in paragraphs 138 through 140 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

72. Deny the allegations in paragraphs 141 through 144 of the Complaint.

## COUNT V
## BREACH OF CONTRACT

73. Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 144 as if fully set forth herein.

74. Deny the allegations in paragraph 146 of the Complaint, except respectfully refer to the Management Contract with respect to the terms thereof.

75. Deny the allegations in paragraphs 147 and 148 of the Complaint.

76. Deny the allegations in paragraph 149 of the Complaint.

77. Deny the allegations in paragraph 150 of the Complaint.

## COUNT VI
## BREACH OF FIDUCIARY DUTY

78. Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 150 of the Complaint as if fully set forth herein.

79. Deny the allegations in paragraphs 152 and 153 of the Complaint except respectfully refer to the Management Contract with respect to the terms thereof.

80. Deny the allegations in paragraphs 154 through 158 of the Complaint.

## COUNT VII
## BREACH OF IMPLIED DUTIES OF
## GOOD FAITH AND FAIR DEALING

81. Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 158 of the Complaint as if fully set forth herein.

82. Deny the allegations in paragraphs 160 through 162 of the Complaint.

## COUNT VIII
## FRAUD

83. Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 162 of the Complaint as if fully set forth herein.

84. Deny the allegations in paragraph 164 of the Complaint except respectfully refer to the Management Contract with respect to the terms thereof.

85. Deny the allegations in paragraph 165 of the Complaint, except respectfully refer to the documents to which reference is made in the paragraph for a statement of any representations contained therein.

86. Deny the allegations in paragraphs 166 through 169 of the Complaint.

87. Deny the allegations in paragraph 170 of the Complaint except admit that Plaintiffs seek monetary compensation as averred therein.

88. Deny the allegations in paragraph 171 of the Complaint except admit that Plaintiffs seek damages as averred therein.

## COUNT IX
## NEGLIGENT AND INTENTIONAL MISREPRESENTATION

89. Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 171 of the Complaint as if fully set forth herein.

90. Deny the allegations in paragraphs 173 through 179 of the Complaint.

91. Deny the allegations in paragraph 180 of the Complaint except admit that Plaintiffs seek monetary compensation as averred therein.

92. Deny the allegations in paragraph 181 of the Complaint except admit that Plaintiffs seek damages as averred therein.

### COUNT X
### PERMANENT INJUNCTIVE RELIEF

93. Repeat and incorporate by reference their answers to paragraphs 1 through 181 of the Complaint as if fully set forth herein.

94. Deny the allegations in paragraph 183 of the Complaint and respectfully refer to the Management Contract with respect to the terms thereof.

95. Deny the allegations in paragraphs 184 through 186 of the Complaint.

### COUNTY XI
### DECLARATORY JUDGMENT
### TERMINATING MANAGEMENT CONTRACT

96. Repeat and incorporate by reference their answers to paragraphs 1 through 186 of the Complaint as if fully set forth herein.

97. Deny the allegations in paragraph 188 of the Complaint except admit that Defendants received in August 1997 a Notice of Termination and Notice to Quit and respectfully refer to that document with regard to the terms thereof.

98. Deny the allegations in paragraph 189 except admit that Sheraton has refused to leave the premises of the hotel.

99. Deny the allegations in paragraphs 190 and 191 of the Complaint.

100. Admit that Plaintiffs seek relief as averred in paragraph 192 of the Complaint and otherwise deny the allegations in paragraph 192 of the Complaint.

### COUNT XII
### ACCOUNTING

101. Repeat and incorporate by reference their answers to paragraphs 1 through 192 of the Compliant as if fully set forth herein.

102. Deny the allegations in paragraph 194 of the Complaint but respectfully refer to the Management Contract for the terms thereof.

103. Deny the allegations in paragraph 195 of the Complaint.

104. Deny the allegations in paragraph 196 of the Complaint except admit that plaintiffs seek relief as averred therein.

### COUNT XIII
### REQUEST FOR RECEIVER

105. Repeat and incorporate by reference their answers to paragraphs 1 through 196 of the Complaint as if fully set forth herein.

106. Deny the allegations in paragraph 198 of the Complaint except admit that Defendants received in August 1997 a purported Notice of Termination and Notice to Quit and respectfully refer to that document with the terms thereof.

107. Deny the allegations in paragraph 199 through 201 of the Complaint.

**[JURY DEMAND]**

108. Admit that Plaintiffs seek relief as averred in paragraph 202 of the Complaint.

## DEFENSES

### First Defense
(Failure to State a Claim)

The Complaint is barred, in whole and in part, for failure to state a claim upon which relief can be granted.

### Second Defense
(Laches)

Plaintiffs' claims are barred, in whole and in part, by the doctrine of laches.

### Third Defense
(Estoppel)

Plaintiffs' claims are barred, in whole and in part, by the doctrine of estoppel.

### Fourth Defense
(Unclean Hands)

Plaintiffs' claims are barred, in whole and in part, by the doctrine of unclean hands.

### Fifth Defense
(Failure to Plead Fraud with Particularity)

Plaintiffs have failed to state the circumstances constituting the alleged fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.

## Sixth Defense
### (Plaintiffs Have Sustained No Injury)

Plaintiffs claims are barred, in whole and in part, because plaintiffs have not sustained any injury and cannot establish a likelihood that they will sustain an injury, as a result of any matter alleged in the Complaint.

## Seventh Defense
### (Statute of Frauds)

Plaintiffs' claims are barred, in whole and in part, by the Statute of Frauds.

## Eighth Defense
### (Statutes of Limitations)

Plaintiffs' claims are barred, in whole and in part, by the applicable statutes of limitations.

## Ninth Defense
### (Breach of Duties and Covenants)

Plaintiffs' claims are barred, in whole and in part, by Plaintiffs' breaches of fiduciary duties and covenants of good faith and fair dealing.

## Tenth Defense
### (Subject Matter Jurisdiction)

The Court lacks subject matter jurisdiction over Counts V through XIII of the Complaint, and should decline to exercise supplemental jurisdiction over those claims.

## Eleventh Defense
### (Good Faith)

Plaintiffs have at all times and with respect to all acts alleged in the Complaint acted in good faith.

## Twelfth Defense
(Proximate Cause)

Any alleged harm to Plaintiffs was not proximately caused by Defendants but was caused by the wrongful conduct of John Hancock, Woodley Road and the Joint Venture as is more fully alleged in the following counterclaims.

## COUNTERCLAIMS

1.    These counterclaims are brought (a) by Sheraton against the Joint Venture and Woodley Road based on these parties' breaches of their contractual duties under the Management Contract; (b) by Sheraton against John Hancock and Sumitomo to enforce these parties' undertaking to secure defendants' rights to damages as a result of wrongful injunction or wrongful termination of the Management Contract, and (c) by ITT Sheraton and its subsidiary Washington Sheraton Corporation ("Washington Sheraton"), both on their own behalves and derivatively on behalf of the Joint Venture, against John Hancock and Sumitomo based on their breaches of contractual and fiduciary duties arising out of the June 12, 1990 Amended and Restated Joint Venture Agreement among John Hancock, Sumitomo and Washington Sheraton as amended from time to time (the "Joint Venture Agreement").

2.    Defendants' counterclaims, like the claims asserted in the Complaint, arise from the parties' varying interests in the management and ownership of the Hotel, a large hotel in the District of Columbia which, when originally opened by the Joint Venture (the "Owner") in the early 1980s, was a leading convention hotel.  In more recent years, the Hotel's competitive position in the Washington market has deteriorated,

and the Hotel is badly in need of renovation, repositioning and capital improvement.

## Jurisdiction

3.    This Court has jurisdiction of the counterclaims pursuant to Rule 13(a) and/or(b), Rule 20, Rule 65 and Rule 65.1 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1367, and pursuant to the Court's authority to enforce an undertaking provided pursuant to Rule 65 of the Federal Rules of Civil Procedure and the order of the Court.

## Parties

4.    Sheraton, ITT Sheraton and Washington Sheraton (collectively, the "Sheraton Parties") are corporations organized under the laws of the State of Delaware and maintain their principal place of business at 60 State Street, Boston, Massachusetts 02109.  Sheraton and Washington Sheraton are wholly-owned subsidiaries of ITT Sheraton.

5.    The Joint Venture, the owner of the Hotel, is a general partnership organized under the laws of the District of Columbia which maintains its principal office c/o John Hancock Properties, Inc., Two Copley Place, Suite 200, Boston, Massachusetts 02117.

6.    On information and belief, John Hancock is a corporation organized under the laws of the Commonwealth of Massachusetts, with its principal place of business at 200 Clarendon Street, Boston, Massachusetts 02117.

7.   On information and belief, Sumitomo is corporation organized under the laws of the state of New York, with its principal place of business at 245 Park Avenue, New York, New York 10167, and a subsidiary of a major Japanese corporation.

8.   Woodley Road is a corporation organized under the laws of the State of Delaware which is wholly owned, directly or through intervening subsidiaries, by John Hancock. Woodley Road maintains its principal place of business c/o John Hancock Properties, Inc., Two Copley Square, Suite 200, Boston, Massachusetts 02117. Woodley Road leases the Hotel from the Joint Venture, and is jointly and severally liable to Sheraton for the violations of the Management Contract alleged herein.

### The Nature of the Litigation

9.   Until March 15, 1998, Sheraton and ITT Sheraton managed the Hotel pursuant to the September 27, 1979 Management Contract, as amended. On March 15, 1998, in accordance with the demands of the plaintiffs and the preliminary injunction issued by this Court, Sheraton quit the premises of the Hotel.

10.   The plaintiffs commenced this litigation not because of any alleged breach of the Management Contract by Sheraton but rather because the plaintiffs were displeased with the economic terms of the Management Contract and wished to "walk away" from their obligations under it.

11.   Plaintiffs have resorted to meritless litigation to free themselves from the Management Contract in part because

of the Management Contract's lengthy term.  The Management Contract's initial term was to end in December, 2000, but Sheraton had the right to renew the Management Contract for three additional terms of ten years each, or until the year 2030.

12.  Plaintiffs' claims of Sheraton's supposed breaches are purely pretextual.  This litigation is a means by which the plaintiffs are attempting to extort Sheraton and to obfuscate their decision to terminate the Management Agreement wrongfully and without cause.

13.  Because Sheraton has the right to renew the Management Contract for ten year terms through the year 2030, the Joint Venture stood to gain as much as $200 million, in John Hancock's estimation, if it could terminate the Management Contract.

14.  While the plaintiffs might wish nothing more than to "walk away" from their obligations to Sheraton under the Management Contract, the law does not permit a party to such a contract to breach the contract without consequences merely   · because, with the benefit of hindsight, the party believes that it struck a bad bargain.

15.  Sheraton and ITT Sheraton dispute not only the veracity of the allegations contained in the Plaintiffs' Complaint but also that the Plaintiffs make their allegations in good faith.

16.  Sheraton comprehensively refuted the plaintiffs' claims in correspondence between Sheraton and the plaintiffs many months before the plaintiffs commenced this litigation.  Sheraton made available to the plaintiffs all documents on which it based its refutation of the plaintiffs' allegations.  The plaintiffs did not avail themselves of the opportunity to review the documents upon which Sheraton's refutation was based.

17.  In commencing baseless litigation, wrongfully terminating the Management Contract and improperly revoking Sheraton's agency, the Owner breached its duties under the Management Contract.  Moreover, as is explained below, the Owner also breached the Management Contract by failing to make required repairs and improvements to the Hotel property and by refusing and failing to pay fees, reimbursements and other charges due and owing to Sheraton, ITT Sheraton and Washington Sheraton.

18.  In addition, John Hancock and the Joint Venture have breached their contractual and fiduciary duties to Washington Sheraton and ITT Sheraton under the Joint Venture Agreement, by, _inter alia_, failing to ensure adequate capital spending and by commencing the baseless litigation against Sheraton and ITT Sheraton.  For the same reasons, John Hancock is liable not only to ITT Sheraton and Washington Sheraton, but also to the Joint Venture itself, on whose behalf ITT Sheraton and Washington Sheraton sue.

## FACTUAL ALLEGATIONS

### Background

19.  The Joint Venture partnership was formed in or about 1979 to expand and improve the then existing Sheraton Park Hotel located on the Hotel site.  Washington Sheraton and John Hancock each held a 50% interest in the Joint Venture at that time.  In 1985, John Hancock purchased an additional 49 percent interest in the Joint Venture from Washington Sheraton.  Plaintiff Sumitomo purchased its 48 percent interest in the Joint Venture from Plaintiff John Hancock in 1990, becoming a third partner in the Joint Venture.  To this day, Washington Sheraton retains a one percent ownership in the Joint Venture.

20.  Pursuant to the terms of the Joint Venture Agreement, John Hancock is the Managing Partner for the Joint Venture (the "Managing Partner").  Among the three partners to the Joint Venture, the Managing Partner has the responsibility for the day-to-day affairs of the Joint Venture.  JVA ¶ 6.01.

21.  The Joint Venture Agreement provides, *inter alia,* that:  (a) only the Managing Partner may bind the Joint Venture (6.01); (b) only the Managing Partner is obligated and responsible to manage the affairs of the Joint Venture (6.01); (c) the Managing Partner cannot act with respect to Major Decisions without the consent of Sumitomo (6.03); (d) Major Decisions include (i) the undertaking of any capital improvement project, (ii) the retention of counsel (6.03), and (iii) the

termination or modification of the Management Contract or any

rights of the Operator; and (e) **any** Partner may effectuate the

removal of a defaulting Managing Partner (6.01).

22.    In connection with Sumitomo's purchase of an

interest in the Joint Venture, the Joint Venture leased the Hotel

to John Hancock's wholly-owned subsidiary Woodley Road, and

assigned its rights and obligations under the Management Contract

to Woodley Road.    The Joint Venture was not released from its

obligations to Sheraton under the Management Contract.

### The Operating Term

23.    The initial "Operating Term" of the Management

Contract was September 27, 1979 to December 31, 2000.

24.    Under the Management Contract, Sheraton, the

"Operator," had the unilateral right to extend the Operating Term

for three successive periods of ten years each through

December 31, 2030.    The Owner had no right to prevent these three

successive 10-year renewals.

25.    Article XXIV of the Management Contract allows a

(non-defaulting) party to terminate the Operating Term only in

the event that an "event of default" is not cured within 15 days

(or, depending upon the default, 90 days) after notice of such

event of default is given.

26.    Article VI of the Management Contract provides:

>    Operator shall have complete authority
>    in respect of and be responsible for,
>    the operation, direction, management and
>    supervision of the Hotel, subject only

to those specific approvals of Owner set
forth herein and to such qualification
on such complete authority as are
contained in the Business Plan referred
to in this Article XI (3). Such
authority of Operator shall include,
without limitation, determination of
labor policies (including the hiring,
transfer and discharge of all employees
and entering into a contract or
contracts with an applicable union or
unions in Owner's name), credit policies
(including entering into agreements with
credit card organizations), terms of
admittance, charges for rooms,
entertainment and amusement policies,
food and beverage policies (including
the right to conduct catering operations
outside of the Hotel), the institution
of such legal proceedings as Operator
shall deem appropriate in connection
with the operation of the Hotel, and all
phases of sales, marketing, advertising,
promotion and publicity relating to the
Hotel. In exercising such authority,
Operator may enter into such contract,
leases, concession agreements and other
undertakings on behalf of Owner as it
shall from time to time consider
appropriate, in Owner's name, and Owner
(if Owner is an individual) or officers
of Owner (if Owner is a corporation or
other legal entity) will execute any or
all of same at Operator's request.

## The Need For Repositioning and Renovation of the Hotel

27. Under the applicable contractual documents, the
responsibility to address the capital needs of the Hotel rests
upon John Hancock as the Managing Partner of the Joint Venture.
Under the Management Contract, Woodley Road and the Joint Venture
are required to provide funds for, inter alia, any "structural
repairs or changes in the Hotel or extraordinary repairs to or
replacements of [Building Appurtenance] equipment" necessary to

maintain the Hotel in good operating condition.  Management

Contract, Article XVI, and Assignment of and Third Amendment to

Management Contract.

28.  While John Hancock must seek Sumitomo's agreement

to non-emergency capital spending, it is John Hancock's job to

anticipate and provide for the Hotel's capital needs, and to

prepare capital spending plans for the consideration of the Joint

Venture.

29.  The June 12, 1990 restatement of the Joint Venture

Agreement, which admitted Sumitomo as a partner, expressly

provided for and contemplated that necessary repairs and

improvements to the Hotel would be undertaken.  Joint Venture

Agreement Section 6.06.

30.  Although certain repairs to the Hotel were

undertaken subsequent to Sumitomo's purchase of its 48% interest

in the Joint Venture, the Hotel remained in need of substantial

repairs and renovation in the early and mid-1990s.  In part, this

need for capital spending arose from the age of the Hotel, which

led to the need to repair or replace obsolete or deteriorated

mechanical and structural systems.  For example, the facade of

the Wardman Tower, the oldest part of the Hotel complex, required

extensive repairs to maintain its structural integrity and

safety.

31.  In addition to the need for renovation and repair,

capital spending for the Hotel was necessary to "reposition" the

Hotel to compete more effectively with other convention hotels in the Washington area.  During 1983, a large new convention center was opened in downtown Washington, and during the 1980s a number of new hotels opened in its vicinity.  Not only were these new competitors more modern than the Hotel, they had the advantage of a location much nearer to traditional Washington tourist attractions, such as the Capitol, White House and Smithsonian Institute, than the Hotel, which is located several miles from central Washington near the National Zoo.

32.  Partly as a result of this new competition, and partly as a result of changing trends in the convention industry, including new competition in other cities, the Hotel's convention business changed, and the Hotel was frequently hosting two or more groups simultaneously, rather than a single convention that sold out the entire Hotel.  This created a critical need to reconfigure the Hotel to add more meeting space that could be used more flexibly.  In addition, the Hotel needed more, and more varied, restaurants and food outlets, and a more modern, expanded health and fitness center.  Finally, the public spaces and rooms in the Hotel, no matter how well maintained, had become "dated" and uninviting in appearance.  Of particular concern was the entrance lobby, which, by contemporary standards, is poorly laid out and confusing to guests.  For all these reasons, the Hotel was in urgent need of a "Master Plan" of capital spending to address both physical and competitive issues.

33. In the early 1990s, the Joint Venture stated its intention to develop a "master strategic plan" to, as described by John Hancock in September 1993, estimate "future cash flow and investment value and as a guideline in deciding upon the level of re-investment of cash flow into the property and/or the amount of additional capital to be invested in the project.

34. In a letter to Mr. Potrykus dated September 30, 1994, ITT Sheraton complained that the master plan studies were proceeding far too slowly, and that Hancock's involvement of ITT Sheraton and communications with Sheraton in that regard were inadequate.

35. The Sheraton Parties were not the first to complain about John Hancock's handling of such matters. In a July 12, 1994 Capital Expense Form, Sumitomo indicated that "the best way to resolve the asset management issue is to handle Hancock as if they were a third-party asset manager, i.e. Yarmouth. If they are unable to provide adequate service to us, we will use this as leverage to get out of our agreement." Upon information and belief, in a letter dated July 22, 1994, Sumitomo raised concerns regarding John Hancock's services under the Asset Management Agreement and the Joint Venture Agreement, and suggested that the Joint Venture should hire an independent asset manager.

36. Although some work was in fact done, the Hotel has continued to deteriorate over the last seven years, and its need

for substantial capital spending to "reposition" itself in its competition with neighboring hotels has remained unaddressed.

37. Notwithstanding repeated requests from Sheraton, and despite Sheraton's assistance in preparing numerous potential renovation plans for the Hotel, Hancock, prior to the initiation of this litigation, never suggested to the Joint Venture, approved or otherwise implemented a capital spending plan that adequately addressed the Hotel's need for renovation and repositioning.

38. The plaintiffs have no one but themselves to blame for the Hotel's needs for significant capital spending, which resulted from the failures of the Joint Venture, Woodley Road and John Hancock to address properly the extensive renovations that are required to make the Hotel competitive with other hotels of its type in its geographic area. Indeed, in view of the Hotel's clear need for renovations, Sheraton's management of the Hotel was an unqualified success.

39. On October 30, 1996, Washington Sheraton made formal demand under the Joint Venture Agreement that John Hancock be removed and replaced as Managing Partner of the Joint Venture based, *inter alia*, on John Hancock's failure to plan and provide for the capital needs of the Hotel. Pursuant to section 6.01 of the Joint Venture Agreement, John Hancock as Managing Partner was then required either to cure its default or step down as Managing Partner in favor of Sumitomo. Without satisfying section 6.01,

John Hancock, on November 21, 1996, John Hancock rejected Washington Sheraton's demand. John Hancock remains the Managing Partner of the Joint Venture in violation of the joint Venture Agreement.

40. John Hancock's failure to plan and provide for the capital needs of the Hotel constitutes a breach of the Management Contract made wilfully and in bad faith.

### John Hancock's Incentive to Terminate or Renegotiate

41. Sumitomo made its investment in the Joint Venture a time when the convergence of record-high real estate prices in the United States and the booming "bubble" economy in Japan led many Japanese companies to make real estate investments in this country which turned disastrous when both of these economic phenomena collapsed in the early 1990s.

42. While Sumitomo overpaid for its interest in the Joint Venture, John Hancock was able, through its sale to Sumitomo, to recover all of its original investment in the Hotel project, which had the effect of reducing John Hancock's economic incentive to invest additional capital in the Hotel to preserve or improve its physical condition and performance.

43. The Hotel's need for capital contributions coincided with a downturn in Washington, D.C., hotel revenues during the early 1990s, which limited John Hancock's and Sumitomo's returns on their investment in the Joint Venture.

44. The failure by the Joint Venture and Woodley Road to maintain the Hotel also derived from a set of agreements which collectively assured that no one other than Sheraton had any immediate economic interest in maintaining the Hotel.

45. Under the Management Contract, Sheraton has received payments based in part on the revenues of the hotel. Therefore, the amount of Sheraton's revenues under the Management Contract has depended, in part, on the extent to which the public found the Hotel to be a well maintained, inviting facility.

46. However, John Hancock's incentive to invest additional capital to renovate and reposition the Hotel was reduced even further by provisions in the Joint Venture Agreement providing, for the June 12, 1990 through December 31, 1995 time period, a preferred return to Sumitomo from the Hotel's cash flow. The preferred return provisions were more likely to reduce John Hancock's own income from the Hotel if significant portions of the Hotel were closed for renovations.

47. Moreover, precisely because Sumitomo received a preferred return, Sumitomo had no immediate incentive to demand the extensive renovations that the parties recognized the Hotel needed at the time when Sumitomo purchased its interest in the Joint Venture.

### The Operations Audit

48. John Hancock, apparently to (a) delay making needed capital contributions, (b) divert attention from its own

managerial shortcomings following Sumitomo's July 1994 complaints and (c) search for an excuse to escape the Joint Venture's obligations under the Management Contract, commenced in late 1994 an "operations" audit of Sheraton's performance under the Management Contract.

49.  The Joint Venture was permitted to conduct such an audit under Article XII of the Management Contract.

50.  The plaintiffs represented to Sheraton that the "operations" audit was being conducted by the Joint Venture in connection with its consideration of further capital investment in the Hotel.

51.  The plaintiffs never indicated that the audit was being conducted by John Hancock (except as Managing Partner for the Joint Venture) or Sumitomo.

52.  In reliance on plaintiffs' representations as to the purpose of the audit and pursuant to Article XII of the Management Contract, Sheraton cooperated fully with the audit, even though it quickly became apparent that the persons who conducted it were woefully ignorant of the economics and practices of the hospitality industry.

53.  After the audit progressed well into 1995, the Joint Venture claimed that it had discovered

> an overwhelming demonstration of breach of contractual obligations, breach of fiduciary obligation, neglect of proper operations, and failure of managerial supervision

causing damages in the amount of $80 million and constituting "cause" to terminate the Management Contract.

54. The Joint Venture's claim of "cause" to terminate the Management Contract was particularly significant because, as was widely understood at that time by the parties, the terms of the 1979 Management Contract, which bound the Joint Venture at Sheraton's option until the year 2030, had become unfavorable to the Joint Venture in comparison to hotel management contracts that were typical of what was available to hotel owners in the market at that time.

55. As explained by Steven Dwyer of Sumitomo in 1997, the Management Contract was "not at all competitive". Another 1997 document generated by John Hancock explained more precisely that renegotiation of the Management Contract "will save us $3 M per year (as is) and $6 M per year" after renovations.

56. By John Hancock's own estimates, the Joint Venture stood to gain in the range of $100 to $200 million by renegotiating or terminating the Management Contract.

57. Sheraton denied the Joint Venture's claim of "cause" for termination and requested substantiation of the claim.

58. Concurrent with its 1995 requests for substantiation, Sheraton determined that, to improve its relationship with the Joint Venture, reduce disruption at the Hotel and facilitate the needed renovations, it was willing from

a business perspective to renegotiate the terms of the management contract to the benefit of the Joint Venture.

59.  In late 1995, Sheraton offered to renegotiate the terms of the Management Contract, and to discuss any actual damages that might be owing to the Joint Venture, while emphasizing that Sumitomo and John Hancock had adduced no evidence of any such damages.

60.  The Joint Venture made no effort to substantiate its damages claim until December 29, 1995, when it sent to Sheraton a Notice of Default (the "1995 Notice of Default").  A copy of the 1995 Notice of Default is annexed hereto as Exhibit A.

61.  "Notice of default" is not required by and triggers no provisions of the Management Contract.  (The Management Contract does provide for notice of "intention to terminate" upon expiry of a fifteen day period.  No such notice was given until July 31, 1997, as discussed below.)

62.  The Notice of Default claimed 15 categories of events of default under subparts XXIV(A)(1) and XXIV(A)(6) of the Management Contract.

63.  Subpart XXIV(A)(1) of the Management Contract states, in summary, that the failure of any party to pay to the other amounts required under the Management Contract for a period of 30 days after it becomes payable constitutes an event of default.

64.  Subpart XXIV(A)(6) of the Management Contract states that failure to perform any "other" material obligation under the Agreement constitutes an event of default.

65.  Responding to the 1995 Notice of Default in a 21-page single-spaced letter dated January 31, 1996 (the "January 31, 1996 letter), Sheraton comprehensively refuted each of the 15 categories of alleged breaches and restated its willingness to further discuss and remedy any defaults and to renegotiate the terms of the Management Contract to the benefit of the Joint Venture.  A copy of the January 31, 1996 letter is annexed hereto as Exhibit B.

66.  Sheraton's January 31, 1996 letter responded directly to the Joint Venture's specific allegations, as summarized below.

67.  The first category of breach alleged by the Owner in the 1995 Notice of Default was the Operator's supposed entry of employee wages and other employee expenses as capital expenses rather than ordinary operating costs, and the Operator's supposed failure to gain reimbursement for the costs associated with employees assigned temporarily to other properties.  With respect to this first category of defaults, the Operator clarified the Owner's misunderstanding of normal accounting practices and explained in detail how Sheraton ensures that employee loaning does not harm Sheraton hotels.

68.  The second category of alleged defaults comprised allegations that the Operator commingled funds of the Owner with its own funds, used the Hotel's funds to pay for services for the Operator's affiliates, and used Hotel facilities to subsidize the purchasing costs of other hotels in the region.  With respect to this second category, the Operator explained how the Hotel benefits from and is compensated for use of space and services, denied knowledge of any commingling of funds, and requested additional information regarding any examples of commingling. The Owner has provided no such additional information.

69.  The third category of alleged defaults comprised allegations that the Operator failed to disclose compensation of senior Hotel employees, and paid excessive and unauthorized compensation to certain employees.  With respect to this third category, the Operator explained that relocation expenses are not considered to be part of "benefits" as that term is used in subpart VI(5) of the Management Contract.  The Operator recognized that it had erroneously on two occasions compensated employees in amounts requiring the Owner's advance approval without having obtained such advance approval.  The Operator further agreed to address this error and any other compensation-related disputes as part of any overall resolution of the issues outstanding among the parties.

70.  The fourth category of alleged breaches concerned employee turnover and employee benefits.  The Owner alleged that

the Operator permitted and caused excessive turnover among senior
employees and that the Operator gave excessive relocation
benefits, violated regulations concerning withholding taxes, and
improperly used Owner's funds to reimburse an employee for the
employee's loss upon the sale of a residence.  With respect to
this fourth category of alleged defaults, the Operator denied
that excessive turnover had occurred, stated that all relocation
benefits had been given in accordance with written policies, and
stated that the Operator had paid withholding taxes to employees
only where appropriate.  The Operator requested more information
so as to address any other concerns.  The Owner provided no such
further information.

　　　　71.  The fifth category of alleged breaches concerned
the use of complimentary rooms.  The Owner alleged that the
Operator improperly allowed use of Hotel rooms free of charge and
at unreasonably low rates, while failing to maintain adequate
controls and record of such uses of rooms.  With respect to this
fifth category of alleged breaches, the Operator responded in
detail with references to numerous reports and studies concerning
the complimentary room use permitted by the Management Contract
and customary in the industry, including detailed information
concerning the complimentary use of rooms at the Hotel and at
other Sheraton hotels by Plaintiffs and their employees.  After
further discussions among the parties, the Operator, as an

accommodation, instituted in mid-1995 monthly reporting to the
Owner with respect to complimentary room use.

72. The sixth category of alleged breaches by the
Operator pertained to the Owner's rights and purported rights to
approve contracts that the Operator entered into.  With respect
to this sixth category of alleged breaches, the Operator
recognized that in each of the years 1991-1993, the Operator
might have executed without Owner approval one contract for
services in excess of the adjusted maximum amount set forth in
subpart VI(8) of the Management Contract.  The Operator stated
that each of these three contracts was beneficial to the hotel
and, in any case, each of them had subsequently been reviewed
with the Owner's representatives at quarterly Owner's meetings.

73. The seventh category of alleged breaches concerned
rebates that the Operator received.  In two full single-spaced
pages, the Operator comprehensively explained how the Hotel had
received value for the rebates that the Operator received, how
the Hotel had benefited from Sheraton's bargaining power at the
national level, and how the rebates had been disclosed to the
Owner on numerous occasions.

74. The eighth category of alleged breaches comprised
allegations that the Operator had inequitably and
disproportionately allocated insurance costs to the Hotel.  In
response, Operator stated exactly how costs of general liability
coverage and property coverage were allocated, and asked the

Owner to provide further information to permit the Operator to address the Owner's concern.  No such further information was forthcoming from the Owner.

75.  The ninth category of alleged breaches comprised allegations that the Operator had improperly imposed on the Hotel marketing costs and the costs of a frequent traveler program that was not in the best interests of the Hotel.  In response, the Operator pointed out that participation in the marketing and frequent traveler program was authorized by the Management Contract and did not involve any improper allocations of costs. The Operator further noted that Sheraton had provided funding for sales in addition to that required under the Management Contract, and stated its strong basis for believing that the frequent traveler programs was in the Hotel's best interests.

76.  The tenth category of alleged breaches comprised allegations that the Operator had failed to maintain adequate internal controls, including internal audit procedures.  The Operator flatly denied these allegations, noting that the Hotel's books and records had always been kept in accordance with the Uniform System of Accounting for Hotels, generally accepted accounting practices, and the requirements of the Management Contract.  The Operator also noted that Arthur Anderson LLP, the Hotel's independent auditor in recent years, had certified its audits without the issuance of a blueback report that would have

been required if the audit had discovered accounting deficiencies or inadequate financial controls.

77. The eleventh category of alleged breaches was comprised of Owner's allegations that the Operator had failed to make full disclosure concerning the Hotel's capital needs. In response, Sheraton pointed out the numerous occasions on which the Owner became aware of the Hotel's capital needs and chose to do nothing about them. For example, Sheraton reminded the Owner that Sumitomo was made fully aware in 1990, when it purchased its share of the Joint Venture, that the Hotel required extensive capital expenditures.

78. The twelfth category of alleged breaches comprised allegations that the Operator failed to make needed repair and maintenance expenditures. In response, the Operator demonstrated that its repair and maintenance expenditures had risen markedly over the previous ten years, both in terms of dollars and in terms of percentage of the Hotel's total revenue. The Operator also noted the Owner's hypocrisy in arguing that the Operator had not spent enough money on capital replacements, when representatives of Sumitomo and Hancock had actually instructed the Operator to reduce the amount of planned capital spending in the Hotel's 1996 capital plan from 4.5 percent of budgeted revenue to 3.0 percent.

79. The thirteenth category of alleged breaches comprised allegations that the Operator had presented materially

misleading budgets and other financial information.  Operator

categorically denied these allegations.  With respect to the

Owner's further allegation that the Operator failed to produce to

the Owner any letters to management issued by the Operator's

public accountants, the Operator stated that, to the best of its

knowledge, it never received any such letters.  And finally, with

respect to the fourteenth and fifteenth categories of alleged

breaches, the Operator noted that these were mere rehashings of

the allegations the Owner had made in the first through

thirteenth categories of the 1995 Notice of Default.

80.  As described above, the purported "breaches" of

the Management Contract that John Hancock alleged after the

"operations" audit were all either nonexistent, examples of

standard practice in the hospitality industry, or of relatively

minor economic significance.

81.  Yet, somehow, John Hancock claimed that as a

result of alleged "breaches," Sheraton had caused damages in

excess of $80 million to the Hotel, which has a value of no more

than twice that amount.  Short of imploding the Hotel buildings

with explosives, it is inconceivable how Sheraton could cause

damages even remotely approaching this magnitude to the Hotel,

and despite repeated requests, John Hancock has refused to

substantiate this figure or explain how it was derived.

82.  Moreover, the Operator's inadvertent lack of

precise compliance with the terms of the Management Contract in

two instances over the long history of the contract did not constitute, either singly or in combination, an event of default that would permit the Owner to terminate the Management Contract.

83. In the January 31, 1996 letter, and repeatedly thereafter, Sheraton offered to provide John Hancock with the documentation on which the January 31, 1996 letter was based. The plaintiffs failed to avail themselves of this opportunity and have continued to insist, without providing any substantiation whatsoever, that Sheraton somehow caused astronomical amounts of damage to the Hotel.

84. Despite the disingenuousness and bad-faith posturing of John Hancock, Sheraton was willing to discuss changes to the Management Contract purely as a business matter, as a way of facilitating the adoption of a renovation plan for the Hotel. For example, Sheraton indicated its willingness to reduce its fees and restructure the terms of the Management Contract if an appropriate renovation plan is adopted.

85. However, John Hancock, which is either institutionally incapable of making a decision or seduced by its own rhetoric of astronomical damages, has been unwilling to agree to any reasonable approach to resolving the controversy.

86. Plaintiffs have declined to share with Sheraton the audit upon which its damages claims are based. (Now, following the commencement of this litigation, plaintiffs take the position that the audit was prepared in anticipation of

litigation on behalf of individual partners John Hancock and Sumitomo, and not by the Joint Venture for operational reasons, and that therefore all documents and communications in connection with the audit constitute privileged matter not subject to discovery or even review by Joint Venture Partner Washington Sheraton Corporation.)

87. During the first half of 1996, the Joint Venture used its unsubstantiated allegations of breach constituting cause for termination in an effort to extort from Sheraton not only concessions in the terms of the Management Contract but also exorbitant sums in damages. When pressed for substantiation of its allegations, the Joint Venture routinely sidestepped the issue.

88. It soon became apparent that the Joint Venture was trying to squeeze out of Sheraton funds to offset the capital investments of over $60 million required of John Hancock and Sumitomo to carry out the necessary renovation and repositioning of the Hotel. By reducing Sumitomo's further investment, John Hancock could avoid Sumitomo's further questioning of its authority as Managing Partner, and perhaps of the nature of its disclosure to Sumitomo in 1990 concerning the Hotel's need for capital investment.

89. Any suggestion that Sumitomo was not satisfied with Sheraton's operation of the Hotel was and is belied by Sumitomo's solicitation of Sheraton in or around summer 1996 as a

potential operator of a Sumitomo-owned hotel in the Chicago area.
Sheraton declined Sumitomo's 1996 request because, already
managing a major convention hotel in Chicago, it was
contractually constrained from considering it.

90.    By mid-1997, Plaintiffs had changed counsel and
the parties had arrived at various potentially viable scenarios
involving the renegotiation or replacement of the management
Contract.    The parties remained, however, unable to resolve the
question of the Joint Venture's still unsubstantiated damage
claims.

91.    The filing of the complaint herein is merely the
continuation of Plaintiffs' efforts to escape the terms of the
Management Contract and extort money from Sheraton by claiming
damages without any good faith basis.

### Wrongful Termination and Revocation

92.    In or about July 1997, John Hancock and Sumitomo,
upon the recommendation of John Hancock, authorized the Joint
Venture to terminate the Operating Term of the Contract.

93.    Subsequently, by notice dated July 31, 1997,
Woodley Road, on behalf of the Joint Venture, gave notice of
intention to terminate the Management Contract after the
expiration of 15 days due to Sheraton's alleged failure to cure
the events of default specified in the 1995 Notice of Default
including without limitation defaults under Sections A.1 and A.6
of Article XXIV of the Management Contract (the "1997 Notice of

RLF1-158972-1                                45

Intention to Terminate").  The 1997 Notice of Intention to Terminate relied completely upon, and did not make any allegations of breach additional to, the allegations set forth in the 1995 Notice of Default.

94.  The 1997 Notice of Intention to Terminate invoked part A of Article XXIV of the Management Contract, which provides that the Management Contract will terminate 15 days after such notice unless noticed events of default are cured within such period or, with respect to defaults referred to in items (1), (5) and (6) of part A that cannot be cured within 15 days after such notice, such noticed events of default are cured within 90 days after such notice.

95.  No events of default existed on July 31, 1997.

96.  Any event of default existing on July 31, 1997 was subsequently cured to as to make the 1997 Notice of Intention to Terminate "of no force and effect" pursuant to part A of Article XXIV of the Management Contract.

97.  Any failure to cure any event of default existing on July 31, 1997 so as to make the 1997 Notice of Intention to Terminate "of no force and effect" pursuant to part A of Article XXIV of the Management Contract is wholly attributable to Plaintiffs' failure to act in good faith.

98.  The Management Contract has not been terminated according to its terms.

99.  Plaintiffs' efforts to terminate the Management Contract constitute a breach of the Management Contract made wilfully and in bad faith.

100. Rather than awaiting resolution of the contractual termination dispute with Sheraton, Woodley Road, in the 1997 Notice of Intention to Terminate, purported to revoke Sheraton's agency to manage the Hotel as of August 15, 1997.

101. The Joint Venture's purported revocation of Sheraton's agency to manage the Hotel was improper under agency law.

102. The Joint Venture invoked the jurisdiction of this Court to enjoin Sheraton from resisting the improper revocation of Sheraton's agency.

103. The revocation of Sheraton's agency to manage the Hotel, which effectively terminated the Operating Term of the Management Contract without cause, constitutes a breach of the Management Contract made wilfully and in bad faith.

104. The harm caused to Sheraton by the revocation of its agency to manage the Hotel, and by the enforcement of such revocation by this Court, cannot be remedied by reinstatement of Sheraton as agent.

### First Counterclaim

105. This claim for relief is brought by Sheraton on its own behalf against the Joint Venture and Woodley Road.

106. Sheraton repeats and realleges the allegations of Paragraphs 1 through 105, above, as if set forth in full herein.

107. Sheraton has properly and fully performed its duties under the Management Contract and has not breached that Contract in any material respect. As a result, Plaintiffs have no contractual right to terminate the Management Contract. By nonetheless revoking Sheraton's agency to operate the Hotel without cause and by obtaining this Court's preliminary injunction to effectuate that revocation, the Joint Venture and Woodley Road have breached the Management Contract and are liable to Sheraton for monetary damages, in an amount to be proved at trial, equivalent to the fees Sheraton would have earned if it had been allowed to continue to perform the Management Contract through its final extension period ending in the year 2030.

108. According to Plaintiffs' own estimations, the amount of damages to which Sheraton is entitled exceeds $100 million.

### Second Counterclaim

109. This claim for relief is brought by Sheraton on its own behalf against Hancock and Sumitomo.

110. Sheraton repeats and realleges the allegations of Paragraphs 1 through 109 above, as if set forth in full herein.

111. As a condition for the entry of its preliminary injunction, the Court required Hancock and Sumitomo to undertake, and they did in fact undertake, to pay all damages suffered by Sheraton if it was wrongfully enjoined, or if the revocation of its agency to operate the Hotel was wrongful and in violation of the Management Contract. Accordingly, Hancock and Sumitomo are directly liable to Sheraton for all damages awarded to Sheraton pursuant to its first counterclaim herein.

### Third Counterclaim

112. This claim for relief is brought by Sheraton on its own behalf against the Joint Venture and Woodley Road.

113. Sheraton repeats and realleges the allegations of Paragraphs 1 through 112, above, as if set forth in full herein.

114. Prior to the wrongful revocation of Sheraton's agency to operate the Hotel, Woodley Road and the Joint Venture breached the Management Agreement in material respects.

115. First, Woodley Road and the Joint Venture each failed to meet their contractual obligations to Sheraton as an Operator to adequately maintain and provide capital repairs and improvements to the Hotel property. As a result, the Hotel lost substantial business and revenue, causing damage to Sheraton in the form of decreased management fees.

116. Second, the Joint Venture and Woodley Road have refused to pay fees and reimbursements to which Sheraton is entitled under the Management Agreement, including without

limitation certain Sheraton sales offices fees, fees for customer complaint servicing, and fees for an employee training program known as SGS 2000. The amount of these unpaid fees, which will be proved at trial, exceeds $1 million.

117. Third, at the time when Sheraton quit the Hotel premises, there remained due and owing certain unbilled charges and expenses that have not yet been quantified, and the Joint Venture and Woodley Road are also liable to Sheraton for any employee severance payments resulting from Sheraton's removal from the Hotel.

118. By virtue of the foregoing allegations, the Joint Venture and Woodley Road have breached their contractual obligations under the Management Contract and are liable to Sheraton for damages resulting from that breach in an amount to be proved at trial.

### Fourth Counterclaim

119. This claim for relief is brought by ITT Sheraton and Washington Sheraton on their own behalf against John Hancock.

120. ITT Sheraton and Washington Sheraton repeat and reallege the allegations of Paragraphs 1 through 119 above as if set forth in full herein.

121. Under the Joint Venture Agreement, John Hancock, as Managing Partner, took on the contractual obligations to the Joint Venture and the other partners to oversee the day-to-day operations of the Hotel and to develop plans and budgets for all

necessary capital spending, including capital spending needed to maintain or improve the Hotel.

122. In addition to its contractual obligations, John Hancock as Managing Partner had a fiduciary duty to the Joint Venture and its other partners to use due care and reasonable diligence in carrying out its responsibilities under the Joint Venture Agreement.

123. ITT Sheraton and Washington Sheraton have been injured by the failure of John Hancock to perform its duties as Managing Partner because (a) the value of their Joint Venture interest has been diminished because John Hancock has caused the Joint Venture to incur the existing and potential financial obligations to Sheraton resulting from the Joint Venture's termination, and thus breach, of the Management Contract; (b) the values of interests in the Joint Venture and its assets have been further reduced as the result of the failure to provide adequate funds for capital renovations and improvements; (c) the cost of necessary repairs has increased as the result of further deterioration caused by John Hancock's delay in addressing the Hotel's capital needs, which will result in larger capital calls to the Joint Venture's partners when the renovation is finally done; and (d) as a result of lost business at the Hotel, the income of the Joint Venture and thus its partners have been reduced.

124. By virtue of the foregoing allegations, John Hancock has acted in bad faith and with wilful misconduct, ill will, recklessness, wantonness and oppressiveness in breaching its contractual and fiduciary duties to ITT Sheraton and Washington Sheraton, and is liable to them for damages resulting from those breaches in an amount to be proved at trial.

### Fifth Counterclaim

125. This claim for relief is brought by ITT Sheraton and Washington Sheraton on their own behalf against John Hancock and the Joint Venture.

126. ITT Sheraton and Washington Sheraton repeat and reallege the allegations of Paragraphs 1 through 125 above as if set forth in full herein.

127. Based on the foregoing allegations, ITT Sheraton and Washington Sheraton are entitled to judgment declaring that, as provided for in section 6.01 of the Joint Venture Agreement, they have validly demanded the removal for cause of John Hancock as Managing Partner, and ordering and directing that John Hancock cease to be Managing Partner.

### Sixth Counterclaim

128. This claim for relief is brought by ITT Sheraton and Washington Sheraton derivatively on behalf of the Joint Venture against John Hancock.

129. Prior to bringing this claim derivatively, Washington Sheraton made a demand on the Joint Venture to remove

John Hancock as Managing Partner of the Joint Venture, which demand was refused.

130. ITT Sheraton and Washington Sheraton repeat and reallege the allegations of Paragraph 1 through 129 above as if set forth in full herein.

131. By virtue of the foregoing allegations, John Hancock, in breach of its contractual obligations and fiduciary duties to the Joint Venture, has wrongfully caused the Joint Venture to incur liability for damages to Sheraton as alleged in the First and Third counterclaims, and is therefore liable to the Joint Venture for all damages awarded to Sheraton.

132. In causing the Joint Venture to incur the foregoing liabilities to Sheraton, John Hancock has acted in bad faith and with wilful misconduct, ill will, recklessness, wantonness and oppressiveness in breaching its fiduciary duties to the Joint Venture.

WHEREFORE, it is respectively requested that the Court enter judgment:

A.    Dismissing the Complaint in all respects;

B.    Granting Sheraton judgments on the First and Third Counterclaims and awarding it damages against the Joint Venture and Woodley Road in an amount to be proved at trial;

C.    Granting Sheraton judgment on the Second Counterclaim and awarding it damages against Hancock and Sumitomo in an amount to be proved at trial;

D.    Granting ITT Sheraton and Washington Sheraton judgment on the Fourth and Fifth Counterclaims; awarding them compensatory and punitive damages against John Hancock in an amount to be proved at trial; declaring that ITT Sheraton and Washington Sheraton have properly demanded the removal for cause of John Hancock as Managing Partner; and directing that John Hancock cease to be Managing partner of the Joint Venture;

E.    Granting judgment derivatively to the Joint Venture on the Sixth Counterclaim declaring that John Hancock is liable to the Joint Venture for the reimbursement of all damages paid by the Joint Venture to Sheraton and awarding compensatory and punitive damages against John Hancock in an amount to be proved at trial;

F.    Granting Sheraton, ITT Sheraton and Washington Sheraton their costs and disbursements of this action, together with such other or further relief as the Court deems just and proper.

Dated:  Wilmington, Delaware
        March 27, 1998

*Srinivas M. Raju*

Allen M. Terrell, Jr. (I.D. #709)
Srinivas M. Raju (I.D. #3313)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 658-6541
Attorneys for Defendants and
    Counterclaims and Third-Party
    Plaintiffs

OF COUNSEL:
John S. Kinzey
Elizabeth Page Smith Fouché
James E. Schwartz
LeBOEUF, LAMB, GREENE & MacRAE
        L.L.P.
125 West 55th Street
New York, New York 10019-5389
212-424-8000

# Exhibit 2



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| 2660 WOODLEY ROAD JOINT VENTURE, )<br>WOODLEY ROAD ASSOCIATES, INC., )<br>JOHN HANCOCK MUTUAL LIFE )<br>INSURANCE COMPANY and )<br>SUMITOMO LIFE REALTY (N.Y.), INC., )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>ITT SHERATON CORPORATION and )<br>SHERATON OPERATING CORPORATION, )<br>)<br>Defendants. )<br>‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ )<br>)<br>ITT SHERATON CORPORATION and )<br>WASHINGTON SHERATON CORPORATION, )<br>both individually and derivatively )<br>on behalf of 2660 WOODLEY ROAD JOINT )<br>VENTURE, and )<br>SHERATON OPERATING CORPORATION, )<br>)<br>Counterclaim Plaintiffs, )<br>)<br>vs. )<br>)<br>2660 WOODLEY ROAD JOINT VENTURE, )<br>WOODLEY ROAD ASSOCIATES, INC., )<br>JOHN HANCOCK MUTUAL LIFE )<br>INSURANCE COMPANY and )<br>SUMITOMO LIFE REALTY (N.Y.), INC., )<br>)<br>Counterclaim Defendants. )| Civil Action No. 97-450-JJF |

## COUNTERDEFENDANTS' REPLY TO COUNTERPLAINTIFFS' AMENDED COUNTERCLAIMS

Counterdefendants 2660 Woodley Road Joint Venture, Woodley Road

Associates, Inc., John Hancock Mutual Life Insurance Company and Sumitomo Life

Realty (N.Y.), Inc. (collectively, "Plaintiffs"), by their undersigned counsel, for their

reply to the amended counterclaims in the above-captioned action (the "Amended

Counterclaims"), hereby state as follows:

Except to the extent expressly, specifically and unambiguously admitted herein,

Plaintiffs deny each and every allegation of the Amended Counterclaims and demand

strict proof thereof.

1.     Plaintiffs state that no response is necessary to paragraph 1 of the

Amended Counterclaims because it is a characterization of the claims being asserted, and

to the extent a response is required, Plaintiffs admit only that the counterclaims are

brought by Sheraton Operating Corporation ("Sheraton"), Washington Sheraton

Corporation ("WSC") and ITT Sheraton Corporation ("ITT Sheraton") (collectively, the

"Sheraton Parties") and deny the remaining allegations of paragraph 1.

2.     Plaintiffs deny the allegations of paragraph 2 of the Amended

Counterclaims.

3.     Plaintiffs state that the allegations of paragraph 3 of the Amended

Counterclaims assert a legal conclusion as to which no response is necessary, but to the

extent a response is required Plaintiffs deny these allegations.

4.     Plaintiffs lack knowledge or information sufficient to form a belief

as to the truth of paragraph 4 of the Amended Counterclaims, and therefore deny those

allegations and demand strict proof thereof.

5.     Plaintiffs admit the allegations contained in paragraph 5 of the

Amended Counterclaims.

6.     Plaintiffs admit the allegations contained in paragraph 6 of the

Amended Counterclaims.

7.    With respect to the allegations of paragraph 7 of the Amended Counterclaims, Plaintiffs admit that Sumitomo is a corporation organized under the laws of the State of New York. Answering further, Plaintiffs state that Sumitomo's principal place of business is 101 East 52nd Street, Second Floor, New York, New York 10167 and that it is a wholly owned subsidiary of Sumitomo Life in Japan. Plaintiffs deny the remaining allegations contained in paragraph 7 of the Amended Counterclaims.

8.    Plaintiffs admit only that Woodley Road is a corporation organized under the laws of the State of Delaware, is wholly owned, directly or through intervening subsidiaries, by John Hancock, and maintains its principal place of business at 200 Clarendon Street, Boston, Massachusetts 02117. Plaintiffs deny the remaining allegations of paragraph 8 of the Amended Counterclaims.

9.    Plaintiffs admit that Sheraton quit the premises of the Hotel on March 15, 1998 pursuant to a court order, but deny the remaining allegations of paragraph 9 of the Amended Counterclaims.

10.    Plaintiffs deny the allegations of paragraph 10 of the Amended Counterclaims.

11.    With respect to paragraph 11 of the Amended Counterclaims, Plaintiffs admit that the Initial Operating Term of the Management Contract was to end December 31, 2000, and refer to the Management Contract for the terms therein. Answering further, Plaintiffs state that the Initial Operating Term was subject to termination of Sheraton's agency. Plaintiffs deny the remaining allegations of paragraph 11 of the Amended Counterclaims.

12.    Plaintiffs deny the allegations of paragraph 12 of the Amended Counterclaims.

13.     Plaintiffs deny the allegations of paragraph 13 of the Amended Counterclaims and refer to the Management Contract for the terms contained therein.

14.     Plaintiffs state that no response is necessary to paragraph 14 of the Amended Counterclaims because it is a legal conclusion, and to the extent a response is required Plaintiffs deny the allegations of paragraph 14 of the Amended Counterclaims to the extent such allegations purport to refer to Plaintiffs or to this litigation.

15.     Plaintiffs state that no response is necessary to paragraph 15 of the Amended Counterclaims because it is a conclusory assertion of fact and law, and Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning Sheraton's and ITT Sheraton's state of mind.  To the extent a response is required, Plaintiffs deny the allegations of paragraph 15 of the Amended Counterclaims.

16.     Plaintiffs deny the allegations of paragraph 16 of the Amended Complaint.  Answering further, the Plaintiffs state that the Sheraton parties did not make available "all documents on which [Sheraton] based its refutation of the plaintiffs' allegations" despite the fact that these documents had been requested by Plaintiffs' counsel prior to the filing of this litigation.

17.     Plaintiffs deny the allegations of paragraph 17 of the Amended Counterclaims.  Answering further, to the extent that the allegations of paragraph 17 purport to state a legal conclusion, no response is necessary.

18.     Plaintiffs deny the allegations of paragraph 18 of the Amended Counterclaims.  Answering further, to the extent that the allegations of paragraph 18 purport to state a legal conclusion, no response is necessary.

19.    With respect to paragraph 19 of the Amended Counterclaims, Plaintiffs admit that the Joint Venture was formed in or about 1979, and that John Hancock acquired a 50% interest in the Joint Venture at that time.   Plaintiffs deny that the Joint Venture was formed "to expand and improve the then existing Sheraton Park Hotel" and refer to the Joint Venture Agreement for the business purposes set forth therein. Plaintiffs admit the remaining allegations of paragraph 19 of the Amended Counterclaims.

20.    Plaintiffs admit that John Hancock is managing partner of the Joint Venture, but Plaintiffs deny the remaining allegations of paragraph 20 of the Amended Counterclaims and refer to Joint Venture Agreement for the terms thereof.

21.    Plaintiffs admit that John Hancock and Sumitomo were parties to the Joint Venture Agreement and refer to the terms thereof.  Answering further, Plaintiffs admit that Major Decisions under the terms of the Joint Venture Agreement include the termination or modification of the Management Contract or the rights of the Operator. Plaintiffs deny the remaining allegations of paragraph 21 of the Amended Counterclaims.

22.    With respect to paragraph 22 of the Amended Counterclaims, Plaintiffs admit that the Joint Venture assigned all rights, title and interest in and to the Management Contract to Woodley Road, that Woodley Road assumed and agreed to perform all duties and obligations of the Joint Venture under the terms of the Management Contract, and that the Joint Venture guaranteed payment and performance of Woodley Road's obligations as "Owner" under the Management Contract.  Plaintiffs deny the remaining allegations of paragraph 22 of the Amended Counterclaims. Answering further, Plaintiffs state that Sheraton consented to the assignment by the Joint Venture and assumption by Woodley Road.

23.    With respect to the allegations of paragraph 23 of the Amended Counterclaims, Plaintiffs admit that Management Contract contemplated an "Initial Operating Term" running through midnight, December 31, 2000. Answering further, Plaintiffs state that the Initial Operating Term was subject to termination of Sheraton's agency.

24.    Plaintiffs deny the allegations of paragraph 24 of the Amended Counterclaims, except that Plaintiffs admit that Sheraton is the "Operator" under the Management Contract and Plaintiffs refer to the terms thereof.

25.    Plaintiffs admit that Article XXIV provides for termination of the Operating Term of the Management Contract, and refer to the terms therein. Plaintiffs deny the remaining allegations of paragraph 25 of the Amended Counterclaims.

26.    Plaintiffs admit that paragraph 26 of the Amended Counterclaims purports to be an excerpt from Article VI of the Management Contract, and refer to the terms therein..

27.    Plaintiffs admit that John Hancock and Sumitomo were parties to the Joint Venture Agreement and that Woodley Road was a party to the Management Contract, and refer to the terms thereof. Answering further, Plaintiffs state that Sheraton is responsible for making such expenditures for repairs and maintenance "as it deems necessary to keep the Hotel in good operating condition," and deferred routine maintenance of critical back of the house items until repairs or replacements were funded by the Joint Venture through emergency capital calls. As a result of this practice, the Sheraton defendants foisted ordinary repair and maintenance expenditures onto the Joint Venture as capital expenditures, which had the result of increasing Sheraton's incentive

fee while the physical condition of the Hotel deteriorated. Plaintiffs deny the remaining allegations of paragraph 27 of the Amended Counterclaims.

28. Plaintiffs admit that John Hancock needed Sumitomo's consent, as the remaining Principal under the Joint Venture Agreement, for any capital expenditures other than (i) those set forth in an approved Business Plan and (ii) Emergency Expenditures made in accordance with Section 4.04 of the Joint Venture Agreement. Answering further, Plaintiffs state that until 1995, John Hancock as Managing Partner made requests for capital from its other partners, Sumitomo and WSC, based upon the capital priorities recommended by Sheraton, and that notwithstanding the capital budgets proposed by Sheraton, the Managing Partner made additional capital calls on a regular basis such that over the past decade capital spending at the Hotel averaged approximately seven (7) per cent of the Hotel's total revenue, well in excess of the 4.5 per cent expenditures that are the industry standard. Plaintiffs deny the remaining allegations of paragraph 28 of the Amended Counterclaims.

29. With respect to paragraph 29 of the Amended Counterclaims, Plaintiffs admit that in connection with Sumitomo's entrance into the Joint Venture, the partners agreed to certain specified future work. Answering further, Plaintiffs state that in connection with Sumitomo's entrance into the Joint Venture, the partners agreed to undertake a main building renovation, and that this project was completed before John Hancock and Sumitomo expressed the need for a comprehensive capital plan to address the frequent emergency cash calls necessitated by Sheraton's inability to properly plan and budget for repair and maintenance of the Hotel. Plaintiffs deny the remaining allegations of paragraph 29 of the Amended Counterclaims.

30.     Plaintiffs admit that capital repairs and renovations were made during the early and mid-1990s at the Owners' expense, that the facade of the Wardman Tower required extensive repairs to maintain its structural integrity and safety (which repairs are under way), and that just a few years after Sumitomo entered the partnership a number of mechanical and structural systems deteriorated and in some instances became inoperable, and thus required repair or replacement. Answering further, Plaintiffs state that numerous repairs were undertaken at the Owners' expense subsequent to Sumitomo's purchase of its 48% interest in the Joint Venture, largely under the supervision of the outside consultant whose retention by the Owners in the mid-1990s was necessitated by Sheraton's incompetence. Plaintiffs specifically allege that the need for these repairs, renovations and replacements resulted from Sheraton's failure to adequately prioritize, plan and budget for the repair and maintenance of the Hotel. As a result of Sheraton's mismanagement, money that could have been used to maintain the Wardman facade, for example, instead went to the purchase and installation of new coffee pots (and the attendant electrical work) which furthered Sheraton's brand image at the expense of the worsened physical condition of the Hotel. Sheraton failed to keep Owners adequately apprised of the need to repair the deterioration of the Wardman facade until a guest was hit by falling brickwork while in the Wardman pool. As a result, the Owners have incurred much larger expenses in repairing the Wardman facade than would have been the case if Sheraton had done routine repair and maintenance of this historically significant structure. Plaintiffs deny the remaining allegations of paragraph 30 of the Amended Counterclaims.

31.     Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph 31 of the Amended Counterclaims that

during 1983 a large new convention center was opened in downtown Washington, and during the 1980's a number of new competitor hotels opened in the Hotel's vicinity, and therefore deny these allegations and demand strict proof thereof. Plaintiffs admit that the Hotel is located near the National Zoo and is not located in downtown Washington. Plaintiffs deny the remaining allegations of paragraph 31 of the Amended Counterclaims. Answering further, Plaintiffs state that the Hotel is a unique asset well situated to serve convention groups too large to fit into smaller downtown hotels, and therefore has a competitive advantage with or without "repositioning."

32.    With respect to paragraph 32 of the Amended Counterclaims, Plaintiffs admit that a Master Plan to address the Hotel's capital spending needs was necessary. Answering further, Plaintiffs state that the Master Plan was specifically requested by John Hancock and Sumitomo, largely as a result of Sheraton's inability to plan and budget for the repair, maintenance and modernization needs of the Hotel. Plaintiffs deny the remaining allegations of paragraph 32 of the Amended Counterclaims.

33.    Plaintiffs admit the allegations of paragraph 33 of the Amended Counterclaims.

34.    Plaintiffs admit that Michael F. Bloomer sent a letter dated September 30, 1994, to Peter Potrykus and refer to that letter for the terms therein. Answering further, Plaintiffs state that Sheraton and/or ITT Sheraton, and not John Hancock, were to blame for the delay in finalizing a renovation plan for submission to the D.C. Board of Zoning Appeals ("BZA"). The initial renovation plan, prepared by Sheraton at Owners' request, lacked sufficient detail and backup to support the requested $60 million investment. Rather than provide backup to support the renovation "plan," Sheraton persisted in demanding that Owners commit an extraordinary amount of capital

without giving Owners any precise indication how the money would be utilized and whether the additional investment was financially justifiable. Already delayed by Sheraton's inability to prepare a credible, documented renovation plan, the Owners were forced to retain a professional project manager, Jonathan Nehmer & Associates ("Nehmer"). Nehmer, the Owners and the on-site property management staff at the Hotel cooperated in developing a renovation plan, which was not finalized for submission to the BZA by the projected deadline because of the intrusive and counterproductive involvement of ITT Sheraton, which refused to let its on-site personnel do their jobs and insisted that its property management personnel scrutinize virtually every aspect of the project. A renovation plan ultimately was submitted to the BZA for approval, and the Joint Venture incurred significant legal expenses and lost a great deal of time in pursuing a plan that ultimately was not approved. Ultimately, the Joint Venture had to go back to the drawing board to devise yet another renovation plan, which is currently under way. Plaintiffs deny the remaining allegations of paragraph 34 of the Amended Counterclaims.

35.    With respect to the allegations of paragraph 35 of the Amended Counterclaims, Plaintiffs admit that a Capital Expense Form dated July 12, 1994 was prepared by Sumitomo, and refer to the terms therein. Plaintiffs deny the remaining allegations of paragraph 35 of the Amended Counterclaims, and specifically allege that Sumitomo at no time sought the removal of John Hancock as managing partner of the Joint Venture, and that Sumitomo rejected WSC's overtures seeking to align Sumitomo with the Sheraton Parties in arranging John Hancock's ouster and preserving Sheraton's status at the Hotel.

36.    Plaintiffs deny the allegations of paragraph 36 of the Amended Counterclaims except that Plaintiffs admit that repair and renovation work was done at

the Hotel from 1991 to 1998. Answering further, Plaintiffs state that the Owners spent millions of dollars to renovate the Hotel while the dispute with Sheraton was pending and sought to correct the effects of Sheraton's neglectful repair and maintenance practices.

37.     Plaintiffs deny the allegations of paragraph 37 of the Amended Counterclaims. Answering further, Plaintiffs allege that Sheraton never provided backup for its initial proposed master plan, and that the Owners had to incur the expense of numerous third parties, and ultimately had to retain a professional project manager, to handle the job because Sheraton was not competent to manage the project.

38.     Plaintiffs deny the allegations of paragraph 38 of the Amended Counterclaims. Answering further, the Plaintiffs state that Sheraton is manufacturing a dispute over the physical condition of the Hotel -- which is being remedied by the Owners through projects that were under way even before this litigation was commenced -- merely as a pretext to divert attention from the damaging allegations of mismanagement in the Complaint, which allegations extend well beyond the Hotel level and reveal a serious breakdown of corporate control and accountability that appear to be symptomatic of ITT Sheraton corporate practice.

39.     With respect to paragraph 39 of the Amended Counterclaims, Plaintiffs admit that WSC demanded that John Hancock be removed as managing partner purportedly under the Joint Venture Agreement for the reasons alleged. Plaintiffs deny that the reasons alleged were valid. Plaintiffs admit that John Hancock rejected WSC's demand and that John Hancock remains Managing Partner of the Joint Venture, and that Sumitomo concurred in John Hancock's decision. Plaintiffs deny the remaining allegations of paragraph 39 of the Amended Counterclaims. Answering further, Plaintiffs state that the demand letter from WSC was a pretext for its present litigation posture, and

reflects WSC's status as nothing but a stalking horse for the interests of its parent corporation.

      40.     Plaintiffs deny the allegations of paragraph 40 of the Amended Counterclaims.

      41.     Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 41 of the Amended Counterclaims and therefore deny these allegations and demand strict proof thereof.

      42.     Plaintiffs deny the allegations of paragraph 42 of the Amended Counterclaims.

      43.     Plaintiffs deny the allegations of paragraph 43 of the Amended Counterclaims. Answering further, Plaintiffs deny that the consideration of the Master Plan coincided with any downturn in DC hotel revenues and Plaintiffs state that the decline in Hotel revenues during the early 1990's coincided with major renovations to the main Hotel building, which were done at Owners' expense. Declining revenues in the hotel industry generally in the early 1990's also coincided with ITT Sheraton's mismanagement and need to find new ways to squeeze more profit out of managed hotels, resulting in overcharging for centralized services, creative funding mechanisms, unlawful rebates and marketing incentives.

      44.     Plaintiffs deny the allegations of paragraph 44 of the Amended Counterclaims. Answering further, the Plaintiffs state that Sheraton's economic interest was in deferring repair and maintenance and forcing expenditures into the capital budget, since this lowered operating expenses and thereby increased fees paid to Sheraton, and that Sheraton's budgets reflected ITT Sheraton's policy -- enforced through corporate scrutiny of all capital budgets -- of favoring front of the house items that promoted

Sheraton's brand image over the back of the house items that preserved the physical condition of the Hotel.

45.    With respect to paragraph 45 of the Amended Counterclaims, Plaintiffs admit only that Sheraton has received certain payments based on revenues of the Hotel and refer to the Management Contact for the terms thereof. As to the remaining allegations of paragraph 45 of the Amended Counterclaims, Plaintiffs lack information or knowledge sufficient to form a belief as to the truth of those allegations and therefore deny these allegations and demand strict proof thereof.

46.    Plaintiffs deny the allegations of paragraph 46 of the Amended Counterclaims.

47.    Plaintiffs deny the allegations of paragraph 47 of the Amended Counterclaims.

48.    With respect to paragraph 48 of the Amended Counterclaims, Plaintiffs admit that legal counsel engaged by John Hancock and Sumitomo conducted an audit. Plaintiffs deny the remaining allegations of paragraph 48 of the Amended Counterclaims.

49.    With respect to paragraph 49 of the Amended Counterclaims, Plaintiffs admit that Plaintiffs' counsel conducted an audit and that audits are permitted under the terms of the Management Contract. Plaintiffs deny the remaining allegations of paragraph 49 of the Amended Counterclaims.

50.    Plaintiffs deny the allegations of paragraph 50 of the Amended Counterclaims.

51.    Plaintiffs deny the allegations of paragraph 51 of the Amended Counterclaims.

52.    Plaintiffs deny the allegations of paragraph 52 of the Amended Counterclaims. Answering further, Plaintiffs state that Sheraton interfered with the audit by, among other things, removing personnel files, failing to show up for meetings, and failing to produce documentation when and as requested. Plaintiffs further state that at no time during the audit did Sheraton notify Plaintiffs that it was relying on any representations made by Plaintiffs.

53.    With respect to paragraph 53 of the Amended Counterclaims, Plaintiffs admit that the audit revealed "an overwhelming demonstration of breach of contractual obligations, breach of fiduciary obligation, neglect of proper operations, and failure of managerial supervision." Plaintiffs also admit that Plaintiffs suffered substantial monetary damages as a result of these and other acts and omissions by the Sheraton Parties, and that these acts and omissions, among others alleged in the Complaint, constitute cause to terminate the Management Contract. Plaintiffs deny the remaining allegations of paragraph 53 of the Amended Counterclaims.

54.    Plaintiffs deny the allegations of paragraph 54 of the Amended Counterclaims. Answering further, Plaintiffs state that Sheraton was extracting exorbitant fees and payments from the Owners while Sheraton ignored the needs of the Hotel, and that other management companies would have managed the property better and on terms that reflected a more appropriate incentive structure.

55.    Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 55 of the Amended Counterclaims, and therefore deny these allegations and demand strict proof thereof. Answering further, Plaintiffs state that in light of Sheratons' pervasive mismanagement of the property, exorbitant fees, misallocated chain wide service expenses, and the need to inject

substantial new capital into the Hotel, ITT Sheraton did not provide competent, competitive management services. Answering further, Plaintiffs, before initiating this litigation, attempted to negotiate a new management contract with Sheraton as a compromise for Sheraton's mismanagement, provided that Sheraton agreed to restrictions making Sheraton more accountable for its management and operation of the Hotel, and that such a contract likely would have resulted in financial savings for the Owners.

56. With respect to the allegations of paragraph 56 of the Amended Counterclaims, Plaintiffs admit that the Joint Venture benefits from terminating Sheraton as manager and ridding the Hotel of the Sheraton brand and its systemic mismanagement and exorbitant fee structure. Plaintiffs lack information or knowledge sufficient to form a belief as to the truth of the remaining allegations of paragraph 56 of the Amended Counterclaims and therefore deny same and demand strict proof thereof.

57. Plaintiffs lack information or knowledge sufficient to form a belief as to the truth of the allegations of paragraph 57 of the Amended Counterclaims, therefore the Plaintiffs deny these allegations and demand strict proof thereof.

58. Plaintiffs lack information or knowledge sufficient to form a belief as to the truth of the allegations of paragraph 58 of the Amended Counterclaims, and therefore deny these allegations and demand strict proof thereof. Answering further, Plaintiffs allege that Sheraton entered into contract renegotiations as part of a stonewalling campaign designed to forestall termination and, attendant thereto, prolong its ability to continue to pay itself exorbitant fees and other "expenses" out of the Hotel's accounts.

59. With respect to paragraph 59 of the Amended Counterclaims, Plaintiffs admit that Sheraton agreed, in principle, to consider a restructuring of the terms

of the Management Contract and offered Plaintiffs several hundred thousand dollars purportedly to compensate Plaintiffs for damages. Plaintiffs deny the remaining allegations of paragraph 59 of the Amended Counterclaims. Answering further, Plaintiffs state that Sheraton entered into these negotiations to avoid termination and to forestall litigation, but failed to engage in good faith negotiations on the terms of a new management contract that would require Sheraton to comply with appropriate managerial controls and standards.

60.    With respect to paragraph 60 of the Amended Counterclaims, Plaintiffs admit that a copy of the default letter is attached as Exhibit A. Plaintiffs deny the remaining allegations of paragraph 60 of the Amended Counterclaims.

61.    With respect to paragraph 61 of the Amended Counterclaims, Plaintiffs admit that the Management Contract provides for notices, defaults, and termination of the agreement, and refer to the terms thereof. Plaintiffs deny the remaining allegations of paragraph 61 of the Amended Counterclaims.

62.    Plaintiffs deny the allegations of paragraph 62 of the Amended Counterclaims and refer to the Notice of Default and the Management Contract for the terms thereof. Answering further, the Plaintiffs admit that the Notice of Default identified no fewer than 50 defaults.

63.    With respect to paragraph 63 of the Amended Counterclaims, Plaintiffs admit that Woodley Road was a party to the Management Contract and refer to the terms thereof. Plaintiffs deny the remaining allegations of paragraph 63 of the Amended Counterclaims.

64.    Plaintiffs admit that paragraph 64 of the Amended Counterclaims purports to quote subpart XXIV(A)(6) of the Management Contract, and refer to the

terms thereof. Plaintiffs deny the remaining allegations of paragraph 64 of the Amended Counterclaims.

   65. With respect to paragraph 65 of the Amended Counterclaims, Plaintiffs admit that Sheraton sent a single spaced letter, purportedly in response to the Notice of Default, dated January 31, 1996, and that a copy of this letter is attached as Exhibit B to the Amended Counterclaims. Plaintiffs deny the remaining allegations of paragraph 65 of the Amended Counterclaims. Answering further, Plaintiffs state that Sheraton, in that letter, confirmed that it had in fact breached the Management Contract in several material respects.

   66. Plaintiffs deny the allegations of paragraph 66 of the Amended Counterclaims.

   67. With respect to paragraph 67 of the Amended Counterclaims, Plaintiffs admit that the Notice of Default and the purported response are the documents attached as Exhibits A and B and refer to the terms therein. Plaintiffs deny the remaining allegations of paragraph 67 of the Amended Counterclaims and deny the truth of the statements made by Sheraton in the purported response. Answering further, Plaintiffs state that Sheraton failed to establish that the Hotel was properly reimbursed for the costs associated with employees assigned temporarily to other properties, and, on information and belief, that this practice continued even after the Owners objected to Sheraton's handling of such costs.

   68. With respect to paragraph 68 of the Amended Counterclaims, Plaintiffs admit that the Notice of Default and the purported response are the documents attached as Exhibit A and B and refer to the terms therein. Plaintiffs deny the remaining allegations of paragraph 68 of the Amended Counterclaims and deny the truth of the

statements made by Sheraton in the purported response. Answering further, Plaintiffs state that Sheraton to this day still has not produced any information as to how the Hotel's cost of centralized services is determined, and has already admitted that rebates used to subsidize the regional purchasing office were largely earned by the Hotel. Plaintiffs further state on information and belief that ITT Sheraton swept funds in the Hotel's bank accounts into holding accounts controlled by ITT Sheraton, without Owners' permission, and still has not explained the circumstances of this commingling of funds

69.    With respect to paragraph 69 of the Amended Counterclaims, Plaintiffs admit that the Notice of Default and the purported response are the documents attached as Exhibit A and B and refer to the terms therein. Plaintiffs deny the remaining allegations of paragraph 69 of the Amended Counterclaims and deny the truth of the statements made by Sheraton in the purported response. Answering further, Plaintiffs state that Sheraton has admitted that relocation benefits are part of employee compensation, as that term is used in the Management Contract, and that it had breached the Management Contract in this respect.

70.    With respect to paragraph 70 of the Amended Counterclaims, Plaintiffs admit that the Notice of Default and the purported response are the documents attached as Exhibit A and B and refer to the terms therein. Plaintiffs deny the remaining allegations of paragraph 70 of the Amended Counterclaims and deny the truth of the statements made by Sheraton in the purported response.

71.    With respect to paragraph 71 of the Amended Counterclaims, Plaintiffs admit that the Notice of Default and the purported response are the documents attached as Exhibit A and B and refer to the terms therein. Plaintiffs also admit that

during 1995 Sheraton did begin reporting complimentary room use to the Owners on a

monthly basis, and that such reports were generated at the request of the Owners.

Plaintiffs deny the remaining allegations of paragraph 71 of the Amended Counterclaims

and deny the truth of the statements made by Sheraton in the purported response.

Answering further, Plaintiffs state that prior to 1995, when the owners brought the issue

of excessive complimentary room use to the attention of Hotel management, Sheraton did

not maintain records reflecting the business purpose of the complimentary room use and

therefore their "response" to the default notice was not made in good faith, and that even

subsequent to 1995 the Hotel continued to violate ITT Sheraton policy.

72.    With respect to paragraph 72 of the Amended Complaint, Plaintiffs

admit that the Notice of Default and the purported response are the documents attached

as Exhibit A and B and refer to the terms therein. Plaintiffs admit that Sheraton executed

contracts in excess of the amount set forth in subpart VI(8) of the Management Contract.

Plaintiffs deny the remaining allegations of paragraph 72 of the Amended Counterclaims

and deny the truth of the remaining statements made by Sheraton in the purported

response. Answering further, Plaintiffs state that in addition to three contracts Sheraton

admits were entered into in violation of the Management Contract, the Sheraton Parties

routinely committed the Hotel to purchase goods and services through the various

purchasing operations in excess of $50,000 per year without Owner approval, as is

evidenced by testimony of Sheraton employees.

73.    With respect to paragraph 73, Plaintiffs admit that the Notice of

Default and the purported response are the documents attached as Exhibit A and B and

refer to the terms therein. Plaintiffs deny the remaining allegations of paragraph 73 of

the Amended Counterclaims and deny the truth of the statements made by Sheraton in the

purported response. Answering further, Plaintiffs state that Sheraton still has not

disclosed how rebates were handled by the profit-making Unifood and Hotel Source

enterprises predating the Sheraton Purchasing Resource, failed to disclose the existence

of funds provided by vendors to ITT Sheraton and other affiliates for marketing purposes,

and on information and belief continues to withhold information about telephone tariff,

tax and commission arrangements, rebates and/or marketing dollars from alcoholic

beverage manufacturers through intermediaries, and rebates and/or kickbacks from

construction contractors and similar vendors, among other as yet unknown rebate

practices designed to increase ITT Sheraton's revenue.

74.     With respect to paragraph 74 of the Amended Counterclaims,

Plaintiffs admit that the Notice of Default and the purported response are the documents

attached as Exhibit A and B and refer to the terms therein. Plaintiffs deny the remaining

allegations of paragraph 74 of the Amended Counterclaims and deny the truth of the

statements made by Sheraton in the purported response. Answering further, Plaintiffs

state that Sheraton has never explained why the Hotel was able to obtain better insurance

rates on its own than were obtained through the Sheraton insurance scheme.

75.     With respect to paragraph 75 of the Amended Counterclaims,

Plaintiffs admit that the Notice of Default and the purported response are the documents

attached as Exhibit A and B and refer to the terms therein. Plaintiffs deny the remaining

allegations of paragraph 75 of the Amended Counterclaims and deny the truth of the

statements made by Sheraton in the purported response. Answering further, Plaintiffs

state that Sheraton has never demonstrated to the Owners the purported benefit to the

Hotel from participating in the SCI program, and that Hotel employees have questioned

the value of the SCI program given the nature of the Hotel's business. Moreover,

Sheraton has never explained why SCI and other institutional marketing is not provided to the Hotel without charge, as required by the terms of the Management Contract.

76.     With respect to paragraph 76 of the Amended Counterclaims, Plaintiffs admit that the Notice of Default and the purported response are the documents attached as Exhibit A and B and refer to the terms therein. Plaintiffs deny the remaining allegations of paragraph 76 of the Amended Counterclaims and deny the truth of the statements made by Sheraton in the purported response. Answering further, Plaintiffs state that ITT Sheraton apparently did not have any internal audit practices with respect to this large convention hotel, and that, on information and belief, Arthur Andersen's audits merely confirmed the amount, but not the propriety, of intercompany fees and other affiliate transactions charged to the Hotel.

77.     With respect to paragraph 77 of the Amended Counterclaims, Plaintiffs admit that the Notice of Default and the purported response are the documents attached as Exhibit A and B and refer to the terms therein. Plaintiffs deny the remaining allegations of paragraph 77 of the Amended Counterclaims and deny the truth of the statements made by Sheraton in the purported response. Answering further, Plaintiffs state that even after the engineering reports in connection with Sumitomo's acquisition, Sheraton still failed to adequately prioritize capital expenditures, resulting in a number of emergency cash calls and, ultimately, the Owners' retention of a third party to provide project management services.

78.     With respect to paragraph 78 of the Amended Counterclaims, Plaintiffs admit that the Notice of Default and the purported response are the documents attached as Exhibit A and B and refer to the terms therein. Plaintiffs deny the remaining allegations of paragraph 78 of the Amended Counterclaims and deny the truth of the

statements made by Sheraton in the purported response. Answering further, Plaintiffs state that John Hancock and Sumitomo did not decrease the amount of capital expenditures in the Hotel's 1996 capital plan from 4.5% to 3%, but merely removed the additional 1.5% from Sheraton's control so that the funds contributed by the Owners over and above the amounts required under the Management Contract would not be misused by Sheraton. Furthermore, Owners typically committed far in excess of the budgeted amounts for capital spending, routinely exceeding industry standards.

79.    With respect to paragraph 79 of the Amended Counterclaims, Plaintiffs admit that the Notice of Default and the purported response are the documents attached as Exhibit A and B and refer to the terms therein. Plaintiffs deny the remaining allegations of paragraph 79 of the Amended Counterclaims and deny the truth of the statements made by Sheraton in the purported response.

80.    Plaintiffs deny the allegations of paragraph 80 of the Amended Counterclaims.

81.    Plaintiffs deny the allegations of paragraph 81 of the Amended Counterclaims.

82.    With respect to paragraph 82 of the Amended Counterclaims, Plaintiffs admit that Sheraton has not complied with the terms of the Management Contract. Plaintiffs deny the remaining allegations of paragraph 82 of the Amended Counterclaims.

83.    With respect to paragraph 83 of the Amended Counterclaims, Plaintiffs admit that Sheraton's January 31, 1996 letter offered to provide John Hancock with documentation on which that letter was purportedly based. Plaintiffs deny the remaining allegations of paragraph 83 of the Amended Counterclaims. Answering

further, Plaintiffs state that Plaintiffs' counsel requested that Sheraton produce this documentation before litigation was commenced, and that Sheraton never followed through on its "offer."

84.    With respect to paragraph 84 of the Amended Counterclaims, Plaintiffs admit that Sheraton indicated its willingness to engage in settlement discussions, part of which would include discussions of a new management agreement that would fundamentally restructure the way Sheraton managed the Hotel. Plaintiffs deny that Sheraton entered such discussions in good faith. Plaintiffs deny the remaining allegations of paragraph 84 of the Amended Counterclaims. Answering further, Plaintiffs state that Sheraton only entered into negotiations when threatened with imminent litigation.

85.    Plaintiffs deny the allegations of paragraph 85 of the Amended Counterclaims.

86.    With respect to paragraph 86 of the Amended Counterclaims, Plaintiffs admit that John Hancock and Sumitomo have declined to share with Sheraton the audit performed at the request of Plaintiffs' legal counsel on grounds of privilege. Answering further, Plaintiffs have filed papers with the Court demonstrating the factual and legal basis for the privilege claims asserted. Plaintiffs deny the remaining allegations of paragraph 86 of the Amended Counterclaims.

87.    Plaintiffs deny the allegations of paragraph 87 of the Amended Counterclaims.

88.    Plaintiffs denied the allegations of paragraph 88 of the Amended Counterclaims.

89.    Plaintiffs deny the allegations of the first sentence of paragraph 89 of the Amended Counterclaims. Plaintiffs lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 89.

90.    With respect to paragraph 90 of the Amended Counterclaims, Plaintiffs admit that by mid-1997 plaintiffs were being represented by current litigation counsel. Plaintiffs deny the remaining allegations of paragraph 90 of the Amended Counterclaims.

91.    Plaintiffs deny the allegations of paragraph 91 of the Amended Counterclaims.

92.    With respect to paragraph 92 of the Amended Counterclaims, Plaintiffs admit that in or about July 1997 John Hancock, as Managing Partner, requested Sumitomo's consent to terminate the Management Contract. Plaintiffs deny the remaining allegations of paragraph 92 of the Amended Counterclaims.

93.    Plaintiffs admit that by notice dated July 31, 1997, Woodley Road gave Notice of Termination and Notice to Quit, and refer to the terms of the Management Contract for the provisions relating thereto. Plaintiffs deny the remaining allegations of paragraph 93 of the Amended Counterclaims.

94.    With respect to paragraph 94 of the Amended Counterclaims, Plaintiffs admit that Woodley Road is a party to the Management Contract, and provided Sheraton with a Notice of Termination and Notice to Quit, and refer to the Management Contract and Notice of Termination and Notice to Quit and the terms therein. Plaintiffs deny the remaining allegations of paragraph 94 of the Amended Counterclaims.

95.    Plaintiffs deny the allegations of paragraph 95 of the Amended Counterclaims.

96. Plaintiffs deny the allegations of paragraph 96 of the Amended Counterclaims, and specifically allege that even after the Notice of Default was received by Sheraton, Sheraton continued to mismanage the Hotel and in some instances continued to violate even ITT Sheraton's internal policies.

97. Plaintiffs deny the allegations of paragraph 97 of the Amended Counterclaims.

98. Plaintiffs deny the allegations of paragraph 98 of the Amended Counterclaims.

99. Plaintiffs deny the allegations of paragraph 99 of the Amended Counterclaims.

100. Plaintiffs deny the allegations of paragraph 100 of the Amended Counterclaims. Answering further, Plaintiffs state that Sheraton's agency was revoked by Woodley Road as of August 18, 1997.

101. Plaintiffs deny the allegations of paragraph 101 of the Amended Counterclaims to the extent any response is necessary to this erroneous pronouncement of agency law.

102. With respect to paragraph 102 of the Amended Counterclaims, Plaintiffs admit that they invoked the jurisdiction of this Court to terminate Sheraton's agency. Plaintiffs deny the remaining allegations of paragraph 102 of the Amended Counterclaims. Answering further, Plaintiffs state that they were forced by Sheraton to seek judicial intervention because Sheraton refused to vacate the premises and turn over operation of the Hotel and thereby engaged in a continuing wrongful trespass.

103. Plaintiffs deny the allegations of paragraph 103 of the Amended Counterclaims

104.    Plaintiffs deny the allegations of paragraph 104 of the Amended Counterclaims.

## First Counterclaim

105.    With respect to paragraph 105 of the Amended Counterclaims, Plaintiffs state that no response is required because it merely identifies the parties on whose behalf the counterclaim is brought and against whom it is brought.  To the extent a response is required, Plaintiffs acknowledge that the claim is purported to be made on behalf of Sheraton against the Joint Venture and Woodley Road.   Plaintiffs deny the remaining allegations of paragraph 105 of the Amended Counterclaims.

106.    Plaintiffs repeat and incorporate by reference their answers to the allegations of paragraph 1 through 106 of the Amended Counterclaims as if fully set forth herein.

107.    Plaintiffs deny the allegations of paragraph 107 of the Amended Counterclaims.

108.    Plaintiffs deny the allegations of paragraph 108 of the Amended Counterclaims.

## Second Counterclaim

109-111.    With respect to paragraphs 109-111, Plaintiffs state that no response is required because Plaintiffs have moved to dismiss this Count.

## Third Counterclaim

112-118.    With respect to paragraphs 112-118, Plaintiffs state that no response is required because Plaintiffs have moved to dismiss this Count.

### Fourth Counterclaim

119-124.     With respect to paragraphs 119-124, Plaintiffs state that no response is required because Plaintiffs have moved to dismiss this Count.

### Fifth Counterclaim

125-127.     With respect to paragraphs 125-127, Plaintiffs state that no response is required because Plaintiffs have moved to dismiss this Count.

### Sixth Counterclaim

128-132.     With respect to paragraphs 128-132, Plaintiffs state that no response is required because Plaintiffs have moved to dismiss this Count.

Plaintiffs expressly reserve the right to answer and assert additional defenses to the Second, Third, Fourth, Fifth and Sixth Counterclaims in the event that their motion to dismiss those counterclaims is not granted in all respects.

## DEFENSES

### First Defense
### Lack of subject matter jurisdiction

The Court lacks subject matter jurisdiction over Counts III - VI of the Amended Counterclaims and should decline to exercise supplemental jurisdiction over those claims.

### Second Defense
### Failure to state a claim

The Amended Counterclaims are barred, in whole and in part, for failure to state a claim upon which relief can be granted.

### Third Defense
### Lack of Standing

The Court lack jurisdiction over Counts VI, V and VI with respect to Counterplaintiff ITT Sheraton, because ITT Sheraton does not have standing to bring these claims.

### Fourth Defense
### Unclean hands

Counterplaintiffs' claims are barred, in whole and in part, by the doctrine of unclean hands.

### Fifth Defense
### Laches

Counterplaintiffs' claims are barred, in whole and in part, by the doctrine of laches.

### Sixth Defense
### Breach of duties and covenants

Counterplaintiffs claims are barred, in whole and in part, by Counterplaintiffs' breaches of contractual and fiduciary duties and covenants of good faith and fair dealing.

### Seventh Defense
### Estoppel

Counterplaintiffs' claims are barred, in whole and in part, by the doctrine of estoppel.

### Eighth Defense
### Counterplaintiffs Have Sustained No Injury

Counterplaintiffs' claims are barred, in whole and in part, because Counterplaintiffs have not sustained any injury and cannot establish a likelihood that they will sustain an injury as a result of any matter alleged in the Complaint.

### Ninth Defense
### Good Faith

Plaintiffs have at all times and with respect to all acts alleged in the Counterclaims acted in good faith.

### Tenth Defense
### Proximate Cause

Any alleged harm to Counterplaintiffs was not proximately caused by Plaintiffs but was caused by the wrongful conduct of ITT Sheraton and Sheraton.

### Eleventh Defense
### Statute of Limitations

Counterplaintiffs' claims are barred, in whole and in part, by the applicable statute of limitations.

### Twelfth Defense
### Arbitration

Counterplaintiffs are not entitled to recovery in this proceeding to the extent that their claims are subject to an arbitration agreement, because they have failed to seek redress through arbitration.

WHEREFORE, Plaintiffs pray that the Counterclaims be dismissed with prejudice, that they be awarded costs in connection with the Counterclaims, and that Plaintiffs be awarded such other and further relief as the Court deems just and proper.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Edward B. Maxwell, 2nd (No. 521)
James P. Hughes, Jr. (No. 3102)
John W. Shaw (No. 3362)
Eleventh Floor, Rodney Square North
P.O. Box 391
Wilmington, Delaware 19899
302/571-6600
 Attorneys for Plaintiffs
 2660 Woodley Road Joint Venture
 Woodley Road Associates Inc.
 John Hancock Mutual Life
 Insurance Company
 Sumitomo Life Realty (N.Y.), Inc.

OF COUNSEL:

William E. Wallace III
Thomas J. O'Brien
William M. Bosch
MORGAN, LEWIS & BOCKIUS LLP
1800 M Street, N.W.
Washington, D.C. 20036
202/467-7000

Date:   April 17, 1998

## CERTIFICATE OF SERVICE

I, John W. Shaw, Esquire, hereby certify that, on April 17, 1998, I caused

copies of the foregoing document to be served upon the following:

**BY HAND**

        Allen N. Terrell, Jr., Esquire
        Richards, Layton & Finger
        One Rodney Square
        P.O. Box 551
        Wilmington, DE 19899

**BY FEDERAL EXPRESS:**

        John S. Kinzey, Esquire
        Elizabeth Smith, Esquire
        LeBoeuf, Lamb, Greene & MacRae L.L.P.
        125 West 55th Street
        New York, NY 10019-5389

John W. Shaw

# Exhibit 3



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

2660 WOODLEY ROAD JOINT VENTURE,      )
WOODLEY ROAD ASSOCIATES, INC.,         )
JOHN HANCOCK MUTUAL LIFE               )
INSURANCE COMPANY and                  )
SUMITOMO LIFE REALTY (N.Y.), INC.,     )
                                        )
        Plaintiffs,                     )        Civil Action No. 97-450-JJF
                                        )
    vs.                                 )
                                        )
ITT SHERATON CORPORATION and           )
SHERATON OPERATING CORPORATION,        )
                                        )
        Defendants.                     )
                                        )
_____ )
                                        )
ITT SHERATON CORPORATION and           )
WASHINGTON SHERATON CORPORATION,       )
both individually and derivatively      )
on behalf of 2660 WOODLEY ROAD JOINT   )
VENTURE, and                            )
SHERATON OPERATING CORPORATION,        )
                                        )
        Counterclaim Plaintiffs,        )
                                        )
    vs.                                 )
                                        )
2660 WOODLEY ROAD JOINT VENTURE,       )
WOODLEY ROAD ASSOCIATES, INC.,         )
JOHN HANCOCK MUTUAL LIFE               )
INSURANCE COMPANY and                  )
SUMITOMO LIFE REALTY (N.Y.), INC.,     )
                                        )
        Counterclaim Defendants.        )

## PLAINTIFFS MOTION TO DISMISS AMENDED COUNTERCLAIMS

Pursuant to Fed. R. Civ. P. 12(b), plaintiffs 2660 Woodley Road Joint

Venture (the "Joint Venture"), John Hancock Mutual Life Insurance Company ("John

Hancock"), Sumitomo Life Realty (N.Y.), Inc. ("Sumitomo") and Woodley Road

Associates, Inc. (the "Tenant") (collectively, "Plaintiffs"), hereby move to dismiss

Counts II through VI of the counterclaims of defendant-counterplaintiffs Sheraton

Operating Corporation ("Sheraton") and ITT Sheraton Corporation ("ITT Sheraton")

(collectively, "the Sheraton defendants"), and of counter-plaintiff Washington Sheraton

Corporation ("WSC").

     Dismissal of Counts IV, V, and VI is warranted under Rule 12(b)(1)

pursuant to Third Circuit precedent establishing that federal courts lack subject matter

jurisdiction over state law counterclaims that do not share a common nucleus of operative

fact with the underlying federal claims.  The counterclaims asserted in those counts are

state law causes of action for which there is no diversity jurisdiction or other independent

basis for federal jurisdiction.  The Court lacks subject matter jurisdiction over Counts IV,

V, and VI of the counterclaims because they do not share a common nucleus of operative

fact with Plaintiffs' federal RICO and antitrust claims, and therefore they do not fall

within the Court's supplemental jurisdiction under 28 U.S.C. § 1367.

     Additional grounds for dismissal under Rule 12(b)(1) exist here with

respect to Counts IV, V, and VI all of which arise under the Joint Venture Agreement

between John Hancock, Sumitomo, and WSC (which is not a party defendant).  ITT

Sheraton is not entitled to relief on those counterclaims as a matter of law because it

lacks standing to sue under that Agreement.  WSC, for its part, is not a proper party to

this litigation because it has been misjoined under Rule 20 in order to assert state law

counterclaims that no other party has standing to bring, and which are not common to and

transactionally related with any questions of law or fact pertaining to Sheraton or the

complaint.

WP3 M:\DOCS3\PUBL\016\PLEAD\6200-1                    - 2 -                                    :3095.1001

Counts II, III, IV, V, and VI must all be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Counts II and III simply fail to allege facts sufficient to give rise to a cause of action. Counts IV, V, and VI fail to state a claim for relief under the Joint Venture Agreement. Count VI must be dismissed for the additional reason that a general partner may not maintain a derivative action on behalf of a general partnership such as the Joint Venture.

In further support of this Motion, Plaintiffs rely on and incorporate by this reference the accompanying brief with attached Appendix.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Edward B. Maxwell, 2nd (No. 521)
James P. Hughes, Jr. (No. 3102)
John W. Shaw (No. 3362)
Eleventh Floor, Rodney Square North
P.O. Box 391
Wilmington, Delaware 19899
302/571-6600
  Attorneys for Plaintiffs
  2660 Woodley Road Joint Venture
  Woodley Road Associates Inc.
  John Hancock Mutual Life
  Insurance Company
  Sumitomo Life Realty (N.Y.), Inc.

OF COUNSEL:

William E. Wallace III
Thomas J. O'Brien
William M. Bosch
MORGAN, LEWIS & BOCKIUS LLP
1800 M Street, N.W.
Washington, D.C. 20036
202/467-7000

Date:   April 17, 1998

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| 2660 WOODLEY ROAD JOINT VENTURE,<br>WOODLEY ROAD ASSOCIATES, INC.,<br>JOHN HANCOCK MUTUAL LIFE<br>INSURANCE COMPANY and<br>SUMITOMO LIFE REALTY (N.Y.), INC., | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No. 97-450-JJF |
| vs. | ) ) | |
| ITT SHERATON CORPORATION and<br>SHERATON OPERATING CORPORATION, | ) ) ) | |
| Defendants. | ) ) | |
| ITT SHERATON CORPORATION and<br>WASHINGTON SHERATON CORPORATION,<br>both individually and derivatively<br>on behalf of 2660 WOODLEY ROAD JOINT<br>VENTURE, and<br>SHERATON OPERATING CORPORATION, | ) ) ) ) ) ) ) | |
| Counterclaim Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| 2660 WOODLEY ROAD JOINT VENTURE,<br>WOODLEY ROAD ASSOCIATES, INC.,<br>JOHN HANCOCK MUTUAL LIFE<br>INSURANCE COMPANY and<br>SUMITOMO LIFE REALTY (N.Y.), INC., | ) ) ) ) ) ) | |
| Counterclaim Defendants. | ) ) | |

## ORDER

At Wilmington this ___ day of _____, 1998, after

consideration of Plaintiffs' Motion to Dismiss Counterclaims, Brief In Support thereof,

and Defendants' and Counter-plaintiffs' responses thereto, and all other filing in

connection therewith, the Court finding good cause for the relief sought by Plaintiffs,

IT IS HEREBY ORDERED that Plaintiffs' Motion to Dismiss

Counterclaims is GRANTED and that Counts II through VI of defendant-

counterplaintiffs ITT Sheraton Corporation and Sheraton Operating Corporation and of

counter-plaintiff Washington Sheraton Corporation are hereby dismissed in their entirety.

_____
United States District Judge

## CERTIFICATE OF SERVICE

I, John W. Shaw, Esquire, hereby certify that, on April 17, 1998, I caused copies of the foregoing document to be served upon the following:

### BY HAND

        Allen N. Terrell, Jr., Esquire
        Richards, Layton & Finger
        One Rodney Square
        P.O. Box 551
        Wilmington, DE 19899

### BY FEDERAL EXPRESS:

        John S. Kinzey, Esquire
        Elizabeth Smith, Esquire
        LeBoeuf, Lamb, Greene & MacRae L.L.P.
        125 West 55th Street
        New York, NY 10019-5389

John W. Shaw

# Exhibit 4



# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

2660 WOODLEY ROAD JOINT VENTURE,  :
 et al.,            :
               :
   Plaintiffs and Counterdefendants, :
               :
   v.             :  C.A. No. 97-450-JJF
               :
ITT SHERATON CORPORATION et al., :
               :
   Defendants and Counterplaintiffs. :

## MEMORANDUM ORDER

Presently before the Court is the Plaintiffs' Motion to Dismiss Amended Counterclaims

(D.I. 144) pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6). The Plaintiffs request

that the Court dismiss Counts IV, V and VI pursuant to Rule 12(b)(1) for lack of subject matter

jurisdiction and standing. The Plaintiffs also request that Counts II, III, IV, V and VI be

dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

Additionally, the Plaintiffs request the dismissal of Count VI for the reason that a general partner

may not maintain a derivative action on behalf of a general partnership. In response, the

Defendants[1] assert that Counts IV, V and VI arise out of the same operative facts underlying the

Plaintiffs' claims, thereby giving the Court supplemental jurisdiction over the counterclaims.

The Defendants also maintain that the Defendant ITT Sheraton Corporation ("ITT") has standing

to sue as a third party beneficiary to the Management Contract and that Washington Sheraton

---

[1] For the purposes of this Memorandum Order, the Court will use the term "Defendants" to refer to ITT Sheraton Corporation ("ITT"), Sheraton Operating Corporation ("SOC") and Washington Sheraton Corporation ("WSC").

Corporation ("WSC") is a properly joined Counter-Plaintiff under Federal Rule of Civil

Procedure 20(a). Finally, the Defendants contend that Counts II, III, IV, V and VI contain

sufficient allegations to overcome a Rule 12(b)(6) challenge. For the reasons set forth below, the

Court will deny the Plaintiffs' Motion to Dismiss Amended Counterclaims (D.I. 144)

## DISCUSSION

### I.    Subject Matter Jurisdiction

The Plaintiffs seek to dismiss Counts IV, V and VI pursuant to Rule 12(b)(1) for lack of

subject matter jurisdiction. As always, the party invoking subject matter jurisdiction, in this case

the Defendants, has the burden of establishing it. Rhoades v. United States, 950 F. Supp. 623,

627 (D. Del. 1996). Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction "over

all claims that are so related to claims in the action within such original jurisdiction that they

form part of the same case or controversy under Article III of the United States Constitution." 28

U.S.C. § 1367(a). Subsumed in the term supplemental jurisdiction is the doctrine of ancillary

jurisdiction which supports the jurisdiction of certain claims interposed by parties other than the

plaintiff.[2] Where a series of claims are based on the same facts, ancillary jurisdiction is

necessary to avoid having the parties choose between litigating the same facts twice or losing

their right to a federal forum. Ambromovage v. United Mine Workers of America, 726 F.2d 972,

989 (3d Cir. 1984). However, the scope of the Court's discretion to exercise supplemental

jurisdiction is limited by the principles of federalism. Id. The Court of Appeals for the Third

---

[2]  The doctrine of pendent jurisdiction is also subsumed in the term supplemental
jurisdiction. Pendent jurisdiction, however, is not at issue in the instant case, therefore this
Memorandum Order will not discuss the aspects of pendent jurisdiction.

Circuit has set forth a three tiered analysis to determine whether ancillary jurisdiction should be exercised in a particular case. Id.

First, the Court must determine whether it has constitutional power to decide the state claim. Id. The Court has such power when the federal and state claims derive from a "common nucleus of operative fact." Id. (citing United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966)). Second, the Court must determine whether exercise of jurisdiction violates a federal policy decision, such as statutory law. Id. at 990. Finally, the Court, in its discretion, must weigh various factors to determine the appropriateness of hearing the non-federal claim. Id. Such factors include, but are not limited to, judicial economy, convenience and fairness to the litigants. Id. The Court must also consider federalism concerns such as dismissal of the federal claims before trial, the likelihood of jury confusion and the predominance of the state claim. Id.

In the instant case, the Plaintiffs assert that the Defendants' counterclaims have nothing in common with the Plaintiffs' federal claims and thus the Court does not have subject matter jurisdiction over the counterclaims. The Plaintiffs maintain that there is no material factual overlap between Counts IV, V and VI and the federal claims. The Plaintiffs argue that the federal claims relate to the Defendants' conduct in the operation and management of the Hotel, whereas the counterclaims focus on the ownership of the Hotel and arise under the Joint Venture Agreement.

In response, the Defendants contend that Counts IV, V and VI arise out of the same nucleus of operative facts and should be tried together with the Plaintiffs' federal claims. The Defendants maintain that all three Counts arise out of the Joint Venture Agreement. Moreover, the Defendants argue that the Joint Venture Agreement and the Management Contract are

3

inextricably connected because together the agreements define the rights and obligations of the parties concerning the Hotel enterprise. Therefore, the Defendants' counterclaims and the Plaintiffs' federal claims contain common questions of law and fact.

Applying the three tiered analysis outlined by the Third Circuit in <u>Ambromovage</u>, the Court finds that the Defendants' and WSC's state law counterclaims share a common nucleus of operative fact with the Plaintiffs' underlying federal claims. The issue in this case is whether the first tier of the analysis has been met, that the counterclaims have a "common nucleus of operative fact" with the underlying federal claims. The Court concludes that this test has been met because the Defendants' counterclaims relate to the factual setting of the Joint Venture Agreement and Management Contract. Taken together, these documents define the duties and responsibilities of the parties which is the underlying issue in the Plaintiffs' federal claims and the Defendants' counterclaims. The Plaintiffs and the Defendants allege injury to their respective business interests and breach of fiduciary duties because of each other's action and/or inaction. To prove the alleged violations, the parties would have several identical witnesses and similar financial and operational information. Therefore, the Court finds that the Defendants' counterclaims have a common nucleus of operative facts with the Plaintiffs' federal claims.

The second tier requires the Court to determine whether exercise of jurisdiction would violate a federal policy decision. The Court finds that the exercise of jurisdiction in this case is not limited by statutory law. The Plaintiffs' claims are based on the federal RICO and antitrust statutes, therefore no statutory limitations are implicated.

The final tier requires the Court to determine whether various factors, taken in light of federalism concerns, would limit the Court's exercise of jurisdiction over the Defendants'

4

counterclaims. In light of the overlap of evidence to be presented and issues in question, the Court finds that judicial economy, convenience and fairness to the litigants weigh in favor of exercising jurisdiction over the Defendants' counterclaims. Moreover, federalism concerns are not present here because, assuming that valid RICO and antitrust claims exist, dismissal of these claims before trial is unlikely. Additionally, the likelihood of jury confusion is remote because all the claims arise out of the Management Contract and Joint Venture Agreement, and several of the same legal issues are present. Thus, the three tier analysis in <u>Ambromovage</u> has been satisfied, and the Court has subject matter jurisdiction over the Defendants' counterclaims.

**II.    Standing**

**A.    ITT Has Standing to Sue**

In order to assert a claim, a party must have standing. To satisfy the constitutional minimum for standing, a party must demonstrate: 1) an invasion of a legally protected interest of the claimant; 2) a causal connection between the alleged injury and the conduct of the defendant; and 3) ability of the court to redress the injury. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992). A third-party has standing to sue on a contract made for its benefit. To be a third-party beneficiary in a contract, the contracting parties must intend to confer the benefit to the third-party. <u>Pierce Associates, Inc. v. Nemours Foundation</u>, 865 F.2d 530, 535 (3d Cir. 1988) (citing <u>Insurance Co. of North America v. Waterhouse</u>, 424 A.2d 675, 679 (Del. Super. 1980)), <u>cert. denied</u>, 492 U.S. 907 (1989). Such intent may be determined from the language of the contract or inferred from the context of the contract and surrounding circumstances. <u>Id.</u>; <u>Robinson v. Magovern</u>, 521 F. Supp. 842, 925 (W.D. Pa. 1981), *aff'd*, 688 F.2d 824 (3d Cir.), *cert. denied*, 459 U.S. 971 (1982).

Here, the Plaintiffs assert that ITT lack standing to sue because it does not have a legally protected interest under the Joint Venture Agreement. Moreover, ITT is not a third-party beneficiary because the parties to the Joint Venture Agreement never intended to benefit ITT upon entering the agreement. The Plaintiffs argue that ITT at best is only an incidental third-party beneficiary.

In response, the Defendants contend that ITT has standing to sue because WSC is a wholly owned subsidiary of ITT and WSC is a signatory to the Joint Venture Agreement. Moreover, ITT is a third-party beneficiary because the Management Contract was created to ultimately benefit the members of the Joint Venture, thereby also benefitting the Defendants.

In these circumstances, the Court finds that at the time of the execution of the Joint Venture Agreement, the parties intended for ITT to be a third-party beneficiary. As a party to the Joint Venture Agreement and a wholly owned subsidiary of ITT, WSC's role is to indirectly hold ITT's interest in the Hotel. Therefore, it is appropriate to recognize ITT as a third-party beneficiary of the Joint Venture Agreement. Consequently, ITT has a legally protected interest and thus has standing to sue under the Joint Venture Agreement.[3]

**B.    WSC is a Proper Party**

Pursuant to Rule 20(a), persons may join as plaintiffs in one action if "they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action." Fed. R. Civ. P. 20(a). Permissive party

---

[3] The other two elements for standing, causal connection and redressability, are not at issue, and the Court will not address them.

6

joinder is appropriate if two conditions are met - commonality and transactional relatedness. 4 James Wm. Moore et al., *Moore's Federal Practice* § 20.04[1] (3d ed. 1997).

The Plaintiffs in this case assert that WSC is not a party defendant and has not been properly joined under Rule 20(a). The Plaintiffs argue that WSC cannot intervene as of right and may not be joined pursuant to Rule 20(a) because the two conditions of commonality and transactional relatedness has not been met. The Plaintiffs contend that there is no common question of law and fact between the Plaintiffs' federal claims and the Defendants' counterclaims. Moreover, the Plaintiffs argue, there is no transactional relatedness between the claims.

The Defendants maintain that the conditions of Rule 20(a) have been satisfied. The Defendants assert that there are common questions of law and fact within the counterclaims. Further, the Defendants assert that the policies of permissive joinder are served by allowing WSC to join in the instant action, thereby avoiding multiple litigation in the future.

To determine whether WSC has been properly joined under Rule 20(a), the Court must first determine whether the claims arise from a series of transactions. Dougherty v. Mieczkowski, 661 F. Supp. 267, 278 (D. Del. 1987). Courts have applied a Rule 13(a) "logical relationship" standard: "[A]ll 'logically stated' events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence." Id. Next, the Court must determine whether the claims share a common question of law or fact. Under Rule 20(a), a single basis of commonality, either in law or fact, is enough for joinder to be acceptable. Id. Moreover, the common question does not need to be the predominant issue in the case. Mesa Computer Utils., Inc. v. Western Union Computer Utils., Inc., 67 F.R.D. 634, 637 (D. Del.

7

1975).

Applying these principles, the Court finds that WSC is a proper party joined pursuant to Rule 20(a). As previously discussed, the Plaintiffs' federal claims arise from the Defendants' duties and responsibilities under the Management Contract. Similarly, the Defendants' counterclaims arise from the Joint Venture Agreement. The Court finds that the two agreements are so intertwined that the claims and counterclaims arise out of a series of transactions which meet the transactionally related requirement. Additionally, the Court finds that there is a common question of law or fact between the Plaintiffs' federal claims and the Defendants' counterclaims. All the claims arise from the fiduciary and legal relationship between the parties. Therefore, to determine the duties and responsibilities of the parties, the Court will have to analyze and interpret both the Joint Venture Agreement and the Management Contract. Because many of the same facts and legal issues are implicated, the Court finds that the counterclaims have at least one question of law or fact in common with the underlying claims. Thus, WSC is a proper party joined pursuant to Rule 20(a).

## III.    Failure to State a Claim Upon Which Relief May be Granted

The Plaintiffs seek to dismiss Counts II, III, IV, V and VI pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). When considering a motion to dismiss, a court must accept as true all allegations in the complaint and must draw all reasonable factual inferences in the light most favorable to the non-moving party. Neitzke v. Williams, 490 U.S. 319, 326 (1989); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255

(3d Cir. 1994). The Court, however, is "not required to accept legal conclusions either alleged or inferred from the pleaded facts." Kost, 1 F.3d at 183. Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45 (1957). In the instant case, the Plaintiffs assert several grounds for dismissing Counts II, III, IV, V and VI pursuant to Rule 12(b)(6).

A.    Sufficiency of Allegations of Breach by John Hancock

The Plaintiffs contend that the Joint Venture Agreement does not create an obligation on the part of John Hancock to address the Hotel's capital spending needs. Referring to Section 6.04 of the Joint Venture Agreement, the Plaintiffs assert that it is the Defendant SOC that is responsible for preparing capital expenditure plans rather than John Hancock. Additionally, the Plaintiffs maintain that if there was a breach of duty, it is not actionable because the Joint Venture Agreement provides that any claims against the partners of the agreement must be based on "actual fraud, bad faith, gross negligence or willful misconduct." (Sec. 6.10, Joint Venture Agreement). Thus, the Plaintiffs assert that Count IV of the counterclaim should be dismissed because the Defendants did not allege such conduct against John Hancock.

The Defendants maintain that SOC's duties and obligations are defined under the Management Contract rather than the Joint Venture Agreement because SOC is not a signatory to the Joint Venture Agreement. Under the Management Contract, SOC is only required to prepare an annual operating, cash flow budget showing projected revenues and expenses anticipated to be paid out of that revenue. (Art. VI(3), Management Contract). Moreover, the Defendants argue that the Management Contract limits to $50,000 annually the aggregate amount of capital

9

improvements that may be charged to current expenses. Such capital improvements are limited to routine replacement and maintenance items that can be funded out of the Hotel's operational cash flow. The Defendants also contend that the Joint Venture Agreement delegates to John Hancock, in its capacity as Managing Partner, the "authority, discretion, obligation and responsibility to manage and control the affairs of the [Joint Venture]." (Art. 6.01, Joint Venture Agreement). The agreement also authorizes the Managing Partner to make capital calls on the partners to effectuate a "Major Decision," which includes capital expenditures other than those set forth in a "Business Plan" previously approved by the parties. (Art. 6.03(B), Joint Venture Agreement).

Additionally, the Defendants argue that the counterclaims expressly allege "bad faith" and "willful misconduct." (Amended Counterclaims ¶¶ 124, 132). The Defendants also contend that bad faith, willful misconduct, fraud and gross negligence may be reasonably inferred from the specific allegations contained in paragraphs 1 through 132 of the Amended Counterclaims. Thus, the Defendants argue, there are sufficient allegations to overcome a motion to dismiss pursuant to Rule 12(b)(6).

After reviewing the evidence in the light most favorable to the Defendants, the Court concludes that the Defendants' counterclaims, alleging breach of fiduciary duties by John Hancock, are sufficient to withstand a Rule 12(b)(6) challenge. The Joint Venture Agreement does not define SOC's duties and obligations. Rather, it is the Management Contract that outlines SOC's duties and obligations to the Hotel. Under the Management Contract SOC is required to prepare a "Business Plan," which does not include preparing a comprehensive capital plan for the Hotel. (Art. VI(3), Management Contract). Furthermore, the Joint Venture

10

Agreement authorizes the Managing Partner to control and manage the affairs of the Joint Venture, which includes calling on other partners to increase capital to effectuate a "Major Decision." (Art. 6.03(B)(38), Joint Venture Agreement). Major Decisions specifically include capital expenditures other than those stated in SOC's business plan. Therefore, the Court concludes that Plaintiff John Hancock is responsible for planning and funding major capital improvement programs.

The Court also concludes that the Defendants' counterclaims sufficiently allege bad faith and willful misconduct on the part of John Hancock. The Defendants specifically allege that John Hancock "acted in bad faith and with wilful misconduct, ill will, recklessness, wantonness and oppressiveness in breaching its contractual and fiduciary duties" to the Defendants. (Amended Counterclaims ¶ 124). The Defendants made similar allegations with regard to John Hancock breaching its duty to the Joint Venture. (Amended Counterclaims ¶ 132). At this juncture, the Court concludes that such allegations are sufficient to overcome a Rule 12(b)(6) challenge. Finally, the Court finds unpersuasive the Plaintiffs' argument that WSC's only remedy is an action for accounting under partnership law. The Court concludes that WSC's rights do not arise from partnership law, but rather from its contractual rights under the Joint Venture Agreement, thereby not limiting WSC's remedy.

B.    Sufficiency of Allegations for Declaratory Relief

The Plaintiffs assert that the Defendants have not shown any legal basis for removing John Hancock as Managing Partner. The Plaintiffs argue that the Defendants have not alleged any acts of fraud or gross negligence on the part of John Hancock, which would make John Hancock subject to removal under the Joint Venture Agreement.

11

In response, the Defendants contend that a partner may be unilaterally removed under section 6.01(D) of the Joint Venture Agreement, which establishes a basis for removal of a defaulting Managing Partner by any other partner. The Defendants also assert that a Managing Partner is subject to removal upon the occurrence of any "uncured Managing Partner Default." (Sec. 6.01(C)(9), Joint Venture Agreement). The Defendants maintain that the counterclaims allege numerous uncured defaults by John Hancock, thereby stating a claim for declaratory relief.

In accordance with the plain language of the Joint Venture Agreement, the Court concludes that the Defendants have sufficiently alleged grounds for the possible removal of John Hancock. Section 6.01 of the agreement specifically states that any partner may remove the Managing Partner for uncured Managing Partner Defaults. Because the agreement does not define "uncured Managing Partner Defaults," the Court will interpret the various allegations in the counterclaims to be possible uncured defaults by John Hancock. Accordingly, the Court concludes that the Defendants have made sufficient allegations for declaratory relief.

C.    Authority to Sue Derivatively on Behalf of the Joint Venture

The Plaintiffs contend that neither WSC nor ITT may bring a derivative action on behalf of the Joint Venture under Delaware law because WSC is a general partner and ITT is a nonpartner. Under Delaware law, a limited partner may bring a derivative action on behalf of the partnership if the general partners have refused to bring such an action or if an effort to cause the general partners to bring the action is unlikely to succeed. See 6 Del. C. § 17-1001 *et seq.* (1996). The Plaintiffs contend that the Joint Venture is not a limited partnership, and no statutory authority exists in Delaware to support a derivative action by a general partner against a general partnership. The Plaintiffs note that the few courts who have dealt with this issue have

12

concluded that, because a general partner has a number of remedies at its disposal for enforcing partnership obligations, such a derivative action is not necessary. Thus, the Plaintiffs contend that WSC and ITT do not have the authority to bring a derivative action on behalf of the Joint Venture.

Although agreeing with the general rule, the Defendants maintain that WSC does not possess the characteristics of a general partner that would make a derivative action inappropriate in this case. The Defendants assert that WSC is a hybrid of a general and limited partner. WSC possesses the unlimited liability of a general partner, but does not have the voting rights or management and control typical of a general partner. Furthermore, the Defendants contend that WSC does not have alternative remedies against the partnership, and WSC should be allowed to maintain its derivative action.

The Court concludes that WSC does not have alternative remedies normally available to a general partner. The Court understands WSC to be a general partner who bears the burden of unlimited liability and yet does not have the management or control typically available to general partners. In these circumstances, the Court will permit WSC to maintain its derivative action, thereby providing WSC, who is without alternative remedies, an opportunity to be heard.

D.    Recovery Pursuant to the Undertaking

The Plaintiffs contend that the Defendants improperly seek recovery pursuant to the Undertaking entered into by John Hancock and Sumitomo. The Plaintiffs assert that there can be no liability on the Undertaking unless a final judgment has been entered in favor of the enjoined party. In this case, there has been no such final judgment, therefore the Plaintiffs contend that Count II of the Defendants counterclaims should be dismissed pursuant to Rule 12(b)(6).

13

The Defendants maintain that Count II states a claim upon which relief may be granted because the Undertaking required the Plaintiffs to pay any damages the Defendant SOC incurred if the termination of its agency to operate the Hotel is determined at trial to be wrongful and in breach of the Management Contract.  The Defendants further comment that if the Plaintiffs agree that the Undertaking can be enforced post-judgment with a motion pursuant to Federal Rule of Civil Procedure 65.1, then the Defendants do not object to the dismissal of Count II as premature.

After reviewing the Defendants' Answer and Counterclaims, the Court finds that the Defendants have sufficiently alleged that the Plaintiffs may have wrongfully terminated Defendant SOC's agency to operate the Hotel.  As such, the Plaintiffs may also be potentially liable to Defendant SOC according to the terms of the Undertaking.  Accordingly, the Court concludes that the Defendants have stated a claim in Count II upon which relief may be granted.

E.    Recovery under the Management Contract

In Count III, the Defendants allege three breaches of the Management Contract by the Plaintiffs: 1) failure to adequately maintain and provide capital repairs and improvements to the Hotel property; 2) refusal to pay fees and reimbursements to Defendant SOC; and 3) failure to pay some as yet unquantified, unbilled charges and expenses, including employee severance payments resulting from Defendant SOC's removal from the Hotel.  (Amended Counterclaims ¶¶ 112-118).

The Plaintiffs contend that the Defendants have not identified any provision in the Management Contract which would entitle the Defendants to relief for these alleged breaches.  Therefore, the Plaintiffs contend that Count III should be dismissed pursuant to Rule 12(b)(6).  In

14

response, the Defendants assert that they have sufficiently alleged each purported breach. Moreover, the Defendants indicate that they are prepared to withdraw the final clause of paragraph 117 of the Amended Counterclaims relating to employee severance payments, while reserving its right to seek reimbursement for such payments in a future proceeding. (Defendants' Memorandum in Opposition to Plaintiffs' Motion to Dismiss Amended Counterclaims, pg. 37).

In accord with the notice pleading requirements of the Federal Rules, the Court concludes that the Defendants' allegations in Count III are sufficient to withstand a Rule 12(b)(6) challenge. Under the notice pleading criteria of the Federal Rules, the Complaint does not need to set forth specific facts, but rather the Complaint need only give the other party fair notice of the basis for the claim. See Fed. R. Civ. P. 8(a)(2); Conley v. Gibson, 355 U.S. 41, 47-48 (1957). It is the discovery process and pretrial procedures which allow parties to define more precisely the disputed facts and issues in each case. Conley, 355 U.S. at 48.

In the instant case, Count III adequately alleges that the Plaintiffs failed to meet their obligations under the Management Contract by not maintaining and providing capital repairs and improvements to the Hotel property. The Defendants allege that this obligation arises from Article XVI of the Management Contract. (Amended Complaint ¶ 27). Furthermore, the Defendants have specified the fees and reimbursements allegedly owed by the Plaintiffs, including the total amount sought by the Defendants. (Amended Complaint ¶ 116). Finally, because the Federal Rules only require notice pleading, it is sufficient that the Defendants allege charges and expenses without stating an exact amount. Thus, the Court concludes that the

15

allegations in Count III are sufficient.

NOW THEREFORE, IT IS HEREBY ORDERED this 6 day of April, 1999 that

Plaintiffs' Motion to Dismiss Amended Counterclaims (D.I. 144) is DENIED.


UNITED STATES DISTRICT JUDGE

16

# Exhibit 5

(302)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

2660 WOODLEY ROAD JOINT VENTURE,  )
    et al.,                             )
                                         )     Civil Action No. 97-450-JJF
    Plaintiffs and Counterdefendants, )
                                         )
    vs.                                  )
                                       )
ITT SHERATON CORPORATION, et al.,  )
                                       )
    Defendants and Counterplaintiffs.  )

## MOTION FOR LEAVE TO SUPPLEMENT COUNTERCLAIMS

    Counterclaimant Washington Sheraton Corporation ("WSC") moves this Court for leave to serve and file the Second Amended Answer and Counterclaim attached to this motion.

    This motion is necessitated by the fact that John Hancock has refused to distribute to Washington Sheraton Corporation an estimated two million dollars in proceeds from the sale of the Hotel, which occurred more than six months ago. Leave of the Court is sought because counsel for plaintiffs has stated that plaintiffs would oppose this motion to amend the counterclaims.

    The grounds for the motion are that the facts on which the supplemental counterclaim is based arose after the time at which Defendants' Answer and Counterclaims and subsequent Amended Answer and Counterclaims were filed and served, yet the interests of justice require that leave be granted to file and serve this Counterclaim in the present action because the Counterclaim is so related to the claims and defenses already present in the action that the parties would benefit from having these claims all tried in a single action.

As set forth fully in the Kinzey Affidavit and the Memorandum of Law submitted herewith, WSC seeks to supplement its counterclaims to add a claim for its 1% interest in the proceeds from the sale of the Hotel by plaintiff 2660 Woodley Road Joint Venture in or about February, 1999. This Counterclaim is related to and arises out of the claims and defenses involving the duties and obligations of the parties under the Management Contract and Joint Venture Agreement already present in this action. In these circumstances, Rule 13(e) of the Federal Rules of Civil Procedure expressly authorizes the Court to allow the service and filing of Counterclaims that arise after the time of the original answer.

No additional discovery will be required to decide this Counterclaim and John Hancock will suffer no prejudice as a result of the introduction of this Counterclaim. There will be no delay in trial preparation as a result of adding this Counterclaim. It is in the interests of all parties that all claims regarding the Hotel be litigated and resolved in this one action.

This motion is based on the pleadings and record in this action, this motion, the attached Second Amended Answer and Counterclaim, the Memorandum of Law and the Affidavit of John Kinzey submitted herewith.

WHEREFORE, WSC respectfully requests that this Court grant it leave to file and serve the Second Amended Answer and Counterclaim attached hereto.

Dated:    Wilmington, Delaware
          October 25, 1999

Allen M. Terrell, Jr. (I.D. # 709)
Srinivas M. Raju (I.D. # 3313)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 658-6541
Attorneys for Defendants and
Counterclaimants and Third-Party Plaintiffs

OF COUNSEL:

John S. Kinzey
Scot C. Gleason
Nicholas W.C. Corson
LeBOEUF, LAMB, GREENE & MacRAE, LL.P.
125 West 55th Street
New York, New York 10019-5389

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

2660 WOODLEY ROAD JOINT VENTURE,  )
WOODLEY ROAD ASSOCIATES, INC.,    )
JOHN HANCOCK MUTUAL LIFE INSURANCE )
COMPANY and SUMITOMO LIFE REALTY  )
(N.Y.), INC.,                     )
                                  )
            Plaintiffs,           )        C.A. No. 97-450-JJF
                                  )
     v.                           )
                                  )
ITT SHERATON CORPORATION and      )
SHERATON OPERATING CORPORATION,   )
                                  )
            Defendants.           )
                                  )
_____  )
                                  )
ITT SHERATON CORPORATION and      )
WASHINGTON SHERATON CORPORATION,  )
both individually and derivatively )
on behalf of 2660 WOODLEY ROAD    )
JOINT VENTURE, and                )
SHERATON OPERATING CORPORATION,   )
                                  )
            Counterclaim Plaintiffs, )
                                  )
     v.                           )
                                  )
2660 WOODLEY ROAD JOINT VENTURE,  )
WOODLEY ROAD ASSOCIATES, INC.,    )
JOHN HANCOCK MUTUAL LIFE          )
INSURANCE COMPANY and SUMITOMO    )
LIFE REALTY (N.Y.), INC.,         )
                                  )
            Counterclaim Defendants. )

SECOND AMENDED ANSWER AND COUNTERCLAIMS

Defendants ITT Sheraton Corporation ("ITT Sheraton") and Sheraton Operating Corporation ("Sheraton") (collectively, "Defendants"), by their undersigned attorneys, for their answer to the complaint in the above-captioned action (the "Complaint"), hereby answer as follows:

*Except to the extent expressly, specifically and unambiguously admitted herein, Defendants deny each and every allegation contained in the Complaint and demand strict proof thereof.*

1.    State that the averments in paragraph 1 of the Complaint do not require response and, alternatively, to the extent that such responses are required, deny such averments except admit that plaintiffs 2660 Woodley Road Joint Venture (the "Joint Venture"), Woodley Road Associates, Inc. ("Woodley Road"), John Hancock Mutual Life Insurance Company ("John Hancock") and Sumitomo Life Realty (N.Y.), Inc. ("Sumitomo") (collectively, "Plaintiffs") bring this action against Defendants.

2.    Admit the allegations in paragraph 2 of the Complaint.

3.    Deny knowledge or information sufficient to form a belief as to the allegations in paragraph 3 of the Complaint.

4.    Deny knowledge or information sufficient to form a belief as to the allegations in paragraph 4 of the Complaint.

5.    Deny knowledge or information sufficient to form a belief as to the allegations in Paragraph 5 of the Complaint.

6.    Admit the allegations in Paragraph 6 of the Complaint, except deny that Sheraton is the alter ego of ITT Sheraton with respect to the acts, claims and causes alleged in the Complaint.

2

7.    Deny the allegations in Paragraph 7 of the Complaint.

8.    Deny the allegations in Paragraph 8 of the Complaint.

9.    Deny the allegations in Paragraph 9 of the Complaint, except admit that the Sheraton Washington Hotel (the "Hotel") is owned by the Joint Venture; that the Hotel is managed pursuant to a September 27, 1979 Management Contract as amended from time to time (the "Management Contract"); and that a copy of the Management Contract is attached as Exhibit A to the Complaint.

10.    Deny the allegations in paragraph 10 of the Complaint.

11.    Deny the allegations in Paragraph 11 of the Complaint.

12.    Deny the allegations in Paragraph 12 of the Complaint, except admit that Plaintiffs purport to have exercised a right to terminate the Management Contract and that a letter referencing "Notice of Termination and Notice to Quit" were delivered to Defendants.

13.    Admit the allegations in Paragraph 13 of the Complaint.

14.    Deny the allegations in Paragraph 14 of the Complaint except admit that Plaintiffs seek relief as averred in said Paragraph.

15.    Admit the allegations in paragraph 15 of the Complaint.

16.    Admit the allegations in paragraph 16 of the Complaint.

17.    Admit the allegations in paragraph 17 of the Complaint.

18.    Deny the allegations in paragraphs 18 through 20 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

3

19.    Deny the allegations in paragraph 21 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

20.    Deny the allegations in paragraphs 22 and 23 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

21.    Deny the allegations in paragraph 24 of the Complaint except admit that ITT Sheraton established a division named ITT Sheraton Purchasing Resource ("Sheraton Purchasing") to organize exclusive and non-exclusive national and regional contracts with vendors and that Sheraton Purchasing was established to replace an ITT Sheraton entity referred to as "The Hotel Source."

22.    Deny the allegations in paragraph 25 of the Complaint except admit that Sheraton participated in Sheraton Purchasing Program as agent for Woodley Road and in connection with the operation of the Hotel entered into contracts negotiated by ITT Sheraton.

23.    Deny the allegations in paragraph 26 of the Complaint except admit that Sheraton paid a fee to ITT Sheraton in connection with the Sheraton Purchasing program.

24.    Deny the allegations in paragraph 27 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

25.    Deny the allegations in paragraphs 28 through 30 of the Complaint.

26.    Deny the allegations in paragraph 31 of the Complaint, except admit that audited financial statements dated February 17, 1995 were issued to the Joint Venture for the fiscal years 1993 and 1994.

4

27.     Deny the allegations in paragraphs 32 through 35 of the Complaint.

28.     Deny the allegations in paragraph 36 of the Complaint, except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

29.     Deny the allegations in paragraphs 37 and 38 of the Complaint.

30.     Deny the allegations in paragraph 39 of the Complaint except admit that Sheraton is a party to the Management Complaint and respectfully refer to that document with respect to the terms thereof.

31.     Deny the allegations in paragraph 40 of the Complaint except admit that Sheraton purchased insurance for the Hotel through ITT Sheraton.

32.     Deny the allegations in paragraph 41 of the Complaint except admit that ITT Sheraton charged the Hotel a percentage of an insurance policy that covered a pool of ITT Sheraton hotels.

33.     Deny the allegations in paragraphs 42 and 43 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

34.     Deny the allegations in paragraphs 44 and 45 of the Complaint.

35.     Deny the allegations in paragraph 46 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

36.     Deny the allegations in paragraphs 47 through 49 of the Complaint.

37.     Deny the allegations in paragraphs 50, 51, 52 and 53 of the Complaint.

38.    Deny the allegations in paragraph 54 of the Complaint, except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

39.    Deny the allegations in paragraph 55 of the Complaint.

40.    Deny the allegations in paragraphs 56, 57 and 58 of the Complaint.

41.    Deny the allegations in paragraph 59 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

42.    Deny the allegations in paragraphs 60 through 63 of the Complaint.

43.    Deny the allegations in paragraph 64 of the Complaint.

44.    Deny the allegations in paragraph 65 of the Complaint.

45.    Deny the allegations in paragraph 66 of the Complaint.

46.    Deny the allegations in paragraphs 67 through 72 of the Complaint

47.    Deny the allegations in paragraph 73 of the Complaint.

48.    Deny the allegations in paragraphs 74 through 76 of the Complaint

49.    Deny the allegations in paragraph 77 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refers to that document for the terms thereof.

50.    Deny the allegations in paragraph 78 of the Complaint.

51.    Deny the allegations in paragraph 79 of the Complaint.

52.    Deny the allegations in paragraphs 80 through 83 of the Complaint.

53.    Deny the allegations in paragraph 84 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refers to that document with respect to the terms thereof.

54.    Deny the allegations in paragraphs 85 through 87 of the Complaint.

55.    Deny the allegations in paragraphs 88 and 89 of the Complaint.

56.    Deny the allegations in paragraphs 90 through 93 of the Complaint.

57.    Deny the allegations in paragraph 94 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

58.    Deny the allegations in paragraphs 95 through 97 of the Complaint.

59.    Deny the allegations in paragraph 98 of the Complaint except admit that Sheraton received in and about December 1995 from Woodley Road a purported Notice of Default and respectfully refer to that document with respect to the contents thereof.

60.    Deny the allegations in paragraph 99 of the Complaint.

61.    Deny the allegations in paragraph 100 of the Complaint, except admit that Sheraton received in or about December, 1995 from Woodley Road a purported Notice of Default and respectfully refer to that document with respect to the contents thereof.

62.    Deny the allegations in paragraphs 101 and 102 of the Complaint.

### COUNT I
### FEDERAL RACKETEER INFLUENCED
### CORRUPT ORGANIZATION (RICO)
### SECTION 1962(C)

63.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 102 of the Complaint as if fully set forth herein.

7

64.    Deny the allegations in paragraphs 104 through 117 of the Complaint.

## COUNT II
### FEDERAL RACKETEER INFLUENCED CORRUPT ORGANIZATION (RICO) SECTION 1962(a)

65.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 117 of the Complaint as if fully set forth herein.

66.    Deny the allegations in paragraphs 119 through 129 of the Complaint.

## COUNT III
### FEDERAL RACKETEER INFLUENCED CORRUPT ORGANIZATION (RICO) SECTION 1962(d)

67.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 129 of the Complaint as if fully set forth herein.

## COUNT IV
### FEDERAL ANTITRUST VIOLATIONS

69.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 though 135 as if fully set forth herein.

70.    Deny the allegations in paragraph 137 of the Complaint except admit that Sheraton, acting under the Management Contract, purchased goods, supplies and services from various vendors.

71.    Deny the allegations in paragraphs 138 through 140 of the Complaint except admit that Sheraton is a party to the Management Contract and respectfully refer to that document with respect to the terms thereof.

72.    Deny the allegations in paragraphs 141 through 144 of the Complaint.

8

## COUNT V
## BREACH OF CONTRACT

73. Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 144 as if fully set forth herein.

74. Deny the allegations in paragraph 146 of the Complaint, except respectfully refer to the Management Contract with respect to the terms thereof.

75. Deny the allegations in paragraphs 147 and 148 of the Complaint.

76. Deny the allegations in paragraph 149 of the Complaint.

77. Deny the allegations in paragraph 150 of the Complaint.

## COUNT VI
## BREACH OF FIDUCIARY DUTY

78. Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 150 of the Complaint as if fully set forth herein.

79. Deny the allegations in paragraphs 152 and 153 of the Complaint except respectfully refer to the Management Contract with respect to the terms thereof.

80. Deny the allegations in paragraphs 154 through 158 of the Complaint.

## COUNT VII
## BREACH OF IMPLIED DUTIES OF
## GOOD FAITH AND FAIR DEALING

81. Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 158 of the Complaint as if fully set forth herein.

82. Deny the allegations in paragraphs 160 through 162 of the Complaint.

9

## COUNT VIII
### FRAUD

83.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 162 of the Complaint as if fully set forth herein.

84.    Deny the allegations in paragraph 164 of the Complaint except respectfully refer to the Management Contract with respect to the terms thereof.

85.    Deny the allegations in paragraph 165 of the Complaint except respectfully refer to the documents to which reference is made in the paragraph for a statement of any representations contained therein.

86.    Deny the allegations in paragraphs 166 through 169 of the Complaint.

87.    Deny the allegations in paragraph 170 of the Complaint except admit that Plaintiffs seek monetary compensation as averred therein.

88.    Deny the allegations in paragraph 171 of the Complaint except admit that Plaintiffs seek damages as averred therein.

## COUNT IX
### NEGLIGENT AND INTENTIONAL MISREPRESENTATION

89.    Repeat and incorporate by reference their answers to the allegations contained in paragraphs 1 through 171 of the Complaint as if fully set forth herein.

90.    Deny the allegations in paragraphs 173 through 179 of the Complaint.

91.    Deny the allegations in paragraph 180 of the Complaint except admit that Plaintiffs seek monetary compensation as averred therein.

92.    Deny the allegations in paragraph 181 of the Complaint except admit that Plaintiffs seek damages as averred therein.

## COUNT X
## PERMANENT INJUNCTIVE RELIEF

93.     Repeat and incorporate by reference their answers to paragraphs 1 through 181 of the Complaint as if fully set forth herein.

94.     Deny the allegations in paragraph 183 of the Complaint and respectfully refer to the Management Contract with respect to the terms thereof.

95.     Deny the allegations in paragraphs 184 through 186 of the Complaint.

## COUNTY XI
## DECLARATORY JUDGMENT
## TERMINATING MANAGEMENT CONTRACT

96.     Repeat and incorporate by reference their answers to paragraphs 1 through 186 of the Complaint as if fully set forth herein.

97.     Deny the allegations in paragraph 188 of the Complaint except admit that Defendants received in August 1997 a Notice of Termination and Notice to Quit and respectfully refer to that document with regard to the terms thereof.

98.     Deny the allegations in paragraph 189 except admit that Sheraton has refused to leave the premises of the hotel.

99.     Deny the allegations in paragraphs 190 and 191 of the Complaint.

100.    Admit that Plaintiffs seek relief as averred in paragraph 192 of the Complaint and otherwise deny the allegations in paragraph 192 of the Complaint.

## COUNT XII
## ACCOUNTING

101.    Repeat and incorporate by reference their answers to paragraphs 1 through 192 of the Compliant as if fully set forth herein.

11

102.    Deny the allegations in paragraph 194 of the Complaint but respectfully refer to the Management Contract for the terms thereof.

103.    Deny the allegations in paragraph 195 of the Complaint.

104.    Deny the allegations in paragraph 196 of the Complaint except admit that plaintiffs seek relief as averred therein.

## COUNT XIII
## REQUEST FOR RECEIVER

105.    Repeat and incorporate by reference their answers to paragraphs 1 through 196 of the Complaint as if fully set forth herein.

106.    Deny the allegations in paragraph 198 of the Complaint except admit that Defendants received in August 1997 a purported Notice of Termination and Notice to Quit and respectfully refer to that document with the terms thereof.

107.    Deny the allegations in paragraph 199 through 201 of the Complaint.

### [JURY DEMAND]

108.    Admit that Plaintiffs seek relief as averred in paragraph 202 of the Complaint.

### DEFENSES

### First Defense
(Failure to State a Claim)

The Complaint is barred, in whole and in part, for failure to state a claim upon which relief can be granted.

### Second Defense
(Laches)

Plaintiffs' claims are barred, in whole and in part, by the doctrine of laches.

12

### Third Defense
(Estoppel)

Plaintiffs' claims are barred, in whole and in part, by the doctrine of estoppel.

### Fourth Defense
(Unclean Hands)

Plaintiffs' claims are barred, in whole and in part, by the doctrine of unclean hands.

### Fifth Defense
(Failure to Plead Fraud with Particularity)

Plaintiffs have failed to state the circumstances constituting the alleged fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.

### Sixth Defense
(Plaintiffs Have Sustained No Injury)

Plaintiffs claims are barred, in whole and in part, because plaintiffs have not sustained any injury and cannot establish a likelihood that they will sustain an injury, as a result of any matter alleged in the Complaint.

### Seventh Defense
(Statute of Frauds)

Plaintiffs' claims are barred, in whole and in part, by the Statute of Frauds.

### Eighth Defense
(Statutes of Limitations)

Plaintiffs' claims are barred, in whole and in part, by the applicable statutes of limitations.

### Ninth Defense
(Breach of Duties and Covenants)

Plaintiffs' claims are barred, in whole and in part, by Plaintiffs' breaches of fiduciary duties and covenants of good faith and fair dealing.

### Tenth Defense
(Subject Matter Jurisdiction)

The Court lacks subject matter jurisdiction over Counts V through XIII of the Complaint, and should decline to exercise supplemental jurisdiction over those claims.

### Eleventh Defense
(Good Faith)

Plaintiffs have at all times and with respect to all acts alleged in the Complaint acted in good faith.

### Twelfth Defense
(Proximate Cause)

Any alleged harm to Plaintiffs was not proximately caused by Defendants but was caused by the wrongful conduct of John Hancock, Woodley Road and the Joint Venture as is more fully alleged in the following counterclaims.

14

## COUNTERCLAIMS

1.      These counterclaims are brought (a) by Sheraton against the Joint Venture and Woodley Road based on these parties' breaches of their contractual duties under the Management Contract; (b) by Sheraton against John Hancock and Sumitomo to enforce these parties' undertaking to secure defendants' rights to damages as a result of wrongful injunction or wrongful termination of the Management Contract, and (c) by ITT Sheraton and its subsidiary Washington Sheraton Corporation ("Washington Sheraton"), both on their own behalves and derivatively on behalf of the Joint Venture, against John Hancock and Sumitomo based on their breaches of contractual and fiduciary duties arising out of the June 12, 1990 Amended and Restated Joint Venture Agreement among John Hancock, Sumitomo and Washington Sheraton as amended from time to time (the "Joint Venture Agreement").

2.      Defendants' counterclaims, like the claims asserted in the Complaint, arise from the parties' varying interests in the management and ownership of the Hotel, a large hotel in the District of Columbia which, when originally opened by the Joint Venture (the "Owner") in the early 1980s, was a leading convention hotel. In more recent years, the Hotel's competitive position in the Washington market has deteriorated, and the Hotel is badly in need of renovation, repositioning and capital improvement.

### Jurisdiction

3.      This Court has jurisdiction of the counterclaims pursuant to Rule 13(a) and/or(b), Rule 13(e), Rule 20, Rule 65 and Rule 65.1 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1367, and pursuant to the Court's authority to enforce an undertaking provided pursuant to Rule 65 of the Federal Rules of Civil Procedure and the order of the Court.

### Parties

4.      Sheraton, ITT Sheraton and Washington Sheraton (collectively, the "Sheraton Parties") are corporations organized under the laws of the State of Delaware and maintain their principal place of business at 60 State Street, Boston, Massachusetts 02109. Sheraton and Washington Sheraton are wholly-owned subsidiaries of ITT Sheraton.

5.      The Joint Venture, the owner of the Hotel, is a general partnership organized under the laws of the District of Columbia which maintains its principal office c/o John Hancock Properties, Inc., Two Copley Place, Suite 200, Boston, Massachusetts 02117.

6.      On information and belief, John Hancock is a corporation organized under the laws of the Commonwealth of Massachusetts, with its principal place of business at 200 Clarendon Street, Boston, Massachusetts 02117.

7.      On information and belief, Sumitomo is corporation organized under the laws of the state of New York, with its principal place of business at 245 Park Avenue, New York, New York 10167, and a subsidiary of a major Japanese corporation.

8.      Woodley Road is a corporation organized under the laws of the State of Delaware which is wholly owned, directly or through intervening subsidiaries, by John Hancock. Woodley Road maintains its principal place of business c/o John Hancock Properties, Inc., Two Copley Square, Suite 200, Boston, Massachusetts 02117.  Woodley Road leases the Hotel from the Joint Venture, and is jointly and severally liable to Sheraton for the violations of the Management Contract alleged herein.

16

### The Nature of the Litigation

9.    Until March 15, 1998, Sheraton and ITT Sheraton managed the Hotel pursuant to the September 27, 1979 Management Contract, as amended. On March 15, 1998, in accordance with the demands of the plaintiffs and the preliminary injunction issued by this Court, Sheraton quit the premises of the Hotel.

10.    The plaintiffs commenced this litigation not because of any alleged breach of the Management Contract by Sheraton but rather because the plaintiffs were displeased with the economic terms of the Management Contract and wished to "walk away" from their obligations under it.

11.    Plaintiffs have resorted to meritless litigation to free themselves from the Management Contract in part because of the Management Contract's lengthy term. The Management Contract's initial term was to end in December, 2000, but Sheraton had the right to renew the Management Contract for three additional terms of ten years each, or until the year 2030.

12.    Plaintiffs' claims of Sheraton's supposed breaches are purely pretextual. This litigation is a means by which the plaintiffs are attempting to extort Sheraton and to obfuscate their decision to terminate the Management Agreement wrongfully and without cause.

13.    Because Sheraton has the right to renew the Management Contract for ten year terms through the year 2030, the Joint Venture stood to gain as much as $200 million, in John Hancock's estimation, if it could terminate the Management Contract.

14.    While the plaintiffs might wish nothing more than to "walk away" from their obligations to Sheraton under the Management Contract, the law does not permit a party to

such a contract to breach the contract without consequences merely because, with the benefit of hindsight, the party believes that it struck a bad bargain.

15.     Sheraton and ITT Sheraton dispute not only the veracity of the allegations contained in the Plaintiffs' Complaint but also that the Plaintiffs make their allegations in good faith.

16.     Sheraton comprehensively refuted the plaintiffs' claims in correspondence between Sheraton and the plaintiffs many months before the plaintiffs commenced this litigation. Sheraton made available to the plaintiffs all documents on which it based its refutation of the plaintiffs' allegations. The plaintiffs did not avail themselves of the opportunity to review the documents upon which Sheraton's refutation was based.

17.     In commencing baseless litigation, wrongfully terminating the Management Contract and improperly revoking Sheraton's agency, the Owner breached its duties under the Management Contract. Moreover, as is explained below, the Owner also breached the Management Contract by failing to make required repairs and improvements to the Hotel property and by refusing and failing to pay fees, reimbursements and other charges due and owing to Sheraton, ITT Sheraton and Washington Sheraton.

18.     In addition, John Hancock and the Joint Venture have breached their contractual and fiduciary duties to Washington Sheraton and ITT Sheraton under the Joint Venture Agreement, by, inter alia, failing to ensure adequate capital spending and by commencing the baseless litigation against Sheraton and ITT Sheraton. For the same reasons, John Hancock is liable not only to ITT Sheraton and Washington Sheraton, but also to the Joint Venture itself, on whose behalf ITT Sheraton and Washington Sheraton sue. John Hancock, as Managing Partner

18

of the Joint Venture, has also breached its contractual duty to Washington Sheraton by wrongfully withholding Washington Sheraton's share of the proceeds obtained from the sale of the Hotel.

## FACTUAL ALLEGATIONS

### Background

19.     The Joint Venture partnership was formed in or about 1979 to expand and improve the then existing Sheraton Park Hotel located on the Hotel site. Washington Sheraton and John Hancock each held a 50% interest in the Joint Venture at that time. In 1985, John Hancock purchased an additional 49 percent interest in the Joint Venture from Washington Sheraton. Plaintiff Sumitomo purchased its 48 percent interest in the Joint Venture from Plaintiff John Hancock in 1990, becoming a third partner in the Joint Venture. On March 9, 1998, Sumitomo sold its 48% interest in the Joint Venture back to John Hancock. To this day, Washington Sheraton retains a one percent ownership in the Joint Venture.

20.     Pursuant to the terms of the Joint Venture Agreement, John Hancock is the Managing Partner for the Joint Venture (the "Managing Partner"). Among the partners to the Joint Venture, the Managing Partner has the responsibility for the day-to-day affairs of the Joint Venture. JVA ¶ 6.01.

21.     The Joint Venture Agreement provides, *inter alia,* that: (a) only the Managing Partner may bind the Joint Venture (6.01); (b) only the Managing Partner is obligated and responsible to manage the affairs of the Joint Venture (6.01); (c) the Managing Partner cannot act with respect to Major Decisions without the consent of Sumitomo (6.03); (d) Major Decisions include (i) the undertaking of any capital improvement project, (ii) the retention of counsel (6.03), and (iii) the termination or modification of the Management Contract or any rights of the Operator; (e) *any* Partner may effectuate the removal of a defaulting Managing Partner

19

(6.01); and the Managing Partner is obligated to proceed with reasonable promptness to liquidate the business of the Joint Venture upon an event of dissolution and must distribute the assets of the Joint Venture to the Partners (10.01).

22.     In connection with Sumitomo's purchase of an interest in the Joint Venture, the Joint Venture leased the Hotel to John Hancock's wholly-owned subsidiary Woodley Road, and assigned its rights and obligations under the Management Contract to Woodley Road. The Joint Venture was not released from its obligations to Sheraton under the Management Contract.

### The Operating Term

23.     The initial "Operating Term" of the Management Contract was September 27, 1979 to December 31, 2000.

24.     Under the Management Contract, Sheraton, the "Operator," had the unilateral right to extend the Operating Term for three successive periods of ten years each through December 31, 2030.  The Owner had no right to prevent these three successive 10-year renewals.

25.     Article XXIV of the Management Contract allows a (non-defaulting) party to terminate the Operating Term only in the event that an "event of default" is not cured within 15 days (or, depending upon the default, 90 days) after notice of such event of default is given.

26.     Article VI of the Management Contract provides:

> Operator shall have complete authority in respect of and be responsible for, the operation, direction, management and supervision of the Hotel, subject only to those specific approvals of Owner set forth herein and to such qualification on such complete authority as are contained in the Business Plan referred to in this Article XI (3).  Such authority of Operator shall include, without limitation,

20

determination of labor policies (including the hiring, transfer and discharge of all employees and entering into a contract or contracts with an applicable union or unions in Owner's name), credit policies (including entering into agreements with credit card organizations), terms of admittance, charges for rooms, entertainment and amusement policies, food and beverage policies (including the right to conduct catering operations outside of the Hotel), the institution of such legal proceedings as Operator shall deem appropriate in connection with the operation of the Hotel, and all phases of sales, marketing, advertising, promotion and publicity relating to the Hotel.  In exercising such authority, Operator may enter into such contract, leases, concession agreements and other undertakings on behalf of Owner as it shall from time to time consider appropriate, in Owner's name, and Owner (if Owner is an individual) or officers of Owner (if Owner is a corporation or other legal entity) will execute any or all of same at Operator's request.

## The Need For Repositioning and Renovation of the Hotel

27.     Under the applicable contractual documents, the responsibility to address the capital needs of the Hotel rests upon John Hancock as the Managing Partner of the Joint Venture.  Under the Management Contract, Woodley Road and the Joint Venture are required to provide funds for, inter alia, any "structural repairs or changes in the Hotel or extraordinary repairs to or replacements of [Building Appurtenance] equipment" necessary to maintain the Hotel in good operating condition.  Management Contract, Article XVI, and Assignment of and Third Amendment to Management Contract.

28.     While John Hancock must seek Sumitomo's agreement to non-emergency capital spending, it is John Hancock's job to anticipate and provide for the Hotel's capital needs, and to prepare capital spending plans for the consideration of the Joint Venture.

29.     The June 12, 1990 restatement of the Joint Venture Agreement, which admitted Sumitomo as a partner, expressly provided for and contemplated that necessary repairs and improvements to the Hotel would be undertaken. Joint Venture Agreement Section 6.06.

30.     Although certain repairs to the Hotel were undertaken subsequent to Sumitomo's purchase of its 48% interest in the Joint Venture, the Hotel remained in need of substantial repairs and renovation in the early and mid-1990s. In part, this need for capital spending arose from the age of the Hotel, which led to the need to repair or replace obsolete or deteriorated mechanical and structural systems. For example, the facade of the Wardman Tower, the oldest part of the Hotel complex, required extensive repairs to maintain its structural integrity and safety.

31.     In addition to the need for renovation and repair, capital spending for the Hotel was necessary to "reposition" the Hotel to compete more effectively with other convention hotels in the Washington area. During 1983, a large new convention center was opened in downtown Washington, and during the 1980s a number of new hotels opened in its vicinity. Not only were these new competitors more modern than the Hotel, they had the advantage of a location much nearer to traditional Washington tourist attractions, such as the Capitol, White House and Smithsonian Institute, than the Hotel, which is located several miles from central Washington near the National Zoo.

32.     Partly as a result of this new competition, and partly as a result of changing trends in the convention industry, including new competition in other cities, the Hotel's convention business changed, and the Hotel was frequently hosting two or more groups simultaneously, rather than a single convention that sold out the entire Hotel. This created a critical need to reconfigure the Hotel to add more meeting space that could be used more flexibly.

In addition, the Hotel needed more, and more varied, restaurants and food outlets, and a more modern, expanded health and fitness center. Finally, the public spaces and rooms in the Hotel, no matter how well maintained, had become "dated" and uninviting in appearance. Of particular concern was the entrance lobby, which, by contemporary standards, is poorly laid out and confusing to guests. For all these reasons, the Hotel was in urgent need of a "Master Plan" of capital spending to address both physical and competitive issues.

33.     In the early 1990s, the Joint Venture stated its intention to develop a "master strategic plan" to, as described by John Hancock in September 1993, estimate "future cash flow and investment value and as a guideline in deciding upon the level of re-investment of cash flow into the property and/or the amount of additional capital to be invested in the project."

34.     In a letter to Mr. Potrykus dated September 30, 1994, ITT Sheraton complained that the master plan studies were proceeding far too slowly, and that Hancock's involvement of ITT Sheraton and communications with Sheraton in that regard were inadequate.

35.     The Sheraton Parties were not the first to complain about John Hancock's handling of such matters. In a July 12, 1994 Capital Expense Form, Sumitomo indicated that "the best way to resolve the asset management issue is to handle Hancock as if they were a third-party asset manager, i.e. Yarmouth. If they are unable to provide adequate service to us, we will use this as leverage to get out of our agreement." Upon information and belief, in a letter dated July 22, 1994, Sumitomo raised concerns regarding John Hancock's services under the Asset Management Agreement and the Joint Venture Agreement, and suggested that the Joint Venture should hire an independent asset manager.

36.    Although some work was in fact done, the Hotel has continued to deteriorate over the last seven years, and its need for substantial capital spending to "reposition" itself in its competition with neighboring hotels has remained unaddressed.

37.    Notwithstanding repeated requests from Sheraton, and despite Sheraton's assistance in preparing numerous potential renovation plans for the Hotel, Hancock, prior to the initiation of this litigation, never suggested to the Joint Venture, approved or otherwise implemented a capital spending plan that adequately addressed the Hotel's need for renovation and repositioning.

38.    The plaintiffs have no one but themselves to blame for the Hotel's needs for significant capital spending, which resulted from the failures of the Joint Venture, Woodley Road and John Hancock to address properly the extensive renovations that are required to make the Hotel competitive with other hotels of its type in its geographic area.  Indeed, in view of the Hotel's clear need for renovations, Sheraton's management of the Hotel was an unqualified success.

39.    On October 30, 1996, Washington Sheraton made formal demand under the Joint Venture Agreement that John Hancock be removed and replaced as Managing Partner of the Joint Venture based, *inter alia*, on John Hancock's failure to plan and provide for the capital needs of the Hotel.  Pursuant to section 6.01 of the Joint Venture Agreement, John Hancock as Managing Partner was then required either to cure its default or step down as Managing Partner in favor of Sumitomo.  Without satisfying section 6.01, John Hancock, on November 21, 1996, John Hancock rejected Washington Sheraton's demand.  John Hancock remains the Managing Partner of the Joint Venture in violation of the joint Venture Agreement.

24

40.    John Hancock's failure to plan and provide for the capital needs of the Hotel constitutes a breach of the Management Contract made wilfully and in bad faith.

### John Hancock's Incentive to Terminate or Renegotiate

41.    Sumitomo made its investment in the Joint Venture a time when the convergence of record-high real estate prices in the United States and the booming "bubble" economy in Japan led many Japanese companies to make real estate investments in this country which turned disastrous when both of these economic phenomena collapsed in the early 1990s.

42.    While Sumitomo overpaid for its interest in the Joint Venture, John Hancock was able, through its sale to Sumitomo, to recover all of its original investment in the Hotel project, which had the effect of reducing John Hancock's economic incentive to invest additional capital in the Hotel to preserve or improve its physical condition and performance.

43.    The Hotel's need for capital contributions coincided with a downturn in Washington, D.C., hotel revenues during the early 1990s, which limited John Hancock's and Sumitomo's returns on their investment in the Joint Venture.

44.    The failure by the Joint Venture and Woodley Road to maintain the Hotel also derived from a set of agreements which collectively assured that no one other than Sheraton had any immediate economic interest in maintaining the Hotel.

45.    Under the Management Contract, Sheraton has received payments based in part on the revenues of the hotel. Therefore, the amount of Sheraton's revenues under the Management Contract has depended, in part, on the extent to which the public found the Hotel to be a well maintained, inviting facility.

46.    However, John Hancock's incentive to invest additional capital to renovate and reposition the Hotel was reduced even further by provisions in the Joint Venture Agreement

25

providing, for the June 12, 1990 through December 31, 1995 time period, a preferred return to Sumitomo from the Hotel's cash flow.  The preferred return provisions were more likely to reduce John Hancock's own income from the Hotel if significant portions of the Hotel were closed for renovations.

47.    Moreover, precisely because Sumitomo received a preferred return, Sumitomo had no immediate incentive to demand the extensive renovations that the parties recognized the Hotel needed at the time when Sumitomo purchased its interest in the Joint Venture.

### The Operations Audit

48.    John Hancock, apparently to (a) delay making needed capital contributions, (b) divert attention from its own managerial shortcomings following Sumitomo's July 1994 complaints and (c) search for an excuse to escape the Joint Venture's obligations under the Management Contract, commenced in late 1994 an "operations" audit of Sheraton's performance under the Management Contract.

49.    The Joint Venture was permitted to conduct such an audit under Article XII of the Management Contract.

50.    The plaintiffs represented to Sheraton that the "operations" audit was being conducted by the Joint Venture in connection with its consideration of further capital investment in the Hotel.

51.    The plaintiffs never indicated that the audit was being conducted by John Hancock (except as Managing Partner for the Joint Venture) or Sumitomo.

52.    In reliance on plaintiffs' representations as to the purpose of the audit and pursuant to Article XII of the Management Contract, Sheraton cooperated fully with the audit,

26

even though it quickly became apparent that the persons who conducted it were woefully ignorant of the economics and practices of the hospitality industry.

53.    After the audit progressed well into 1995, the Joint Venture claimed that it had discovered

> an overwhelming demonstration of breach of contractual obligations, breach of fiduciary obligation, neglect of proper operations, and failure of managerial supervision

causing damages in the amount of $80 million and constituting "cause" to terminate the Management Contract.

54.    The Joint Venture's claim of "cause" to terminate the Management Contract was particularly significant because, as was widely understood at that time by the parties, the terms of the 1979 Management Contract, which bound the Joint Venture at Sheraton's option until the year 2030, had become unfavorable to the Joint Venture in comparison to hotel management contracts that were typical of what was available to hotel owners in the market at that time.

55.    As explained by Steven Dwyer of Sumitomo in 1997, the Management Contract was "not at all competitive". Another 1997 document generated by John Hancock explained more precisely that renegotiation of the Management Contract "will save us $3 M per year (as is) and $6 M per year" after renovations.

56.    By John Hancock's own estimates, the Joint Venture stood to gain in the range of $100 to $200 million by renegotiating or terminating the Management Contract.

57.    Sheraton denied the Joint Venture's claim of "cause" for termination and requested substantiation of the claim.

58.    Concurrent with its 1995 requests for substantiation, Sheraton determined that, to improve its relationship with the Joint Venture, reduce disruption at the Hotel and facilitate the needed renovations, it was willing from a business perspective to renegotiate the terms of the management contract to the benefit of the Joint Venture.

59.    In late 1995, Sheraton offered to renegotiate the terms of the Management Contract, and to discuss any actual damages that might be owing to the Joint Venture, while emphasizing that Sumitomo and John Hancock had adduced no evidence of any such damages.

60.    The Joint Venture made no effort to substantiate its damages claim until December 29, 1995, when it sent to Sheraton a Notice of Default (the "1995 Notice of Default"). A copy of the 1995 Notice of Default is annexed hereto as Exhibit A.

61.    "Notice of default" is not required by and triggers no provisions of the Management Contract. (The Management Contract does provide for notice of "intention to terminate" upon expiry of a fifteen day period. No such notice was given until July 31, 1997, as discussed below.)

62.    The Notice of Default claimed 15 categories of events of default under subparts XXIV(A)(1) and XXIV(A)(6) of the Management Contract.

63.    Subpart XXIV(A)(1) of the Management Contract states, in summary, that the failure of any party to pay to the other amounts required under the Management Contract for a period of 30 days after it becomes payable constitutes an event of default.

64.    Subpart XXIV(A)(6) of the Management Contract states that failure to perform any "other" material obligation under the Agreement constitutes an event of default.

65.    Responding to the 1995 Notice of Default in a 21-page single-spaced letter dated January 31, 1996 (the "January 31, 1996 letter), Sheraton comprehensively refuted each of

28

the 15 categories of alleged breaches and restated its willingness to further discuss and remedy any defaults and to renegotiate the terms of the Management Contract to the benefit of the Joint Venture. A copy of the January 31, 1996 letter is annexed hereto as Exhibit B.

66.    Sheraton's January 31, 1996 letter responded directly to the Joint Venture's specific allegations, as summarized below.

67.    The first category of breach alleged by the Owner in the 1995 Notice of Default was the Operator's supposed entry of employee wages and other employee expenses as capital expenses rather than ordinary operating costs, and the Operator's supposed failure to gain reimbursement for the costs associated with employees assigned temporarily to other properties. With respect to this first category of defaults, the Operator clarified the Owner's misunderstanding of normal accounting practices and explained in detail how Sheraton ensures that employee loaning does not harm Sheraton hotels.

68.    The second category of alleged defaults comprised allegations that the Operator commingled funds of the Owner with its own funds, used the Hotel's funds to pay for services for the Operator's affiliates, and used Hotel facilities to subsidize the purchasing costs of other hotels in the region. With respect to this second category, the Operator explained how the Hotel benefits from and is compensated for use of space and services, denied knowledge of any commingling of funds, and requested additional information regarding any examples of commingling. The Owner has provided no such additional information.

69.    The third category of alleged defaults comprised allegations that the Operator failed to disclose compensation of senior Hotel employees, and paid excessive and unauthorized compensation to certain employees. With respect to this third category, the Operator explained that relocation expenses are not considered to be part of "benefits" as that

29

term is used in subpart VI(5) of the Management Contract. The Operator recognized that it had erroneously on two occasions compensated employees in amounts requiring the Owner's advance approval without having obtained such advance approval. The Operator further agreed to address this error and any other compensation-related disputes as part of any overall resolution of the issues outstanding among the parties.

70.    The fourth category of alleged breaches concerned employee turnover and employee benefits. The Owner alleged that the Operator permitted and caused excessive turnover among senior employees and that the Operator gave excessive relocation benefits, violated regulations concerning withholding taxes, and improperly used Owner's funds to reimburse an employee for the employee's loss upon the sale of a residence. With respect to this fourth category of alleged defaults, the Operator denied that excessive turnover had occurred, stated that all relocation benefits had been given in accordance with written policies, and stated that the Operator had paid withholding taxes to employees only where appropriate. The Operator requested more information so as to address any other concerns. The Owner provided no such further information.

71.    The fifth category of alleged breaches concerned the use of complimentary rooms. The Owner alleged that the Operator improperly allowed use of Hotel rooms free of charge and at unreasonably low rates, while failing to maintain adequate controls and record of such uses of rooms. With respect to this fifth category of alleged breaches, the Operator responded in detail with references to numerous reports and studies concerning the complimentary room use permitted by the Management Contract and customary in the industry, including detailed information concerning the complimentary use of rooms at the Hotel and at other Sheraton hotels by Plaintiffs and their employees. After further discussions among the

30

parties, the Operator, as an accommodation, instituted in mid-1995 monthly reporting to the Owner with respect to complimentary room use.

72.    The sixth category of alleged breaches by the Operator pertained to the Owner's rights and purported rights to approve contracts that the Operator entered into. With respect to this sixth category of alleged breaches, the Operator recognized that in each of the years 1991-1993, the Operator might have executed without Owner approval one contract for services in excess of the adjusted maximum amount set forth in subpart VI(8) of the Management Contract. The Operator stated that each of these three contracts was beneficial to the hotel and, in any case, each of them had subsequently been reviewed with the Owner's representatives at quarterly Owner's meetings.

73.    The seventh category of alleged breaches concerned rebates that the Operator received. In two full single-spaced pages, the Operator comprehensively explained how the Hotel had received value for the rebates that the Operator received, how the Hotel had benefited from Sheraton's bargaining power at the national level, and how the rebates had been disclosed to the Owner on numerous occasions.

74.    The eighth category of alleged breaches comprised allegations that the Operator had inequitably and disproportionately allocated insurance costs to the Hotel. In response, Operator stated exactly how costs of general liability coverage and property coverage were allocated, and asked the Owner to provide further information to permit the Operator to address the Owner's concern. No such further information was forthcoming from the Owner.

75.    The ninth category of alleged breaches comprised allegations that the Operator had improperly imposed on the Hotel marketing costs and the costs of a frequent traveler program that was not in the best interests of the Hotel. In response, the Operator pointed

31

out that participation in the marketing and frequent traveler program was authorized by the Management Contract and did not involve any improper allocations of costs. The Operator further noted that Sheraton had provided funding for sales in addition to that required under the Management Contract, and stated its strong basis for believing that the frequent traveler programs was in the Hotel's best interests.

76.    The tenth category of alleged breaches comprised allegations that the Operator had failed to maintain adequate internal controls, including internal audit procedures. The Operator flatly denied these allegations, noting that the Hotel's books and records had always been kept in accordance with the Uniform System of Accounting for Hotels, generally accepted accounting practices, and the requirements of the Management Contract. The Operator also noted that Arthur Anderson LLP, the Hotel's independent auditor in recent years, had certified its audits without the issuance of a blueback report that would have been required if the audit had discovered accounting deficiencies or inadequate financial controls.

77.    The eleventh category of alleged breaches was comprised of Owner's allegations that the Operator had failed to make full disclosure concerning the Hotel's capital needs. In response, Sheraton pointed out the numerous occasions on which the Owner became aware of the Hotel's capital needs and chose to do nothing about them. For example, Sheraton reminded the Owner that Sumitomo was made fully aware in 1990, when it purchased its share of the Joint Venture, that the Hotel required extensive capital expenditures.

78.    The twelfth category of alleged breaches comprised allegations that the Operator failed to make needed repair and maintenance expenditures. In response, the Operator demonstrated that its repair and maintenance expenditures had risen markedly over the previous ten years, both in terms of dollars and in terms of percentage of the Hotel's total revenue. The

Operator also noted the Owner's hypocrisy in arguing that the Operator had not spent enough money on capital replacements, when representatives of Sumitomo and Hancock had actually instructed the Operator to reduce the amount of planned capital spending in the Hotel's 1996 capital plan from 4.5 percent of budgeted revenue to 3.0 percent.

79.     The thirteenth category of alleged breaches comprised allegations that the Operator had presented materially misleading budgets and other financial information.  Operator categorically denied these allegations.  With respect to the Owner's further allegation that the Operator failed to produce to the Owner any letters to management issued by the Operator's public accountants, the Operator stated that, to the best of its knowledge, it never received any such letters.  And finally, with respect to the fourteenth and fifteenth categories of alleged breaches, the Operator noted that these were mere rehashings of the allegations the Owner had made in the first through thirteenth categories of the 1995 Notice of Default.

80.     As described above, the purported "breaches" of the Management Contract that John Hancock alleged after the "operations" audit were all either nonexistent, examples of standard practice in the hospitality industry, or of relatively minor economic significance.

81.     Yet, somehow, John Hancock claimed that as a result of alleged "breaches," Sheraton had caused damages in excess of $80 million to the Hotel, which has a value of no more than twice that amount.  Short of imploding the Hotel buildings with explosives, it is inconceivable how Sheraton could cause damages even remotely approaching this magnitude to the Hotel, and despite repeated requests, John Hancock has refused to substantiate this figure or explain how it was derived.

82.     Moreover, the Operator's inadvertent lack of precise compliance with the terms of the Management Contract in two instances over the long history of the contract did not

33

constitute, either singly or in combination, an event of default that would permit the Owner to terminate the Management Contract.

83.    In the January 31, 1996 letter, and repeatedly thereafter, Sheraton offered to provide John Hancock with the documentation on which the January 31, 1996 letter was based. The plaintiffs failed to avail themselves of this opportunity and have continued to insist, without providing any substantiation whatsoever, that Sheraton somehow caused astronomical amounts of damage to the Hotel.

84.    Despite the disingenuousness and bad-faith posturing of John Hancock, Sheraton was willing to discuss changes to the Management Contract purely as a business matter, as a way of facilitating the adoption of a renovation plan for the Hotel.  For example, Sheraton indicated its willingness to reduce its fees and restructure the terms of the Management Contract if an appropriate renovation plan is adopted.

85.    However, John Hancock, which is either institutionally incapable of making a decision or seduced by its own rhetoric of astronomical damages, has been unwilling to agree to any reasonable approach to resolving the controversy.

86.    Plaintiffs have declined to share with Sheraton the audit upon which its damages claims are based.  (Now, following the commencement of this litigation, plaintiffs take the position that the audit was prepared in anticipation of litigation on behalf of individual partners John Hancock and Sumitomo, and not by the Joint Venture for operational reasons, and that therefore all documents and communications in connection with the audit constitute privileged matter not subject to discovery or even review by Joint Venture Partner Washington Sheraton Corporation.)

87.    During the first half of 1996, the Joint Venture used its unsubstantiated allegations of breach constituting cause for termination in an effort to extort from Sheraton not only concessions in the terms of the Management Contract but also exorbitant sums in damages. When pressed for substantiation of its allegations, the Joint Venture routinely sidestepped the issue.

88.    It soon became apparent that the Joint Venture was trying to squeeze out of Sheraton funds to offset the capital investments of over $60 million required of John Hancock and Sumitomo to carry out the necessary renovation and repositioning of the Hotel. By reducing Sumitomo's further investment, John Hancock could avoid Sumitomo's further questioning of its authority as Managing Partner, and perhaps of the nature of its disclosure to Sumitomo in 1990 concerning the Hotel's need for capital investment.

89.    Any suggestion that Sumitomo was not satisfied with Sheraton's operation of the Hotel was and is belied by Sumitomo's solicitation of Sheraton in or around summer 1996 as a potential operator of a Sumitomo-owned hotel in the Chicago area. Sheraton declined Sumitomo's 1996 request because, already managing a major convention hotel in Chicago, it was contractually constrained from considering it.

90.    By mid-1997, Plaintiffs had changed counsel and the parties had arrived at various potentially viable scenarios involving the renegotiation or replacement of the management Contract. The parties remained, however, unable to resolve the question of the Joint Venture's still unsubstantiated damage claims.

91.    The filing of the complaint herein is merely the continuation of Plaintiffs' efforts to escape the terms of the Management Contract and extort money from Sheraton by claiming damages without any good faith basis.

35

## Wrongful Termination and Revocation

92.    In or about July 1997, John Hancock and Sumitomo, upon the recommendation of John Hancock, authorized the Joint Venture to terminate the Operating Term of the Contract.

93.    Subsequently, by notice dated July 31, 1997, Woodley Road, on behalf of the Joint Venture, gave notice of intention to terminate the Management Contract after the expiration of 15 days due to Sheraton's alleged failure to cure the events of default specified in the 1995 Notice of Default including without limitation defaults under Sections A.1 and A.6 of Article XXIV of the Management Contract (the "1997 Notice of Intention to Terminate"). The 1997 Notice of Intention to Terminate relied completely upon, and did not make any allegations of breach additional to, the allegations set forth in the 1995 Notice of Default.

94.    The 1997 Notice of Intention to Terminate invoked part A of Article XXIV of the Management Contract, which provides that the Management Contract will terminate 15 days after such notice unless noticed events of default are cured within such period or, with respect to defaults referred to in items (1), (5) and (6) of part A that cannot be cured within 15 days after such notice, such noticed events of default are cured within 90 days after such notice.

95.    No events of default existed on July 31, 1997.

96.    Any event of default existing on July 31, 1997 was subsequently cured to as to make the 1997 Notice of Intention to Terminate "of no force and effect" pursuant to part A of Article XXIV of the Management Contract.

97.    Any failure to cure any event of default existing on July 31, 1997 so as to make the 1997 Notice of Intention to Terminate "of no force and effect" pursuant to part A of

36

Article XXIV of the Management Contract is wholly attributable to Plaintiffs' failure to act in good faith.

98.     The Management Contract has not been terminated according to its terms.

99.     Plaintiffs' efforts to terminate the Management Contract constitute a breach of the Management Contract made wilfully and in bad faith.

100.    Rather than awaiting resolution of the contractual termination dispute with Sheraton, Woodley Road, in the 1997 Notice of Intention to Terminate, purported to revoke Sheraton's agency to manage the Hotel as of August 15, 1997.

101.    The Joint Venture's purported revocation of Sheraton's agency to manage the Hotel was improper under agency law.

102.    The Joint Venture invoked the jurisdiction of this Court to enjoin Sheraton from resisting the improper revocation of Sheraton's agency.

103.    The revocation of Sheraton's agency to manage the Hotel, which effectively terminated the Operating Term of the Management Contract without cause, constitutes a breach of the Management Contract made wilfully and in bad faith.

104.    The harm caused to Sheraton by the revocation of its agency to manage the Hotel, and by the enforcement of such revocation by this Court, cannot be remedied by reinstatement of Sheraton as agent.

### Failure to Distribute Assets of the Joint Venture

105.    In or about February, 1999, the Joint Venture sold the Hotel. Upon information and belief the sale price for the Hotel was in excess of two-hundred million dollars. Washington Sheraton, as the holder of a 1% interest in the Joint Venture, is entitled to its share of the sale proceeds, approximately two million dollars.

106.   Sale or other disposition of all or substantially all of the Joint Venture's assets is an event of dissolution under Section 10.01(3) of the Joint Venture Agreement.   The Hotel constituted all or substantially all of the Joint Venture's assets.

107.   John Hancock, as Managing Partner, is obligated to proceed with reasonable promptness to liquidate the business of the Joint Venture upon an event of dissolution and must distribute the assets of the Joint Venture to the Partners.

108.   The sale of the Hotel occurred over seven months ago and despite Washington Sheraton's repeated demands, John Hancock has failed to distribute any of the proceeds from the sale of the Hotel.

### First Counterclaim

109.    This claim for relief is brought by Sheraton on its own behalf against the Joint Venture and Woodley Road.

110.    Sheraton repeats and realleges the allegations of Paragraphs 1 through 105, above, as if set forth in full herein.

111.    Sheraton has properly and fully performed its duties under the Management Contract and has not breached that Contract in any material respect. As a result, Plaintiffs have no contractual right to terminate the Management Contract. By nonetheless revoking Sheraton's agency to operate the Hotel without cause and by obtaining this Court's preliminary injunction to effectuate that revocation, the Joint Venture and Woodley Road have breached the Management Contract and are liable to Sheraton for monetary damages, in an amount to be proved at trial, equivalent to the fees Sheraton would have earned if it had been allowed to continue to perform the Management Contract through its final extension period ending in the year 2030.

112.    According to Plaintiffs' own estimations, the amount of damages to which Sheraton is entitled exceeds $100 million.

### Second Counterclaim

113.    This claim for relief is brought by Sheraton on its own behalf against Hancock and Sumitomo.

114.    Sheraton repeats and realleges the allegations of Paragraphs 1 through 109 above, as if set forth in full herein.

115.    As a condition for the entry of its preliminary injunction, the Court required Hancock and Sumitomo to undertake, and they did in fact undertake, to pay all damages suffered by Sheraton if it was wrongfully enjoined, or if the revocation of its agency to operate the Hotel

was wrongful and in violation of the Management Contract. Accordingly, Hancock and Sumitomo are directly liable to Sheraton for all damages awarded to Sheraton pursuant to its first counterclaim herein.

### Third Counterclaim

116.    This claim for relief is brought by Sheraton on its own behalf against the Joint Venture and Woodley Road.

117.    Sheraton repeats and realleges the allegations of Paragraphs 1 through 112, above, as if set forth in full herein.

118.    Prior to the wrongful revocation of Sheraton's agency to operate the Hotel, Woodley Road and the Joint Venture breached the Management Agreement in material respects.

119.    First, Woodley Road and the Joint Venture each failed to meet their contractual obligations to Sheraton as an Operator to adequately maintain and provide capital repairs and improvements to the Hotel property. As a result, the Hotel lost substantial business and revenue, causing damage to Sheraton in the form of decreased management fees.

120.    Second, the Joint Venture and Woodley Road have refused to pay fees and reimbursements to which Sheraton is entitled under the Management Agreement, including without limitation certain Sheraton sales offices fees, fees for customer complaint servicing, and fees for an employee training program known as SGS 2000. The amount of these unpaid fees, which will be proved at trial, exceeds $1 million.

121.    Third, at the time when Sheraton quit the Hotel premises, there remained due and owing certain unbilled charges and expenses that have not yet been quantified, and the

Joint Venture and Woodley Road are also liable to Sheraton for any employee severance payments resulting from Sheraton's removal from the Hotel.

122.    By virtue of the foregoing allegations, the Joint Venture and Woodley Road have breached their contractual obligations under the Management Contract and are liable to Sheraton for damages resulting from that breach in an amount to be proved at trial.

<u>Fourth Counterclaim</u>

123.    This claim for relief is brought by ITT Sheraton and Washington Sheraton on their own behalf against John Hancock.

124.    ITT Sheraton and Washington Sheraton repeat and reallege the allegations of Paragraphs 1 through 119 above as if set forth in full herein.

125.    Under the Joint Venture Agreement, John Hancock, as Managing Partner, took on the contractual obligations to the Joint Venture and the other partners to oversee the day-to-day operations of the Hotel and to develop plans and budgets for all necessary capital spending, including capital spending needed to maintain or improve the Hotel.

126.    In addition to its contractual obligations, John Hancock as Managing Partner had a fiduciary duty to the Joint Venture and its other partners to use due care and reasonable diligence in carrying out its responsibilities under the Joint Venture Agreement.

127.    ITT Sheraton and Washington Sheraton have been injured by the failure of John Hancock to perform its duties as Managing Partner because (a) the value of their Joint Venture interest has been diminished because John Hancock has caused the Joint Venture to incur the existing and potential financial obligations to Sheraton resulting from the Joint Venture's termination, and thus breach, of the Management Contract; (b) the values of interests in the Joint Venture and its assets have been further reduced as the result of the failure to provide adequate

41

funds for capital renovations and improvements; (c) the cost of necessary repairs has increased as the result of further deterioration caused by John Hancock's delay in addressing the Hotel's capital needs, which will result in larger capital calls to the Joint Venture's partners when the renovation is finally done; and (d) as a result of lost business at the Hotel, the income of the Joint Venture and thus its partners have been reduced.

128.    By virtue of the foregoing allegations, John Hancock has acted in bad faith and with wilful misconduct, ill will, recklessness, wantonness and oppressiveness in breaching its contractual and fiduciary duties to ITT Sheraton and Washington Sheraton, and is liable to them for damages resulting from those breaches in an amount to be proved at trial.

<div align="center"><u>Fifth Counterclaim</u></div>

129.    This claim for relief is brought by ITT Sheraton and Washington Sheraton on their own behalf against John Hancock and the Joint Venture.

130.    ITT Sheraton and Washington Sheraton repeat and reallege the allegations of Paragraphs 1 through 125 above as if set forth in full herein.

131.    Based on the foregoing allegations, ITT Sheraton and Washington Sheraton are entitled to judgment declaring that, as provided for in section 6.01 of the Joint Venture Agreement, they have validly demanded the removal for cause of John Hancock as Managing Partner, and ordering and directing that John Hancock cease to be Managing Partner.

<div align="center"><u>Sixth Counterclaim</u></div>

132.    This claim for relief is brought by ITT Sheraton and Washington Sheraton derivatively on behalf of the Joint Venture against John Hancock.

<div align="center">42</div>

133.    Prior to bringing this claim derivatively, Washington Sheraton made a demand on the Joint Venture to remove John Hancock as Managing Partner of the Joint Venture, which demand was refused.

134.    ITT Sheraton and Washington Sheraton repeat and reallege the allegations of Paragraph 1 through 129 above as if set forth in full herein.

135.    By virtue of the foregoing allegations, John Hancock, in breach of its contractual obligations and fiduciary duties to the Joint Venture, has wrongfully caused the Joint Venture to incur liability for damages to Sheraton as alleged in the First and Third counterclaims, and is therefore liable to the Joint Venture for all damages awarded to Sheraton.

136.    In causing the Joint Venture to incur the foregoing liabilities to Sheraton, John Hancock has acted in bad faith and with wilful misconduct, ill will, recklessness, wantonness and oppressiveness in breaching its fiduciary duties to the Joint Venture.

<u>Seventh Counterclaim</u>

137.    This claim for relief is brought by Washington Sheraton against John Hancock as Managing Partner of the Joint Venture.

138.    Washington Sheraton repeats and realleges the allegations of Paragraphs 1 through 136 above as if set forth in full herein.

139.    Based on the foregoing, John Hancock has breached its contractual obligations as Managing Partner of the Joint Venture to distribute with reasonable promptness the net assets of the Joint Venture to Washington Sheraton following the sale of the Hotel. John Hancock is liable to Washington Sheraton for damages in the amount of the share of the net assets of the Joint Venture to which Washington Sheraton is entitled.

WHEREFORE, it is respectively requested that the Court enter judgment:

A.    Dismissing the Complaint in all respects;

B.    Granting Sheraton judgments on the First and Third Counterclaims and awarding it damages against the Joint Venture and Woodley Road in an amount to be proved at trial;

C.    Granting Sheraton judgment on the Second Counterclaim and awarding it damages against Hancock and Sumitomo in an amount to be proved at trial;

D.    Granting ITT Sheraton and Washington Sheraton judgment on the Fourth and Fifth Counterclaims; awarding them compensatory and punitive damages against John Hancock in an amount to be proved at trial; declaring that ITT Sheraton and Washington Sheraton have properly demanded the removal for cause of John Hancock as Managing Partner; and directing that John Hancock cease to be Managing partner of the Joint Venture;

E.    Granting judgment derivatively to the Joint Venture on the Sixth Counterclaim declaring that John Hancock is liable to the Joint Venture for the reimbursement of all damages paid by the Joint Venture to Sheraton and awarding compensatory and punitive damages against John Hancock in an amount to be proved at trial;

F.    Granting Washington Sheraton judgment on the Seventh Counterclaim and awarding it damages in an amount to be proved at trial.

G.    Granting Sheraton, ITT Sheraton and Washington Sheraton their costs and

disbursements of this action, together with such other or further relief as the Court deems just and

proper.

Dated:  Wilmington, Delaware
        October 25, 1999

_____
Allen M. Terrell, Jr. (I.D. #709)
Srinivas M. Raju (I.D. #3313)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 658-6541
Attorneys for Defendants and
  Counterclaims and Third-Party
  Plaintiffs

OF COUNSEL:
John S. Kinzey
Scot C. Gleason
Nicholas W.C. Corson
LeBOEUF, LAMB, GREENE & MacRAE
        L.L.P.
125 West 55th Street
New York, New York 10019-5389
212-424-8000



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

2660 WOODLEY ROAD JOINT VENTURE,  )
    et al.,                        )
                                   )
    Plaintiffs and Counterdefendants,  )
                                   )
    vs.                            )
                                   )
ITT SHERATON CORPORATION, et al.,  )
                                   )
    Defendants and Counterplaintiffs.  )

Civil Action No. 97-450-JJF

MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR LEAVE TO SUPPLEMENT COUNTERCLAIMS

Counterplaintiff Washington Sheraton Corporation ("WSC"), by and through its

counsel, submits this memorandum of law in support of its Motion for Leave to Supplement

Counterclaims.

## INTRODUCTION

This motion is necessitated by the fact that John Hancock has refused to distribute

to Washington Sheraton Corporation an estimated two million dollars in proceeds from the sale of

the Hotel, which occurred more than six months ago.  Leave of the Court is sought because

counsel for plaintiffs has stated that plaintiffs would oppose this motion to amend the

counterclaims.

The grounds for the motion are that the facts on which the supplemental

counterclaim (the "Counterclaim") is based arose after the time at which Defendants' original

Answer and subsequent Amended Answer and Counterclaim were filed and served, yet the

interests of justice require that leave be granted to file and serve this Counterclaim in the present

action because the Counterclaim is so related to the claims and defenses already present in the action that the parties would benefit from having these claims all tried in a single action. The counterclaims already present in this action allege that plaintiff John Hancock has breached contractual and fiduciary duties as Managing Partner of the 2660 Woodley Road Joint Venture (the "Joint Venture"). After Sheraton was removed as operator of the Hotel, pursuant to this Court's preliminary injunction order, the Hotel was sold in or around February, 1999, for an amount believed to be in excess of two-hundred million dollars. WSC, as a 1% partner of the Joint Venture that owned the Hotel, is entitled to its share of the net sale proceeds. WSC seeks to supplement its counterclaims to add a claim against plaintiff John Hancock, the Managing Partner of the Joint Venture, for WSC's share of the sale proceeds.

## FACTS

The Joint Venture owned the Hotel. Plaintiff John Hancock holds a 99% interest in the Joint Venture. Counterplaintiff WSC, a subsidiary of Sheraton, holds a 1% interest in the Joint Venture. Kinzey Aff., ¶ 1. Plaintiffs filed the complaint in this action on August 1, 1997, seeking a declaratory judgment that they had revoked an agency given to defendant Sheraton as operator of the Hotel, and injunctive relief to prevent Sheraton from continuing to exercise its agency powers. Plaintiffs also alleged that Sheraton, as operator of the Hotel pursuant to a Management Contract, breached that contract and its duties as operator owed to plaintiffs as owners of the Hotel.

On September 19, 1997, Sheraton answered the complaint and filed counterclaims alleging that John Hancock breached contractual and fiduciary duties as Managing Partner of the Joint Venture. Sheraton was joined in its counterclaims by third party counterplaintiff WSC. After the Court's decision granting plaintiff's motion for a preliminary injunction allowing John

2

Hancock to remove Sheraton as operator of the Hotel, Sheraton and WSC amended their counterclaims to include a claim for damages for wrongful termination of the Management Contract.

In or about February, 1999, after the filing of the original answer and counterclaim and the amended counterclaims, the Joint Venture sold the Hotel. Kinzey Aff., ¶ 2. The sale price for the Hotel is believed to be in excess of two-hundred million dollars. Id. WSC, as holder of a 1% interest in the Joint Venture, is entitled to its share of the proceeds from the sale of the Hotel. WSC has made demand for its share of the proceeds. Kinzey Aff., ¶¶ 3 - 5. To date, John Hancock has wrongfully withheld WSC's share of the proceeds from the sale of the Hotel, believed to be in excess of two million dollars. Kinzey Aff., ¶ 7. Counsel for plaintiffs stated that plaintiffs would oppose a motion to amend the counterclaims. Kinzey Aff., ¶ 6.

## ARGUMENT

I.  **WSC's Counterclaim for its Share of the Sale Proceeds is Related to and Arises out of the Same Transactions and Occurrences as the Main Counterclaims Already Present in this Case**

Federal Rule of Civil Procedure 13(e) provides that a claim which matured after serving a pleading may, with the permission of court, be presented as a counterclaim by supplemental pleading. See Skaro v. Eastern Sav. Bank, 866 F. Supp. 229, 233-34 (W.D. Pa. 1994) (in action requesting accounting and equitable and declaratory relief in connection with mortgage bond agreement, court sustained jurisdiction over defendant's after-acquired counterclaim seeking to recover amounts due on side agreement made to keep bond current because it arose out of same transaction or occurrence as main claim and was within court's supplemental jurisdiction under 28 U.S.C. § 1367(a)). The premise of Rule 13(e) is that closely related claims, including after-arising counterclaims, should be tried together to avoid the

3

inefficiencies of multiple proceedings. See Skaro, 866 F. Supp. at 233-34 (W.D. Pa. 1994) (quoting Harbor Ins. Co. v. Continental Bank Corp., 922 F.2d 357 (7th Cir. 1990)).

Federal Rule of Civil Procedure 15(a) provides that a party may amend the party's pleading by leave of court, and leave shall be freely given when justice so requires. This rule has been liberally construed to favor granting leave to amend pleadings absent a substantial reason to deny. See Berkshire Fashions, Inc. v. The M.V. Hakusan II, 954 F.2d 874, 887 (3d Cir. 1992) (rationale for construction of Rule 15 stems from liberal approach to amendments embodied in judicial interpretation of rule).

This Counterclaim involves the exact same parties and the exact same agreements that are at issue in the case already. WSC has already asserted claims against John Hancock for breaches of John Hancock's duties as Managing Partner of the Joint Venture. Now, John Hancock has committed an additional breach of its duties under the Joint Venture Agreement by wrongfully withholding more than two-million dollars of the Hotel sale proceeds to which WSC is legally entitled.. The interests of judicial economy and justice require that this Counterclaim be tried with the rest of this case so that all disputes regarding the Hotel and the parties' relationship can be resolved in one proceeding.

The factors that a district court may use to deny leave to amend, including delay in discovery and trial preparation and undue prejudice to the opposing party, are not present in this case. WSC has not delayed in bringing this Counterclaim. The Hotel was sold in March, and WSC has sought to receive its share of the sale proceeds from John Hancock through the ordinary course of business. It is only in recent weeks that it has become apparent that John Hancock does not intend to honor its obligation to distribute the sale proceeds to WSC.

4

Moreover, the existing counterclaims already allege that John Hancock breached its duties as Managing Partner of the Joint Venture. No additional discovery is required with respect to the supplemental Counterclaim. There is no dispute that the Hotel was sold and that John Hancock has not distributed any sale proceeds to WSC. There will be no delay in trial preparation. Finally, John Hancock will suffer no prejudice by the introduction of this Counterclaim. It is in the interests of all parties that all claims regarding the Hotel be litigated and resolved in this one action.

## CONCLUSION

For all of the above reasons, this Court should grant WSC leave to file and serve the Second Amended Answer and Counterclaim attached hereto.

Dated: Wilmington, Delaware
      October ___, 1999

                                         Allen M. Terrell, Jr. (I.D. # 709)
                                         Srinivas M. Raju (I.D. # 3313)
                                         RICHARDS, LAYTON & FINGER
                                         One Rodney Square
                                         P.O. Box 551
                                         Wilmington, Delaware 19899
                                         (302) 658-6541
                                         Attorneys for Defendants and
                                         Counterclaimants and Third-Party Plaintiffs

OF COUNSEL:

John S. Kinzey
Scot C. Gleason
Nicholas W.C. Corson
LeBOEUF, LAMB, GREENE & MacRAE, LL.P.
125 West 55th Street
New York, New York 10019-5389

<div align="center">5</div>

## CERTIFICATE OF SERVICE

I hereby certify this 25th day of October, 1999, that I caused copies of the

foregoing Memorandum of Law in Support of Motion for Leave to Supplement Counterclaims to

be served upon the following counsel in the manner indicated:

**BY HAND**
James P. Hughes, Esq.
Young, Conaway, Stargatt & Taylor
Rodney Square North
P.O. Box 391
Wilmington, DE 19899

**BY FEDERAL EXPRESS**
William Wallace, III
Morgan, Lewis & Bockius, LLP
1800 M Street, N.W.
Washington, D.C. 20036

Allen M. Terrell, Jr. (#709)

RLF1-199590-1

# Exhibit 6

LEXSEE 1999 U.S. DIST. LEXIS 20860

**2660 WOODLEY ROAD JOINT VENTURE, WOODLEY ROAD ASSOCIATES, INC., JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY and SUMITOMO LIFE REALTY (N.Y.), INC., Plaintiffs, v. ITT SHERATON CORPORATION and SHERATON OPERATING CORPORATION, Defendants.**

**Civil Action No. 97-450-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**1999 U.S. Dist. LEXIS 20860**

**December 2, 1999, Decided**

**COUNSEL:** [*1] For 2660 WOODLEY ROAD JOINT VENTURE, WOODLEY ROAD ASSOCIATES, INC., JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, SUMITOMO LIFE REALTY (N.Y.) INC., plaintiffs, counter-defendants: Edward B. Maxwell, 2nd, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For ITT SHERATON CORPORATION, SHERATON OPERATING CORPORATION, defendants: Allen M. Terrell, Jr., Richards, Layton & Finger, Wilmington, DE.

For WASHINGTON SHERATON CORPORATION, ITT SHERATON CORPORATION, SHERATON OPERATING CORPORATION, counter-claimants: Allen M. Terrell, Jr., Richards, Layton & Finger, Wilmington, DE.

**JUDGES:** Joseph J. Farnan, Jr., UNITED STATES DISTRICT JUDGE

**OPINION BY:** Joseph J. Farnan, Jr.

**OPINION:**

**ORDER**

WHEREAS, presently before the Court are a number of pending motions;

WHEREAS, the Court has considered the arguments presented by both sides regarding the pending motions;

NOW, THEREFORE on this 2 day of December, 1999, IT IS HEREBY ORDERED that:

1. Plaintiffs' Motion for Summary Judgment On All Counterclaims (D.I. 254) is DENIED as it relates to counterclaims I, II, and III. Counterclaims IV, V, and VI will be SEVERED from the pending trial for subsequent consideration;

2. Defendants' Motion for Summary [*2] Judgment on Plaintiff's Federal Causes of Action (D.I. 260) is DENIED;

3. Motion by Counterclaimant Washington Sheraton for Leave to Supplement Counterclaims (D.I. 302) is DENIED;

4. Motion by Plaintiffs for Order to Show Cause (D.I. 307) is DENIED;

5. Defendants' application as contained in its Memorandum of Law in Support of their Motion in Limine to Construe Contract (D.I. 312) is DENIED.

Joseph J. Farnan, Jr.

UNITED STATES DISTRICT JUDGE

# Exhibit 7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| 2660 WOODLEY ROAD JOINT VENTURE et al., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 97-450 JJF |
| ITT SHERATON CORPORATION, et al | ) ) ) | |
| Defendants. | ) ) | |

JUDGMENT IN A CIVIL CASE

This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict on December 10, 1999 and answered a General Verdict Form Accompanied By Special Interrogatories, a copy attached hereto.

IT IS ORDERED AND ADJUDGED that judgment is entered in favor of the Plaintiff, 2660 Woodley Road Joint Venture, et al and against the Defendants, ITT Sheraton Corporation, et al.

District Judge

Date: December 13, 1999

PETER T. DALLEO, CLERK

(By) Deputy Clerk

PAGE.02                                                    DEC 15 1999 09:55

UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF DELAWARE

*Filed in Open Court*
*12/10/99*

| | |
|---|---|
| 2660 WOODLEY ROAD JOINT VENTURE, *et al.,* ) | |
| ) | |
| Plaintiffs and Counterplaintiffs, ) | Civil Action No. 97-450-JJF |
| ) | |
| vs. ) | |
| ) | |
| ITT SHERATON CORPORATION, *et al.,* ) | |
| ) | |
| Defendants and Counterplaintiffs. ) | |

## GENERAL VERDICT FORM ACCOMPANIED BY
## SPECIAL INTERROGATORIES

### INSTRUCTIONS:

As judges of the facts, you are being asked to answer questions, called "interrogatories," to record your findings on certain factual issues that have been presented in this trial. You are to deliberate and answer every interrogatory by circling the appropriate response (YES or NO). Your answer to each interrogatory must be unanimous.

In addition, your verdict on each of Plaintiff's claims will be recorded on this verdict form. You must decide either for Plaintiffs or for Sheraton on each claim. Your verdict on each claim must be unanimous. If, after full deliberation, you are unable to reach a verdict on any claim, you are to notify the bailiff.

After you have completed your deliberations and entered on this form your answers to the interrogatories and your verdicts on the Plaintiffs' claims, the foreperson of the jury must sign the verdict form, certifying that it accurately records the answers and verdicts of the jury. Then notify the bailiff that you have completed the verdict form.

## SPECIAL INTERROGATORIES and GENERAL VERDICT FORM

### Plaintiffs' RICO Claims-Special Interrogatories

1. Did Sheraton violate the Racketeer Influenced and Corrupt Practices Act ("RICO")?

    YES OR (NO)

2. If you answered YES in Question 1: Were plaintiffs injured in their business or property as a result of Sheraton's conduct?  YES  NO  NOT APPLICABLE.

**(IF NO OR NOT APPLICABLE, OMIT QUESTIONS 3-6.)**

### Plaintiffs' RICO Claims-General Verdicts

3. On Plaintiffs' claim under 18 U.S.C. Section 1962(c), we find for:

    Plaintiffs_____    Defendants_____

4. On Plaintiffs' claim under 18 U.S.C. Section 1962(a), we find for:

    Plaintiffs_____    Defendants_____

5. On Plaintiffs' claim under 18 U.S.C. Section 1962(d), we find for:

    Plaintiffs_____    Defendants_____

6. If you found for Plaintiffs in Questions 3,4 or 5, what amount of damages, if any, should plaintiffs be awarded (specify a dollar amount or zero)? $_____

### Plaintiffs' Robinson-Patman Claim-General Verdict

7. On Plaintiffs' claim under the Robinson-Patman Act, we find for:

    Plaintiffs _√_    Defendants_____

8. If you found for Plaintiffs in Question 7, what amount of damages, if any, should plaintiffs be awarded (specify a dollar amount or zero)? $ 750,000

**Plaintiffs' Contract Claims-Special Interrogatories and Verdict**

9. Did Sheraton materially breach the Management Contract with respect to its obligations

concerning any of the following services or duties:

a. to act as owners agent        (YES) OR NO

b. purchasing services?        (YES) OR NO

c. frequent traveler program ("SCI")?        YES OR (NO)

d. reservations system?        YES OR (NO)

e. "usable denials" practices?        YES OR (NO)

f. workers compensation        (YES) OR NO

g. complimentary rooms practices?        YES OR (NO)

h. any other contractual duty?        YES OR (NO)

**ANSWER QUESTION 10 ONLY WITH RESPECT TO THOSE ITEMS, IF ANY, FOR**

**WHICH YOU ANSWERED YES IN QUESTION 9.**

10. What damages, if any, do you award to plaintiffs for a breach of the Management Contract

concerning each of the following (specify either zero or a dollar amount):

a. to act as owners agent        $ 10.26 mm

b. purchasing services?        $ 250,000

c. frequent traveler program ("SCI")?        $ 0

d. reservations system?        $ 0

e. "usable denials" practices?        $ 0

f. workers compensation        $ 222,000

g. complimentary rooms practices?        $ 0

h. any other contractual duty?        $ 0

PAGE.06 .

DEC 15 1995 08:59

**ANSWER QUESTION 11 ONLY FOR THOSE ITEMS FOR WHICH YOU AWARDED A DOLLAR AMOUNT IN QUESTION 10.**

<u>**Plaintiffs' Other Common Law Claims-General Verdicts**</u>

12. On Plaintiffs' claim for breach of fiduciary duty, we find for:

    Plaintiffs ✓    Defendants _____

13. On Plaintiffs' claim for breach of the implied duty of good faith and fair dealing, we find for:

    Plaintiffs ✓    Defendants _____

14. On Plaintiffs' claim for fraud, we find for

    Plaintiffs _____    Defendants ✓

15. On Plaintiffs' claim for intentional or negligent misrepresentation, we find for:

    Plaintiffs ✓    Defendants _____

16. If you found for Plaintiffs in Questions 12, 13, 14 or 15, what damages, if any, do you award (specify dollar amount or zero)? $ 1.1 MM

<u>**Plaintiffs' claim for Punitive Damages**</u>

17. On Plaintiffs' claim for punitive damages, we find for:

    Plaintiffs ✓    Defendants _____

18. If you found for Plaintiffs in Question 17, what amount of punitive damages do you award to Plaintiffs (specify dollar amount or zero)? $ 37.5 MM m

PAGE.07                                                          DEC 15 1999 09:55

## Defendants' Contract Counterclaims-Special Interrogatories

19. On Defendants' counterclaim for wrongful termination of the Management Contract, we find for:

        Defendants _____     Plaintiffs \_\_\_\_ ✓

20. If you found for Defendant in Question 17, what damages, if any, do you award (specify dollar amount or zero)? $ \_\_\_0\_\_\_

21. On Defendants' counterclaim for breach of the Management Contract, we find for:

        Defendants _____     Plaintiffs \_\_\_\_ ✓

22. If you found for Defendants in Question 19, what damages, if any, do you award (specify dollar amount or zero)? $ \_\_\_0\_\_\_

DATED: _Dec. 10, 1999_

                                    **FOREPERSON**

                                      **JUROR**

                                      **JUROR**

                                      **JUROR**

                                      **JUROR**

                                      **JUROR**

                                      **JUROR**

                                      **JUROR**

5

# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2007 JAN 10 PM 3: 07

2660 WOODLEY ROAD JOINT          :
VENTURE, et al.,                 :
                                 :
       Plaintiffs and            :
       Counterclaim Defendants,  :
                                 :
       v.                        :Civil Action No. 97-450-JJF
                                 :
ITT SHERATON CORPORATION,        :
et al.,                          :
                                 :
       Defendants and            :
       Counterclaim Plaintiffs.  :

## AMENDED JUDGMENT IN A CIVIL CASE

This action came before the Court for a trial by jury. The
issues have been tried and the jury has rendered its verdict on
December 10, 1999, and answered a General Verdict Form
Accompanied By Special Interrogatories, a copy attached hereto.

IT IS ORDERED AND ADJUDGED that:

1.    Judgment is entered in favor of Plaintiffs, 2660
Woodley Road Joint Venture, et al. and against Defendants, ITT
Sheraton Corporation, et al., jointly and severally in the amount
of $12,582,000 in compensatory damages and $17,415,000 in
punitive damages.

2.    On Plaintiffs' claim under the Robinson-Patman Act,
Defendants shall, jointly and severally, pay to Plaintiffs the
additional sum of $2,250,000, which amount represents the
statutory trebling of the jury's $750,000 compensatory damages

award, as provided by 15 U.S.C. § 15(a).

3.    In the event that Plaintiffs seek recovery of attorneys' fees pursuant to 15 U.S.C. § 15(a) and the taxation of costs Plaintiffs shall file an application therefor not later than sixty (60) days after the entry of this Amended Judgment In A Civil Case, and this application shall not extend the time to appeal pursuant to Fed. R. App. P. 4(a)(4).

*+ interest ?*

_____
UNITED STATES DISTRICT JUDGE


Date:    January 10, 2002        PETER T. DALLEO, CLERK

_____
(By) Deputy Clerk

# Exhibit 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| 2660 WOODLEY ROAD JOINT VENTURE, et al., | ) ) ) |
| Plaintiffs and Counterclaim Defendants, | ) ) ) |
| v. | ) Civil Action No. 97-450-JJF ) |
| ITT SHERATON CORPORATION, et al., | ) ) ) |
| Defendants and Counterclaim Plaintiffs. | ) ) ) |

## SECOND AMENDED JUDGMENT IN A CIVIL CASE

This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict on December 10, 1999, and answered a General Verdict Form Accompanied By Special Interrogatories, a copy attached hereto.

IT IS ORDERED AND ADJUDGED that:

1.      Judgment is entered in favor of Plaintiffs, 2660 Woodley Road Joint Venture, et al. and against Defendants, ITT Sheraton Corporation, et al., jointly and severally in the amount of $12,582,000 in compensatory damages and $17,415,000 in punitive damages.

2.      On Plaintiffs' claim under the Robinson-Patman Act, Defendants shall, jointly and severally, pay to Plaintiffs the additional sum of $1,500,000, which amount represents the statutory trebling of the jury's $750,000 compensatory damages award already accounted for in paragraph 1 of this Second Amended Judgment, as provided by 15 U.S.C. § 15(a).

3.      In the event that Plaintiffs seek recovery of attorneys' fees pursuant to 15 U.S.C. § 15(a) and the taxation of costs, Plaintiffs shall file an application therefor not later than sixty (60) days after the entry of this Amended Judgment In A Civil Case, and this application shall not extend the time to appeal pursuant to Fed. R. App. P. 4(a)(4).


UNITED STATES DISTRICT JUDGE

PETER T. DALLEO, CLERK


(By) Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF DELAWARE

Filed in Open Court
12/10/99 *sm*

```
_____  )
                                )
                                )
2660 WOODLEY ROAD JOINT VENTURE, )
     et al.,                    )
                                )        Civil Action No. 97-450-JJF
     Plaintiffs and Counterplaintiffs, )
                                )
         vs.                    )
                                )
ITT SHERATON CORPORATION, et al., )
                                )
     Defendants and Counterplaintiffs. )
```

## GENERAL VERDICT FORM ACCOMPANIED BY
## SPECIAL INTERROGATORIES

### INSTRUCTIONS:

As judges of the facts, you are being asked to answer questions, called "interrogatories," to record your findings on certain factual issues that have been presented in this trial. You are to deliberate and answer every interrogatory by circling the appropriate response (YES or NO). Your answer to each interrogatory must be unanimous.

In addition, your verdict on each of Plaintiff's claims will be recorded on this verdict form. You must decide either for Plaintiffs or for Sheraton on each claim. Your verdict on each claim must be unanimous. If, after full deliberation, you are unable to reach a verdict on any claim, you are to notify the bailiff.

After you have completed your deliberations and entered on this form your answers to the interrogatories and your verdicts on the Plaintiffs' claims, the foreperson of the jury must sign the verdict form, certifying that it accurately records the answers and verdicts of the jury. Then notify the bailiff that you have completed the verdict form.

## SPECIAL INTERROGATORIES and GENERAL VERDICT FORM

**Plaintiffs' RICO Claims-Special Interrogatories**

1.  Did Sheraton violate the Racketeer Influenced and Corrupt Practices Act ("RICO")?

    YES OR NO

2.  If you answered YES in Question 1: Were plaintiffs injured in their business or property as a result of Sheraton's conduct?  YES  NO  NOT APPLICABLE.

**(IF NO OR NOT APPLICABLE, OMIT QUESTIONS 3-6.)**

**Plaintiffs' RICO Claims-General Verdicts**

3.  On Plaintiffs' claim under 18 U.S.C. Section 1962(c), we find for:

    Plaintiffs____    Defendants_____

4.  On Plaintiffs' claim under 18 U.S.C. Section 1962(a), we find for:

    Plaintiffs____    Defendants_____

5.  On Plaintiffs' claim under 18 U.S.C. Section 1962(d), we find for:

    Plaintiffs____    Defendants_____

6.  If you found for Plaintiffs in Questions 3,4 or 5, what amount of damages, if any, should plaintiffs be awarded (specify a dollar amount or zero)?  $_____

**Plaintiffs' Robinson-Patman Claim-General Verdict**

7.  On Plaintiffs' claim under the Robinson-Patman Act, we find for:

    Plaintiffs  _✓_    Defendants_____

8.  If you found for Plaintiffs in Question 7, what amount of damages, if any, should plaintiffs be awarded (specify a dollar amount or zero)?  $ _750,000_

2

**Plaintiffs' Contract Claims-Special Interrogatories and Verdict**

9.  Did Sheraton materially breach the Management Contract with respect to its obligations concerning any of the following services or duties:

a.  to act as owners agent                                      YES OR NO

b.  purchasing services?                                        YES OR NO

c.  frequent traveler program ("SCI")?           YES OR NO

d.  reservations system?                                     YES OR NO

e.  "usable denials" practices?                        YES OR NO

f.   workers compensation                              YES OR NO

g.  complimentary rooms practices?              YES OR NO

h.  any other contractual duty?                      YES OR NO

ANSWER QUESTION 10 ONLY WITH RESPECT TO THOSE ITEMS, IF ANY, FOR

WHICH YOU ANSWERED YES IN QUESTION 9.

10. What damages, if any, do you award to plaintiffs for a breach of the Management Contract concerning each of the following (specify either zero or a dollar amount):

a.  to act as owners agent                              $ 10.26 mm

b.  purchasing services?                                 $ 250,000

c.  frequent traveler program ("SCI")?        $ 0

d.  reservations system?                                $ 0

e.  "usable denials" practices?                      $ 0

f.   workers compensation                            $ 222,000

g.  complimentary rooms practices?            $ 0

    any other contractual duty?                     $ 0

3

ANSWER QUESTION 11 ONLY FOR THOSE ITEMS FOR WHICH YOU AWARDED

A DOLLAR AMOUNT IN QUESTION 10.

**Plaintiffs' Other Common Law Claims-General Verdicts**

12. On Plaintiffs' claim for breach of fiduciary duty, we find for:

    Plaintiffs __✓__    Defendants _____

13. On Plaintiffs' claim for breach of the implied duty of good faith and fair dealing, we find for:

    Plaintiffs __✓__    Defendants _____

14. On Plaintiffs' claim for fraud, we find for

    Plaintiffs _____    Defendants __✓__

15. On Plaintiffs' claim for intentional or negligent misrepresentation, we find for:

    Plaintiffs __✓__    Defendants _____

16. If you found for Plaintiffs in Questions 12, 13, 14 or 15, what damages, if any, do you award (specify dollar amount or zero)? $ __1.1 MM__

**Plaintiffs' claim for Punitive Damages**

17. On Plaintiffs'claim for punitive damages, we find for:

    Plaintiffs __✓__    Defendants _____

18. If you found for Plaintiffs in Question 17, waht amount of punitive damages do you award to Plaintiffs (specify dollar amount or zero)? $ __37.5M MM__

4

**Defendants' Contract Counterclaims-Special Interrogatories**

19. On Defendants' counterclaim for wrongful termination of the Management Contract, we find

for:

      Defendants _____     Plaintiffs ✓_____

20. If you found for Defendant in Question 17, what damages, if any, do you award (specify

dollar amount or zero)? $_____ 0 _____

21. On Defendants' counterclaim for breach of the Management Contract, we find for:

      Defendants _____     Plaintiffs ✓_____

22. If you found for Defendants in Question 19, what damages, if any, do you award (specify
dollar amount or zero)? $_____ 0 _____

DATED: Dec 10, 1999

_____
FOREPERSON

_____
JUROR

_____
JUROR

_____
JUROR

_____
JUROR

_____
JUROR

_____
JUROR

_____
JUROR

5

CERTIFICATE OF SERVICE

I hereby certify this 6th day of January, 2000, that I caused copies of the foregoing **Defendants' Response To Plaintiffs' Motion For Final Judgment On All Claims** to be served upon the following counsel in the manner indicated:

BY HAND
James P. Hughes, Esq.
Young, Conaway, Stargatt & Taylor
Rodney Square North
P.O. Box 391
Wilmington, DE 19899

BY FEDERAL EXPRESS
William M. Bosch, Esq.
Morgan, Lewis & Bockius, LLP
1800 M Street, N.W.
Washington, D.C. 20036

Jeffrey L. Moyer (#3309)

# Exhibit 10

LEXSEE 2004 U.S. APP. LEXIS 10230

**2660 WOODLEY ROAD JOINT VENTURE; WOODLEY ROAD ASSOCIATES, INC.; JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY; \* SUMITOMO LIFE REALTY (N.Y.) INC. v. ITT SHERATON CORPORATION; SHERATON OPERATING CORPORATION; WASHINGTON SHERATON CORPORATION \*\* ITT Sheraton Corporation, Sheraton Operating Corporation and Washington Sheraton Corporation, \*\* Appellant No. 02-1297. 2660 WOODLEY ROAD JOINT VENTURE; WOODLEY ROAD ASSOCIATES, INC.; JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY; \* SUMITOMO LIFE REALTY (N.Y.) INC. Appellants No. 02-1418 v. ITT SHERATON CORPORATION; SHERATON OPERATING CORPORATION; WASHINGTON SHERATON CORPORATION \*\***

\* Dismissed per the Clerk Order of 5/23/02

\*\* Dismissed per the Court Order of 9/25/02

**Nos. 02-1297/1418**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*369 F.3d 732; 2004 U.S. App. LEXIS 10230; 2004-1 Trade Cas. (CCH) P74,423*

**February 13, 2003, Argued
May 25, 2004, Filed**

**PRIOR HISTORY:** [\*\*1] On Appeal From the United States District Court For the District of Delaware. (D.C. Civ. No. 97-cv-00450). Chief District Judge: Hon. Joseph J. Farnan, Jr. *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp., 2002 U.S. Dist. LEXIS 439 (D. Del., Jan. 10, 2002)*

**DISPOSITION:** Affirmed in part, reversed in part and remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellee hotel franchisee sued appellant hotel franchisor for commercial bribery under § 2(c) of the Robinson-Patman Act, 15 U.S.C.S. § 13(c), for violation of other federal laws, and for breach of contract and related state law claims. After a jury trial, the United States District Court for the District of Delaware entered judgment in favor of the franchisee, including punitive damages. The franchisor sought review of the damage awards.

**OVERVIEW:** Pursuant to a purchasing program, the franchisor negotiated vendor discounts, which it received directly as a rebate. The franchisee alleged that this pro-

gram violated § 2(c). On appeal, the court vacated part of the damage award. The franchisee lacked antitrust standing to bring the § 2(c) commercial bribery claim. A private right of action under § 2(c) was provided by § 4 of the Clayton Act, 15 U.S.C.S. § 15(a), which required proof of an antitrust injury. The payment of inflated purchase prices to vendors did not constitute the type of injury that the antitrust laws were intended to prevent. The breaches of contract and agency caused these injuries. The lack of injury was fatal to antitrust standing. Even assuming such injury, the franchisee failed to establish standing. The vendors were more direct victims of this commercial bribery scheme. Thus, the court vacated the antitrust damage award. The court also vacated the award for breach of the agency provision of the management agreement. There was no evidence that the harm for this breach that was not also included in the itemization of damages in the jury verdict form. The court also reduced the punitive damage award.

**OUTCOME:** The court vacated the anti-trust award, the award for purchasing services, and the award for breach of the agency agreement. The court affirmed the workers' compensation award and the award for breach of fiduciary duty, breach of the implied duty of good faith and fair dealing, and intentional or negligent misrepresenta-

369 F.3d 732, *; 2004 U.S. App. LEXIS 10230, **;
2004-1 Trade Cas. (CCH) P74,423

tion. The court reduced the punitive damages and re-manded the case for entry of a judgment reflecting this opinion.

## LexisNexis(R) Headnotes

*Antitrust & Trade Law > Price Discrimination > Brokerage*
*Antitrust & Trade Law > Price Discrimination > Defenses > General Overview*
*Antitrust & Trade Law > Robinson-Patman Act > General Overview*
[HN1] See 15 U.S.C.S. § 13(c).

*Antitrust & Trade Law > Price Discrimination > Brokerage*
*Antitrust & Trade Law > Robinson-Patman Act > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Bribery > Commercial Bribery > General Overview*
[HN2] The United States Supreme Court has never decided a 15 U.S.C. § 13(c) commercial bribery case. However, in dicta in Federal Trade Commission v. Henry Broch, Inc., the court noted that § 13(c) does encompass commercial bribery.

*Antitrust & Trade Law > Robinson-Patman Act > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Bribery > Commercial Bribery > General Overview*
[HN3] As a general principle, a critical element of commercial bribery is the breach of the duty of fidelity.

*Antitrust & Trade Law > Clayton Act > Coverage*
*Antitrust & Trade Law > Robinson-Patman Act > Claims*
*Antitrust & Trade Law > Robinson-Patman Act > Remedies > Damages*
[HN4] Although § 2(c) of the Robinson-Patman Act, 15 U.S.C.S. § 13(c) defines certain conduct as illegal, it does not create a private right of action to sue for damages resulting from violations of the Act. Rather, the private right of action for a § 2(c) Robinson-Patman Act claim, as for all private plaintiff antitrust rights of action, is provided by § 4 of the Clayton Act, 15 U.S.C.S. § 15(a).

*Antitrust & Trade Law > Clayton Act > General Overview*
*Antitrust & Trade Law > Private Actions > Injuries & Remedies > General Overview*
[HN5] See 15 U.S.C.S. § 15(a).

*Antitrust & Trade Law > Private Actions > Injuries & Remedies > Clayton Act*
*Antitrust & Trade Law > Robinson-Patman Act > Claims*
*Antitrust & Trade Law > Robinson-Patman Act > Remedies > Damages*
[HN6] In order to recover treble damages under § 4(a) of the Clayton Act, 15 U.S.C.S. § 15(a), a private plaintiff must do more than simply show "an injury causally linked to" a violation of the antitrust laws. A plaintiff must also prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. Thus, the United States Supreme Court pronounced in J. Truett Payne Co. v. Chrysler Motors Corp., that, even if there has been a violation of the Robinson-Patman Act, 15 U.S.C.S. § 13(c), a plaintiff is not excused from its burden of proving antitrust injury and damages.

*Antitrust & Trade Law > Price Discrimination > Competitive Injury > General Overview*
*Antitrust & Trade Law > Robinson-Patman Act > Claims*
[HN7] A § 2(c) of the Robinson-Patman Act, 15 U.S.C.S. § 15(c), plaintiff does not have to prove competitive injury to establish a violation. In Federal Trade Commission v. Simplicity Pattern Co., the United States Supreme Court noted, that § 2(d) of the Robinson-Patman Act, 15 U.S.C.S. § 13(c), makes the business practices described therein unlawful. Therefore, the proscriptions of § 2(c) of the Robinson-Patman Act are absolute and § 2(c) does not require, as proof of a prima facie violation, a showing that the illicit practice has had an injurious or destructive effect on competition. Accordingly, the presence of an anti-competitive effect is not necessary to prove a violation of section 2(c). The anti-competitive effect is the presumed result of the illegal conduct.

*Antitrust & Trade Law > Private Actions > Injuries & Remedies > General Overview*
*Antitrust & Trade Law > Private Actions > Standing > General Overview*
*Antitrust & Trade Law > Robinson-Patman Act > Claims*

[HN8] A successful § 2(c) of the Robinson-Patman Act, 15 U.S.C.S. § 13(c), plaintiff must still prove more than a § 2(c) violation and the accompanying anti-competitive effect to prevail. The plaintiff must also establish the requisite antitrust injury, and this requires more than establishing the anti-competitive effect that is endemic in the violation. In other words, the mere fact that certain conduct has an anticompetitive effect does not mean that a given plaintiff has suffered an antitrust injury, or that a given plaintiff is the appropriate party to seek recovery under the antitrust laws. Accordingly, even a plaintiff who can show antitrust injury may lack antitrust standing.

*Antitrust & Trade Law > Private Actions > Standing > General Overview*
*Civil Procedure > Justiciability > Standing > General Overview*
[HN9] The factors that are relevant in an antitrust standing challenge are: (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addressed the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages. The traditional concept of antitrust injury continues to be an important part of antitrust standing under this formulation. It is subsumed within the second factor of the five-prong inquiry (that is, whether the plaintiff's alleged injury is the type the antitrust laws were intended to remedy). The antitrust standing inquiry is not a black-letter rule, but rather, it is essentially a balancing test comprised of many constant and variable factors.

*Antitrust & Trade Law > Private Actions > Standing > General Overview*
*Civil Procedure > Justiciability > Standing > General Overview*
[HN10] Antitrust injury thus becomes but one element of the inquiry into antitrust standing. It is a necessary but insufficient condition of antitrust standing. Therefore, even a plaintiff who can show antitrust injury may lack antitrust standing, because the remaining Associated General Contractors factors may weigh against allowing him or her to sue under the antitrust laws.

*Civil Procedure > Trials > Jury Trials > Jury Instructions > General Overview*
*Civil Procedure > Appeals > Standards of Review > Harmless & Invited Errors > General Overview*
*Torts > Damages > Punitive Damages > General Overview*
[HN11] An error in challenged jury instruction is invited, and thus does not provide basis for reversal, where parties failed to request instruction that they asserted on appeal and their proposed instruction was remarkably similar to that actually given.

*Civil Procedure > Judgments > Relief From Judgment > Additurs & Remittiturs > Remittiturs*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN12] An appellate court reviews a grant of remittitur for abuse of discretion.

*Civil Procedure > Judgments > Relief From Judgment > Additurs & Remittiturs > Remittiturs*
*Civil Procedure > Remedies > Damages > Punitive Damages*
*Torts > Damages > Punitive Damages > General Overview*
[HN13] An appellate court affords a district court's assessment of punitive damages a degree of deference since that court is familiar with the evidence.

COUNSEL: ANDREW L. FREY (ARGUED), Mayer, Brown, Rowe & Maw, New York, NY. EVEN M. TAGER, ROBERT L. BRONSTON, Mayer, Brown, Rowe & Maw, Washington, D.C., Attorneys for Appellants/Cross-Appellees ITT Sheraton Corporation and Sheraton Operating Corporation.

THOMAS A. ARENA (ARGUED), WILLIAM E. WALLACE, III, TIMOTHY P. WEI, Milbank, Tweed, Hadley & McCloy LLP, New York, NY, Attorneys for Appellees/Cross-Appellants 2660 Woodley Road Joint Venture; John Hancock Mutual Life Insurance Company; and Sumitomo Life Realty (N.Y.) Inc.

JUDGES: BEFORE: ALITO and McKEE, Circuit Judges, and SCHWARZER, * Senior District Judge

* Honorable William W. Schwarzer, Senior United States District Judge, Northern District of California, sitting by designation.

OPINION BY: McKEE

369 F.3d 732, \*; 2004 U.S. App. LEXIS 10230, \*\*;
2004-1 Trade Cas. (CCH) P74,423

## OPINION:

[\*735] OPINION OF THE COURT

McKEE, Circuit Judge.

We are asked to review the propriety of damage awards, including an award for punitive damages, in an action for commercial bribery under § 2(c) of the Robinson-Patman Act, racketeering under the Racketeer Influenced [\*\*2] Corrupt Organization Act ("RICO"), breach of contract and related state law claims. We hold that the plaintiff can not maintain an action under § 2(c) of the Robinson-Patman Act because it has not established antitrust standing. We also hold that the record does not support portions of other damage awards, including the award for punitive damages, as explained more fully below. Accordingly, we will affirm in part and reverse in part, and remand for further proceedings consistent with this opinion.

## I.    FACTUAL    AND    PROCEDURAL BACKGROUND

John Hancock Life Insurance Company, 2660 Woodley Road Joint Venture and Woodley Road Associates, Inc. (collectively referred to as "Hancock") together owned the Sheraton Washington Hotel (the "Hotel"). In September 1979, Hancock entered into a Management Agreement under which Sheraton agreed to act as Hancock's agent in managing the Hotel's operations. In return, Sheraton received a percentage of the Hotel's gross revenue and a share of its net cash flow.

The suit arises from an arrangement known as the "Sheraton Purchasing Resource" program (the "SPR") that was initiated pursuant to the terms of the Management Agreement. Pursuant to the terms [\*\*3] of the SPR program, Sheraton negotiated large-volume discounts with vendors seeking to supply Sheraton managed hotels. Sheraton then required the vendors to add a surcharge to the price billed to the individual hotels for each purchase. However, the surcharge was not itemized, or even disclosed, on any bills or invoices that vendors sent to individual hotels. Rather, the surcharge was remitted directly to Sheraton in the form of a "rebate." The Management Agreement provided that Sheraton was entitled to be reimbursed for the costs of providing these services. Sheraton claimed that these rebates reimbursed it for the centralized purchasing services it provided under the SPR program as well as associated overhead costs.

The Management Agreement between Sheraton and Hancock remained in effect until 1993, when differences between the parties led to its termination. Thereafter, Hancock filed this lawsuit. In its complaint, Hancock alleged: violations of § 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c); [\*736] violations of RICO, 18

U.S.C. § 1961; and state law claims of breach of contract, breach of fiduciary duty, and breach of the implied duty of good [\*\*4] faith and fair dealing; as well as fraud, and intentional or negligent misrepresentation. Hancock also claimed that Sheraton failed to properly act as its agent in operating its reservation system, failing to limit usable denials, n1 improperly profiting from providing Workers' Compensation insurance, permitting excessive numbers of complimentary rooms, and breaching other unspecified contractual duties.

n1 According to Sheraton, a usable denial occurs when a potential guest is denied a reservation when a room is actually available. Sheraton's Br. as appellant/cross-appellee, at 13.

Hancock's suit proceeded to trial where a jury found for Sheraton on Hancock's RICO claim, but found for Hancock on its Robinson-Patman Act claim. The jury also found for Hancock on several of its state law claims, including claims that Sheraton had breached the Management Agreement with regard to purchasing services, and providing Workers Compensation insurance. The jury further found in favor in Hancock on its breach of fiduciary [\*\*5] duty claim. The jury concluded that Sheraton breached an implied duty of good faith and fair dealing, and that Sheraton was liable for its misrepresentations to Hancock. The jury awarded damages of $ 750,000 on the Robinson-Patman Act claim (subsequently trebled by the court), a total of $ 10,732,000 on the breach of contract claims, $ 1,100,000 on the tort claims, and $ 37,500,000 in punitive damages. The district court denied Sheraton's motion for judgment as a matter of law but granted a remittitur thereby reducing the punitive damages to $ 17,415,000. The district court then entered judgment in favor of Hancock in the total amount of $ 31,497,000, but denied Hancock's motion for attorneys' fees and taxation of costs without prejudice. Sheraton appealed from the judgment, and Hancock cross-appealed from the remittitur. n2 For the reasons that follow, we will affirm in part and reverse in part.

n2 We have jurisdiction under 28 U.S.C. § 1291.

## II. DISCUSSION

### A. ROBINSON-PATMAN [\*\*6]  ACT CLAIM

#### Hancock's Antitrust Standing

Sheraton renews its argument that Hancock lacks antitrust standing to bring a claim under § 2(c) of the

*Robinson-Patman Act.* n3 We must address that issue before addressing the merits of the appeal or cross-appeal.

> n3 *The Robinson-Patman Act of 1936* was enacted as an amendment to the *Clayton Act. Great Atlantic & Pacific Tea Co. v. Federal Trade Commission, 106 F.2d 667, 669, 29 F.T.C. 1591 (3d Cir. 1939).*

*Section 2(c) of the Robinson-Patman Act* provides:

> [HN1] It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact [**7] for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person [*737] by whom such compensation is so granted or paid.

*15 U.S.C. § 13(c).* "Congress enacted section 2(c), the Act's brokerage provision, primarily to curb one particular abuse by large chain store buyers, namely the use of 'dummy' brokerage fees as a means of securing price rebates." *Environmental Tectonics v. W.S. Kirkpatrick, Inc., 847 F.2d 1052, 1066 (3d Cir. 1988)* (citation omitted). This concern arose from large stores using their economic dominance to force sellers to pay a fee for doing business. "The large stores required the sellers to pay a 'brokerage' to persons employed by the buyers. These persons had rendered no service, and would simply pay over the commissions to their employers." *Seaboard Supply Co. v. Congoleum Corp., 770 F.2d 367, 371 (3d Cir. 1985).*

However, Hancock's § 2(c) claim is not a dummy brokerage claim. Rather, Hancock has fashioned its § 2(c) action as a commercial bribery claim. n4 Surprisingly, [HN2] the Supreme Court has never decided a § 2(c) commercial bribery case. However, [**8] in *dicta* in *Federal Trade Commission v. Henry Broch, Inc., 363 U.S. 166, 4 L. Ed. 2d 1124, 80 S. Ct. 1158 (1960),* the

Court noted that *§ 2(c)* does encompass commercial bribery. *Id. at 169 n.6* ("And although not mentioned in the Committee Reports, the debates on the bill show clearly that § 2(c) was intended to proscribe other practices such as the 'bribing' of a seller's broker by the buyer.") (citation omitted). n5 Similarly, in *dicta* in *California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 513, 30 L. Ed. 2d 642, 92 S. Ct. 609 (1972),* the Court again noted that "bribery of a public purchasing [*738] agent may constitute a violation of § 2(c) of the Clayton Act, as amended by the Robinson-Patman Act." In addition, a number of courts of appeals have held that § 2(c) encompasses commercial bribery. n6 Although we once expressed skepticism about "whether Congress intended to sweep commercial bribery within the ambit of § 2(c)," *Seaboard Supply, 770 F.2d at 371,* we have since agreed that "commercial bribery is actionable under 2(c)." *Environmental Tectonics, 847 F.2d at 1066.*

> n4 Sheraton insists that the SPR program was not commercial bribery because the rebates simply served to compensate it for the costs it incurred in operating the program. Nevertheless, it accepts Hancock's characterization of the SPR program as commercial bribery for purposes of this appeal.

[HN3] As a general principle, a critical element of commercial bribery is the breach of the duty of fidelity. For example, the Model Penal Code provides:

> **Commercial Bribery and Breach of Duty to Act Disinterestedly.**
>
> (1) A person commits a misdemeanor if he solicits, accepts or agrees to accept any benefit as consideration for knowingly violating or agreeing to violate a duty of fidelity to which he is subject as:
>
> (a) partner, agent, or employee of another;
>
> (b) trustee, guardian, or other fiduciary;
>
> (c) lawyer, physician, accountant, appraiser, or other professional adviser or informant;

(d) officer, director, manager or other participant in the direction of the affairs of an incorporated or unincorporated association; or

(e) arbitrator or other purportedly disinterested adjudicator or referee.

(2) A person who holds himself out to the public as being engaged in the business of making disinterested selection, appraisal, or criticism of commodities or services commits a misdemeanor if he solicits, accepts or agrees to accept any benefit to influence his selection, appraisal or criticism.

(3) A person commits a misdemeanor if he confers, or offers or agrees to confer, any benefit the acceptance of which would be criminal under this Section.

MODEL PENAL CODE § 224.8. *See United States v Dischner, 960 F.2d 870 (9th Cir. 1992).*

[**9]

n5 In *Broch* a manufacturer sold apple concentrate at a price of $ 1.30 a gallon. The manufacturer sold through a broker and paid the broker a commission of 5. One buyer would not pay more than $ 1.25 for the concentrate and the manufacturer refused to lower his price unless the broker agreed to take a cut in his commission from 5 to 3. The broker agreed and the sale was consummated at $ 1.25 with a lower commission. The Court viewed this transaction as identical to one in which the broker received a commission of 5, the normal commission, and then turned over a part of the commission, i.e., 2, to the buyer. That would have been illegal under § 2(c) as a payment in lieu of brokerage and, therefore, the Court found that the reduction in commission in *Broch* was also a payment in lieu of brokerage.

n6 *See, e.g., Harris v. Duty Free Shoppers Ltd. Partnership, 940 F.2d 1272 (9th Cir. 1991); Stephen Jay Photography, Ltd. v. Olan Mills, 903 F.2d 988 (4th Cir. 1990); Larry R. George Sales Co. v. Cool Attic Corp., 587 F.2d 266 (5th Cir.*

*1979); Grace v. E.J. Kozin, 538 F.2d 170 (7th Cir. 1976); Calnetics Corp. v. Volkswagen of America, Inc., 532 F.2d 674 (9th Cir. 1976); Rangen, Inc. v. Sterling Nelson & Sons, 351 F.2d 851 (9th Cir. 1965); Fitch v. Kentucky-Tennessee Light & Power Co., 136 F.2d 12 (6th Cir. 1943).*

[**10]

Nevertheless, [HN4] although § 2(c) of the Robinson-Patman Act defines certain conduct as illegal, it does not create a private right of action to sue for damages resulting from violations of the Act. Rather, the private right of action for a § 2(c) Robinson-Patman Act claim, as for all private plaintiff antitrust rights of action, is provided by § 4 of the Clayton Act. *Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 853 (2d Cir. 1987). Section 4 of the Clayton Act* provides:

[HN5] Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

*15 U.S.C. § 15(a).* However, [HN6] in order to recover treble damages under § 4(a) of the Clayton Act, a private plaintiff must do more than simply show "an injury causally linked to" a violation of the antitrust laws. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 50 L. Ed. 2d 701, 97 S. Ct. 690 (1977).* [**11] A plaintiff must also prove "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* Thus, the Court pronounced in *J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 568, 68 L. Ed. 2d 442, 101 S. Ct. 1923 (1981),* "even if there has been a violation of the Robinson-Patman Act, [a plaintiff] is not excused from its burden of proving antitrust injury and damages."

As noted above, the Supreme Court has not yet defined "antitrust injury," for purposes of a § 2(c) Robinson-Patman claim. However, Hancock argues that it suffered antitrust injury as a result of Sheraton's commercial bribery scheme, *i.e.,* the SPR program. Hancock refers to this program as a "kickback" and claims that Sheraton inflated Hancock's purchasing costs by adding SPR sur-

charges and then collecting the increased costs in the form of the rebates it collected from Hancock's vendors. According to Hancock, it suffered antitrust injury because it could only purchase goods from vendors participating in Sheraton's SPR program, and it had to pay these artificially inflated prices for goods purchased [**12] through that program. Hancock also argues that the increased cost put it at a competitive disadvantage with regard to hotels owned by Sheraton.

However, we do not think that paying inflated purchasing prices to vendors, without more, is "an injury of the type the antitrust laws were intended to prevent [*739] . . . that flows from that which makes the defendants' acts unlawful." *Brunswick, 429 U.S. at 489.* Rather, Hancock's injury was caused by a breach of contract and the corruption of the principal-agent relationship. We agree that, in an appropriate case, a breach of contract or a breach of fiduciary duty could result in the kind of injury "the antitrust laws were intended to prevent." However, we do not believe that Hancock has established such an injury here. The absence of such injury is fatal to Hancock's attempt to establish antitrust standing. n7

n7 As noted above, Sheraton manages the Hotel under contract with Hancock. However, Sheraton also manages hotels that it actually owns. Hancock also alleges that the rebate scheme put it at a competitive disadvantage to Sheraton-owned hotels because, according to Hancock, "the rebate scheme impacted the Hotel differently that it did Sheraton-owned hotels: The rebate program increased the costs of the goods and services [Hancock] purchased on behalf of the Hotel, whereas the rebate scheme did not impose a real costs on Sheraton-owned hotels, which simply 'paid' the kickback to their corporate parent." Hancock's Br. at 23.

However, Sheraton argues that Hancock produced no evidence that Hancock was put at a competitive disadvantage vis-a-vis Sheraton-owned hotels because the evidence established that there are no Sheraton-owned hotels in the Washington, D.C. area where the Hotel does business. Sheraton's Br. at 26. Absent any such competition, Sheraton argues, Hancock could not have been put at a competitive disadvantage by the surcharge and therefore could not have sustained a competitive injury because of it.

[**13]

"Antitrust standing and its terminological cousin, antitrust injury, are often confused." *Triple M Roofing*

*Corp. v. Tremco, Inc., 753 F.2d 242, 247 (2d Cir. 1985).* "Lack of standing and antitrust injury often have been invoked interchangeably against a plaintiff even though each concept involves a distinct element of the § 4 action." *Greater Rockford Energy and Technology Co. v. Shell Oil Co., 998 F.2d 391, 395 (7th Cir. 1993).* Part of this confusion may result from the ease with which antitrust injury and competitive injury can be conflated into a single inquiry. n8

n8 The difficulty in distinguishing these two interrelated concepts was summed up by the district court in *Wilson v. Ringsby Truck Lines, Inc., 320 F. Supp. 699, 700 (D. Colo. 1970).* There the court candidly noted, "we must confess at the outset that we find antitrust standing cases more than a little confusing and certainly beyond our powers of reconciliation." A commentator subsequently noted that the "court could hardly have been faulted, for the confusion it noted has been endemic to these cases since the creation of the treble-damages action." Daniel Richman, Note, *Antitrust Standing, Antitrust Injury, and the Per Se Standard, 93 Yale L. J. 1309 (1984).*

[**14]

It is now settled that [HN7] a § 2(c) plaintiff does not have to prove competitive injury to establish a § 2(c) violation. In *Federal Trade Commission v. Simplicity Pattern Co., 360 U.S. 55, 65, 3 L. Ed. 2d 1079, 79 S. Ct. 1005 (1959),* the Supreme Court noted, *inter alia,* that *§ 2(c) of the Robinson-Patman Act* makes the business practices described therein unlawful. Therefore, "the proscriptions [of § 2(c)] are absolute. . .[and § 2(c) does not] require[], as proof of a *prima facie* violation, a showing that the illicit practice has had an injurious or destructive effect on competition." *Id.* Accordingly, "the presence of an anti-competitive effect is not necessary to prove a violation of section 2(c)." *Seaboard Supply Co. v. Congoleum Corp., 770 F.2d 367, 371 n.3 (3d Cir. 1985).* The anti-competitive effect is the presumed result of the illegal conduct.

However, [HN8] the successful plaintiff must still prove more than a § 2(c) violation and the accompanying anti-competitive effect to prevail. The plaintiff must also establish the requisite antitrust *injury,* and this requires more than establishing [*740] the anti-competitive effect that is endemic in the [**15] violation. In other words, the mere fact that certain conduct has an anticompetitive effect does not mean that a given plaintiff has suffered an antitrust injury, or that a given plaintiff is the appropriate party to seek recovery under the antitrust laws. Accordingly, "even a plaintiff who can

show antitrust injury may lack antitrust standing. . . ." *Barton & Pittinos, Inc., v. Smith Kline Beecham Corp.,* 118 F.3d 178, 182 (3rd Cir. 1997). The Supreme Court explained this in *Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 74 L. Ed. 2d 723, 103 S. Ct. 897 (1983).* There, the Court said:

[a] literal reading of *[§ 4 of the Clayton Act]* is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation. Some of our prior cases have paraphrased the statute in an equally expansive way. But before we hold that the statute is as broad as its words suggest, we must consider whether Congress intended such an open-ended meaning.

*Id. at 529-30* (footnote omitted). *Associated General Contractors* involved a number of [**16] carpenters' unions that alleged that Associated General Contractors, a trade association made up of general contractors, had coerced customers and competing contractors to give some of their business to non-union contractors. n9 Plaintiffs alleged that the coercion resulted in less business for firms employing union carpenters. The Court held that because the carpenters' unions were "neither a consumer nor a competitor in the market in which trade was constrained," their injuries were not the type of injury that the antitrust laws were designed to prevent. *Id. at 539.* The carpenters' unions may well have had a cause of action under other statutes or common law, and a different plaintiff may have had a cause of action under the antitrust statutes. However, the carpenters' unions had no standing to sue under those laws. The Court reached this conclusion even though the Association's conduct had an anticompetitive effect. Moreover, firms hiring union carpenters had clearly suffered an anticompetitive injury because the Association's coercion made it more difficult for those firms to win contracts. Yet, notwithstanding the anticompetitive effect of the conduct in question, [**17] the Court concluded that the plaintiff carpenters' unions had not suffered a sufficient antitrust injury.

n9   The Association's customers included landowners who needed construction services.

In arriving at that decision, the Court read the antitrust statutes in light of their common law background and read a "proximate cause element into *§ 4 [Clayton Act]* actions. *Greater Rockford Energy, 998 F.2d at 394.*

As a result of *Associated General Contractors, § 4 of the Clayton Act* has been given a narrowed reading. We have

synthesized the Court's analysis into the following formulation of [HN9] the factors that are relevant in an antitrust standing challenge:

(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of [**18] the injury, which addressed the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust [*741] violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Barton & Pittinos, 118 F.3d at 181* (citing *In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1165-66 (3d Cir. 1993)).* The traditional concept of antitrust injury continues to be an important part of antitrust standing under this formulation. It is subsumed within the second factor of the 5 prong inquiry (i.e. "whether the plaintiff's alleged injury is . . . the type . . . the antitrust laws were intended to [remedy]"). *City of Pittsburgh v. West Penn Power Comp., 147 F.3d 256, 264 (3d Cir. 1998).* "The antitrust standing inquiry is not a black-letter rule, but rather, [it] is essentially a balancing test comprised of many constant and variable factors." *Id., at 264-5* (internal quotation marks omitted).

[HN10] Antitrust injury thus becomes but one element of the inquiry into antitrust standing. It is "a necessary but [**19] insufficient condition of antitrust standing." *Barton & Pittinos, 118 F.3d at 182* (citing *Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d at 1166).* Therefore, as noted above, "even a plaintiff who can show antitrust injury may lack antitrust standing, because the remaining *[Associated General Contractors]* factors may weigh against allowing him or her to sue under the antitrust laws." n10 *Id.* (citing *Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 110 n.5, 93 L. Ed. 2d 427, 107 S. Ct. 484 (1986)).*

369 F.3d 732, *; 2004 U.S. App. LEXIS 10230, **;
2004-1 Trade Cas. (CCH) P74,423

n10 The antitrust injury requirement of the antitrust standing inquiry is analogous to the minimum standing requirement of a case or controversy within the meaning of Article III, § 2 of the Constitution, while the other *Associated General Contractors* factors are analogous to the prudential limitations on standing. *Barton & Pittinos, 118 F.3d at 182 n.4; City of Pittsburgh, 147 F.3d at 264.* [*See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Incorp., 140 F.3d 478, 484-85 (3d Cir. 1998),* for a discussion of Article III standing and the prudential limitations on standing.]

[**20]

"The *Associated General* test has been regularly and consistently applied as the passageway through which antitrust plaintiffs must advance." *City of Pittsburgh, 147 F.3d at 264.* Accordingly, even if we assume *arguendo* that Hancock suffered an antitrust injury because it paid inflated prices as a result of Sheraton's alleged commercial bribery, that would not necessarily establish Hancock's antitrust standing. Hancock must still navigate through the course defined by *Associated General.* Yet, it can not successfully do that on this record because it can not circumnavigate the barrier posed by *Associated General* factors (1), (3), (4) or (5). With regard to factors (1) n11 and (3), n12 we think it is important to remember that Sheraton contends that the surcharge and rebate aspects of the SPR program was not commercial bribery at all, but simply a way for it to recoup the costs it incurred in administering the program. Even if Sheraton inflated the amount of those charges beyond that which was necessary to recoup its costs, the propriety of Hancock maintaining an antitrust action is still problematic for reasons we will elaborate upon below.

n11 "The causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm[.]"

[**21]

n12 "The directness of the injury. . . ."

Even if we assume Hancock is correct as to factors (1) and (3), it surely can not survive an inquiry under factor (4) n13 because there are clearly "more direct victims" of Sheraton's alleged commercial bribery scheme. Vendors who may have [*742] been prevented from selling goods to Hancock because they refused to participate in the SPR program of surcharges and rebates are far more direct victims of Sheraton's scheme than Han-

cock. Moreover, their injury is much closer to the kind of injury antitrust laws address because the displaced vendors were unable to participate in the market created by the SPR program. Significantly, Hancock comes close to conceding as much in its complaint. Hancock alleges:

> vendors unwilling to pay kickbacks to Defendants were competitively harmed, and by mandating the Hotel's participation in national and regional contracts negotiated by [Sheraton], Defendants denied [Hancock] the opportunity to obtain advantageous prices and terms from nonparticipating vendors. Favored vendors not only drew sales or profits from nonfavored [**22] vendors, but the attendant reduction in competition and higher costs resulted in direct antitrust injury to [Hancock].

Complaint at P 143.

> n13 "The existence of more direct victims of the alleged antitrust violations[.]"

Although Hancock does allege that it suffered an anticompetitive injury by being forced to pay higher prices as a result of reduced competition, we think Hancock is in an analogous situation to the carpenters' unions in *Associated General Contractors.* There, customers suffered a more direct and more appropriate antitrust injury even though the alleged antitrust violation had an effect on the carpenters' union. There is an analogous situation here if we compare the injury of the excluded vendors to Hancock's injury.

Unlike the *Sherman Act,* which "protects *competition,* not *competitors,* . . . the *Robinson-Patman Act* extends its protection to competitors." *Monahan's Marine, Inc. v. Boston Whaler, Inc., 866 F.2d 525, 528 (1st Cir. 1989)* (emphasis in [**23] original). We think our discussion in *Environmental Tectonics* is therefore also quite helpful to this analysis. There, a company bribed foreign officials in order to receive a contract to supply aircraft equipment to the foreign government's air force, and a competitor brought a § 2(c) commercial bribery claim. n14 The district court dismissed the action in its entirety on the basis of the act of state doctrine. n15 We reversed because we concluded that the act of state doctrine did not apply. n16 In doing so, we noted the difficulty of precisely defining standing under § 2(c). *847 F.2d at 1066.* We also noted that "it is generally agreed that a direct competitor of a company that obtains a con-

369 F.3d 732, *; 2004 U.S. App. LEXIS 10230, **;
2004-1 Trade Cas. (CCH) P74,423

tract through commercial bribery has standing to press a 2(c) claim against the briber." *Id.* (citations omitted). Admittedly, we did not limit the class of potential § 2(c) commercial bribery plaintiffs to disfavored competitors. However, we mentioned disfavored competitors having § 2(c) commercial bribery standing after stating: "In order to proceed with a claim, a plaintiff must be able [*743] to demonstrate that it is within the class of those injured in their business or [**24] property, who, based on a variety of factors, are best suited to further the purposes of the statute by remedying the violation alleged." *Id. at 1066* (citing *Alberta Gas Chemicals, Ltd. v. E. I. DuPont De Nemours and Co., 826 F.2d 1235, 1240 (3d Cir. 1987))*. Significantly, the portion of the *Alberta Gas Chemicals* opinion we cited discusses both *Brunswick* and *Associated General.*

n14 The suit involved several claims in addition to the § 2(c) commercial bribery claim. However, the other claims are not relevant to the issues here.

n15 "The doctrine is the judiciary's institutional response to the foreign relations tensions that can be generated when a United States court appears to sit in judgment on a foreign state's regulation of its internal affairs. Under the doctrine, the courts of this country will refrain from judging the validity of a foreign state's governmental acts in regard to matters within that country's borders. The party moving for the doctrine's application has the burden of proving that dismissal is an appropriate response to the circumstances presented in the case." *Environmental Tectonics, 847 F.2d at 1057-58* (citations omitted).
[**25]

n16 As noted, we also held that commercial bribery is actionable under § 2(c). *847 F.2d at 1066.*

Moreover, even if we focus on Hancock's allegation that it had to pay inflated prices because it was forced to purchase only from "favored vendors," and ignore Hancock's admission that "vendors unwilling to pay kickbacks . . . were competitively harmed[,]" we would still conclude that Hancock can not establish antitrust standing under the fifth factor in the *Barton & Pittings* analysis. That requires us to consider whether an award of antitrust damages would be duplicative, and Hancock's antitrust recovery is inextricably intertwined with its

awards on the breach of contract and breach of fiduciary duty claims.

As noted above, Hancock asserted a number of state law claims arising from the SPR program. The jury found that Hancock suffered $ 250,000 in damages related to the purchasing services program and it also awarded $ 1,100,000 for Sheraton's breach of fiduciary duty. The actions supporting those awards constitute breach of contract and breach of fiduciary duty. Allowing [**26] a separate recovery under § 2(c) creates insurmountable problems in apportioning damages along with the real possibility of cumulative damages. n17

n17 Indeed, given the nature of Hancock's claimed damages, duplicative recovery is not only possible, it is exceedingly probable if not inevitable.

Accordingly, we hold that Hancock does not have antitrust standing to pursue its § 2(c) Robinson-Patman Act claim. We will therefore vacate the award of $ 750,000 (subsequently trebled by the district court) on that claim.

## B. BREACH OF THE AGENCY PROVISION OF THE MANAGEMENT AGREEMENT

### Sufficiency of the Evidence.

Sheraton claims that there is insufficient evidence to sustain the award of $ 10,260,000 for breach of the agency provision of the Management Agreement. Sheraton maintains that there is no evidence of harm for that breach that is not also captured in the itemization of possible damages set forth in the jury interrogatories on the verdict form. On that form, the jury awarded $ 10,260,000 [**27] for breach of the agency provision, and also separately awarded $ 250,000 for purchasing services and $ 222,000 for Workers' Compensation. It awarded no damages for the other categories listed on the verdict form: the frequent traveler program, the reservations system, "usable denials" practices, complimentary rooms practices, or for any other contractual duty. The relevant interrogatory asks jurors: "what damages, if any, do you award to plaintiffs for a breach of the Management Contract concerning each of the following. . . ."

Hancock responds by arguing that the evidence of the breach of the agency provision extended beyond the rebate payments, and suggests several possible bases for the $ 10,260,000 award. We are not persuaded. For example, Hancock relies upon the Workers' Compensation program. However, as noted, the jury separately awarded $ 222,000 for that program. Hancock cites the level of usable denial practices and the frequent travelers pro-

gram, which were itemized on the verdict form. However, the jury awarded no [*744] damages for them. Hancock also cites an unexplained and unquantified item that it refers to as a bogus relocation expense. However, no such item was listed on [**28] the verdict form. Lastly, Hancock argues that Sheraton swept certain of its bank accounts and claims that also supported an award of damages. However, the sweeping of accounts occurred after termination of the agency provision. Thus, none of those explanations supports awarding $ 10,260,000 for breach of the agency provision. Alternatively, Hancock contends that the jury could have awarded damages on the theory that a fiduciary breach entitled Hancock to disgorgement of the fees it paid to Sheraton over the life of the Management Agreement. Hancock claims that the award of $ 10,260,000 represents 15% of the $ 68,400,000 Hancock paid. Citing the Restatement (Second) of Agency, § 469, Hancock suggests that Sheraton lost its right to compensation because it wilfully breached its contractual obligations and that disgorgement is an appropriate remedy for fiduciary breach. We disagree.

First, the jury made no finding of wilful breach of contract and it was never instructed on applying principles of disgorgement. Second, the jury verdict includes a specific finding for breach of fiduciary duty and the jury listed an amount of $ 1,100,000 as damages for [**29] that breach. Accordingly, we find no support for the award of $ 10,260,000, and will therefore vacate that award.

## C. PUNITIVE DAMAGES

Sheraton challenges the punitive damage award on several grounds. It argues that the award was not supported by clear and convincing evidence, that the relevant jury instructions were erroneous, and that the award was excessive.

Sheraton argues on appeal that the District of Columbia standard of proof on Hancock's punitive damages claim applies and that, under that standard, punitive damages can be awarded "only if it is shown by clear and convincing evidence that the tort committed by the defendant was aggravated by egregious conduct and a state of mind that justifies punitive damages." *Johanthan Woodner Co. v. Breeden*, 665 A.2d 929, 938 (D.C. 1995).

Hancock argues otherwise and claims that Delaware law governs the standard of proof and, under that standard, the preponderance of evidence standard applies to punitive damages. *See Cloroben Chem. Corp. v. Comegys*, 464 A.2d 887, 891 (Del. 1983).

The district court instructed the jury that it must find the elements of punitive damages by a preponderance of [**30] the evidence. Sheraton did not object to that in-

struction. We have held that this type of error is fundamental error entitling a defendant to a new trial; it is not subject to waiver. *Beardshall v. Minuteman Press Int'l, Inc.*, 664 F.2d 23 (3d Cir. 1981). However, Sheraton submitted proposed jury instructions that did not include an instruction that entitlement to punitive damages must be established by clear and convincing evidence. Therefore, assuming that the instruction was wrong, it was tantamount to invited error. *U.S. v. West Indies Transport, Inc.*, 37 V.I. 579, 127 F.3d 299, 306 (3d Cir. 1997) (holding that [HN11] error in challenged jury instruction was invited, and thus did not provide basis for reversal, when defendants failed to request instruction that they asserted on appeal and their proposed instruction was remarkably similar to that actually given).

In ruling on Sheraton's post-trial motion, the district court determined the amount of the punitive damages to be $ 11,610,000. That included the award of $ 10,260,000 for breach of the agency [*745] agreement. Since we are vacating the award for breach of the agency agreement, we must concomitantly [**31] reduce the punitive damage award so that it only reflects the surviving damages - $ 250,000 for purchasing activities, and $ 1,100,000 for common law damages, or $ 1,350,000. n18 In granting the remittitur, the district court determined that punitive damages should be one and one-half times the relevant compensatory damages. We adopt that ratio for the purpose of calculating the judgment on remand for several reasons.

n18 The district court noted that plaintiffs did not specify an amount for breach of Workers' Compensation in their computation of relevant compensatory damages, and it therefore did not include that amount in its calculation.

[HN12] We review a grant of remittitur for abuse of discretion. *Gumbs v. Pueblo Int'l*, 823 F.2d 768, 771 (3d Cir. 1987). [HN13] We also afford the district court's assessment of punitive damages a degree of deference since that court is familiar with the evidence. *See Keenan v. City of Philadelphia*, 983 F.2d 459, 472 (3d Cir. 1992). Moreover, although [**32] Hancock has cross-appealed from the grant of the remittitur, neither party has taken issue with the district court's ratio. n19 Accordingly we will reduce the punitive damage award to $ 2,025,000.

n19 *See State Farm Mut. Automobile Ins. Co. v. Campbell*, U.S.Sup.Ct. No. 01-1289 (April 7, 2003) (stating that "in practice, few awards exceeding a single-digit ratio between punitive and

369 F.3d 732, *; 2004 U.S. App. LEXIS 10230, **;
2004-1 Trade Cas. (CCH) P74,423

compensatory damages, to a significant degree, will satisfy due process.").

## IV. CONCLUSION

For the reasons stated above, we will vacate the award of $ 750,000 for violation of the *Robinson-Patman Act*, as subsequently trebled by the trial court to $ 2,250,000; as well as the award of $ 250,000 for purchasing services, and the $ 10,260,000 award for breach of the agency agreement. We will affirm the awards of $ 222,000 for Workers' Compensation; and $ 1,100,000 for breach of fiduciary duty, breach of the implied duty of good faith and fair dealing, and intentional or negligent misrepresentation. We will reduce punitive [**33] damages to $ 2,025,000, for reasons already stated. We remand to the district court with direction to enter judgment consistent with this opinion and for further appropriate proceedings. n20

n20 We have considered the remaining contentions of the parties and conclude that we can affirm the district court's rulings on those issues without further discussion.

# Exhibit 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

2660 WOODLEY ROAD JOINT VENTURE, et
al.,

        Plaintiffs and Counter-defendants,

        vs.

ITT SHERATON CORPORATION, et al.,

        Defendants and Counter-plaintiffs.

Civil Action No. 97-450-JJF

**PROPOSED JUDGMENT**

    At Wilmington this _1st_ day of ~~February~~ March 2005, having considered the Motion of

Plaintiffs 2660 Woodley Road Joint Venture, Woodley Road Associates, Inc., and John Hancock

Mutual Life Insurance Company (now known as John Hancock Life Insurance Company)

(collectively, "John Hancock") for the District Court to Enter Judgment Consistent with the

Third Circuit's Opinion and Remand of May 25, 2004, and the Response of Defendants ITT

Sheraton Corporation and Sheraton Operating Corporation (collectively, "Sheraton") to

Plaintiffs' Motion for Entry of Judgment; and

        WHEREAS, on October 3, 2002, Sheraton made a payment to John Hancock of

$1,544,728.87, which payment satisfied Sheraton's obligations under the Court's initial

Judgment entered on December 13, 1999, for (i) the $1,100,000 award in favor of John Hancock

on its claims for breach of fiduciary duty, breach of the implied duty of good faith and fair

dealing, and intentional or negligent misrepresentation, and (ii) the $222,000 award in favor of

John Hancock on its beach of contract claim relating to the workers' compensation provision in

the Management Agreement, with interest at the rate of 5.670% compounded annually.

**IT IS HEREBY ORDERED** that judgment is entered as follows:

1.  In favor of John Hancock and against Sheraton, jointly and severally, in the amount of $1,100,000 in damages for John Hancock's claims for breach of fiduciary duty, breach of the implied duty of good faith and fair dealing, and intentional or negligent misrepresentation, with interest at the rate of 5.67% compounded, which amount Sheraton has already paid to John Hancock, as set forth above;

2.  In favor of John Hancock and against Sheraton, jointly and severally, in the amount of $222,000 in damages for breach of the workers compensation provision of the Management Agreement, with interest at the rate of 5.67% compounded, which amount Sheraton has already paid to John Hancock, as set forth above;

3.  In favor of John Hancock and against Sheraton, jointly and severally, in the amount of $2,025,000 in punitive damages;

4.  In favor of John Hancock and against Sheraton, jointly and severally, in the amount of $250,000 in damages for breach of the purchasing services provision of the Management Agreement;

5.  Post-judgment interest in favor of John Hancock on the foregoing amounts set forth in paragraphs 3 and 4, above, at the rate of 5.670%, compounded annually and computed on a daily basis, from December 13, 1999 to the date of payment, with such post-judgment interest amounting to a total of $722,364.46 as of December 13, 2004, and thereafter accruing at a daily rate of $465.61, from December 13, 2004 to the present; and

6. In favor of John Hancock and against Sheraton, jointly and severally, in the amount of $51,710.36, for costs.

Dated: February __, 2005    *March 1*

_____
United States District Judge

NY2:#4629644